**REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED**

1  Mark D. Selwyn (SBN: 244180)
   mark.selwyn@wilmerhale.com
2  WILMER CUTLER PICKERING
     HALE AND DORR LLP
3  950 Page Mill Road
   Palo Alto, CA 94304
4  Telephone: +1 650 858 6000
   Facsimile: +1 650 858 6100
5
6  William F. Lee (pro hac vice forthcoming)
   william.lee@wilmerhale.com
7  Joseph J. Mueller (pro hac vice forthcoming)
   joseph.mueller@wilmerhale.com
8  Timothy Syrett (pro hac vice forthcoming)
   timothy.syrett@wilmerhale.com
   WILMER CUTLER PICKERING
9    HALE AND DORR LLP
10 60 State Street
   Boston, MA 02109
11 Telephone: +1 617 526 6000
   Facsimile: +1 617 526 5000
12
   Leon B. Greenfield (pro hac vice forthcoming)
13 leon.greenfield@wilmerhale.com
   Nina S. Tallon (pro hac vice forthcoming)
14 nina.tallon@wilmerhale.com
   WILMER CUTLER PICKERING
15   HALE AND DORR LLP
   1875 Pennsylvania Avenue, N.W.
16 Washington, DC 20006
   Telephone: +1 202 663 6000
17 Facsimile:  +1 202 663 6363

18 *Attorneys for Plaintiff*
   APPLE INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| APPLE INC., | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ACACIA RESEARCH CORPORATION, CELLULAR COMMUNICATIONS EQUIPMENT LLC, SAINT LAWRENCE COMMUNICATIONS LLC, CELLULAR COMMUNICATIONS EQUIPMENT GMBH, SAINT LAWRENCE COMMUNICATIONS GMBH, CONVERSANT INTELLECTUAL PROPERTY MANAGEMENT INC., CORE WIRELESS LICENSING S.A.R.L., AND CORE WIRELESS LICENSING LTD. | **JURY TRIAL DEMANDED** |
| Defendants. | |

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

### INTRODUCTION

1.     Apple Inc. ("Apple") brings this action to remedy a continuing anticompetitive scheme.  Acacia Research Corporation and its subsidiaries (collectively, "Acacia") and Conversant Intellectual Property Management Inc. ("Conversant") and its subsidiaries (collectively, "Conversant") have respectively colluded with Nokia Corporation (itself and through its affiliates Nokia Solutions and Networks Oy and Nokia Technologies Oy (collectively "Nokia")) to obtain from Nokia thousands of patents as part of a plan to extract and extort exorbitant revenues unfairly and anticompetitively from Apple and other innovative suppliers of cell phones, and ultimately from the consumers of those products.  Acacia, Conversant, and many other patent assertion entities ("PAEs") have conspired with Nokia to use unfair and anticompetitive patent assertions to improperly tax the innovations of cell phone makers.

2.     This conduct is all the more pernicious because it unfairly and anticompetitively evades binding commitments that Nokia made to license declared standard essential patents ("SEPs") on fair, reasonable, and non-discriminatory ("FRAND") terms.  Nokia positioned itself to claim that its patents cover technologies included in telecommunications standards by repeatedly assuring standard-setting organizations that it would license its patents fairly.  Yet Acacia and Conversant are now conspiring with Nokia in a scheme to diffuse and abuse such patents and, as the PAEs and Nokia fully intended, monetize those false promises by extracting exorbitant non-FRAND royalties in ways Nokia could not.

3.     Acacia's and Conversant's illegal conduct takes place against the backdrop of Nokia's failure as a supplier of cell phones.  In 2011, Nokia remained a major supplier of cell phones, but, due to its failure to innovate, was facing business prospects so dire that Nokia ultimately exited the cell phone market.  As Nokia's CEO had announced to employees the previous year, Nokia was standing on "a burning platform."  Unable to compete with innovative companies such as Apple—which had developed a revolutionary hardware and software platform—Nokia quickly transformed itself.  It changed from a company focused on supplying cell phones and other consumer products to a company bent on exploiting the patents that remain from its years as a

successful cell phone supplier.  In its changed form, Nokia has sought to extract exorbitant patent royalties from Apple and other cell phone makers, and Acacia and Conversant have been its willing conspirators to that end.

4.     With the active collaboration of Acacia and Conversant, Nokia avoids licensing its own portfolio directly and transparently, though it is fully competent to do so.  Instead, Nokia has divided its patent portfolio and distributed portions of it among Acacia, Conversant, and other PAEs, while retaining an interest in revenues generated by those PAEs.  Nokia then enlists mercenary PAEs – including Acacia and Conversant – that have offered their services aggressively to threaten, sue, and thereby extract exorbitant, above-market royalties from cell phone makers, including for declared SEPs.  The reasons why Conversant and Acacia have conspired with Nokia are clear.  The PAEs can take advantage of the fact that—unlike Nokia, which now focuses on the network business—they produce nothing at all and therefore have no desire or need for "patent peace," and can impose disproportionate discovery and litigation costs on the product companies they sue.  By conspiring with Nokia in a scheme to disperse the Nokia portfolio to the PAEs, Acacia and Conversant can obtain more royalties from product companies than Nokia cold have obtained through direct and transparent licensing, and then share with Nokia the ill-gotten fruits of their illegal exploitation.

5.     Acacia and Conversant are chief partners with Nokia in an overarching patent transfer scheme that has resulted in at least nine PAE partners armed with former Nokia patents, many of which have embarked on serial, abusive, and anticompetitive assertions of their former Nokia patents (both SEPs and non-SEPs) against Apple.  These Nokia partners have sued Apple *at least twelve times* based on former Nokia patents alone.  Acacia and its shell subsidiaries, themselves, have sued Apple in the United States and abroad *more than forty times*, based on patents they acquired from Nokia or others, demanding exorbitant royalties based on unsupported infringement claims.  For its part, Conversant, through its subsidiary Core Wireless Licensing S.a.r.l. ("Core Wireless"), has asserted over two dozen patents against Apple.  These serial assertions and litigations have forced Apple to incur multiple millions of dollars in defense costs, precisely the sort

of leverage that Acacia and Conversant intended to create when they agreed to conspire with Nokia. In sum, by conspiring with Nokia to obtain weak Nokia patents and then using them to extort product innovators, Acacia and Conversant have engaged in widespread violations of competition law and breaches of FRAND commitments.

6.     That Acacia and Conversant have fully intended to maximize the total royalties that can be extracted from Apple and other cell phone makers using former Nokia patents is apparent from the structure of their agreements with Nokia: Nokia has retained the right to receive a large portion of any royalties and settlements that Acacia, Conversant, and their respective subsidiaries extract.  And, collectively, Nokia and its partners are demanding far more in royalties than Nokia could have sought on its own.  Unless enjoined and remedied, the conduct described herein will continue to injure Apple, other participants in industries that are vital to the national economy, and consumers in the United States and elsewhere.

7.     Acacia's and Conversant's schemes to conspire with Nokia for the abusive and anticompetitive diffusion of Nokia's patent portfolio has already imposed extraordinary costs and burdens on the cell phone industry.  Rather than defend against patent assertions by Nokia alone, Apple and other victims of the scheme are subjected to serial assertions by Acacia, Conversant, and their shell subsidiaries, who (along with other PAEs) have offered up their services to add to the cumulative burdens on Apple, other suppliers of cell phones, and U.S. and other consumers.

8.     Apple brings this action to address the harm it has already suffered from the violations of federal antitrust and state unfair competition laws and breaches of contracts set forth herein.  Apple has suffered damages from excessive royalty payments and the costs and burdens of defending against the barrage of patent litigation unleashed by Acacia and Conversant, along with other PAEs.  Apple also seeks injunctive relief to put an end to the illegal conduct and the resulting harm to Apple, the broader industry, and U.S. and other consumers, and to unwind the patent transfers that have enabled the anticompetitive conduct described herein.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

### THE PARTIES

9.     Plaintiff Apple designs and sells innovative, iconic consumer electronics such as the iPhone, iPad, and MacBook.  Apple is a corporation organized and existing under the laws of the State of California with its principal place of business at 1 Infinite Loop, Cupertino, California 95014.

10.     Defendant Acacia Research Corporation is a publicly-traded corporation that describes itself as "an intermediary in the patent marketplace."  Acacia Research Corporation 2015 Form 10-K, p. 1.  Acacia Research Corporation has a bewildering array of shell subsidiaries that "generate revenues and related cash flows from the granting of intellectual property rights for the use of patented technologies that our operating subsidiaries control or own."  *Id.*  Acacia Research Corporation is a Delaware corporation having its principal place of business at 500 Newport Center Drive, Suite 700, Newport Beach, California 92660.  Defendants Cellular Communications Equipment LLC ("CCE") and Saint Lawrence Communications LLC ("SLC") are subsidiaries of Acacia Research Group LLC, which is in turn a wholly-owned subsidiary of Acacia Research Corporation.  CCE is a Texas limited liability company with its principal place of business in Plano, Texas.  SLC is a Texas limited liability company, having a principal place of business at 2400 Dallas Parkway, Suite 200, Plano, Texas 75093.  Defendants Cellular Communications Equipment GmbH ("CCE Germany") and Saint Lawrence Communications GmbH ("SLC Germany") are German subsidiaries of Acacia.  Both CCE Germany and SLC Germany are German limited liability companies with their principal place of business at Pettenkoferstrasse 4, 80336 Munich, Germany.  Given the opaque, constantly changing legal structures of Acacia Research Corporation and its subsidiaries, there may be other subsidiaries of Acacia Research Corporation to which former Nokia patents have been transferred; therefore, these subsidiaries cannot all be listed by name and can instead only be identified based on the origin of the asserted patents.

11.     Defendant Conversant Intellectual Property Management Inc. is a privately-held company that describes itself as "in the business of making innovation more rewarding."[1]

---

[1]     *See* Conversant, "Our Services," *available at* http://www.conversantip.com/our-services/.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Conversant Intellectual Property Management Inc. is a Canadian corporation having its principal place of business at 515 Legget Drive, Suite 704, Ottawa ON, Canada K2K 3G4.  Defendants Core Wireless Licensing S.a.r.l. ("Core Wireless S.a.r.l.") and Core Wireless Licensing Ltd. ("Core Wireless USA") (collectively, "Core Wireless") are wholly-owned subsidiaries of Conversant Intellectual Property Management Inc.  Core Wireless S.a.r.l. is a corporation duly organized and existing under the laws of the Grand Duchy of Luxembourg, having a principal place of business at 16 Avenue Pasteur L-2310 Luxembourg.  Core Wireless USA is a Texas limited company having a principal place of business at 5601 Granite Parkway, Suite 1300, Plano, Texas 75024.

### JURISDICTION AND VENUE

12.     Apple brings this action under Sections 1 and 2 of the Sherman Act and Sections 4 and 7 of the Clayton Act, 15 U.S.C. §§ 1, 2, 15, and 18; for breach of contract; under Cal. Bus. & Prof. Code § 17200 et seq.; and to prevent and restrain Acacia's and Conversant's anticompetitive conduct and other violations of the law and to recover damages, the costs of this suit, and reasonable attorneys' fees.

13.     This Court has jurisdiction over the federal claims alleged under 28 U.S.C. §§ 1331 and 1337(a).  This Court has jurisdiction over the breach of contract and unfair competition claims arising under state law pursuant to 28 U.S.C. § 1367(a).

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because, during the relevant period, Acacia and Conversant resided, transacted business, were found, or had agents in this District, and because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this district.

### INTRADISTRICT ASSIGNMENT

15.     The appropriate intradistrict assignment is the San Jose Division.  Under Civil Local Rule 3-2(c), a civil action shall be assigned to the division "serving the county in which the action arises."  An action "arises in the county in which a substantial part of the events or omissions which give rise to the claim occurred."  Civ. L.R. 3-2(c).  Here, a substantial part of those events or omissions occurred in Santa Clara County, where Apple is headquartered and where a substantial

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

portion of the events set forth in this Complaint have a locus.  Civil actions arising in Santa Clara County "shall be assigned to the San Jose Division."  *Id.* at 3-2(e).

### ACACIA'S AND CONVERSANT'S ANTICOMPETITIVE PATENT TRANSFER SCHEME WITH NOKIA

### I.       Acacia, Conversant, and Other PAEs Partner with Nokia in an Anticompetitive and Illegal Patent Transfer Scheme

16.     Apple's iPhone was first available to the public on June 29, 2007.  The iPhone revolutionized the cellular industry and was acclaimed as the "Invention of the Year."[2]  Traditional suppliers like Nokia were unable to compete with the groundbreaking technologies Apple brought to mobile products.

17.     By 2010, Nokia realized it was unable to compete on the merits in the marketplace with Apple.  Nokia's then Chief Executive Officer Stephen Elop acknowledged Nokia's struggles. In a letter to employees, Mr. Elop compared the state of Nokia's business to a man standing on a burning oil platform in the North Sea—facing a choice of burning to death or jumping into freezing waters—and suggested that Nokia faced a similar choice.  He emphasized that drastic changes were necessary to restore Nokia to competitiveness, and conceded that "we missed big trends, and we lost time."[3]  As he recognized, "there is intense heat coming from our competitors, more rapidly than we ever expected.  Apple disrupted the market by redefining the smartphone…. The first iPhone shipped in 2007, and we still don't have a product that is close to their experience."[4]

18.     Nokia tried to reclaim through litigation what it had lost in the marketplace, bringing patent claims against Apple—against which Apple defended and counterclaimed—in multiple fora in the United States and Germany.  The only case in which Nokia patents were tried to a decision was in the International Trade Commission, where Nokia failed to obtain relief on any of the seven patents it asserted against Apple.

---

[2]      Lev Grossman, "Invention of the Year: The iPhone," *Time Magazine* (Nov. 1, 2007).
[3]      *See* "Full Text: Nokia CEO Stephen Elop's 'Burning Platform' Memo," *Wall Street Journal* (Feb. 9, 2011), *available at* http://blogs.wsj.com/tech-europe/2011/02/09/full-text-nokia-ceo-stephen-elops-burning-platform-memo/.
[4]      *Id.*

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

19.     In 2011, Apple and Nokia settled their litigations and entered into a cross-license agreement.  As part of that agreement, Nokia provided a list of recently "divested" patents that the agreement did not cover.  But Nokia failed to tell Apple why Nokia had excluded those patents from the agreement—namely, to provide the initial ammunition for an illegal patent transfer scheme that would breach FRAND obligations and bring additional patent-related abuses far beyond what Nokia could do itself.  Unbeknownst to Apple, also in 2011, Nokia had launched secret plans to monetize these reserved patents, including through abusive assertions against Apple.  Those patents were eventually transferred to Core Wireless S.a.r.l. to be used for extorting excessive royalties, including from Apple.

20.     Just as it was setting in motion this and other abusive patent transfer schemes, Nokia began to take measures that ultimately led it to evacuate its "burning platform."  In 2011, Nokia abandoned its proprietary operating system, Symbian, in favor of a collaboration with Microsoft to adopt Microsoft's new mobile operating system, Windows Phone 7.  Despite attempts to re-energize its business, Nokia's share of global smartphone sales fell from 50.9% in Q4 2007 to 12.2% in Q4 2011.  In 2014, Nokia exited the cell phone business altogether to focus on other pursuits.[5]

21.     With its cell phone business dying, Nokia began to seek out willing conspirators and to commence its illegal patent transfer scheme in full force; that scheme has continued in full effect to the present.  The driving force behind Nokia's strategy was to diffuse its patent portfolio and place it in the hands of PAEs.  Acacia and Conversant were its chief conspirators.  As illustrated below, Nokia stands as the hub of a network of collaborator PAEs that receive patents from Nokia, and its chief co-conspirators Acacia and Conversant then scatter those patents among their own webs of shell companies:

---

[5]     *See* "Global Market Share Held by Nokia Smartphones from 1st Quarter 2007 to 2nd Quarter 2013," *Statista*, *available at* https://www.statista.com/statistics/263438/market-share-held-by-nokia-smartphones-since-2007/.

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***



## II.    Diffusing Patents as an Anticompetitive Scheme

22.    Acacia, Conversant, and the other PAEs to which Nokia collectively transferred thousands of patents have no business other than patent licensing and litigation.  Nokia's transfers of patents—the *diffusion* of Nokia's portfolio—to Acacia, Conversant, and other PAEs have, as Nokia and its PAE collaborators intended, dramatically enhanced the market power associated with those patents.  Nokia, in turn, has shared in the fruits that increased power brings by obtaining an ongoing share of the exorbitant royalties that Acacia, Conversant, and other PAEs receive.

23.    PAEs like Acacia and Conversant face no risks to their reputation or their ongoing business relationships by adopting aggressive licensing or litigation practices.  Nor do they face the risk of counter-assertions of their targets' patents.  Indeed, Acacia and Conversant cultivate a reputation for brazen and ruthless patent assertion tactics precisely to attract operating companies like Nokia to partner with them to extract value from and tax innovators based on weak patents.  And because Acacia, Conversant, and other PAEs had no role in prosecuting the former Nokia patents, their litigation discovery costs are a fraction of those Nokia would have faced.  The Nokia patent transfers mean that the holder of the prosecution evidence is no longer a party to the litigation

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

but rather a mere third party located in Finland.  This makes obtaining that evidence more burdensome, complicated, and often less complete—thereby increasing the likelihood of a mistaken verdict of infringement or failure to find unenforceability.  Accordingly, Acacia, Conversant, and other PAEs to which Nokia transferred patents can bring lawsuits to enforce weak or low-value patents that Nokia (as a practicing entity) would not assert because they have different abilities and incentives to do so.

24.     Moreover, because Acacia, Conversant, and the other PAEs each hold only a portion of the original Nokia portfolio, it is impossible for an innovative product supplier to obtain a license to the entire former Nokia portfolio at anything like the same price that it would have paid had the patents not been diffused (even putting aside the factors described in Paragraph 233).  Acacia, Conversant, and the other PAEs can threaten or impose separate litigation, transaction, and royalty costs that inflate the cost of a license far beyond the marginal value that Nokia could have obtained for the transferred patents had it not dispersed them—notwithstanding that neither Nokia nor its PAE conspirators can avoid the obligation to demonstrate the merits of each patent in their respective portfolios for which they seek a royalty.  Moreover, by conspiring with Nokia to diffuse the Nokia patent portfolio, Acacia and Conversant seek to take advantage of another dynamic that Nokia contends influences recoveries in patent assertions and litigation.  According to an expert report that Nokia submitted in a prior proceeding: "[T]he relationship between the number of patents and the total royalty rate is not linear.  For example, a license to a single [SEP] may be 2.5% … while a license to ten or more [SEPs] rarely exceeds 5%."[6]  Thus, by creating a network of conspiring PAEs to hold slices of its former portfolio and sharing in the proceeds of the PAEs' assertions, Nokia seeks to work with PAE collaborators like Acacia and Conversant to extract royalty rents and tax product innovators in yet another way that would not have been possible had it kept its portfolio intact.

25.     Nokia's dispersal and diffusion of its patents among Acacia, Conversant, and other PAEs has manufactured market power that derives not from any inventive value of the patents, but rather from a scheme to exploit.  Put another way, diffusion does not "unlock" fair value that Nokia

---

[6]     Expert Report of Eric Stasik, *Nokia Corp. v. Vias De Telecommunicacion Vitelcom, S.L.*, Mercantile Court of Barcelona (Compl. filed Nov. 18, 2004) at ¶ 44 (Nov. 17, 2004).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

cannot itself obtain.  Nokia could have obtained fair value for its patents by direct and transparent licensing.  Indeed, Nokia has publicly stated that its subsidiary, Nokia Technologies, conducts "Nokia's industry leading patent licensing business."[7]  Given this self-acknowledged core expertise, the reason why Acacia and Conversant are scheming with Nokia  to vest the PAEs  with responsibility for asserting former Nokia patents is obvious:  Product companies can be hit up for higher payments when Nokia outsources enforcement to a network of uninhibited PAEs willing to demand anticompetitive royalties, and Nokia and the PAEs can share in the spoils of that exploitation through their revenue-sharing agreements.

26.     For declared SEPs, the patent transfer scheme provides Acacia, Conversant, and Nokia an enormous additional illicit benefit:  It enables Nokia to escape all constraining effects of Nokia's promise to license those patents on FRAND terms.  And Acacia's, Conversant's, and other PAEs' sharing of the supracompetitive fruits of this evasion drives the very economics of the conspiracies.

27.     When Nokia, itself, demands inflated royalties for patents it has declared essential to industry standards, it fails to comply with its FRAND promises; but it faces bounds on the reach of its demands because it remains an operating company and a participant in industry standard-setting activities.  When Nokia diffuses its declared SEPs to Acacia, Conversant, and other PAEs, however, Nokia rids itself of those constraints.  By doing so, and by exploiting the other dynamics described in Paragraph 22-25, Nokia (working with its conspiring PAEs) has positioned itself to maximize exploitation of Apple and other suppliers of products that support industry standards.  Those companies are locked into practicing standardized technologies that Nokia claims are covered by its current and former patents as a result of the very (false) FRAND promises that Nokia and its PAE partners have breached.

28.     This conspiratorial diffusion strategy frustrates the essential purposes of the FRAND commitment in another way as well.  By scattering its portfolio for the purpose and with the effect of driving up transaction costs and evading FRAND commitments, the scheme not only introduces

---

[7]     Nokia 2015 Form 20-F, p. 36.

inefficiencies but also makes it impossible for Apple and other product suppliers to license all of Nokia's current or former declared SEPs from a single party (Nokia) and on FRAND terms.  This undermines standard-setting's procompetitive purposes in facilitating wide adoption of industry standards on economically reasonable terms, and, instead, transforms standard-setting into a mechanism for holding up and extracting exorbitant royalties from product suppliers, bringing immediate harm to product suppliers and end consumers through higher prices and reduced innovation and quality.  Over the longer run, abusive patent transfer schemes, like the one Nokia has employed here, chill standard-setting activities and the procompetitive benefits they bring.

29.     Nokia's PAE partners, including Acacia and Conversant, have in turn dispersed and diffused their patent portfolios among shell companies that they control.  As Nokia and the PAEs intended, this further enhances the artificial market power and provides a means to further extract exorbitant royalties and violate FRAND commitments.

**III.     Anticompetitive Effects in Relevant Markets from Nokia's, Acacia's, and Conversant's Anticompetitive Patent Transfer Scheme**

**A.     Patented Technology Markets and Market/Monopoly Power Therein**

30.     Through the illegal conduct set forth herein, competition has been injured, and monopoly power has been created or enhanced in markets for functions performed by technologies purportedly covered by former Nokia patents (the "Patented Technology Markets").  Each Patented Technology Market consists of a technology covered by a patent that Nokia transferred to Acacia, Conversant, or another PAE, and any other patented technologies that compete or competed to perform the same function.  Each technology purportedly covered by former Nokia patents competes or formerly competed with other technologies to perform functions associated with those technologies.  The Patented Technology Markets are worldwide because competing technologies may be acquired from anywhere, and Nokia's, Acacia's, and Conversant's conduct has harmed competition in interstate commerce in these markets.

31.     Many of the Patented Technology Markets encompass technology purportedly covered by a declared SEP that Nokia transferred to Acacia, Conversant, or another PAE (the "SEP

1   Technology Markets").  As explained in more detail below, in SEP Technology Markets, there are

2   no substitutes for the technology purportedly covered by the former Nokia patent—whether or not

3   that patent is actually valid and infringed.  That is because once the relevant standard is established,

4   any technologies that formerly competed with that technology are no longer viable substitutes:

5   Suppliers of products that will support a given standardized feature must use the corresponding

6   standardized technology.  Moreover, because product suppliers design and make enormous sunk

7   investments in products that support standards developed by the European Telecommunications

8   Standards Institute ("ETSI"), and the only significant telecommunications networks in many parts of

9   the world support only ETSI standards, makers of products that support ETSI standards have no

10  economically viable option to switch to supplying products that support other standards rather than

11  ETSI standards.  Accordingly, Acacia, Conversant, and other PAEs hold monopoly power in the

12  SEP Technology Markets.

13        32.     For both declared SEPs and non-SEPs, the exorbitant royalties that Acacia,

14  Conversant, and other PAEs have extracted from Apple and others is direct evidence that competing

15  suppliers of technology do not provide a significant constraint on the PAEs' ability to extract

16  supracompetitive royalties, and that the PAEs hold monopoly power in the relevant Patented

17  Technology Markets.  That monopoly power is independent of whether the patents asserted are

18  actually valid and infringed.

19  **B.      The Overall Anticompetitive Patent Diffusion Scheme**

20        33.     When it diffused its portfolio to multiple PAEs, including Acacia and Conversant,

21  Nokia armed each of them with portfolios of former Nokia patents large enough for the PAEs to

22  extract unreasonable and unjustifiable royalties from Apple and other product companies, whether or

23  not the patents they assert are actually valid and infringed.  Each of the PAEs has a large enough

24  portfolio to force product companies to either take a license or engage in uneconomic litigation.

25        34.     The collaboration to distribute Nokia's portfolio of patents into many different

26  portfolios held by Acacia, Conversant, and other PAEs, facilitates extracting of revenues from

27  product companies in ways that could not have been accomplished but for the diffusion.  The

28

diffusion increases the targets' costs in responding to multiple assertions (as alleged above), and also allows the conspirators to exploit the risk of error in patent damages calculations. Diffusion is profitable to patent holders and especially burdensome to product suppliers, in part, because patent damages may erroneously include more than the incremental value of the patented technology itself, and instead include value attributable to other aspects of the product not covered by the asserted patent; and these dynamics increase patent holders' leverage in licensing negotiations. Patent holders are more likely to be able to "double dip" into that excess value if the patents are owned by separate entities, making it harder for courts to observe and address the aggregate, "royalty stacking" implications of individual assertions. Nokia, Acacia, Conversant, and the other PAEs structured their operations to capture this ability to "double dip," whether through litigation or through increased leverage to extract exorbitant royalties in licensing negotiations.

35.    Nokia has transferred massive numbers of patents to Acacia, Conversant, and other PAEs. As part of those transfers, Nokia has agreed with each of its PAE co-conspirators that Nokia and the co-conspirator will ***each separately enforce*** its portion of the diffused portfolio to maximize the aggregate royalties that can be extracted from product companies. These agreements transform what was once a single licensing negotiation for a single royalty into a multitude of separate assertions against the same products, at an increased total cost due to the changed incentives and abilities of PAEs to assert these patents. Nokia and those PAEs have thereby increased market power and created or enhanced monopoly power associated with those patents. PAEs like Acacia and Conversant have gained the ability to extract exorbitant royalties in each of the Patented Technology Markets wholly unrelated to any inventive value of the patented technologies.

36.    The agreements between Nokia, on the one hand, and Acacia or Conversant, on the other, harmed competition in the markets for cell phones and other devices with cellular capability (such as tablets) (collectively, the "Cellular Device Markets") during the period Nokia was attempting to compete in the cell phone business. Because cell phones and other devices with cellular capability can be acquired from global suppliers, the markets are worldwide. At the time Nokia began its diffusion campaign to inflate licensing royalties, it was still a supplier of cell

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

phones.  By seeking to impose exorbitant royalties on its competitors, Nokia was attempting to raise its rivals' costs, and possibly even exclude them from the market altogether if Acacia, Conversant, or its other PAE collaborators had been able to obtain an injunction using one of the patents.  As to the downstream Cellular Device Markets (post-Nokia's exit), the abusive patent transfer scheme inflates prices and decreases innovation and quality by raising the costs and burdens associated with product suppliers' licensing technologies purportedly covered by Nokia's patents and discouraging them from making the large investments required to innovate effectively.

**C.     Nokia's and Acacia's Conspiracy to Anticompetitively Diffuse Patents**

37.     Nokia partnered with Acacia because of, and to take advantage of, Acacia's abusive enforcement strategies.  Even before Acacia acquired patents from Nokia, it began a torrent of litigation against Apple, filing 26 separate lawsuits using 18 separate subsidiaries:

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 6:12-cv-00124 (E.D. Tex.), and transferred to Case No. 5:13-cv-01776 (N.D. Cal.);

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 6:12-cv-00125 (E.D. Tex.), and transferred to Case No. 5:13-cv-01777 (N.D. Cal.);

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 6:13-cv-00028 (E.D. Tex.), and transferred to Case No. 5:13-cv-02023 (N.D. Cal.);

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 3:13-cv-04469 (N.D. Cal.);

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 3:13-cv-04468 (N.D. Cal.);

- *AutoText Technologies, Inc. v. Apple Inc. et al.*, Case No. 1:07-cv-03513 (N.D. Ohio);

- *Brandywine Communications Technologies, LLC v. Apple Inc.*, Case No. 6:12-cv-00262 (M.D. Fla.);

- *Brandywine Communications Technologies, LLC v. Apple Inc. et al.*, Case No. 6:11-cv-01512 (M.D. Fla.);

- *Data Engine Technologies LLC v. Apple Inc.*, Case No. 6:12-cv-00697 (E.D. Tex.);

- *Digital Background Corporation v. Apple Inc.*, Case No. 5:08-cv-03639 (N.D. Cal.);

<u>*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*</u>

- *Digitech Image Technologies LLC v. Apple Inc.*, Case No. 8:12-cv-02125 (C.D. Cal.);

- *Efficient Online Purchasing LLC et al. v. Apple Inc. et al.*, Case No. 1:11-cv-00222 (D. Del.);

- *Express Card Systems LLC v. Apple Inc.*, Case No. 6:13-cv-00136 (E.D. Tex.);

- *Fast Memory Erase LLC v. Spansion Inc. et al.*, Case No. 3:08-cv-00977 (N.D. Tex.);

- *Intercarrier Communications LLC v. Apple Inc.*, Case No. 3:12-cv-00764 (E.D. Va.);

- *IP Innovation LLC. et al. v. Apple Inc.*, Case No. 2:07-cv-00146 (E.D. Tex.);

- *Mobile Enhancement Solutions LLC v. Apple Inc. et al.*, Case No. 3:12-cv-00795 (N.D. Tex.);

- *Online News Link LLC v. Apple Inc. et al.*, Case No. 2:09-cv-00312 (E.D. Tex.);

- *Optimum Power Solutions LLC v. Apple Inc. et. al.*, Case No. 3:11-cv-01509 (N.D. Cal.);

- *Restricted Spending Solutions, LLC v. Apple Inc.*, Case No. 3:08-cv-00093 (S.D. Ill.);

- *Shared Memory Graphics, LLC v. Apple Inc. et al.*, Case No. 3:10-cv-02475 (N.D. Cal.);

- *SmartPhone Technologies LLC v. Apple Inc. et al.*, Case No. 6:13-cv-00196 (E.D. Tex.);

- *SmartPhone Technologies LLC v. Apple Inc. et al.*, Case No. 6:11-cv-00604 (E.D. Tex.);

- *SmartPhone Technologies LLC v. Research in Motion Corporation et al.*, Case No. 6:10-cv-00074 (E.D. Tex.);

- *Software Restore Solutions, LLC v. Apple Inc.*, Case No. 1:11-cv-05625 (N.D. Ill.); and

- *Software Restore Solutions, LLC v. Apple Inc. et al.*, Case No. 1:10-cv-03628 (N.D. Ill.).

38.     Recognizing Acacia's well-established track record for abusive patent assertions, Nokia seized the opportunity to make Acacia a chief partner in its patent transfer scheme to

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED**

compensate for its own failing cell phone business.  No later than February 21, 2013, Nokia Siemens Networks Oy and Nokia Siemens Networks Vermoegensverwaltung GMBH (now Nokia Networks and wholly owned by Nokia Corporation) sold at least 16 patents to Acacia Research Group LLC, which then transferred the patents to its subsidiary Cellular Communications Equipment LLC ("CCE"). Nokia later transferred hundreds of additional patents to Acacia, which then transferred them to CCE, through at least the following transactions:

- On June 18, 2013, Nokia Siemens Networks Oy transferred at least four patents to Acacia Research Group LLC, which then transferred them to CCE;

- On June 24, 2013, Nokia Siemens Networks Oy transferred at least one patent to Acacia Research Group LLC, which then transferred it to CCE;

- On March 24, 2014, Nokia Solutions and Networks Oy transferred at least fifteen patents to CCE;

- On June 10, 2014, Nokia Solutions and Networks Oy transferred at least one patent to CCE;

- On September 16, 2014, Nokia Solutions and Networks Oy transferred at least seven patents to CCE;

- On December 24, 2014, Nokia Solutions and Networks Oy and Nokia Solutions and Networks GMBH transferred at least thirty-three patents to CCE; and

- On March 27, 2015, Nokia Solutions and Networks Oy transferred at least two patents to CCE, effective December 24, 2014.

39.     Acacia now claims to own a portfolio of 505 former Nokia patents and patent applications.[8]  Nokia has retained an interest in the royalties Acacia extracts.[9]

40.     That the serial transfers of patents from Nokia to Acacia have led to anticompetitive effects is evident from the events that have followed.  Acacia and its subsidiaries have made exorbitant royalty demands on Apple, filed waves of lawsuits against Apple, and threatened to continue asserting patents until Apple pays Acacia's extortionate price.

---

[8]     *See* Acacia Research Group LLC, Q3 2016 Corporate Presentation at p. 10, available at http://acaciaresearch.com/wp-content/uploads/2016/10/Acacia-Research-Corporate-Presentation-Q3-2016.pdf.
[9]     *See id.* at p. 8 (discussing Acacia's "Partnership" model).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

41.      Apple's good-faith attempts to resolve Acacia's demands and achieve patent peace have been futile, largely because Nokia has repeatedly transferred additional portfolios of patents to Acacia to allow Acacia to "reload" and repeatedly sue Apple.  For example, [██████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████.]

42.      On July 22, 2013, Apple [███████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████]

43.      Beginning in 2014, Acacia, through its subsidiaries and shell companies, launched a new wave of 16 lawsuits against Apple:

- On January 27, 2014[10] and April 7, 2014, CCE filed its first suits against Apple, asserting patents acquired from Nokia;

- On April 8, 2014, Innovative Display Technologies LLC sued Apple;

- On May 16, 2014, Adaptix filed its first suit against Apple in Japan;

- On January 26, 2015, Adaptix filed a second wave of suits against Apple;

- On April 30, 2015, CCE sued Apple four more times, again asserting patents acquired from Nokia;

- On May 1, 2015, Parthenon Unified Memory Architecture LLC sued Apple;

---

[10]      Voluntarily dismissed on February 12, 2014. (*See Cellular Communications Equipment LLC v. Apple Inc., et al.,* Case No. 6:13-cv-00028 (E.D. Tex.).)

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

- On July 8, 2015, Adaptix filed its second suit against Apple in Japan;

- On August 10, 2015, Limestone Memory System LLC sued Apple;

- On December 17, 2015, CCE Germany sued Apple in Germany;

- On December 30, 2015, SLC Germany sued Apple in Germany; and

- On January 27, 2016, SLC sued Apple, asserting patents acquired from VoiceAge.

44.     Acacia brings cases to take advantage of the leverage that it has obtained through its scheme with Nokia and other entities, and extorts licensing fees from the cost and disruption of the litigation process.

45.     The litigations that Acacia has brought through its Adaptix subsidiary (not involving Nokia patents) illustrate the way that Acacia seeks to monetize Apple's expected litigation costs, rather than the value of its technologies.  Nokia has transferred its patents to Acacia anticipating and intending that Acacia will adopt these same tactics with Nokia's patents, thereby increasing the royalties Nokia and Acacia can extract.

46.     Acacia has described Adaptix as controlling one of its "marquee" portfolios, and Acacia repeatedly confirmed to investors its "confidence that the Adaptix portfolio will earn significant revenues."[11]  Indeed, Acacia has touted that "we expect adjudicated trials for our…Adaptix portfolio to be [one of] the revenue drivers."[12]

47.     When tested in litigation, however, Adaptix's tactics evidence a strategy that focuses on maximizing litigation costs rather than seeking justified compensation for patent quality.  From 2012 to 2015, Adaptix filed ***seven complaints in the United States against Apple*** resulting in five separate lawsuits against Apple and cellular network providers—three cases in a first wave in 2012,[13] and two cases in a second wave in 2015.[14]  Although Apple prevailed on summary judgment

---

[11]     Acacia Research Corporation Q3 2015 Earnings Call (Oct. 22, 2015).

[12]     Acacia Research Corporation Q2 2015 Earnings Call (July 23, 2015).

[13]     *Adaptix, Inc. v. Apple Inc.*, Case No. 5:13-cv-01776 (N.D. Cal.); *Adaptix, Inc. v. Apple Inc.*, Case No. 5:13-cv-01777 (N.D. Cal.); *Adaptix, Inc. v. Apple Inc.*, Case No. 5:13-cv-02023 (N.D. Cal.).

[14]     *Adaptix, Inc. v. Apple Inc.*, Case No. 5:15-cv-00365 (N.D. Cal.); *Adaptix, Inc. v. Apple Inc.*, Case No. 5:15-cv-00364 (N.D. Cal.).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

in the first wave of cases, Adaptix reasserted the same patents against substantially similar products, leading to dismissal based on the reasoning already adopted in the first cases.  This repeated assertion of failed legal theories through multiple case filings reflects Acacia's intention to deliberately drive up Apple's litigation costs, rather than to obtain royalties on valuable patents.

48.     Acacia has engaged in similar exploitation on product suppliers through CCE.  In the **six** lawsuits CCE brought against Apple in less than a two-year period, it has prevailed on only one patent at trial, and received a jury award for substantially less than it demanded.

49.     As these examples illustrate, because Acacia's litigation costs and risks are trivial in comparison with those of the operating companies it sues, it can afford to bring these types of serial, low-value suits based on weak or low-value patents under the theory that even a modest settlement will be profitable with minimal risk.  As Acacia's former CEO Marvin Key put it:  Acacia's "volume licensing business" is based on the principle that "it will make more financial sense for [its targets] to settle smaller opportunities rather than litigate every single one."[15]

**D.     Nokia's and Acacia's Evasion of Nokia's FRAND Licensing Commitments**

50.     Starting around 2012, Acacia began to acquire declared SEPs relating to cellular standards.  Many of these patents were acquired from Nokia.

**1.     Standard-Setting Confers Monopoly Power on Owners of Declared SEPs**

51.     Nokia was actively involved in the standard-setting process used by ETSI and the Third Generation Partnership Project ("3GPP") as they developed the standards that came to be used in many cellular telecommunications systems worldwide:  GSM (a 2G standard); GPRS (a 2.5G standard); UMTS/WCMDA (a 3G standard); and LTE (a 4G standard).

52.     Standard-setting activities create significant benefits by allowing manufacturers of many different devices to invest in the design and marketing of their products knowing that those products will interoperate effectively with other manufacturers' devices, and that they will likely have a large customer base if the standard is widely adopted.

---

[15]     Acacia Research Corporation Q4 2015 Earnings Call (Feb. 25, 2016).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

53.     However, standards will only be widely adopted if implementers expect to have an opportunity to compete on a level playing field in the new market.  When companies decide to implement a standard, they make significant investments in designing their products and supply chains around the standard.  Once they have made those investments, they are "locked in" to the standard—it would be hugely expensive to start over with a new technology, even if that other technology is just as good.  The risk potential implementers face is that a patentee will engage in "patent hold-up" after they have become locked into the standard.  In a patent hold-up, a patent owner waits until a standard has become widely adopted and then seeks to extort far more in royalties than its technology is worth, because implementers are already locked in and therefore cannot avoid exorbitant royalty demands.

54.     The owner of a declared SEP acquires monopoly power over the corresponding SEP Technology Market purportedly covered by its patent.  That is because, after a technology is standardized, formerly competing technologies are no longer available as substitutes for any product supplier wishing to comply with a standardized feature in the relevant standard.  The standards promulgated by 3GPP and ETSI have been widely adopted, leaving product manufacturers with little choice but to support those standards for cellular connectivity.  Moreover, Apple and other manufacturers have made massive investments to comply with these ETSI standards, and thus are locked into using them.

**2.     FRAND Licensing Commitments:  Essential Safeguards and Prerequisites to Standardizing Patented Technology**

55.     To constrain the exercise of this monopoly power in SEP Technology Markets, standard-setting organizations require participants to disclose the patents they own that might cover the standard, and, as a condition of having technologies that they claim are covered by their patents standardized, to agree to license those patents on FRAND terms.  In particular, ETSI's Intellectual Property Rights Policy ("IPR Policy") requires its members to disclose their patents or patent applications during the standard-setting process (i.e., before the technology is or might be incorporated into the standard), and to promise to license those patents on FRAND terms if they are essential to the standard.

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

56.     With regard to disclosure of potentially essential patents, Clause 4.1 of the IPR Policy states:

> Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

57.     ETSI requires that "[w]hen an ESSENTIAL [Intellectual Property Right] relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ["FRAND"] terms and conditions under such IPR."[16]

58.     If an ETSI participant is unwilling to commit to licensing its patents on FRAND terms and conditions, the ETSI IPR Policy mandates that the participant's technologies be excluded from the standard.  Clause 8.1.1 of the 2008 ETSI IPR Policy states:  "Where prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION an IPR owner informs ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION in accordance with Clause 6.1 above, the General Assembly shall … satisfy itself that a viable alternative technology is available …."  In those instances in which, in the opinion of the General Assembly, no viable alternative technology exists, Clause 8.1.2 further provides that work on the standard or technical specification at issue "shall cease."  These terms make clear that in deciding to incorporate technology into its standards, ETSI relies on its members' FRAND commitments regarding potentially essential patents and patent applications.

59.     3GPP did not adopt its own intellectual property rights policy but instead decided that members of each of its Organizational Partners (of which ETSI is one) would abide by the respective Organizational Partners' intellectual property rights policies.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1

2

### 3.    Nokia's FRAND Commitments Are Binding Contractual Obligations that Transfer with SEPs

3       60.    As a longstanding member of ETSI, Nokia is (and was at all relevant times)

4  contractually bound to abide by ETSI's IPR Policy (including during its participation in 3GPP).

5  Nokia submitted hundreds of declarations to ETSI identifying patents and patent applications that

6  Nokia claimed were essential to the various standards adopted by ETSI and 3GPP.  Nokia submitted

7  its first declaration on April 3, 2000, and has continued to submit additional declarations regularly,

8  including most recently on October 12, 2016.  Nokia's declarations committed to licensing those

9  patents on FRAND terms.

10      61.    Once Nokia started to flounder in the cell phone business, it began transferring its

11 declared SEPs to PAEs like Acacia and Conversant with the intent and effect of enhancing

12 monopoly power in the corresponding SEP Technology Markets.

13      62.    Nokia has long acknowledged that a FRAND commitment applies to all future

14 owners of the patent.  In a submission to the European Commission in 2008, Nokia stated that "it

15 would not make sense…if the FRAND commitment evaporated when ownership of the patent

16 changes."[17]  And Nokia stated to the press in 2015 that when it divested SEPs over the previous few

17 years, "the FRAND obligations passed to the new owners."[18]

18      63.    Indeed, the current version of the ETSI IPR Policy explicitly states that FRAND

19 commitments are encumbrances on the patent that bind all successors-in-interest.  In particular,

20 Clause 6.1*bis* states:

21              FRAND licensing undertakings made pursuant to Clause 6 shall be
                interpreted as encumbrances that bind all successors-in-interest.

22              Recognizing that this interpretation may not apply in all legal
                jurisdictions, any Declarant who has submitted a FRAND undertaking

23              according to the POLICY who transfers ownership of ESSENTIAL
                IPR that is subject to such undertaking shall include appropriate

24              provisions in the relevant transfer documents to ensure that the
                undertaking is binding on the transferee and that the transferee will

25              similarly include appropriate provisions in the event of future transfers
                with the goal of binding all successors-in-interest. The undertaking

26              shall be interpreted as binding on successors-in-interest regardless of

27

28

whether such provisions are included in the relevant transfer documents.

64.     ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other parties that implement an ETSI standard.  In particular, the stated objective of the policy, described in Clause 3.1, is to "reduce the risk" to those implementing the standards "that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable." Apple, as a member of ETSI and an implementer of standards that ETSI adopted, is an intended third-party beneficiary of Nokia's FRAND commitments made under the ETSI IPR Policy.

### 4.     Acacia's and Nokia's Use of Patent Transfers to Facilitate Breaches of FRAND Obligations

65.     Acacia is well aware that the declared SEPs it owns remain subject to FRAND commitments made by the original patent owners.  In presentations to investors, Acacia has observed that the FRAND commitments applicable to its VoiceAge patents would present "legal and regulatory challenges."[19]  Despite that acknowledgment, however, Acacia and its subsidiaries have disputed in litigation that the royalty charged for its declared SEPs must be FRAND.

66.     As they have previously acknowledged, Nokia and Acacia are contractually obligated to make all their patents subject to their FRAND licensing commitments available on FRAND terms. But Nokia and Acacia have nonetheless used their patent transfer scheme as a device to evade its FRAND obligations while sharing in the exorbitant non-FRAND royalties that Acacia is able to extract—and Acacia has breached its obligations as an acquirer of FRAND-committed patents by demanding those royalties.

67.     Indeed, throughout this scheme, Nokia has continued to declare additional patents to ETSI, commit to FRAND licensing of those patents, and then transfer those patents to PAEs like Acacia.  Since 2012 Nokia has declared at least 23 patents to ETSI as standard essential that it later transferred to PAEs.  For example, Nokia Siemens Networks Oy declared EP 2,550,762 to be

---

[19]     Acacia Research Group, LLC, Research Analyst Day Presentation, p. 31 (Nov. 4, 2014), *available at* http://acaciaresearch.com/wp-content/uploads/2013/10/2014-Acacia-Research-Analyst-Day-Presentation-11-5-14.pdf.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

essential to the LTE communication standard on March 7, 2013, committed to license that patent family on FRAND terms,[20] and then transferred the patent to CCE on June 20, 2014.  The U.S. version of that patent, U.S. Patent No. 8,867,472, was asserted by CCE in the Eastern District of Texas on April 30, 2015, against Apple and many other cellular product suppliers based on allegations that the defendants were practicing the LTE standard.

68.    Similarly, on June 30, 2014, Nokia Solutions and Networks Oy declared U.S. Patent No. 8,738,075 essential to the LTE standard and committed to license it on FRAND terms.  On April 15, 2015, Nokia transferred that patent to CCE.

69.    Acacia has repeatedly refused to negotiate FRAND royalty rates for the declared SEPs it holds.

70.    On information and belief, on or around the end of 2012, Acacia entered into an agreement with Nokia Siemens Networks under which Acacia (1) acquired a subset of Nokia's cellular-related patents that included FRAND-committed declared SEPs, and (2) committed to pay Nokia a share of the revenues that it received from asserting those patents.

71.    On August 15, 2014, Acacia [███████████████████████████████ ████████████████████████████████████████] If applied across the industry to other patents declared essential to cellular standards, the demanded royalty would result in an aggregate royalty stack that exceeds by many times the cost of the baseband chip that provides cellular functionality—and that even ***exceeds the price of an iPhone***.  CCE's German subsidiary has since sought an injunction on one former Nokia declared SEP, EP 2,210,361, but refuses even to offer a license to that patent, instead insisting that it will offer a license to that patent only on the condition that Apple pays for a license to all of Acacia's patents.  This position is a breach of the FRAND commitment attached to that patent and is particularly egregious because some of the patents Acacia seeks to force Apple to license have been dismissed from litigation with prejudice.

---

[20]    Clause 6.2 of the ETSI IPR Policy provides:  "An undertaking pursuant to Clause 6.1 with regard to a specified member of a PATENT FAMILY shall apply to all existing and future ESSENTIAL IPRs of that PATENT FAMILY."

_**REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED**_

72.     Because Nokia has transferred portions of its former cellular portfolio to multiple PAEs, Apple would have to pay multiple licensors—not just Nokia—to sell its products without risk of allegations that it has infringed cellular patents, whether or not the asserted patents are actually valid, infringed, and enforceable.  In this way, Nokia and its conspiring PAEs, like Acacia and Conversant, are able to demand a higher—manifestly non-FRAND—royalty that far exceeds what Nokia could demand absent the anticompetitive patent transfer agreements.  This is just one example of how the collusion between Nokia and Acacia has used diffusion of patents into multiple portfolios to inflate royalties on grounds having no relationship to the value of the underlying technologies.

73.     As Nokia well knew when it decided to transfer declared SEPs to Acacia in furtherance of its abusive patent transfer scheme, Acacia had established for itself a richly deserved reputation for blatantly breaching FRAND commitments in its efforts to license SEPs acquired from practicing entities.  In late 2013, Acacia set out to acquire SEPs relating to a voice coding standard called AMR-WB.  This standard is used in a feature offered by carriers like AT&T and Verizon called HD Voice.

74.     On information and belief, in or around December 2013, Acacia acquired a portfolio of declared SEPs from VoiceAge, including EP 1,354,315; EP 1,125,276; EP 1,125,284; EP 1,125,285; EP 1,125,286; and EP 1,232,494 (the "VoiceAge Patents"), and agreed to share royalties with VoiceAge.  Those patents had previously been declared as essential to ETSI and subject to a FRAND commitment.  On information and belief, Nokia owns an interest in the royalties that Acacia extracts from these patents by virtue of an equity stake that Nokia owns in VoiceAge.

75.     Apple had previously licensed the VoiceAge patents through the W-CDMA patent pool administered by Sipro Lab Telecom.  One of the goals of the Sipro patent pool is to ensure "access to worldwide patents that are essential to W-CDMA FDD 3GPP Standard under fair, reasonable and non-discriminatory [FRAND] terms and conditions."[21]  Through the Sipro pool, Apple paid a royalty for a license that included the VoiceAge Patents through December 2016.

---

[21]     Sipro Lab Telecom, _W-CDMA_, available at http://www.sipro.com/W-CDMA.html.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

76.     After acquiring the VoiceAge Patents, Acacia immediately raised the license price and began to demand above-FRAND royalties.  [███████████████████████████████████████████████████████████████████████████████] Apple explained this to Acacia, and [███████████████████████████████████], Acacia sued Apple through its subsidiary, SLC Germany, in Düsseldorf, Germany, seeking an injunction against the sale of Apple's iPhones and iPads in Germany based on the VoiceAge Patents, in contravention of Nokia's FRAND commitments.

77.     Acacia has repeatedly attempted to extract exorbitant royalties on its portfolio by seeking to enjoin Apple's business in Germany on the basis of FRAND-committed patents.  On December 17, 2015, Acacia's German subsidiary, CCE GmBH, sued Apple in Düsseldorf, Germany, and sought a declaratory judgment that it is entitled to enjoin Apple from selling iPhones and iPads in Germany based on a patent acquired from Nokia.

78.     In both cases, Acacia sued without prior warning.  Acacia has since refused to withdraw its requests for injunctive relief notwithstanding Apple's willingness to negotiate a license—which plainly breaches its FRAND obligation.

79.     When it was still a leading supplier of cell phones, Nokia acknowledged that it is inappropriate to seek an injunction based on a FRAND-committed patent.  In a submission to the European Commission in 2008, Nokia stated that "it would not make sense if it was possible for an essential patent owner to obtain an injunction against anyone prepared to take a license on FRAND terms."[22]  Yet, Nokia reneged on that position once its cell phone business began its decline, and it has now conspired with PAEs like Acacia and Conversant to offload its declared SEPs and other patents to the PAEs and enlist them in extracting inflated royalties from other cell phone companies to share with Nokia.

80.     Acacia's and Nokia's efforts to circumvent the FRAND commitments applicable to many of Nokia's declared SEPs is a quintessential example of "patent hold-up" that implicates the

---

[22]     Tim Frain, Director IPR Regulatory Affairs, Nokia Corporation, "FRAND Best Practice," submitted to the European Commission Workshop on IPR in ICT Standardisation, Brussels (Nov. 19, 2008).  As Nokia's product business deteriorated, it has flip-flopped on its initial understanding of the FRAND commitment in some cases.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

very anticompetitive dangers of standard-setting the ETSI IPR Policy was designed to avoid.  Nokia has breached its FRAND commitments and then transferred declared SEPs to a PAE that it well knew would refuse to license on FRAND terms, going so far as to base the structure and financial terms of its scheme with Acacia on that premise.  Acacia, for its own part, has breached FRAND undertakings and committed illegal anticompetitive acts by demanding non-FRAND royalties, notwithstanding that it was bound by Nokia's commitment to license on FRAND terms all implementers of the relevant cellular standards.

81.     By transferring FRAND-committed, declared SEPs to Acacia and other PAEs as part of a scheme to avoid those commitments, Nokia has breached FRAND commitments.  But for Nokia's false FRAND commitments, the relevant standard-setting organizations would have refused to standardize technologies that Nokia has claimed are covered by its current and former declared SEPs.  Accordingly, through its patent transfer scheme, Nokia has enhanced monopoly power in relevant SEP Technology Markets, and Acacia has conspired in that scheme by entering into patent transfer agreements designed to evade Nokia's FRAND commitments.

**E.     Conversant's and Nokia's Conspiracy to Engage in Similar Anticompetitive Conduct**

82.     Nokia's scheme with Acacia was mirrored by Nokia's scheme with Conversant.

83.     Nokia established Core Wireless as an entity for holding over 2,000 patents transferred from Nokia in 2011.  Core Wireless was subsequently acquired by Conversant (then known as MOSAID).  Roughly 1,200 of the patents acquired from Nokia were declared SEPs.  These declared SEPs allegedly related to a variety of cellular standards, including GSM, GPRS, UMTS, and LTE.  Core Wireless was structured to return a significant portion of its patent revenues to its investors, including Nokia.  With respect to the former Nokia portfolio, it was reported that Core Wireless and MOSAID would return approximately two-thirds of any licensing and enforcement revenue to Nokia and its other investors.[23]

---

[23]     *See* MOSAID, Briefing Paper on Antitrust Issues Related to 'Patent Assertion Entity" Business Models, at p. 4, *available at* http://www.conversantip.com/wp-content/uploads/MOSAID-Antitrust-Briefing_May-2013.pdf.

84.     As it did with Acacia, Nokia has partnered with Conversant with purposes and intent of increasing the royalties it can extract from former Nokia patents.  After the former Nokia patents were transferred to Core Wireless, Core Wireless sued Apple on eight alleged SEPs in February 2012 without any prior contact, and subsequently increased its claims to fourteen alleged SEPs.  Core Wireless demanded royalties amounting to billions of dollars from Apple.  This far exceeded a FRAND royalty rate, and Core Wireless used litigation coercively to try to extract its non-FRAND demands, including seeking an injunction based on declared SEPs.  This disregard for FRAND has occurred despite Conversant's public acknowledgment that it is contractually obligated to abide by Nokia's prior FRAND commitments, a point reaffirmed by Conversant's CEO during his testimony at a recent trial.[24]

85.     Conversant's and Nokia's scheme is ongoing.  Nokia continues to make FRAND commitments on additional patents and transfer them to Conversant.  For example, on December 10, 2012, Nokia Corporation declared U.S. Patent No. 7,631,037 to be essential to UMTS, and committed to license it on FRAND terms.  Nokia then transferred the patent to Core Wireless Licensing S.A.R.L. on April 28, 2014.  Core Wireless also filed two additional lawsuits against Apple in Texas in September 2014, including a case with five alleged SEPs.

86.     To date, Conversant has obtained an infringement verdict on just two patents out of 19 it has asserted in the two cases that proceeded to jury trials; and for the two patents on which it succeeded at trial, it obtained a jury verdict of less than a third of the royalties Conversant sought.

87.     As with Acacia, Conversant has conspired in Nokia's illegal monopolization scheme by entering into patent transfer agreements designed to evade Nokia's FRAND commitments.

**F.     Nokia Has Enlisted Other PAE Conspirators in Anticompetitive Schemes**

88.     In addition to its exploitive conspiracies with Acacia and Conversant, Nokia has also coordinated with several other PAEs to effectuate its patent transfer scheme.  For these patent transfers as well, on information and belief, Nokia has retained a share of the royalties to be extracted using its former patents.  Each time Nokia arms an additional PAE conspirator with a

---

[24]     *Id.* at p. 4 n.6; *see also* Transcript at 596:3-14, Dec. 7, 2016, *Core Wireless Licensing v. Apple Inc.* (C-15-05008 NC).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

portfolio of former Nokia patents, Nokia—as the hub of the enterprise—creates another entity with a portfolio of patents that can be abusively asserted against Apple and other potential licensees.  And each patent portfolio transfer away from Nokia gives those PAEs more ammunition.  As Nokia increases the number of conspiring PAEs and the number of patent portfolios transfers, it enhances the abusive, unfair, and anticompetitive synergies described herein, and enables Nokia and its conspirators (including Acacia and Conversant) to reap royalties far higher than those that Nokia could have extracted had its former patent portfolio remained in its own hand to license in an open and transparent way.  This continuing patent transfer scheme has elevated the costs and burdens associated with Apple and other product suppliers seeking to obtain relief from the onslaught of abusive assertions of Nokia's current and former patents, whether by negotiating a license at an inflated royalty, defending infringement claims, or seeking to enforce Nokia's FRAND commitments.  As the examples described below illustrate, the patent transfer scheme has exploited multiple suppliers of cellular devices in the form of exorbitant royalties and burdens that Nokia could never have imposed without the patent transfers, demonstrating the enhanced market power and creation and enhancement of monopoly power that Nokia and its PAE conspirators have obtained through the transfers.  This has led to further injury to consumers in the United States and elsewhere through higher prices and reduced innovation and quality for cellular devices.

89.    In particular, Nokia has sold patents to at least the following entities, among others: Vringo, Inc.; Sisvel International; and Inventergy.  As the examples below detail, these transfers have allowed Nokia and its partners to demand exorbitant royalties unrelated to the value of the technologies, drive up transaction and litigation costs, and evade Nokia's FRAND commitments.

### 1.    Nokia's Coordination with Vringo

90.    Vringo, Inc. is a PAE that acquired over 500 Nokia patents in 2012, including declared SEPs relating to wireless telecommunications standards GSM, GPRS, UMTS/WCDMA, and LTE.  Nokia retained an interest in any royalties or infringement damages that Vringo might obtain using the patents.[25]

---

[25]    *See* "Nokia to Sell 500 Patents to Licensing Firm Vringo," Aug. 9, 2012, *available at* http://finance.yahoo.com/news/nokia-sell-500-patents-licensing-193248944.html.  *See also* Vringo,

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

91.     After acquiring the declared SEPs from Nokia, Vringo began a campaign to extract from various product suppliers royalties far exceeding any FRAND level that Nokia could extract itself.

92.     Vringo's enforcement of those patents illustrates the anticompetitive effects associated with diffusion.  For example, Vringo began a campaign against ZTE Corporation, another cellular handset maker.  Vringo brought multiple actions against ZTE around the world, driving up ZTE's defense costs.  Moreover, in violation of Nokia's FRAND commitments, Vringo sought excessive royalties on former Nokia SEPs, and obtained injunctions against ZTE practicing the UMTS and LTE standards based on ZTE's alleged infringement of SEPs in several jurisdictions. Vringo's enforcement strategy and violation of bedrock FRAND principles have led to investigations by competition authorities in Europe and China.

### 2.     Nokia's Coordination with Sisvel

93.     Sisvel International is a PAE that acquired approximately 450 patents from Nokia in January 2012, including approximately 350 declared SEPs relating to the GPRS (2.5G) and UMTS (3G) wireless telecommunications standards.

94.     Sisvel's enforcement of those patents violates its FRAND obligations.  Despite its obligation to license its declared SEPs on FRAND terms (which encompasses a commitment not to seek injunctive relief), Sisvel sought and obtained an injunction from the Düsseldorf Regional Court in Germany preventing a Chinese cellular handset manufacturer from selling its devices based on alleged use of SEPs relating to GPRS and UMTS.  Sisvel similarly obtained injunctions against other companies that sought to exhibit their cellular handsets at a convention in Germany.

---

Inc. Form 8-K Aug. 9, 2012, *available at* https://www.sec.gov/Archives/edgar/data/1410428/000114420412043832/ v320786_8k.htm ("The Company agreed to compensate Nokia with a cash payment and certain ongoing rights in revenues generated from the patent portfolio.").

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

### 3. Nokia's Coordination with Inventergy

95.     Inventergy is a PAE that acquired nearly 760 patents from Nokia and others. Seventy-seven patents were acquired from Nokia in June 2014 and related to IP Multimedia Subsystems.  Inventergy pays its partners, including Nokia, a percentage of future royalties.[26]

96.     Inventergy has begun using these patents to extract royalties from various entities, such as Sonus Networks, a communications equipment supplier.  Inventergy demanded $24 to $97 million from Sonus for a license to its portfolio, including the Nokia patents.  Sonus eventually paid an exorbitant amount for a license rather than litigate, after it was sued for patent infringement by Inventergy, which asserted many patents, including some previously owned by Nokia.

## IV. Acacia's and Conversant's Conspiracy With Nokia Harm Apple, the Cellular Industry, and Consumers

97.     The agreements to transfer patents from Nokia to Acacia, Conversant, and other PAEs enable those PAEs illegally to exploit those patents in ways that Nokia could not, and for Nokia and the PAEs to share in the value created by that exploitation.  This has led to anticompetitive effects and creation and enhancement of monopoly power in the Patented Technology Markets.

98.     In particular, the illegal scheme described herein has resulted in inflated licensing royalties—i.e., higher prices—and imposed burdens, costs, and uncertainties for Apple and other purchasers in each of the Patented Technology Markets.  The purchasers in those markets include cellular device manufacturers that are potential and actual licensees.  In addition, as a result of the illegal conduct of Nokia, Acacia, Conversant, and other PAEs in the Patented Technology Markets, U.S. and other end consumers have been harmed and face a continuing threat of increased prices and reduced innovation and quality for cell phones and other cellular devices.

99.     This illegal conduct causes obvious harm to licensees such as Apple—*i.e.*, customers in the Patented Technology Markets—when they are compelled to pay inflated royalties.  Licensing

---

[26]     Inventergy Global Q4 2015 Earnings Call (Apr. 4, 2016) ("Our business model is one in which we pay the modest amount upfront for these patents, and we provide a portion of our net revenue for the licensing or sales of these patents back to the original patent owners.").

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

customers are also harmed, even when they do not acquiesce to an inflated royalty, by being forced to incur substantial expenses, uncertainty, and burdens in resisting the patent litigations and threats that the patent transfer schemes of Nokia, Acacia, Conversant, and other PAEs have enabled.  For example, Apple has spent millions to date on outside resources (including counsel, experts, and vendors) to defend against Acacia's demands and the same to defend against Conversant and Core Wireless's demands.  Apple has also been harmed by the enormous amounts of time its employees have been forced to spend on these litigations, including collecting information and documents and preparing for depositions, rather than doing their jobs.  Nokia, Acacia, and Conversant have employed the patent transfer agreements set forth herein and others to impose these costs on licensees and potential licensees in the Patented Technology Markets, and to use their leverage to extract unreasonable and unjustified royalties.

100.    For declared SEPs specifically, the schemes to diffuse Nokia patents and evade FRAND commitments has led to precisely the sort of anticompetitive effects that ETSI's IPR Policy was designed to avoid.  In particular, Nokia has obtained monopoly power through its knowingly false FRAND commitments, and, through its conspiracies with PAEs, imposed exorbitant non-FRAND royalties (or heavy costs in trying to avoid such royalties) on Apple and other suppliers of products that support cellular standards.  This has led to inflated prices in SEP Technology Markets associated with Nokia's declared SEPs, as well as higher prices and reduced innovation and quality in the Cellular Device Markets.  Moreover, the illicit transfer schemes have chilled, and, if not enjoined, will continue to chill procompetitive standard-setting, to the detriment of industry and American and other consumers alike.

## COUNT I

### BREACH OF FRAND CONTRACT

101.    Apple repeats and realleges each allegation above as if fully set forth herein.

102.    Nokia contractually bound itself to make certain patents available on FRAND terms and conditions.  FRAND commitments are binding on all subsequent patent owners, including

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Acacia and Conversant, which had knowledge of the encumbrance at the time they purchased Nokia's patents.

103.    When Acacia and Conversant acquired these declared SEPs, these entities entered into express or implied contractual commitments with ETSI.

104.    Apple, as a member of ETSI and an implementer of ETSI standards, is an intended third-party beneficiary of these contracts with ETSI. Each third party that would potentially implement ETSI standards such as LTE, including Apple, was an intended beneficiary of the original patent holders' agreement with ETSI (which continues to bind Nokia, Acacia, and Conversant).

105.    These contracts have been breached by Nokia's transferring of its patents to Acacia and Conversant, with the knowledge and intent of the parties to those agreements that Acacia and Conversant would not abide by the terms of Nokia's FRAND commitments.

106.    Acacia and Conversant have breached these contracts by refusing to offer licenses to their declared SEPs on FRAND terms and conditions, and by seeking injunctions blocking Apple's products based on such patents.

107.    As a direct result of Acacia's and Conversant's contractual breaches, Apple has suffered harm to its business and property, and, absent an injunction, Apple will continue to suffer from these effects.  Apple's past and continuing harm includes litigation costs, supracompetitive licensing rates, business uncertainty, and business resources lost in dealing with the consequences of Acacia's, and Conversant's contractual breaches.

## COUNT II

**ACACIA-NOKIA, CORE WIRELESS-NOKIA AGREEMENTS TO RESTRAIN COMPETITION IN CELLULAR TECHNOLOGY LICENSING
(SECTION 1 OF THE SHERMAN ACT)**

108.    Apple repeats and realleges each allegation above as if fully set forth herein.

109.    Acacia and Conversant (through its subsidiary Core Wireless) respectively reached agreements with Nokia to acquire patents for the purpose of coordinating to increase the total royalties obtained from licensing those patents.  Nokia receives a share of the excessive royalties that Acacia or Conversant collects.  Acacia and Nokia intended that, through their conspiracy, Acacia

would extract royalties from cell phone and other cellular device makers—like Apple—far beyond what Nokia could collect itself (particularly given the constraints on its patent assertions) using former Nokia patents in conjunction with other patents acquired by Acacia.  Likewise, Conversant and Nokia intended that, through their conspiracy, Conversant would extract royalties from cell phone and other cellular device sellers and manufacturers—like Apple—far beyond what Nokia could collect itself (particularly given the constraints on its patent assertions) using former Nokia patents in conjunction with other patents acquired by Conversant.

110.    Nokia's respective agreements with Acacia, Conversant, and other PAEs were expressly intended to enable and had the effect of enabling the PAEs to extract exorbitant royalties based on FRAND-committed patents, far beyond those that Nokia could extract itself.  As they intended in reaching these agreements, Nokia and the other PAEs share in the fruits of the exorbitant non-FRAND royalties that the PAEs demand and obtain from product suppliers through Nokia's interest in the royalties the PAEs obtain.

111.    The agreements to transfer patents substantially raised prices and resulted in other anticompetitive effects in the Patented Technology Markets associated with those patents, and for downstream cellular devices sold to consumers in the Cellular Device Markets.

112.    These inflated prices and other anticompetitive effects resulted from, among other things, the parties' agreements to transfer FRAND-committed SEPs with the specific purpose and effect of evading those FRAND commitments, thereby allowing the parties to share in ill-gotten royalties by evading the commitments.

113.    The agreements to transfer patents generated no efficiencies, and in fact were designed to create inefficiencies in the licensing that Nokia, Acacia, and Conversant could exploit to harm Apple, other potential licensees, and finished product consumers.  Any conceivable efficiencies that the agreements may have created were significantly outweighed by their anticompetitive effects.

114.    When these transfers began, Nokia was a major supplier of cell phones, in competition with Apple and others to sell such products to consumers in the Cellular Device

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Markets.  By agreeing to transfer its patents to Acacia and Conversant to achieve these anticompetitive effects, Nokia sought to raise its rivals' costs in the Cellular Device Markets to regain lost market share, and Acacia and Conversant were active conspirators in that scheme.  The anticompetitive effects from the illegal agreements transferring patents to Nokia and others have continued since Nokia stopped supplying cell phones, in the form of higher prices and other anticompetitive effects in Patented Technology Markets and in the downstream Cellular Device Markets.

115.    As a direct result of Nokia's and Acacia's, and Nokia's and Conversant's, unlawful agreements, Apple has suffered harm to its business and property, and, absent an injunction, Apple will continue to suffer from these effects.  Apple's past and continuing harm includes being forced to pay supracompetitive licensing rates substantially higher than those it would have been forced to pay but for the illegal agreements, business uncertainty, litigations costs, and business resources lost in dealing with the consequences of the unlawful agreements.

## COUNT III

### UNLAWFUL ASSET ACQUISITION
### (SECTION 7 OF THE CLAYTON ACT)

116.    Apple repeats and realleges each allegation above as if fully set forth herein.

117.    As previously alleged, the relevant markets are the Patented Technology Markets and the downstream Cellular Device Markets.

118.    Acacia has acquired from Nokia and others over 1,000 patents, which are assets under Section 7 of the Clayton Act.  The effect of the acquisitions from Nokia has been to lessen competition substantially, and to tend to create a monopoly in the Patented Technology Markets by increasing the cost and likelihood of litigation, evading reputational constraints on Nokia's ability to extract exorbitant royalties, and evading FRAND requirements.  The acquisitions also reduced competition in the downstream Cellular Device Markets by raising costs for Nokia's then-rivals.  Put differently, the acquisitions resulted in significantly enhanced ability and incentives to harm

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

competition.  Acacia's anticompetitive patent acquisitions from Nokia include at least the transactions alleged in Paragraph 38.

119.    Conversant, through its subsidiary Core Wireless, has acquired from Nokia over 2,000 patents, which are assets under Section 7 of the Clayton Act.  The effect of those acquisitions has been substantially to lessen competition, and to tend to create a monopoly, in the Patented Technology Markets by increasing the cost and likelihood of litigation, evading reputational constraints on Nokia's ability to extract exorbitant royalties, and evading FRAND requirements. The acquisitions also reduced competition in the downstream Cellular Device Markets by raising costs for Nokia's then-rivals.  Put differently, the acquisitions resulted in significantly enhanced ability and incentives to harm competition.  Conversant's anticompetitive patent acquisitions from Nokia include at least the transactions alleged in Paragraphs 83 and 85.

120.    As a direct result of Acacia's and Conversant's unlawful patent acquisitions, Apple has suffered harm to its business and property, and, absent an injunction and rescission of these transactions, Apple will continue to suffer from these effects.  Apple's past and continuing harm includes litigation costs, supracompetitive licensing rates, business uncertainty, and business resources lost in dealing with the consequences of Acacia's and Conversant's assertion of its unlawfully acquired patents.  As a result of Acacia's and Conversant's unlawful acquisitions, consumers in the Cellular Device Markets have suffered or are threatened with higher prices and reduced innovation and quality.

COUNT IV

**CONSPIRACIES TO MONOPOLIZE THE SEP TECHNOLOGY MARKETS**
**(SECTION 2 OF THE SHERMAN ACT)**

121.    Apple repeats and realleges each allegation above as if fully set forth herein.

122.    Nokia acquired monopoly power in each of the SEP Technology Markets when patented technologies were incorporated into industry standards by 3GPP and ETSI.  In each SEP Technology Market, the standard-setting organization's standardization of Nokia's technology excluded alternative technologies for performing similar functionality.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

123.     Before standardization, the technologies purportedly covered by Nokia's declared SEPs faced competitive constraints from alternative technologies for standardization or from standard-setting organizations' options not to standardize functions performed by technologies purportedly covered by Nokia's declared SEPs and to leave the choice of technologies to perform those functions up to each standard implementer.  Because technologies purportedly covered by Nokia's declared SEPs have been incorporated into industry standards, Apple and other product suppliers seeking to support a standardized feature can no longer use alternatives, and are thus locked into the corresponding standardized technology.  Potential licensees in the SEP Technology Markets have no substitute alternative technologies that could constrain Nokia's licensing demands.  As a result, Nokia has (or had) the power to charge Apple and other potential licensees supracompetitive prices to license the Nokia (or former Nokia) declared SEPs.

124.     In accepting Nokia's proposals for inclusion in standards, 3GPP and ETSI relied on Nokia to comply with its promises to adhere to the ETSI IPR Policy.  In particular, 3GPP relied on Nokia to abide by its commitments to license SEPs on FRAND terms.  If Nokia had not committed to license its patents on FRAND terms, or Nokia's commitment has been known to be false, 3GPP and ETSI would not have incorporated those technologies in the standard.

125.     When it made its FRAND commitments, Nokia did not intend to adhere to FRAND terms.  By transferring patents to Acacia, Conversant, and other PAEs so those PAEs could claim the FRAND commitment did not apply at all, demand non-FRAND royalties, or threaten injunctions based on SEPs, Nokia breached its obligation to make its declared-SEPs available on FRAND terms.

126.     Nokia, on the one hand, and Acacia and Conversant on the other, reached agreements to transfer declared SEPs from Nokia to Acacia and from Nokia to Conversant to increase the total royalties obtained from licensing those patents.  For these SEP transfers, Nokia has received or intends to receive value based on the royalties that Acacia and Conversant collect.  Acacia and Nokia specifically intended that, by evading Nokia's FRAND commitments, Acacia would extract from cellular device suppliers—such as Apple—royalties far beyond what Nokia could collect itself, thus enhancing the ill-gotten monopoly power associated with those patents in the SEP Technology

Markets.  The patent transfers from Nokia to Conversant were similarly motivated by the parties' specific intent that Conversant would extract non-FRAND royalties beyond what Nokia itself could collect, thus enhancing the ill-gotten monopoly power associated with those patents in the SEP Technology Markets.

127.    Having conspired with Nokia to obtain former patents as part of Nokia's patent transfer scheme, Acacia and Conversant have the power to charge Apple and other potential licensees supracompetitive prices to license the former Nokia declared SEPs.

128.    As Nokia knew, intended, and agreed with them that they would do, Acacia and Conversant have demanded non-FRAND royalties and have threatened to enjoin Apple's products based on SEPs to increase its leverage, thereby enhancing and exercising Nokia's wrongfully obtained monopoly power.  Moreover, Acacia, Conversant, and other PAEs to which Nokia has transferred patents manufactured additional monopoly power by strategically distributing patents to shell subsidiaries.  These subsidiaries are structured to maximize the litigation and negotiation costs imposed on Acacia's, Conversant's, and other PAEs' targets through the assertion of patents in piecemeal fashion, while minimizing the risk that any litigation setbacks would affect the remainder of the portfolio.

129.    Acacia and Conversant have violated Section 2 of the Sherman Act by respectively coordinating and conspiring with Nokia with the specific intent of monopolizing the SEP Technology.

130.    As a direct result of Acacia's and Conversant's respective unlawful conspiracies with Nokia to monopolize, Apple has suffered harm to its business and property, and, absent an injunction, Apple will continue to suffer from these effects.  Apple's past and continuing harm includes supracompetitive licensing rates, business uncertainty, attorneys' fees, and business resources lost in dealing with the consequences of Acacia's and Conversant's unlawful conspiracies to monopolize.  As a result of the unlawful conspiracies to monopolize, consumers in the Cellular Device Markets have suffered or are threatened with higher prices and reduced innovation and quality.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

COUNT V

**UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200**

131.    Apple repeats and realleges each allegation above as if fully set forth herein.

132.    Acacia and Conversant have engaged and continue to engage in unfair competition in violation of Cal. Bus. Prof. Code § 17200, et seq.  As set forth above, Acacia and Conversant have engaged in illegal conduct by violating the Sherman and Clayton Acts, and, as discussed below, their conduct also violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.  That conduct is also unfair in that it violates the spirit and policy of the antitrust laws.

133.    Acacia's and Conversant's unfair business practices include their respective conspiracies with Nokia to evade Nokia's FRAND commitments by transferring declared SEPs to Acacia and Conversant.  The acquiring parties would then demand non-FRAND royalties and would seek injunctions in violation of those FRAND commitments.

134.    The United States Federal Trade Commission ("FTC") enforces Section 5 of the Federal Trade Commission Act, which is similar to Cal. Bus. & Prof. Code § 17200.  Section 5 of the FTC Act is used as a model in interpreting Cal. Bus. & Prof. Code § 17200.

135.    The FTC has brought an action under Section 5 where, like here, an acquiring firm refused to abide by licensing commitments that its predecessor made in connection with industry standard-setting activities.  *See* Decision and Order, *In the Matter of Negotiated Data Solutions LLC*, File No. 051-0094 (Jan. 23, 2008), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2008/01/080122do.pdf.

136.    The FTC has also brought actions under Section 5 where, like here, a holder of FRAND-committed patents sought to obtain an injunction against a standard implementer.  *See*, *e.g.*, Decision and Order, *In the Matter of Motorola Mobility LLC*, File No. 121-120 (July 24, 2013), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2013/07/130724 googlemotorolado.pdf.

137.    As a direct result of Acacia's and Conversant's wrongful conduct, competition has been injured in the Patented Technology Markets as alleged above.  Moreover, this conduct threatens

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

injury to downstream competition for price, innovation, and quality in Cellular Device Markets, thereby injuring consumers in California and elsewhere.  These threatened injuries include the passing on to consumers of improperly inflated royalties, and decreases in innovation and quality competition for cellular devices that comply with relevant standards by raising costs for innovators to bring products to market via exorbitant, non-FRAND licensing terms.

138.     As a direct result of Acacia's and Conversant's illegal conduct, Apple has suffered economic harm in the form of litigation costs and diversion of resources away from innovation to respond to these entities' serial nuisance suits.

## RELIEF SOUGHT

Apple respectfully requests the following relief:

A.     That Defendants' unlawful conduct be declared a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18;

B.     That Defendants' unlawful conduct be declared a violation of Cal. Bus. Prof. Code § 17200, et seq.;

C.     That Defendants' unlawful conduct be judged a breach of contract;

D.     That Apple recover damages against Acacia and Conversant, including incidental and consequential damages, in an amount to be determined and multiplied to the extent provided by law;

E.     That all contracts or agreements that Nokia, on the one hand, and or Acacia or Conversant, on the other, entered into in violation of the Sherman Act, Clayton Act, Cal. Bus. Prov. Code § 17200, et seq., or in breach of Nokia's FRAND undertakings be declared void and the patents covered by those transfer agreements be transferred back from Acacia and Conversant (or their respective subsidiaries) to Nokia;

F.     That all patents transferred by Nokia to, or acquired by, Acacia or Conversant (or their respective subsidiaries) in violation of the Sherman Act, Clayton Act, Cal. Bus. Prof. Code § 17200, et seq., or in breach of Nokia's FRAND undertakings be declared unenforceable;

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

G.    That Acacia and Conversant be enjoined from seeking injunctions against Apple based on declared SEPs for which Nokia made FRAND commitments;

H.    That Apple be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

I.    That Apple be awarded such additional relief as the Court may deem proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Apple demands a trial by jury on all issues triable by jury.

**_REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED_**

DATED: December 20, 2016

Respectfully submitted,


By:    /s/ Mark D. Selwyn

Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile:  +1 650 858 6100

William F. Lee
william.lee@wilmerhale.com
Joseph J. Mueller
joseph.mueller@wilmerhale.com
Timothy Syrett
timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile:  +1 617 526 5000

Leon B. Greenfield
leon.greenfield@wilmerhale.com
Nina S. Tallon
nina.tallon@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile:  +1 202 663 6363


*Attorneys for Plaintiff*
   APPLE INC.