*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100

William F. Lee (pro hac vice forthcoming)
william.lee@wilmerhale.com
Joseph J. Mueller (pro hac vice forthcoming)
joseph.mueller@wilmerhale.com
Timothy Syrett (pro hac vice forthcoming)
timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000

Leon B. Greenfield (pro hac vice forthcoming)
leon.greenfield@wilmerhale.com
Nina S. Tallon (pro hac vice forthcoming)
nina.tallon@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile:  +1 202 663 6363

*Attorneys for Plaintiff*
APPLE INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC., | Case No.5:16-cv-07266 |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| NOKIA CORPORATION, NOKIA SOLUTIONS AND NETWORKS OY, NOKIA TECHNOLOGIES OY, ACACIA RESEARCH CORPORATION, CELLULAR COMMUNICATIONS EQUIPMENT LLC, SAINT LAWRENCE COMMUNICATIONS LLC, CELLULAR COMMUNICATIONS | **JURY TRIAL DEMANDED** |

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1

EQUIPMENT GMBH, SAINT LAWRENCE
COMMUNICATIONS GMBH,
CONVERSANT INTELLECTUAL
PROPERTY MANAGEMENT INC., CORE
WIRELESS LICENSING S.A.R.L., AND
CORE WIRELESS LICENSING LTD.

Defendants.

2

3

4

5

6

7

## INTRODUCTION

8        1.        Apple Inc. ("Apple") brings this action to remedy a continuing anticompetitive

9  scheme.  Having failed as a supplier of cell phones, Nokia Corporation (itself and through its

10  affiliates Nokia Solutions and Networks Oy and Nokia Technologies Oy (collectively "Nokia"))

11  has transferred thousands of patents to Acacia Research Corporation and its subsidiaries

12  (collectively, "Acacia"), Conversant Intellectual Property Management Inc. ("Conversant") and

13  its subsidiaries (collectively, "Conversant"), and other patent assertion entities ("PAEs") as part

14  of a plan to extract and extort exorbitant revenues unfairly and anticompetitively from Apple and

15  other innovative suppliers of cell phones, and ultimately from the consumers of those products.

16  Nokia has conspired with Acacia, Conversant, and many other PAEs to use unfair and

17  anticompetitive patent assertions to strike back at, and improperly tax the innovations of cell

18  phone makers.

19        2.        This conduct of Nokia—with Acacia, Conversant, and its other PAE

20  conspirators—is all the more pernicious because it unfairly and anticompetitively evades binding

21  commitments that Nokia made to license declared standard essential patents ("SEPs") on fair,

22  reasonable, and non-discriminatory ("FRAND") terms.  Nokia positioned itself to claim that its

23  patents cover technologies included in telecommunications standards by repeatedly assuring

24  standard-setting organizations that it would license its patents fairly.  Yet Nokia has now

25

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1  diffused those patents to colluding PAEs that, as Nokia fully intended, monetize Nokia's false

2  promises by extracting exorbitant non-FRAND royalties in ways Nokia could not.

3        3.        In 2011, Nokia remained a major supplier of cell phones, but, due to its failure to

4  innovate, was facing business prospects so dire that Nokia ultimately exited the cell phone

5  market.  As Nokia's CEO had announced to employees the previous year, Nokia was standing on

6  "a burning platform."  Unable to compete with innovative companies such as Apple—which had

7  developed a revolutionary hardware and software platform—Nokia quickly transformed itself.  It

8  changed from a company focused on supplying cell phones and other consumer products to a

9  company bent on exploiting the patents that remain from its years as a successful cell phone

10  supplier.  In its changed form, Nokia has sought to extract exorbitant patent royalties from Apple

11  and other cell phone makers, and Acacia and Conversant have been its willing conspirators to

12  that end.

13        4.        Nokia does not seek to license its own portfolio directly and transparently, though

14  it is fully competent to do so.  Instead, Nokia has divided its patent portfolio and distributed

15  portions of it among Acacia, Conversant, and other PAEs, while retaining an interest in revenues

16  generated by those PAEs.  Nokia then enlists the PAEs as mercenaries to aggressively threaten,

17  sue, and thereby extract exorbitant, above-market royalties from cell phone makers, including for

18  declared SEPs.  The reasons why Nokia has conspired with these entities are clear.  The PAEs

19  can take advantage of the fact that—unlike Nokia, which now focuses on the network business—

20  they produce nothing at all and therefore have no desire or need for "patent peace," and can

21  impose disproportionate discovery and litigation costs on the product companies they sue.  By

22  dispersing the portfolio to the PAEs, Nokia can obtain more royalties from product companies

23  than it could obtain through direct and transparent licensing, allowing Nokia to illegally exploit

24  product companies based on weak current and former Nokia patents.

25

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

5.  Nokia's patent transfer scheme has resulted in at least nine PAE partners armed with former Nokia patents, many of which have embarked on serial abusive assertions of their former Nokia patents (both SEPs and non-SEPs) against Apple.  These Nokia partners have sued Apple ***at least twelve times*** based on former Nokia patents alone.  Acacia and its shell subsidiaries have sued Apple in the United States and abroad ***more than forty times***, based on patents they acquired from Nokia or others, demanding exorbitant royalties based on unsupported infringement claims.  For its part, Conversant, through its subsidiary Core Wireless Licensing S.a.r.l. ("Core Wireless"), has asserted over two dozen patents against Apple. These serial assertions and litigations have forced Apple to incur multiple millions of dollars in defense costs, precisely the sort of leverage that Nokia, Acacia, and Conversant intended to create when they agreed to conspire.

6.  Consistent with its and its conspirators' intent to coordinate to maximize the total royalties that can be extracted from Apple and other cell phone makers and to divide the spoils, Nokia has retained the right to receive a large portion of any royalties and settlements that Acacia, Conversant, and their respective subsidiaries extract using former Nokia patents.  And, collectively, Nokia and its partners are demanding far more in royalties than Nokia could have sought on its own.  Unless enjoined and remedied, the conduct described herein will continue to injure Apple, other participants in industries that are vital to the national economy, and consumers in the United States and elsewhere.

7.  The abusive and anticompetitive diffusion of Nokia's patent portfolio among a multitude of PAEs has already imposed extraordinary costs and burdens on the cell phone industry.  Rather than defend against patent assertions by Nokia alone, Apple and other victims of Nokia's scheme are subjected to serial assertions by a range of PAEs and their shell subsidiaries doing Nokia's bidding, each adding to the cumulative burdens on Apple, other suppliers of cell phones, and U.S. and other consumers.  .

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

8.      Apple brings this action to address the harm it has already suffered from Nokia's, Acacia's, and Conversant's violations of federal antitrust and state unfair competition laws and breaches of contracts.  Apple has suffered damages from excessive royalty payments and the costs and burdens of defending against the barrage of patent litigation unleashed by Acacia, Conversant, and the other PAEs enlisted by Nokia.  Apple also seeks injunctive relief to put an end to Nokia's, Acacia's, and Conversant's illegal conduct and the resulting—and accelerating— harm to Apple, the broader industry, and U.S. and other consumers, and to unwind the patent transfers that have enabled the anticompetitive conduct described herein.

## THE PARTIES

9.      Plaintiff Apple designs and sells innovative, iconic consumer electronics such as the iPhone, iPad, and MacBook.  Apple is a corporation organized and existing under the laws of the State of California with its principal place of business at 1 Infinite Loop, Cupertino, California 95014.

10.      Defendant Nokia Corporation is a public limited liability company incorporated under the laws of the Republic of Finland.  Nokia was at one time a major manufacturer of cell phones, but was unable to compete as cell phones became increasingly innovative.  Today, it continues to be a major supplier of other communications products.  Defendants Nokia Solutions and Networks Oy ("NSN") and Nokia Technologies Oy ("Nokia Technologies") are subsidiaries of Nokia Corporation.  NSN sells network infrastructure equipment and related services.  The business that became NSN, a Finnish corporation, was formerly known as Nokia Siemens Networks, a joint venture between Nokia Corporation and Siemens Aktiengesellschaft.  Nokia Corporation acquired full ownership of NSN on August 7, 2013.  Nokia Technologies, a Finnish corporation, focuses on "Nokia's industry leading patent licensing business."  Nokia 2015 Form 20-F, p. 36.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1    11.    Defendant Acacia Research Corporation is a publicly-traded corporation that

2   describes itself as "an intermediary in the patent marketplace."  Acacia Research Corporation

3   2015 Form 10-K, p. 1.  Acacia Research Corporation has a bewildering array of shell

4   subsidiaries that "generate revenues and related cash flows from the granting of intellectual

5   property rights for the use of patented technologies that our operating subsidiaries control or

6   own."  *Id.*  Acacia Research Corporation is a Delaware corporation having its principal place of

7   business at 500 Newport Center Drive, Suite 700, Newport Beach, California 92660.  Defendants

8   Cellular Communications Equipment LLC ("CCE") and Saint Lawrence Communications LLC

9   ("SLC") are subsidiaries of Acacia Research Group LLC, which is in turn a wholly-owned

10  subsidiary of Acacia Research Corporation.  CCE is a Texas limited liability company with its

11  principal place of business in Plano, Texas.  SLC is a Texas limited liability company, having a

12  principal place of business at 2400 Dallas Parkway, Suite 200, Plano, Texas 75093.  Defendants

13  Cellular Communications Equipment GmbH ("CCE Germany") and Saint Lawrence

14  Communications GmbH ("SLC Germany") are German subsidiaries of Acacia.  Both CCE

15  Germany and SLC Germany are German limited liability companies with their principal place of

16  business at Pettenkoferstrasse 4, 80336 Munich, Germany.  Given the opaque, constantly

17  changing legal structures of Acacia Research Corporation and its subsidiaries, there may be other

18  subsidiaries of Acacia Research Corporation to which former Nokia patents have been

19  transferred; therefore, these subsidiaries cannot all be listed by name and can instead only be

20  identified based on the origin of the asserted patents.

21    12.    Defendant Conversant Intellectual Property Management Inc. is a privately-held

22  company that describes itself as "in the business of making innovation more rewarding."[1]

23  Conversant Intellectual Property Management Inc. is a Canadian corporation having its principal

24  place of business at 515 Legget Drive, Suite 704, Ottawa ON, Canada K2K 3G4.  Defendants

25

---

[1]    *See* Conversant, "Our Services," *available at* http://www.conversantip.com/our-services/.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Core Wireless Licensing S.a.r.l. ("Core Wireless S.a.r.l.") and Core Wireless Licensing Ltd. ("Core Wireless USA") (collectively, "Core Wireless") are wholly-owned subsidiaries of Conversant Intellectual Property Management Inc.  Core Wireless S.a.r.l. is a corporation duly organized and existing under the laws of the Grand Duchy of Luxembourg, having a principal place of business at 16 Avenue Pasteur L-2310 Luxembourg.  Core Wireless USA is a Texas limited company having a principal place of business at 5601 Granite Parkway, Suite 1300, Plano, Texas 75024.

### JURISDICTION AND VENUE

13.     Apple brings this action under Sections 1 and 2 of the Sherman Act and Sections 4 and 7 of the Clayton Act, 15 U.S.C. §§ 1, 2, 15, and 18; for breach of contract; under Cal. Bus. & Prof. Code § 17200 et seq.; and to prevent and restrain Nokia's, Acacia's, and Conversant's anticompetitive conduct and other violations of the law and to recover damages, the costs of this suit, and reasonable attorneys' fees.

14.     This Court has jurisdiction over the federal claims alleged under 28 U.S.C. §§ 1331 and 1337(a).  This Court has jurisdiction over the breach of contract and unfair competition claims arising under state law pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because, during the relevant period, Nokia, Acacia, and Conversant resided, transacted business, were found, or had agents in this District, and because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this district.

### INTRADISTRICT ASSIGNMENT

16.     The appropriate intradistrict assignment is the San Jose Division.  Under Civil Local Rule 3-2(c), a civil action shall be assigned to the division "serving the county in which the action arises."  An action "arises in the county in which a substantial part of the events or

omissions which give rise to the claim occurred." Civ. L.R. 3-2(c).  Here, a substantial part of those events or omissions occurred in Santa Clara County, where Apple is headquartered and where a substantial portion of the events set forth in this Complaint have a locus.  Civil actions arising in Santa Clara County "shall be assigned to the San Jose Division."  *Id.* at 3-2(e).

NOKIA'S, ACACIA'S, AND CONVERSANT'S ANTICOMPETITIVE PATENT TRANSFER SCHEME

I.    **Nokia Partners with Acacia, Conversant, and Other PAEs in an Anticompetitive and Illegal Patent Transfer Scheme**

17.    Apple's iPhone was first available to the public on June 29, 2007.  The iPhone revolutionized the cellular industry and was acclaimed as the "Invention of the Year."[2] Traditional suppliers like Nokia were unable to compete with the groundbreaking technologies Apple brought to mobile products.

18.    By 2010, Nokia realized it was unable to compete on the merits in the marketplace with Apple.  Nokia's then Chief Executive Officer Stephen Elop acknowledged Nokia's struggles.  In a letter to employees, Mr. Elop compared the state of Nokia's business to a man standing on a burning oil platform in the North Sea—facing a choice of burning to death or jumping into freezing waters—and suggested that Nokia faced a similar choice.  He emphasized that drastic changes were necessary to restore Nokia to competitiveness, and conceded that "we missed big trends, and we lost time."[3]  As he recognized, "there is intense heat coming from our competitors, more rapidly than we ever expected.  Apple disrupted the market by redefining the smartphone….  The first iPhone shipped in 2007, and we still don't have a product that is close to their experience."[4]

---

[2]    Lev Grossman, "Invention of the Year: The iPhone," *Time Magazine* (Nov. 1, 2007).
[3]    *See* "Full Text: Nokia CEO Stephen Elop's 'Burning Platform' Memo," *Wall Street Journal* (Feb. 9, 2011), *available at* http://blogs.wsj.com/tech-europe/2011/02/09/full-text-nokia-ceo-stephen-elops-burning-platform-memo/.
[4]    *Id.*

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

19.    Nokia tried to reclaim through litigation what it had lost in the marketplace, bringing patent claims against Apple—against which Apple defended and counterclaimed—in multiple fora in the United States and Germany.  The only case in which Nokia patents were tried to a decision was in the International Trade Commission, where Nokia failed to obtain relief on any of the seven patents it asserted against Apple.

20.    In 2011, Apple and Nokia settled their litigations and entered into a cross-license agreement.  As part of that agreement, Nokia provided a list of recently "divested" patents that the agreement did not cover.  But Nokia failed to tell Apple why Nokia had excluded those patents from the agreement—namely, to provide the initial ammunition for an illegal patent transfer scheme that would breach FRAND obligations and bring additional patent-related abuses far beyond what Nokia could do itself.  Unbeknownst to Apple, also in 2011, Nokia had launched secret plans to monetize these reserved patents, including through abusive assertions against Apple.  Those patents were eventually transferred to Core Wireless S.a.r.l. to be used for extorting excessive royalties, including from Apple.

21.    Just as it was setting in motion this and other abusive patent transfer schemes, Nokia began to take measures that ultimately led it to evacuate its "burning platform."  In 2011, Nokia abandoned its proprietary operating system, Symbian, in favor of a collaboration with Microsoft to adopt Microsoft's new mobile operating system, Windows Phone 7.  Despite attempts to re-energize its business, Nokia's share of global smartphone sales fell from 50.9% in Q4 2007 to 12.2% in Q4 2011.  In 2014, Nokia exited the cell phone business altogether to focus on other pursuits.[5]

22.    With its cell phone business dying, Nokia began to seek out willing conspirators and to commence its illegal patent transfer scheme in full force; that scheme has continued

---

[5]    *See* "Global Market Share Held by Nokia Smartphones from 1st Quarter 2007 to 2nd Quarter 2013," *Statista*, *available at* https://www.statista.com/statistics/263438/market-share-held-by-nokia-smartphones-since-2007/.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1  unabated to the present.  The driving force behind Nokia's strategy was to diffuse its patent

2  portfolio and place it in the hands of PAEs.  Acacia and Conversant were its chief conspirators.

3  As illustrated below, Nokia stands as the hub of a network of collaborator PAEs that receive

4  patents from Nokia, many of which (including its chief co-conspirators Acacia and Conversant)

5  then scatter those patents among their own webs of shell companies:



## II.    Diffusing Patents as an Anticompetitive Scheme

23.    Acacia, Conversant, and the other PAEs to which Nokia collectively transferred

thousands of patents have no business other than patent licensing and litigation.  Nokia's

transfers of patents—the *diffusion* of Nokia's portfolio—to Acacia, Conversant, and other PAEs

have, as Nokia and its PAE collaborators intended, dramatically enhanced the market power

associated with those patents.  Nokia, in turn, has shared in the fruits that increased power brings

1  by obtaining an ongoing share of the exorbitant royalties that Acacia, Conversant, and other

2  PAEs receive.

3      24.    PAEs like Acacia and Conversant face no risks to their reputation or their ongoing

4  business relationships by adopting aggressive licensing or litigation practices.  Nor do they face

5  the risk of counter-assertions of their targets' patents.  Indeed, Acacia and Conversant cultivate a

6  reputation for brazen and ruthless patent assertion tactics precisely to attract operating companies

7  like Nokia to partner with them to extract value from and tax innovators based on weak patents.

8  And because Acacia, Conversant, and other PAEs had no role in prosecuting the former Nokia

9  patents, their litigation discovery costs are a fraction of those Nokia would have faced.  The

10  Nokia patent transfers mean that the holder of the prosecution evidence is no longer a party to

11  the litigation but rather a mere third party located in Finland.  This makes obtaining that evidence

12  more burdensome, complicated, and often less complete—thereby increasing the likelihood of a

13  mistaken verdict of infringement or failure to find unenforceability.  Accordingly, Acacia,

14  Conversant, and other PAEs to which Nokia transferred patents can bring lawsuits to enforce

15  weak or low-value patents that Nokia (as a practicing entity) would not assert because they have

16  different abilities and incentives to do so.

17      25.    Moreover, because Acacia, Conversant, and the other PAEs each hold only a

18  portion of the original Nokia portfolio, it is impossible for an innovative product supplier to

19  obtain a license to the entire former Nokia portfolio at anything like the same price that it would

20  have paid had the patents not been diffused (even putting aside the factors described in

21  Paragraph 24).  Acacia, Conversant, and the other PAEs can threaten or impose separate

22  litigation, transaction, and royalty costs that inflate the cost of a license far beyond the marginal

23  value that Nokia could have obtained for the transferred patents had it not dispersed them—

24  notwithstanding that neither Nokia nor its PAE conspirators can avoid the obligation to

25  demonstrate the merits of each patent in their respective portfolios for which they seek a royalty.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1    Moreover, by conspiring to diffuse Nokia's patent portfolio, Nokia, Acacia, and Conversant seek

2    to take advantage of another dynamic that Nokia contends influences recoveries in patent

3    assertions and litigation.  According to an expert report that Nokia submitted in a prior

4    proceeding: "[T]he relationship between the number of patents and the total royalty rate is not

5    linear.  For example, a license to a single [SEP] may be 2.5% … while a license to ten or more

6    [SEPs] rarely exceeds 5%."[6]  Thus, by creating a network of conspiring PAEs to hold slices of its

7    former portfolio and sharing in the proceeds of the PAEs' assertions, Nokia seeks to work with

8    PAE collaborators like Acacia and Conversant to extract royalty rents and tax product innovators

9    in yet another way that would not have been possible had it kept its portfolio intact.

10        26.    Nokia's dispersal and diffusion of its patents among Acacia, Conversant, and

11    other PAEs has manufactured market power that derives not from any inventive value of the

12    patents, but rather from a scheme to exploit.  Put another way, diffusion does not "unlock" fair

13    value that Nokia cannot itself obtain.  Nokia could have obtained fair value for its patents by

14    direct and transparent licensing.  Indeed, Nokia has publicly stated that its subsidiary, Nokia

15    Technologies, conducts "Nokia's industry leading patent licensing business."[7]  Given this self-

16    acknowledged core expertise, the reason why Nokia and its PAE conspirators (including Acacia

17    and Conversant) agree to vest the PAEs with responsibility for asserting former Nokia patents is

18    obvious:  Product companies can be hit up for higher payments when Nokia outsources

19    enforcement to a network of uninhibited PAEs willing to demand anticompetitive royalties, and

20    Nokia and the PAEs can share in the spoils of that exploitation through their revenue-sharing

21    agreements.

22        27.    For declared SEPs, Nokia's patent transfer scheme provides Nokia an enormous

23    additional illicit benefit:  It enables Nokia to escape all constraining effects of Nokia's promise

24

25    ------

[6]    Expert Report of Eric Stasik, *Nokia Corp. v. Vias De Telecommunicacion Vitelcom, S.L.*, Mercantile Court of Barcelona (Compl. filed Nov. 18, 2004) at ¶ 44 (Nov. 17, 2004).
[7]    Nokia 2015 Form 20-F, p. 36.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1  to license those patents on FRAND terms.  And Nokia's sharing of the supracompetitive fruits of

2  its evasion with Acacia, Conversant, and its other PAE co-conspirators drives the very

3  economics of the conspiracies.

4          28.      When Nokia, itself, demands inflated royalties for patents it has declared essential

5  to industry standards, it fails to comply with its FRAND promises; but it faces bounds on the

6  reach of its demands because it remains an operating company and a participant in industry

7  standard-setting activities.  When Nokia diffuses its declared SEPs to Acacia, Conversant, and

8  other PAEs, however, Nokia rids itself of those constraints.  By doing so, and by exploiting the

9  other dynamics described in Paragraph 23-26, Nokia has positioned itself to maximize

10 exploitation of Apple and other suppliers of products that support industry standards.  Those

11 companies are locked into practicing standardized technologies that Nokia claims are covered by

12 its current and former patents as a result of the very (false) FRAND promises that Nokia and its

13 PAE partners have breached.

14         29.      This conspiratorial diffusion strategy frustrates the essential purposes of the

15 FRAND commitment in another way as well.  By scattering its portfolio for the purpose and with

16 the effect of driving up transaction costs and evading FRAND commitments, the scheme not

17 only introduces inefficiencies but also makes it impossible for Apple and other product suppliers

18 to license all of Nokia's current or former declared SEPs from a single party (Nokia) and on

19 FRAND terms.  This undermines standard-setting's procompetitive purposes in facilitating wide

20 adoption of industry standards on economically reasonable terms, and, instead, transforms

21 standard-setting into a mechanism for holding up and extracting exorbitant royalties from

22 product suppliers, bringing immediate harm to product suppliers and end consumers through

23 higher prices and reduced innovation and quality.  Over the longer run, abusive patent transfer

24 schemes, like the one Nokia has employed here, chill standard-setting activities and the

25 procompetitive benefits they bring.

30.    Nokia's PAE partners, including Acacia and Conversant, have in turn dispersed and diffused their patent portfolios among shell companies that they control.  As Nokia and the PAEs intended, this further enhances the artificial market power and provides a means to further extract exorbitant royalties and violate FRAND commitments.

**III.    Anticompetitive Effects in Relevant Markets from Nokia's, Acacia's, and Conversant's Anticompetitive Patent Transfer Scheme**

**A.    Patented Technology Markets and Market/Monopoly Power Therein**

31.    Through their illegal conduct, Nokia, Acacia, and Conversant have injured competition and created or enhanced monopoly power in markets for functions performed by technologies purportedly covered by former Nokia patents (the "Patented Technology Markets"). Each Patented Technology Market consists of a technology covered by a patent that Nokia transferred to Acacia, Conversant, or another PAE, and any other patented technologies that compete or competed to perform the same function.  Each technology purportedly covered by former Nokia patents competes or formerly competed with other technologies to perform functions associated with those technologies.  The Patented Technology Markets are worldwide because competing technologies may be acquired from anywhere, and Nokia's, Acacia's, and Conversant's conduct has harmed competition in interstate commerce in these markets.

32.    Many of the Patented Technology Markets encompass technology purportedly covered by a declared SEP that Nokia transferred to Acacia, Conversant, or another PAE (the "SEP Technology Markets").  As explained in more detail below, in SEP Technology Markets, there are no substitutes for the technology purportedly covered by the former Nokia patent— whether or not that patent is actually valid and infringed.  That is because once the relevant standard is established, any technologies that formerly competed with that technology are no longer viable substitutes:  Suppliers of products that will support a given standardized feature must use the corresponding standardized technology.  Moreover, because product suppliers

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

design and make enormous sunk investments in products that support standards developed by the European Telecommunications Standards Institute ("ETSI"), and the only significant telecommunications networks in many parts of the world support only ETSI standards, makers of products that support ETSI standards have no economically viable option to switch to supplying products that support other standards rather than ETSI standards. Accordingly, Acacia, Conversant, and other PAEs hold monopoly power in the SEP Technology Markets.

33.    For both declared SEPs and non-SEPs, the exorbitant royalties that Acacia, Conversant, and other PAEs have extracted from Apple and others is direct evidence that competing suppliers of technology do not provide a significant constraint on the PAEs' ability to extract supracompetitive royalties, and that the PAEs hold monopoly power in the relevant Patented Technology Markets. That monopoly power is independent of whether the patents asserted are actually valid and infringed.

**B.    The Overall Anticompetitive Patent Diffusion Scheme**

34.    When it diffused its portfolio to multiple PAEs, including Acacia and Conversant, Nokia armed each of them with portfolios of former Nokia patents large enough for the PAEs to extract unreasonable and unjustifiable royalties from Apple and other product companies, whether or not the patents they assert are actually valid and infringed. Each of the PAEs has a large enough portfolio to force product companies to either take a license or engage in uneconomic litigation.

35.    The collaboration to distribute Nokia's portfolio of patents into many different portfolios held by Acacia, Conversant, and other PAEs facilitates extracting of revenues from product companies in ways that Nokia could not have done but for the diffusion. The diffusion increases the targets' costs in responding to multiple assertions (as alleged above), and also allows the conspirators to exploit the risk of error in patent damages calculations. Diffusion is

profitable to patent holders and especially burdensome to product suppliers, in part, because patent damages may erroneously include more than the incremental value of the patented technology itself, and instead include value attributable to other aspects of the product not covered by the asserted patent; and these dynamics increase patent holders' leverage in licensing negotiations. Patent holders are more likely to be able to "double dip" into that excess value if the patents are owned by separate entities, making it harder for courts to observe and address the aggregate, "royalty stacking" implications of individual assertions. Nokia, Acacia, Conversant, and the other PAEs structured their operations to capture this ability to "double dip," whether through litigation or through increased leverage to extract exorbitant royalties in licensing negotiations.

36.     Nokia has transferred massive numbers of patents to Acacia, Conversant, and other PAEs. As part of those transfers, Nokia has agreed with each of its PAE co-conspirators that Nokia and the co-conspirator will **each separately enforce** its portion of the diffused portfolio to maximize the aggregate royalties that can be extracted from product companies. These agreements transform what was once a single licensing negotiation for a single royalty into a multitude of separate assertions against the same products, at an increased total cost due to the changed incentives and abilities of PAEs to assert these patents. Nokia and those PAEs have thereby increased market power and created or enhanced monopoly power associated with those patents. PAEs like Acacia and Conversant have gained the ability to extract exorbitant royalties in each of the Patented Technology Markets wholly unrelated to any inventive value of the patented technologies.

37.     The agreements between Nokia, on the one hand, and Acacia or Conversant, on the other, harmed competition in the markets for cell phones and other devices with cellular capability (such as tablets) (collectively, the "Cellular Device Markets") during the period Nokia was attempting to compete in the cell phone business. Because cell phones and other devices

with cellular capability can be acquired from global suppliers, the markets are worldwide.  At the time Nokia began its diffusion campaign to inflate licensing royalties, it was still a supplier of cell phones.  By seeking to impose exorbitant royalties on its competitors, Nokia was attempting to raise its rivals' costs, and possibly even exclude them from the market altogether if Acacia, Conversant, or its other PAE collaborators had been able to obtain an injunction using one of the patents.  As to the downstream Cellular Device Markets (post-Nokia's exit), the abusive patent transfer scheme inflates prices and decreases innovation and quality by raising the costs and burdens associated with product suppliers' licensing technologies purportedly covered by Nokia's patents and discouraging them from making the large investments required to innovate effectively.  Moreover, with a recent announcement that Nokia has a new venture involving "Nokia branded smartphones and tablets,"[8]  Nokia is once again employing Acacia, Conversant, and other of its conspiring PAEs to assert weak or low-value patents in ways that could raise the costs of Nokia's own potential cell phone and tablet rivals, thereby injuring competition and end consumers.

## C.     Nokia's and Acacia's Conspiracy to Anticompetitively Diffuse Patents

38.     Nokia partnered with Acacia because of, and to take advantage of, Acacia's abusive enforcement strategies.  Even before Acacia acquired patents from Nokia, it began a torrent of litigation against Apple, filing 26 separate lawsuits using 18 separate subsidiaries:

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 6:12-cv-00124 (E.D. Tex.), and transferred to Case No. 5:13-cv-01776 (N.D. Cal.);

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 6:12-cv-00125 (E.D. Tex.), and transferred to Case No. 5:13-cv-01777 (N.D. Cal.);

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 6:13-cv-00028 (E.D. Tex.), and transferred to Case No. 5:13-cv-02023 (N.D. Cal.);

---

[8] *See generally* http://www.hmdglobal.com/about/#story.

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 3:13-cv-04469 (N.D. Cal.);

- *Adaptix, Inc. v. Apple Inc. et al.*, Case No. 3:13-cv-04468 (N.D. Cal.);

- *AutoText Technologies, Inc. v. Apple Inc. et al.*, Case No. 1:07-cv-03513 (N.D. Ohio);

- *Brandywine Communications Technologies, LLC v. Apple Inc.*, Case No. 6:12-cv-00262 (M.D. Fla.);

- *Brandywine Communications Technologies, LLC v. Apple Inc. et al.*, Case No. 6:11-cv-01512 (M.D. Fla.);

- *Data Engine Technologies LLC v. Apple Inc.*, Case No. 6:12-cv-00697 (E.D. Tex.);

- *Digital Background Corporation v. Apple Inc.*, Case No. 5:08-cv-03639 (N.D. Cal.);

- *Digitech Image Technologies LLC v. Apple Inc.*, Case No. 8:12-cv-02125 (C.D. Cal.);

- *Efficient Online Purchasing LLC et al. v. Apple Inc. et al.*, Case No. 1:11-cv-00222 (D. Del.);

- *Express Card Systems LLC v. Apple Inc.*, Case No. 6:13-cv-00136 (E.D. Tex.);

- *Fast Memory Erase LLC v. Spansion Inc. et al.*, Case No. 3:08-cv-00977 (N.D. Tex.);

- *Intercarrier Communications LLC v. Apple Inc.*, Case No. 3:12-cv-00764 (E.D. Va.);

- *IP Innovation LLC. et al. v. Apple Inc.*, Case No. 2:07-cv-00146 (E.D. Tex.);

- *Mobile Enhancement Solutions LLC v. Apple Inc. et al.*, Case No. 3:12-cv-00795 (N.D. Tex.);

- *Online News Link LLC v. Apple Inc. et al.*, Case No. 2:09-cv-00312 (E.D. Tex.);

- *Optimum Power Solutions LLC v. Apple Inc. et. al.*, Case No. 3:11-cv-01509 (N.D. Cal.);

REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED

- *Restricted Spending Solutions, LLC v. Apple Inc.*, Case No. 3:08-cv-00093 (S.D. Ill.);

- *Shared Memory Graphics, LLC v. Apple Inc. et al.*, Case No. 3:10-cv-02475 (N.D. Cal.);

- *SmartPhone Technologies LLC v. Apple Inc. et al.*, Case No. 6:13-cv-00196 (E.D. Tex.);

- *SmartPhone Technologies LLC v. Apple Inc. et al.*, Case No. 6:11-cv-00604 (E.D. Tex.);

- *SmartPhone Technologies LLC v. Research in Motion Corporation et al.*, Case No. 6:10-cv-00074 (E.D. Tex.);

- *Software Restore Solutions, LLC v. Apple Inc.*, Case No. 1:11-cv-05625 (N.D. Ill.); and

- *Software Restore Solutions, LLC v. Apple Inc. et al.*, Case No. 1:10-cv-03628 (N.D. Ill.).

39.    Recognizing Acacia's well-established track record for abusive patent assertions, Nokia seized the opportunity to make Acacia a chief partner in its patent transfer scheme to compensate for its own failing cell phone business.  No later than February 21, 2013, Nokia Siemens Networks Oy and Nokia Siemens Networks Vermoegensverwaltung GMBH (now Nokia Networks and wholly owned by Nokia Corporation) sold at least 16 patents to Acacia Research Group LLC, which then transferred the patents to its subsidiary Cellular Communications Equipment LLC ("CCE").  Nokia later transferred hundreds of additional patents to Acacia, which then transferred them to CCE, through at least the following transactions:

- On June 18, 2013, Nokia Siemens Networks Oy transferred at least four patents to Acacia Research Group LLC, which then transferred them to CCE;

- On June 24, 2013, Nokia Siemens Networks Oy transferred at least one patent to Acacia Research Group LLC, which then transferred it to CCE;

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

- On March 24, 2014, Nokia Solutions and Networks Oy transferred at least fifteen patents to CCE;

- On June 10, 2014, Nokia Solutions and Networks Oy transferred at least one patent to CCE;

- On September 16, 2014, Nokia Solutions and Networks Oy transferred at least seven patents to CCE;

- On December 24, 2014, Nokia Solutions and Networks Oy and Nokia Solutions and Networks GMBH transferred at least thirty-three patents to CCE; and

- On March 27, 2015, Nokia Solutions and Networks Oy transferred at least two patents to CCE, effective December 24, 2014.

40. Acacia now claims to own a portfolio of 505 former Nokia patents and patent applications.[9] Nokia has retained an interest in the royalties Acacia extracts.[10]

41. That the serial transfers of patents from Nokia to Acacia have led to anticompetitive effects is evident from the events that have followed. Acacia and its subsidiaries have made exorbitant royalty demands on Apple, filed waves of lawsuits against Apple, and threatened to continue asserting patents until Apple pays Acacia's extortionate price.

42. Apple's good-faith attempts to resolve Acacia's demands and achieve patent peace have been futile, largely because Nokia has repeatedly transferred additional portfolios of patents to Acacia to allow Acacia to "reload" and repeatedly sue Apple. For example, ███████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[9]    *See* Acacia Research Group LLC, Q3 2016 Corporate Presentation at p. 10, available at http://acaciaresearch.com/wp-content/uploads/2016/10/Acacia-Research-Corporate-Presentation-Q3-2016.pdf.
[10]    *See id.* at p. 8 (discussing Acacia's "Partnership" model).

**_REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED_**

1  ████████████████████████████████████████████████████

2  ████ ]

3      43.    On July 22, 2013, Apple [████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ████████████████████████████ ]

11      44.    Beginning in 2014, Acacia, through its subsidiaries and shell companies, launched

12  a new wave of 16 lawsuits against Apple:

13
        • On January 27, 2014[11] and April 7, 2014, CCE filed its first suits against
14          Apple, asserting patents acquired from Nokia;

15        • On April 8, 2014, Innovative Display Technologies LLC sued Apple;

16        • On May 16, 2014, Adaptix filed its first suit against Apple in Japan;
17
        • On January 26, 2015, Adaptix filed a second wave of suits against Apple;
18
        • On April 30, 2015, CCE sued Apple four more times, again asserting patents
19          acquired from Nokia;

20        • On May 1, 2015, Parthenon Unified Memory Architecture LLC sued Apple;

21        • On July 8, 2015, Adaptix filed its second suit against Apple in Japan;
22
        • On August 10, 2015, Limestone Memory System LLC sued Apple;
23
        • On December 17, 2015, CCE Germany sued Apple in Germany;
24

25  ---
    [11]    Voluntarily dismissed on February 12, 2014. (*See Cellular Communications Equipment
    LLC v. Apple Inc., et al.,* Case No. 6:13-cv-00028 (E.D. Tex.).)

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

- On December 30, 2015, SLC Germany sued Apple in Germany; and

- On January 27, 2016, SLC Germany sued Apple, asserting patents acquired from VoiceAge.

45.    Acacia brings cases to take advantage of the leverage that it has obtained through its scheme with Nokia and other entities, and extorts licensing fees from the cost and disruption of the litigation process.

46.    The litigations that Acacia has brought through its Adaptix subsidiary (not involving Nokia patents) illustrate the way that Acacia seeks to monetize Apple's expected litigation costs, rather than the value of its technologies.  Nokia has transferred its patents to Acacia anticipating and intending that Acacia will adopt these same tactics with Nokia's patents, thereby increasing the royalties Nokia and Acacia can extract.

47.    Acacia has described Adaptix as controlling one of its "marquee" portfolios, and Acacia repeatedly confirmed to investors its "confidence that the Adaptix portfolio will earn significant revenues."[12]  Indeed, Acacia has touted that "we expect adjudicated trials for our…Adaptix portfolio to be [one of] the revenue drivers."[13]

48.    When tested in litigation, however, Adaptix's tactics evidence a strategy that focuses on maximizing litigation costs rather than seeking justified compensation for patent quality.  From 2012 to 2015, Adaptix filed **seven complaints in the United States against Apple** resulting in five separate lawsuits against Apple and cellular network providers—three cases in a first wave in 2012,[14] and two cases in a second wave in 2015.[15]  Although Apple prevailed on summary judgment in the first wave of cases, Adaptix reasserted the same patents against

---

[12]    Acacia Research Corporation Q3 2015 Earnings Call (Oct. 22, 2015).

[13]    Acacia Research Corporation Q2 2015 Earnings Call (July 23, 2015).

[14]    *Adaptix, Inc. v. Apple Inc.*, Case No. 5:13-cv-01776 (N.D. Cal.); *Adaptix, Inc. v. Apple Inc.*, Case No. 5:13-cv-01777 (N.D. Cal.); *Adaptix, Inc. v. Apple Inc.*, Case No. 5:13-cv-02023 (N.D. Cal.).

[15]    *Adaptix, Inc. v. Apple Inc.*, Case No. 5:15-cv-00365 (N.D. Cal.); *Adaptix, Inc. v. Apple Inc.*, Case No. 5:15-cv-00364 (N.D. Cal.).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

substantially similar products, leading to dismissal based on the reasoning already adopted in the first cases.  This repeated assertion of failed legal theories through multiple case filings reflects Acacia's intention to deliberately drive up Apple's litigation costs, rather than to obtain royalties on valuable patents.

49.    Acacia has engaged in similar exploitation on product suppliers through CCE.  In the *six* lawsuits CCE brought against Apple in less than a two-year period, it has prevailed on only one patent at trial, and received a jury award for substantially less than it demanded.

50.    As these examples illustrate, because Acacia's litigation costs and risks are trivial in comparison with those of the operating companies it sues, it can afford to bring these types of serial, low-value suits based on weak or low-value patents under the theory that even a modest settlement will be profitable with minimal risk.  As Acacia's former CEO Marvin Key put it: Acacia's "volume licensing business" is based on the principle that "it will make more financial sense for [its targets] to settle smaller opportunities rather than litigate every single one."[16]

**D.    Nokia's and Acacia's Evasion of Nokia's FRAND Licensing Commitments**

51.    Starting around 2012, Acacia began to acquire declared SEPs relating to cellular standards.  Many of these patents were acquired from Nokia.

**1.    Standard-Setting Confers Monopoly Power on Owners of Declared SEPs**

52.    Nokia was actively involved in the standard-setting process used by ETSI and the Third Generation Partnership Project ("3GPP") as they developed the standards that came to be used in many cellular telecommunications systems worldwide:  GSM (a 2G standard); GPRS (a 2.5G standard); UMTS/WCMDA (a 3G standard); and LTE (a 4G standard).

53.    Standard-setting activities create significant benefits by allowing manufacturers of many different devices to invest in the design and marketing of their products knowing that those

---

[16]    Acacia Research Corporation Q4 2015 Earnings Call (Feb. 25, 2016).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

products will interoperate effectively with other manufacturers' devices, and that they will likely have a large customer base if the standard is widely adopted.

54.    However, standards will only be widely adopted if implementers expect to have an opportunity to compete on a level playing field in the new market.  When companies decide to implement a standard, they make significant investments in designing their products and supply chains around the standard.  Once they have made those investments, they are "locked in" to the standard—it would be hugely expensive to start over with a new technology, even if that other technology is just as good.  The risk potential implementers face is that a patentee will engage in "patent hold-up" after they have become locked into the standard.  In a patent hold-up, a patent owner waits until a standard has become widely adopted and then seeks to extort far more in royalties than its technology is worth, because implementers are already locked in and therefore cannot avoid exorbitant royalty demands.

55.    The owner of a declared SEP acquires monopoly power over the corresponding SEP Technology Market purportedly covered by its patent.  That is because, after a technology is standardized, formerly competing technologies are no longer available as substitutes for any product supplier wishing to comply with a standardized feature in the relevant standard.  The standards promulgated by 3GPP and ETSI have been widely adopted, leaving product manufacturers with little choice but to support those standards for cellular connectivity.  Moreover, Apple and other manufacturers have made massive investments to comply with these ETSI standards, and thus are locked into using them.

### 2.    FRAND Licensing Commitments:  Essential Safeguards and Prerequisites to Standardizing Patented Technology

56.    To constrain the exercise of this monopoly power in SEP Technology Markets, standard-setting organizations require participants to disclose the patents they own that might cover the standard, and, as a condition of having technologies that they claim are covered by

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

their patents standardized, to agree to license those patents on FRAND terms.  In particular, ETSI's Intellectual Property Rights Policy ("IPR Policy") requires its members to disclose their patents or patent applications during the standard-setting process (i.e., before the technology is or might be incorporated into the standard), and to promise to license those patents on FRAND terms if they are essential to the standard.

57.    With regard to disclosure of potentially essential patents, Clause 4.1 of the IPR Policy states:

> Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

58.    ETSI requires that "[w]hen an ESSENTIAL [Intellectual Property Right] relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ["FRAND"] terms and conditions under such IPR."[17]

59.    If an ETSI participant is unwilling to commit to licensing its patents on FRAND terms and conditions, the ETSI IPR Policy mandates that the participant's technologies be excluded from the standard.  Clause 8.1.1 of the 2008 ETSI IPR Policy states:  "Where prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION an IPR owner informs ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION in accordance with Clause 6.1 above, the General Assembly shall … satisfy

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

itself that a viable alternative technology is available …."  In those instances in which, in the opinion of the General Assembly, no viable alternative technology exists, Clause 8.1.2 further provides that work on the standard or technical specification at issue "shall cease."  These terms make clear that in deciding to incorporate technology into its standards, ETSI relies on its members' FRAND commitments regarding potentially essential patents and patent applications.

60.    3GPP did not adopt its own intellectual property rights policy but instead decided that members of each of its Organizational Partners (of which ETSI is one) would abide by the respective Organizational Partners' intellectual property rights policies.

### 3. Nokia's FRAND Commitments Are Binding Contractual Obligations that Transfer with SEPs

61.    As a longstanding member of ETSI, Nokia is (and was at all relevant times) contractually bound to abide by ETSI's IPR Policy (including during its participation in 3GPP). Nokia submitted hundreds of declarations to ETSI identifying patents and patent applications that Nokia claimed were essential to the various standards adopted by ETSI and 3GPP.  Nokia submitted its first declaration on April 3, 2000, and has continued to submit additional declarations regularly, including most recently on October 12, 2016.  Nokia's declarations committed to licensing those patents on FRAND terms.

62.    Nokia never intended to make its patents available on FRAND terms, and always sought excessive, non-FRAND royalties.  Once Nokia started to flounder in the cell phone business and began transferring its declared SEPs to PAEs like Acacia and Conversant with the intent and effect of enhancing monopoly power in the corresponding Patented Technology Markets, however, its demands became even more exorbitant.

63.    Nokia has long acknowledged that a FRAND commitment applies to all future owners of the patent.  In a submission to the European Commission in 2008, Nokia stated that "it would not make sense…if the FRAND commitment evaporated when ownership of the patent

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

changes."[18]  And Nokia stated to the press in 2015 that when it divested SEPs over the previous few years, "the FRAND obligations passed to the new owners."[19]

64.    Indeed, the current version of the ETSI IPR Policy explicitly states that FRAND commitments are encumbrances on the patent that bind all successors-in-interest.  In particular, Clause 6.1*bis* states:

> FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest. Recognizing that this interpretation may not apply in all legal jurisdictions, any Declarant who has submitted a FRAND undertaking according to the POLICY who transfers ownership of ESSENTIAL IPR that is subject to such undertaking shall include appropriate provisions in the relevant transfer documents to ensure that the undertaking is binding on the transferee and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding all successors-in-interest. The undertaking shall be interpreted as binding on successors-in-interest regardless of whether such provisions are included in the relevant transfer documents.

65.    ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other parties that implement an ETSI standard.  In particular, the stated objective of the policy, described in Clause 3.1, is to "reduce the risk" to those implementing the standards "that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."  Apple, as a member of ETSI and an implementer of standards that ETSI adopted, is an intended third-party beneficiary of Nokia's FRAND commitments made under the ETSI IPR Policy.

**4.    Nokia's and Acacia's Use of Patent Transfers to Facilitate Breaches of FRAND Obligations**

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

66.     Acacia is well aware that the declared SEPs it owns remain subject to FRAND commitments made by the original patent owners.  In presentations to investors, Acacia has observed that the FRAND commitments applicable to its VoiceAge patents would present "legal and regulatory challenges."[20]  Despite that acknowledgment, however, Acacia and its subsidiaries have disputed in litigation that the royalty charged for its declared SEPs must be FRAND.

67.     As they have previously acknowledged, Nokia and Acacia are contractually obligated to make all their patents subject to their FRAND licensing commitments available on FRAND terms.  But Nokia has nonetheless employed its patent transfer scheme with Acacia as a device to evade its FRAND obligations while sharing in the exorbitant non-FRAND royalties that Acacia is able to extract—and Acacia has breached its obligations as an acquirer of FRAND-committed patents by demanding those royalties.

68.     Indeed, throughout this scheme, Nokia has continued to declare additional patents to ETSI, commit to FRAND licensing of those patents, and then transfer those patents to PAEs like Acacia.  Since 2012 Nokia has declared at least 23 patents to ETSI as standard essential that it later transferred to PAEs.  For example, Nokia Siemens Networks Oy declared EP 2,550,762 to be essential to the LTE communication standard on March 7, 2013, committed to license that patent family on FRAND terms,[21] and then transferred the patent to CCE on June 20, 2014.  The U.S. version of that patent, U.S. Patent No. 8,867,472, was asserted by CCE in the Eastern District of Texas on April 30, 2015, against Apple and many other cellular product suppliers based on allegations that the defendants were practicing the LTE standard.

---

[20]     Acacia Research Group, LLC, Research Analyst Day Presentation, p. 31 (Nov. 4, 2014), *available at* http://acaciaresearch.com/wp-content/uploads/2013/10/2014-Acacia-Research-Analyst-Day-Presentation-11-5-14.pdf.

[21]     Clause 6.2 of the ETSI IPR Policy provides:  "An undertaking pursuant to Clause 6.1 with regard to a specified member of a PATENT FAMILY shall apply to all existing and future ESSENTIAL IPRs of that PATENT FAMILY."

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

69.   Similarly, on June 30, 2014, Nokia Solutions and Networks Oy declared U.S. Patent No. 8,738,075 essential to the LTE standard and committed to license it on FRAND terms.  On April 15, 2015, Nokia transferred that patent to CCE.

70.   Nokia and Acacia have repeatedly refused to license the declared SEPs they hold on FRAND terms.

71.   On information and belief, on or around the end of 2012, Acacia entered into an agreement with Nokia Siemens Networks under which Acacia (1) acquired a subset of Nokia's cellular-related patents that included FRAND-committed declared SEPs, and (2) committed to pay Nokia a share of the revenues that it received from asserting those patents.

72.   On August 15, 2014, Acacia [███████████████████████████████████████ ███████████████████████████████████] If applied across the industry to other patents declared essential to cellular standards, the demanded royalty would result in an aggregate royalty stack that exceeds by many times the cost of the baseband chip that provides cellular functionality—and that even ***exceeds the price of an iPhone***.  CCE's German subsidiary has since sought an injunction on one former Nokia declared SEP, EP 2,210,361, but refuses even to offer a license to that patent, instead insisting that it will offer a license to that patent only on the condition that Apple pays for a license to all of Acacia's patents.  This position is a breach of the FRAND commitment attached to that patent and is particularly egregious because some of the patents Acacia seeks to force Apple to license have been dismissed from litigation with prejudice.

73.   [███████████████████████████████████████████████████████ ████████████████████████████] Moreover, because Nokia has transferred portions of its former cellular portfolio to multiple PAEs, Apple would have to pay multiple licensors— not just Nokia—to sell its products without risk of allegations that it has infringed cellular patents, whether or not the asserted patents are actually valid, infringed, and enforceable.  In this

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

way, Nokia and its conspiring PAEs, like Acacia, are able to demand a higher—manifestly non-FRAND—royalty that far exceeds what Nokia could demand absent the anticompetitive patent transfer agreements. This is just one example of how the collusion between Nokia and Acacia has used diffusion of patents into multiple portfolios to inflate royalties on grounds having no relationship to the value of the underlying technologies.

74. As Nokia well knew when it decided to transfer declared SEPs to Acacia in furtherance of its abusive patent transfer scheme, Acacia had established for itself a richly deserved reputation for blatantly breaching FRAND commitments in its efforts to license SEPs acquired from practicing entities. In late 2013, Acacia set out to acquire SEPs relating to a voice coding standard called AMR-WB. This standard is used in a feature offered by carriers like AT&T and Verizon called HD Voice.

75. On information and belief, in or around December 2013, Acacia acquired a portfolio of declared SEPs from VoiceAge, including EP 1,354,315; EP 1,125,276; EP 1,125,284; EP 1,125,285; EP 1,125,286; and EP 1,232,494 (the "VoiceAge Patents"), and agreed to share royalties with VoiceAge. Those patents had previously been declared as essential to ETSI and subject to a FRAND commitment. On information and belief, Nokia owns an interest in the royalties that Acacia extracts from these patents by virtue of an equity stake that Nokia owns in VoiceAge.

76. Apple had previously licensed the VoiceAge patents through the W-CDMA patent pool administered by Sipro Lab Telecom. One of the goals of the Sipro patent pool is to ensure "access to worldwide patents that are essential to W-CDMA FDD 3GPP Standard under fair, reasonable and non-discriminatory [FRAND] terms and conditions."[22] Through the Sipro pool, Apple paid a royalty for a license that included the VoiceAge Patents through December 2016.

---

[22] Sipro Lab Telecom, *W-CDMA*, available at http://www.sipro.com/W-CDMA.html.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1    77.    After acquiring the VoiceAge Patents, Acacia immediately raised the license price

2 and began to demand above-FRAND royalties. [█████████████████████████████████████

3 ████████████████████████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████████████],

5 Acacia sued Apple through its subsidiary, SLC Germany, in Düsseldorf, Germany, seeking an

6 injunction against the sale of Apple's iPhones and iPads in Germany based on the VoiceAge

7 Patents, in contravention of Nokia's FRAND commitments.

8    78.    Acacia has repeatedly attempted to extract exorbitant royalties on its portfolio by

9 seeking to enjoin Apple's business in Germany on the basis of FRAND-committed patents. On

10 December 17, 2015, Acacia's German subsidiary, CCE Germany, sued Apple in Düsseldorf,

11 Germany, and sought a declaratory judgment that it is entitled to enjoin Apple from selling

12 iPhones and iPads in Germany based on a patent acquired from Nokia.

13    79.    In both cases, Acacia sued without prior warning. Acacia has since refused to

14 withdraw its requests for injunctive relief notwithstanding Apple's willingness to negotiate a

15 license—which plainly breaches its FRAND obligation.

16    80.    When it was still a leading supplier of cell phones, Nokia acknowledged that it is

17 inappropriate to seek an injunction based on a FRAND-committed patent. In a submission to the

18 European Commission in 2008, Nokia stated that "it would not make sense if it was possible for

19 an essential patent owner to obtain an injunction against anyone prepared to take a license on

20 FRAND terms."[23] Yet, Nokia reneged on that position once its cell phone business began its

21 decline, and it embarked on its anticompetitive scheme to offload its declared SEPs and other

22

23

---

24 [23]    Tim Frain, Director IPR Regulatory Affairs, Nokia Corporation, "FRAND Best Practice,"
submitted to the European Commission Workshop on IPR in ICT Standardisation, Brussels
25 (Nov. 19, 2008). As Nokia's product business deteriorated, it has flip-flopped on its initial
understanding of the FRAND commitment in some cases.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

patents to PAEs and enlist them in extracting inflated royalties from other cell phone companies to share with Nokia.

81.    Nokia's and Acacia's efforts to circumvent the FRAND commitments applicable to many of Nokia's declared SEPs is a quintessential example of "patent hold-up" that implicates the very anticompetitive dangers of standard-setting the ETSI IPR Policy was designed to avoid. Nokia has breached its FRAND commitments and engaged in illegal anticompetitive activity by transferring declared SEPs to a PAE that it well knew would refuse to license on FRAND terms, going so far as to base the structure and financial terms of its scheme with Acacia on that premise.  Acacia, for its own part, has breached FRAND undertakings and committed illegal anticompetitive acts by demanding non-FRAND royalties, notwithstanding that it was bound by Nokia's commitment to license on FRAND terms all implementers of the relevant cellular standards.

82.    By transferring FRAND-committed, declared SEPs to Acacia and other PAEs as part of a scheme to avoid those commitments, Nokia has breached FRAND commitments.  But for Nokia's false FRAND commitments, the relevant standard-setting organizations would have refused to standardize technologies that Nokia has claimed are covered by its current and former declared SEPs.  Accordingly, through its patent transfer scheme, Nokia has enhanced monopoly power in relevant SEP Technology Markets, and Acacia has conspired in that scheme by entering into patent transfer agreements designed to evade Nokia's FRAND commitments.

**E.    Nokia's and Conversant's Conspiracy to Engage in Similar Anticompetitive Conduct**

83.    Nokia's scheme with Acacia was mirrored by Nokia's scheme with Conversant.

84.    Nokia established Core Wireless as an entity for holding over 2,000 patents transferred from Nokia in 2011.  Core Wireless was subsequently acquired by Conversant (then known as MOSAID).  Roughly 1,200 of the patents acquired from Nokia were declared SEPs.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

These declared SEPs allegedly related to a variety of cellular standards, including GSM, GPRS, UMTS, and LTE.  Core Wireless was structured to return a significant portion of its patent revenues to its investors, including Nokia.  With respect to the former Nokia portfolio, it was reported that Core Wireless and MOSAID would return approximately two-thirds of any licensing and enforcement revenue to Nokia and its other investors.[24]

85.     As it did with Acacia, Nokia has partnered with Conversant with purposes and intent of increasing the royalties it can extract from former Nokia patents.  After the former Nokia patents were transferred to Core Wireless, Core Wireless sued Apple on eight alleged SEPs in February 2012 without any prior contact, and subsequently increased its claims to fourteen alleged SEPs.  Core Wireless demanded royalties amounting to billions of dollars from Apple.  This far exceeded a FRAND royalty rate, and Core Wireless used litigation coercively to try to extract its non-FRAND demands, including seeking an injunction based on declared SEPs.  This disregard for FRAND has occurred despite Conversant's public acknowledgment that it is contractually obligated to abide by Nokia's prior FRAND commitments, a point reaffirmed by Conversant's CEO during his testimony at a recent trial.[25]

86.     Nokia and Conversant's scheme is ongoing.  Nokia continues to make FRAND commitments on additional patents and transfer them to Conversant.  For example, on December 10, 2012, Nokia Corporation declared U.S. Patent No. 7,631,037 to be essential to UMTS, and committed to license it on FRAND terms.  Nokia then transferred the patent to Core Wireless Licensing S.A.R.L. on April 28, 2014.  Core Wireless also filed two additional lawsuits against Apple in Texas in September 2014, including a case with five alleged SEPs.

---

[24]     *See* MOSAID, Briefing Paper on Antitrust Issues Related to 'Patent Assertion Entity" Business Models, at p. 4, *available at* http://www.conversantip.com/wp-content/uploads/MOSAID-Antitrust-Briefing_May-2013.pdf.

[25]     *Id.* at p. 4 n.6; *see also* Transcript at 596:3-14, Dec. 7, 2016, *Core Wireless Licensing v. Apple Inc.* (C-15-05008 NC).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

87.    To date, Conversant has obtained an infringement verdict on just two patents out of nineteen it has asserted against Apple in the two cases that proceeded to jury trials; and for the two on which it succeeded at trial, it obtained a jury verdict of less than a third of the royalties Conversant sought.

88.    As with Acacia, Conversant has conspired in Nokia's illegal monopolization scheme by entering into patent transfer agreements designed to evade their FRAND commitments.

**F.    Nokia's Has Enlisted Other PAE Conspirators in Anticompetitive Schemes**

89.    In addition to its exploitive conspiracies with Acacia and Conversant, Nokia has also coordinated with several other PAEs to effectuate its patent transfer scheme.  For these patent transfers as well, on information and belief, Nokia has retained a share of the royalties to be extracted using its former patents.  Each time Nokia arms an additional PAE conspirator with a portfolio of former Nokia patents, Nokia—as the hub of the enterprise—creates another entity with a portfolio of patents that can be abusively asserted against Apple and other potential licensees.  And each patent portfolio transfer away from Nokia gives those PAEs more ammunition.  As Nokia increases the number of conspiring PAEs and the number of patent portfolios transfers, it enhances the abusive, unfair, and anticompetitive synergies described herein, and enables Nokia and its conspirators to reap royalties far higher than those that Nokia could have extracted had its former patent portfolio remained in its own hand to license in an open and transparent way.  Nokia's continuing patent scheme has elevated the costs and burdens associated with Apple and other product suppliers seeking to obtain relief from the onslaught of abusive assertions of Nokia's current and former patents, whether by negotiating a license at an inflated royalty, defending infringement claims, or seeking to enforce Nokia's FRAND commitments.  As the examples described below illustrate, Nokia's patent transfer scheme has

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

exploited multiple suppliers of cellular devices in the form of exorbitant royalties and burdens that Nokia could never have imposed without the patent transfers, demonstrating the enhanced market power and creation and enhancement of monopoly power that Nokia and its PAE conspirators have obtained through the transfers.  This has led to further injury to consumers in the United States and elsewhere through higher prices and reduced innovation and quality for cellular devices.

90.     In particular, Nokia has sold patents to at least the following entities, among others:  Vringo, Inc.; Sisvel International; and Inventergy.  As the examples below detail, these transfers have allowed Nokia and its partners to demand exorbitant royalties unrelated to the value of the technologies, drive up transaction and litigation costs, and evade Nokia's FRAND commitments.

### 1.     Nokia's Coordination with Vringo

91.     Vringo, Inc. is a PAE that acquired over 500 Nokia patents in 2012, including declared SEPs relating to wireless telecommunications standards GSM, GPRS, UMTS/WCDMA, and LTE.  Nokia retained an interest in any royalties or infringement damages that Vringo might obtain using the patents.[26]

92.     After acquiring the declared SEPs from Nokia, Vringo began a campaign to extract from various product suppliers royalties far exceeding any FRAND level that Nokia could extract itself.

93.     Vringo's enforcement of those patents illustrates the anticompetitive effects associated with diffusion.  For example, Vringo began a campaign against ZTE Corporation,

---

[26]     *See* "Nokia to Sell 500 Patents to Licensing Firm Vringo," Aug. 9, 2012, *available at* http://finance.yahoo.com/news/nokia-sell-500-patents-licensing-193248944.html.  *See also* Vringo, Inc. Form 8-K Aug. 9, 2012, *available at* https://www.sec.gov/Archives/edgar/data/1410428/000114420412043832/v320786_8k.htm ("The Company agreed to compensate Nokia with a cash payment and certain ongoing rights in revenues generated from the patent portfolio.").

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

another cellular handset maker.  Vringo brought multiple actions against ZTE around the world, driving up ZTE's defense costs.  Moreover, in violation of Nokia's FRAND commitments, Vringo sought excessive royalties on former Nokia SEPs, and obtained injunctions against ZTE practicing the UMTS and LTE standards based on ZTE's alleged infringement of SEPs in several jurisdictions.  Vringo's enforcement strategy and violation of bedrock FRAND principles have led to investigations by competition authorities in Europe and China.

### 2.    Nokia's Coordination with Sisvel

94.    Sisvel International is a PAE that acquired approximately 450 patents from Nokia in January 2012, including approximately 350 declared SEPs relating to the GPRS (2.5G) and UMTS (3G) wireless telecommunications standards.

95.    Sisvel's enforcement of those patents violates its FRAND obligations.  Despite its obligation to license its declared SEPs on FRAND terms (which encompasses a commitment not to seek injunctive relief), Sisvel sought and obtained an injunction from the Düsseldorf Regional Court in Germany preventing a Chinese cellular handset manufacturer from selling its devices based on alleged use of SEPs relating to GPRS and UMTS.  Sisvel similarly obtained injunctions against other companies that sought to exhibit their cellular handsets at a convention in Germany.

### 3.    Nokia's Coordination with Inventergy

96.    Inventergy is a PAE that acquired nearly 760 patents from Nokia and others. Seventy-seven patents were acquired from Nokia in June 2014 and related to IP Multimedia Subsystems.  Inventergy pays its partners, including Nokia, a percentage of future royalties.[27]

---

[27]    Inventergy Global Q4 2015 Earnings Call (Apr. 4, 2016) ("Our business model is one in which we pay the modest amount upfront for these patents, and we provide a portion of our net revenue for the licensing or sales of these patents back to the original patent owners.").

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

97.    Inventergy has begun using these patents to extract royalties from various entities, such as Sonus Networks, a communications equipment supplier.  Inventergy demanded $24 to $97 million from Sonus for a license to its portfolio, including the Nokia patents.  Sonus eventually paid an exorbitant amount for a license rather than litigate, after it was sued for patent infringement by Inventergy, which asserted many patents, including some previously owned by Nokia.

## IV.    Nokia's Anticompetitive Patent Transfers Harm Apple, the Cellular Industry, and Consumers

98.    Nokia's agreements to transfer patents to Acacia, Conversant, and other PAEs enable those PAEs illegally to exploit those patents in ways that Nokia could not, and for Nokia and the PAEs to share in the value created by that exploitation.  This has led to anticompetitive effects and creation and enhancement of monopoly power in the Patented Technology Markets.

99.    In particular, the illegal scheme of Nokia, Acacia, Conversant, and other PAEs has resulted in inflated licensing royalties—i.e., higher prices—and imposed burdens, costs, and uncertainties for Apple and other purchasers in each of the Patented Technology Markets.  The purchasers in those markets include cellular device manufacturers that are potential and actual licensees.  In addition, as a result of the illegal conduct of Nokia, Acacia, Conversant, and other PAEs in the Patented Technology Markets, U.S. and other end consumers have been harmed and face a continuing threat of increased prices and reduced innovation and quality for cell phones and other cellular devices.

100.    This illegal conduct causes obvious harm to licensees such as Apple—*i.e.*, customers in the Patented Technology Markets—when they are compelled to pay inflated royalties.  Licensing customers are also harmed, even when they do not acquiesce to an inflated royalty, by being forced to incur substantial expenses, uncertainty, and burdens in resisting the patent litigations and threats that the patent transfer schemes of Nokia, Acacia, Conversant, and

1    other PAEs have enabled.  For example, Apple has spent millions to date on outside resources

2    (including counsel, experts, and vendors) to defend against Acacia's demands and the same to

3    defend against Conversant and Core Wireless's demands.  Apple has also been harmed by the

4    enormous amounts of time its employees have been forced to spend on these litigations,

5    including collecting information and documents and preparing for depositions, rather than doing

6    their jobs.  Nokia, Acacia, and Conversant have employed the patent transfer agreements set

7    forth herein and others to impose these costs on licensees and potential licensees in the Patented

8    Technology Markets, and to use their leverage to extract unreasonable and unjustified royalties.

9        101.    For declared SEPs specifically, Nokia's scheme (with Acacia and Conversant and

10   other PAEs) to diffuse its patents and evade FRAND commitments has led to precisely the sort

11   of anticompetitive effects that ETSI's IPR Policy was designed to avoid.  In particular, Nokia has

12   obtained monopoly power through its knowingly false FRAND commitments, and, through its

13   conspiracies with PAEs, imposed exorbitant non-FRAND royalties (or heavy costs in trying to

14   avoid such royalties) on Apple and other suppliers of products that support cellular standards.

15   This has led to inflated prices in SEP Technology Markets associated with Nokia's declared

16   SEPs, as well as higher prices and reduced innovation and quality in the Cellular Device

17   Markets.  Moreover, Nokia's illicit transfer scheme has chilled, and, if not enjoined, will

18   continue to chill procompetitive standard-setting, to the detriment of industry and American and

19   other consumers alike.

20

                                              COUNT I

                                   **BREACH OF FRAND CONTRACT**

22       102.    Apple repeats and realleges each allegation above as if fully set forth herein.

23       103.    Nokia contractually bound itself to make certain patents available on FRAND

24   terms and conditions.  FRAND commitments are binding on all subsequent patent owners,

25

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

including Acacia and Conversant, which had knowledge of the encumbrance at the time they purchased Nokia's patents.

104.    When Acacia and Conversant acquired these declared SEPs, these entities entered into express or implied contractual commitments with ETSI.

105.    Apple, as a member of ETSI and an implementer of ETSI standards, is an intended third-party beneficiary of Nokia's, Acacia's, and Conversant's contracts with ETSI to license certain of their patents on FRAND terms.  Each third party that would potentially implement ETSI standards such as LTE, including Apple, was an intended beneficiary of the original patent holders' agreement with ETSI (which continues to bind Nokia, Acacia, and Conversant).

106.    Nokia has breached these contracts by transferring its patents to Acacia and Conversant, with knowledge and intent that Acacia and Conversant would not abide by the terms of Nokia's FRAND commitments.

107.    Acacia and Conversant have breached these contracts by refusing to offer licenses to their declared SEPs on FRAND terms and conditions, and by seeking injunctions blocking Apple's products based on such patents.

108.    As a direct result of Nokia's, Acacia's, and Conversant's contractual breaches, Apple has suffered harm to its business and property, and, absent an injunction, Apple will continue to suffer from these effects.  Apple's past and continuing harm includes litigation costs, supracompetitive licensing rates, business uncertainty, and business resources lost in dealing with the consequences of Nokia's, Acacia's, and Conversant's contractual breaches.

### COUNT II

**NOKIA-ACACIA, NOKIA-CORE WIRELESS AGREEMENTS TO RESTRAIN COMPETITION IN CELLULAR TECHNOLOGY LICENSING (SECTION 1 OF THE SHERMAN ACT)**

109.    Apple repeats and realleges each allegation above as if fully set forth herein.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

110.    Nokia reached agreements with Acacia, Conversant, and other PAEs to transfer patents for the purpose of coordinating to increase the total royalties obtained from licensing those patents.  Nokia receives a share of the excessive royalties that Acacia or Conversant collects.  Nokia and Acacia intended that, through their conspiracy, Acacia would extract royalties from cell phone and other cellular device makers—like Apple—far beyond what Nokia could collect itself (particularly given the constraints on its patent assertions) using former Nokia patents in conjunction with other patents acquired by Acacia.  Likewise, Nokia and Conversant intended that, through their conspiracy, Conversant would extract royalties from cell phone and other cellular device sellers and manufacturers—like Apple—far beyond what Nokia could collect itself (particularly given the constraints on its patent assertions) using former Nokia patents in conjunction with other patents acquired by Conversant.

111.    Nokia's respective agreements with Acacia, Conversant, and other PAEs were expressly intended to enable and had the effect of enabling the PAEs to extract exorbitant royalties based on FRAND-committed patents, far beyond those that Nokia could extract itself. As they intended in reaching these agreements, Nokia and the other PAEs share in the fruits of the exorbitant non-FRAND royalties that the PAEs demand and obtain from product suppliers through Nokia's interest in the royalties the PAEs obtain.

112.    The agreements to transfer patents substantially raised prices and resulted in other anticompetitive effects in the Patented Technology Markets associated with those patents, and for downstream cellular devices sold to consumers in the Cellular Device Markets.

113.    These inflated prices and other anticompetitive effects resulted from, among other things, the parties' agreements to transfer FRAND-committed SEPs with the specific purpose and effect of evading those FRAND commitments, thereby allowing the parties to share in ill-gotten royalties by evading the commitments.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

114.    The agreements to transfer patents generated no efficiencies, and in fact were designed to create inefficiencies in the licensing that Nokia, Acacia, and Conversant could exploit to harm Apple, other potential licensees, and finished product consumers.  Any conceivable efficiencies that the agreements may have created were significantly outweighed by their anticompetitive effects.

115.    When these transfers began, Nokia was a major supplier of cell phones, in competition with Apple and others to sell such products to consumers in the Cellular Device Markets.  By agreeing to transfer its patents to Acacia and Conversant to achieve these anticompetitive effects, Nokia sought to raise its rivals' costs in the Cellular Device Markets to regain lost market share.  The anticompetitive effects from Nokia's illegal agreements transferring patents to Nokia and others have continued since Nokia stopped supplying cell phones, in the form of higher prices and other anticompetitive effects in Patented Technology Markets and in the downstream Cellular Device Markets.  Now that it has been announced Nokia has a strategic partnership for cell phones and tablets, the transfers once against threaten to raise the costs of Nokia's rivals in Cellular Device Markets.

116.    As a direct result of Nokia's and Acacia's, and Nokia's and Conversant's, unlawful agreements, Apple has suffered harm to its business and property, and, absent an injunction, Apple will continue to suffer from these effects.  Apple's past and continuing harm includes being forced to pay supracompetitive licensing rates substantially higher than those it would have been forced to pay but for the illegal agreements, business uncertainty, litigations costs, and business resources lost in dealing with the consequences of Nokia's and Acacia's, and Nokia's and Conversant's unlawful agreements.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

COUNT III

### UNLAWFUL ASSET ACQUISITION
### (SECTION 7 OF THE CLAYTON ACT)

117.    Apple repeats and realleges each allegation above as if fully set forth herein.

118.    As previously alleged, the relevant markets are the Patented Technology Markets and the downstream Cellular Device Markets.

119.    Acacia has acquired from Nokia and others over 1,000 patents, which are assets under Section 7 of the Clayton Act.  The effect of the acquisitions from Nokia has been to lessen competition substantially, and to tend to create a monopoly in the Patented Technology Markets by increasing the cost and likelihood of litigation, evading reputational constraints on Nokia's ability to extract exorbitant royalties, and evading FRAND requirements.  Put differently, the acquisitions resulted in significantly enhanced ability and incentives to harm competition.  Acacia's anticompetitive patent acquisitions from Nokia include at least the transactions alleged in Paragraph 39.  The acquisitions also reduced competition in the downstream Cellular Device Markets by raising costs for Nokia's then-rivals.  And going forward, the acquisitions of Nokia patents threatens to raise costs for Nokia's future rivals in those Markets, as Nokia participates in a strategic partnership for cell phones and tablets.

120.    Conversant, through its subsidiary Core Wireless, has acquired from Nokia over 2,000 patents, which are assets under Section 7 of the Clayton Act.  The effect of those acquisitions has been substantially to lessen competition, and to tend to create a monopoly, in the Patented Technology Markets by increasing the cost and likelihood of litigation, evading reputational constraints on Nokia's ability to extract exorbitant royalties, and evading FRAND requirements.  Put differently, the acquisitions resulted in significantly enhanced ability and incentives to harm competition.  Acacia's anticompetitive patent acquisitions from Nokia include at least the transactions alleged in Paragraphs 84 and 86.  The acquisitions also reduced competition in the downstream Cellular Device Markets by raising costs for Nokia's then-rivals.

And going forward, the acquisitions of Nokia threatens to aise costs for Nokia's future rivals in those Markets, as Nokia participates in a strategic partnership for cell phones and tablets.

121.    As a direct result of Acacia's and Conversant's unlawful patent acquisitions, Apple has suffered harm to its business and property, and, absent an injunction and rescission of these transactions, Apple will continue to suffer from these effects.  Apple's past and continuing harm includes litigation costs, supracompetitive licensing rates, business uncertainty, and business resources lost in dealing with the consequences of Acacia's and Conversant's assertion of its unlawfully acquired patents.  As a result of Acacia's and Conversant's unlawful acquisitions, consumers in the Cellular Device Markets have suffered or are threatened with higher prices and reduced innovation and quality.

COUNT IV

**MONOPOLIZATION OF THE SEP TECHNOLOGY MARKETS**
**(SECTION 2 OF THE SHERMAN ACT)**

**(Claim Against Nokia Only)**

122.    Apple repeats and realleges each allegation above as if fully set forth herein.

123.    Nokia acquired monopoly power in each of the SEP Technology Markets when patented technologies were incorporated into industry standards by 3GPP and ETSI.  In each SEP Technology Market, the standard-setting organization's standardization of Nokia's technology excluded alternative technologies for performing similar functionality.

124.    Before standardization, the technologies purportedly covered by Nokia's declared SEPs faced competitive constraints from alternative technologies for standardization or from standard-setting organizations' options not to standardize functions performed by technologies purportedly covered by Nokia's declared SEPs and to leave the choice of technologies to perform those functions up to each standard implementer.  Because technologies purportedly covered by Nokia's declared SEPs have been incorporated into industry standards, Apple and

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

1    other product suppliers seeking to support a standardized feature can no longer use alternatives,

2    and are thus locked into the corresponding standardized technology.  Potential licensees in the

3    SEP Technology Markets have no substitute alternative technologies that could constrain

4    Nokia's licensing demands.  As a result, Nokia has (or had) the power to charge Apple and other

5    potential licensees supracompetitive prices to license the Nokia (or former Nokia) declared

6    SEPs.

7            125.    In accepting Nokia's proposals for inclusion in standards, 3GPP and ETSI relied

8    on Nokia to comply with its promises to adhere to the ETSI IPR Policy.  In particular, 3GPP

9    relied on Nokia to abide by its commitments to license SEPs on FRAND terms.  If Nokia had not

10   committed to license its patents on FRAND terms, or Nokia's commitment has been known to be

11   false, 3GPP and ETSI would not have incorporated those technologies in the standard.

12           126.    When it made its FRAND commitments, Nokia did not intend to adhere to

13   FRAND terms.  By transferring patents to Acacia, Conversant, and other PAEs so those PAEs

14   could claim the FRAND commitment did not apply at all, demand non-FRAND royalties, or

15   threaten injunctions based on SEPs, Nokia breached its obligation to make its declared-SEPs

16   available on FRAND terms.

17           127.    As a direct result of Nokia's unlawful monopolization, Apple has suffered harm

18   to its business and property.  Apple's past and continuing harm includes supracompetitive

19   licensing rates, business uncertainty, litigation costs, and business resources lost in dealing with

20   the consequences of Nokia's unlawful monopolization.  As a result of Nokia's unlawful

21   monopolization, consumers of cellular devices have suffered or are threatened with higher prices

22   and reduced  innovation and quality.

23

24

25

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

COUNT V

**CONSPIRACIES TO MONOPOLIZE THE SEP TECHNOLOGY MARKETS**
**(SECTION 2 OF THE SHERMAN ACT)**

128.    Apple repeats and realleges each allegation above as if fully set forth herein.

129.    Nokia, on the one hand, and Acacia and Conversant on the other, reached agreements to transfer declared SEPs from Nokia to Acacia and from Nokia to Conversant to increase the total royalties obtained from licensing those patents.  For these SEP transfers, Nokia has received or intends to receive value based on the royalties that Acacia and Conversant collect.  Nokia and Acacia specifically intended that, by evading Nokia's FRAND commitments, Acacia would extract from cellular device suppliers—such as Apple—royalties far beyond what Nokia could collect itself, thus enhancing the ill-gotten monopoly power associated with those patents in the SEP Technology Markets.  The patent transfers from Nokia to Conversant were similarly motivated by the parties' specific intent that Conversant would extract non-FRAND royalties beyond what Nokia itself could collect, thus enhancing the ill-gotten monopoly power associated with those patents in the SEP Technology Markets.

130.    Before standardization, the technologies purportedly covered by Nokia declared SEPs faced competitive constraints from alternative technologies for standardization or from standard-setting organizations' options not to standardize functions performed by technologies purportedly covered by Nokia's declared SEPs and to leave the choice of technologies to perform those functions up to each standard implementer.  Because technologies purportedly covered by Nokia's declared SEPs have been incorporated into industry standards, Apple and other product suppliers seeking to support a standardized feature can no longer use alternatives, and are thus locked into the corresponding standardized technology.  As a result, Nokia has (or had) the power to charge Apple and other potential licensees supracompetitive prices to license the Nokia (or former Nokia) declared SEPs.

131.    Having conspired with Nokia to obtain former patents as part of Nokia's patent transfer scheme, Acacia and Conversant have the power to charge Apple and other potential licensees supracompetitive prices to license the former Nokia declared SEPs.

132.    As Nokia knew, intended, and agreed with them that they would do, Acacia and Conversant have demanded non-FRAND royalties and have threatened to enjoin Apple's products based on SEPs to increase its leverage, thereby enhancing and exercising Nokia's wrongfully obtained monopoly power.  Moreover, Acacia, Conversant, and other PAEs to which Nokia has transferred patents manufactured additional monopoly power by strategically distributing patents to shell subsidiaries.  These subsidiaries are structured to maximize the litigation and negotiation costs imposed on Acacia's, Conversant's, and other PAEs' targets through the assertion of patents in piecemeal fashion, while minimizing the risk that any litigation setbacks would affect the remainder of the portfolio.

133.    Nokia and Acacia, and Nokia and Conversant, have violated Section 2 of the Sherman Act by coordinating and conspiring with the specific intent of monopolizing the SEP Technology Markets in ways that would not have been possible but for the patent transfer scheme.

134.    As a direct result of Nokia's and Acacia's, and Nokia's and Conversant's, unlawful conspiracies to monopolize, Apple has suffered harm to its business and property, and, absent an injunction, Apple will continue to suffer from these effects.  Apple's past and continuing harm includes supracompetitive licensing rates, business uncertainty, attorneys' fees, and business resources lost in dealing with the consequences of Nokia's and its PAE partners' unlawful conspiracy to monopolize.  As a result of Nokia's and its PAE partners' unlawful conspiracy to monopolize, consumers in the Cellular Device Markets have suffered or are threatened with higher prices and  reduced innovation and quality.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

COUNT VI

**UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200**

135.    Apple repeats and realleges each allegation above as if fully set forth herein.

136.    Nokia and Acacia, and Nokia and Conversant, engaged in unfair competition in violation of Cal. Bus. Prof. Code § 17200, et seq.  As set forth above, Nokia and Acacia, and Nokia and Conversant, have engaged in illegal conduct by violating the Sherman and Clayton Acts, and, as discussed below, their conduct also violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.  That conduct is also unfair in that it violates the spirit and policy of the antitrust laws.

137.    Nokia's, Acacia's, and Conversant's unfair business practices include their efforts to evade Nokia's FRAND commitments by transferring declared SEPs to Acacia and Conversant.  The acquiring parties would then demand non-FRAND royalties and would seek injunctions in violation of those FRAND commitments.

138.    The United States Federal Trade Commission ("FTC") enforces Section 5 of the Federal Trade Commission Act, which is similar to Cal. Bus. & Prof. Code § 17200.  Section 5 of the FTC Act is used as a model in interpreting Cal. Bus. & Prof. Code § 17200.

139.    The FTC has brought an action under Section 5 where, like here, an acquiring firm refused to abide by licensing commitments that its predecessor made in connection with industry standard-setting activities.  *See* Decision and Order, *In the Matter of Negotiated Data Solutions LLC*, File No. 051-0094 (Jan. 23, 2008), *available at* https://www.ftc.gov/sites/default/files/ documents/cases/2008/01/080122do.pdf.

140.    The FTC has also brought actions under Section 5 where, like here, a holder of FRAND-committed patents sought to obtain an injunction against a standard implementer.  *See*, *e.g.*, Decision and Order, *In the Matter of Motorola Mobility LLC*, File No. 121-120 (July 24,

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

2013), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2013/07/130724 googlemotorolado.pdf.

141.    As a direct result of Nokia's, Acacia's, and Conversant's wrongful conduct, competition has been injured in the Patented Technology Markets as alleged above.  Moreover, this conduct threatens injury to downstream competition for price, innovation, and quality in Cellular Device Markets, thereby injuring consumers in California and elsewhere.  These threatened injuries include the passing on to consumers of improperly inflated royalties, and decreases in innovation and quality competition for cellular devices that comply with relevant standards by raising costs for innovators to bring products to market via exorbitant, non-FRAND licensing terms.

142.    As a direct result of Acacia's and Conversant's illegal conduct, Apple has suffered economic harm in the form of litigation costs and diversion of resources away from innovation to respond to these entities' serial nuisance suits.

## RELIEF SOUGHT

Apple respectfully requests the following relief:

A.    That Defendants' unlawful conduct be declared a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for Acacia and Conversant, Section 7 of the Clayton Act, 15 U.S.C. § 18;

B.    That Defendants' unlawful conduct be declared a violation of Cal. Bus. Prof. Code § 17200, et seq.;

C.    That Defendants' unlawful conduct be judged a breach of contract;

D.    That Apple recover damages against Nokia, Acacia, and Conversant, including incidental and consequential damages, in an amount to be determined and multiplied to the extent provided by law;

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

E.    That all contracts or agreements that Nokia, on the one hand, and or Acacia or Conversant, on the other, entered into in violation of the Sherman Act, Clayton Act, Cal. Bus. Prov. Code § 17200, et seq., or in breach of Nokia's FRAND undertakings be declared void and the patents covered by those transfer agreements be transferred back from Acacia and Conversant (or their respective subsidiaries) to Nokia;

F.    That all patents transferred by Nokia to, or acquired by, Acacia or Conversant (or their respective subsidiaries) in violation of the Sherman Act, Clayton Act, Cal. Bus. Prof. Code § 17200, et seq., or in breach of Nokia's FRAND undertakings be declared unenforceable;

G.    That Nokia, Acacia and Conversant be enjoined from seeking injunctions against Apple based on declared SEPs for which Nokia made FRAND commitments;

H.    That Apple be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

I.    That Apple be awarded such additional relief as the Court may deem proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Apple demands a trial by jury on all issues triable by jury.

DATED: December 21, 2016                 Respectfully submitted,

                                         By:    /s/ Mark D. Selwyn

                                         Mark D. Selwyn (SBN: 244180)
                                         mark.selwyn@wilmerhale.com
                                         WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                         950 Page Mill Road
                                         Palo Alto, CA 94304
                                         Telephone: +1 650 858 6000
                                         Facsimile: +1 650 858 6100

                                         William F. Lee
                                         william.lee@wilmerhale.com
                                         Joseph J. Mueller
                                         joseph.mueller@wilmerhale.com
                                         Timothy Syrett
                                         timothy.syrett@wilmerhale.com
                                         WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                         60 State Street
                                         Boston, MA 02109
                                         Telephone: +1 617 526 6000
                                         Facsimile: +1 617 526 5000

                                         Leon B. Greenfield
                                         leon.greenfield@wilmerhale.com
                                         Nina S. Tallon
                                         nina.tallon@wilmerhale.com
                                         WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                         1875 Pennsylvania Avenue, N.W.
                                         Washington, DC 20006
                                         Telephone: +1 202 663 6000
                                         Facsimile: +1 202 663 6363

                                         *Attorneys for Plaintiff*
                                           APPLE INC.