1 | ALLEN RUBY (Bar No. 47109)
JAMES J. ELACQUA (Bar No. 187897)
2 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
3 | Palo Alto, California  94301-1908
Telephone:     (650) 470-4500
4 | Facsimile:     (650) 470-4570
Allen.Ruby@skadden.com
5 | James.Elacqua@skadden.com

6 | *Attorneys for* NOKIA CORPORATION,
NOKIA SOLUTIONS AND NETWORKS OY, and
7 | NOKIA TECHNOLOGIES OY

8 | Additional Counsel Listed on Next Page

9 |

UNITED STATES DISTRICT COURT

10 |

NORTHERN DISTRICT OF CALIFORNIA

11 |

SAN JOSE DIVISION

12 |

13 | APPLE, INC.

CASE NO.:  5:16-cv-7266

14 |            Plaintiff,

**NOTICE OF MOTION AND
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED
COMPLAINT; MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT THEREOF**

15 |        v.

16 | NOKIA CORPORATION, NOKIA
SOLUTIONS AND NETWORKS OY,
17 | NOKIA TECHNOLOGIES OY, ACACIA
RESEARCH CORPORATION,
18 | CELLULAR COMMUNICATION
EQUIPMENT LLC, SAINT LAWRENCE
19 | COMMUNICATIONS, LLC, CELLULAR
COMMUNICATIONS EQUIPMENT
20 | GMBH, SAINT LAWRENCE
COMMUNICATIONS GMBH,
21 | CONVERSANT INTELLECTUAL
PROPERTY MANAGEMENT INC., CORE
22 | WIRELESS LICENSING S.A.R.L., AND
CORE WIRELESS LICENSING LTD.

Date:   August 31, 2017
Time:   9:00 a.m.
Judge:  Honorable Edward J. Davila

Complaint Filed: December 21, 2016

23 |            Defendants.

24 |

25 |

26 |

27 |

28 |

---

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                          **Case No. 5:16-cv-7266**

STEVEN C. SUNSHINE (admitted *pro hac vice*)
JULIA K. YORK (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone:     (202) 371-7000
Facsimile:     (202) 393-5760
Steven.Sunshine@skadden.com
Julia.York@skadden.com

*Attorneys for* NOKIA CORPORATION, NOKIA SOLUTIONS AND NETWORKS OY, and
NOKIA TECHNOLOGIES OY

ED NELSON (admitted *pro hac vice*)
RYAN GRIFFIN (admitted *pro hac vice*)
NELSON BUMGARDNER
3131 West 7th Street, Suite 300
Fort Worth, TX 76107
Telephone:     (817) 377-9111
Facsimile:     (817) 377-3485
Ed@nelbum.com
Ryan@nelbum.com

BRADLEY W. CALDWELL (admitted *pro hac vice*)
J. AUSTIN CURRY (admitted *pro hac vice*)
CALDWELL CASSADY &  CURRY
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone:     (214) 888-4848
Facsimile:     (214) 888-4849
bcaldwell@caldwellcc.com
acurry@caldwellcc.com

PATRICIA PEDEN (Bar No. 206440)
LECLAIRRYAN
44 Montgomery Street, Suite 3100
San Francisco, California 94104
Telephone:     (415) 913-4932
Facsimile:     (415) 391-8766
Patricia.Peden@leclairryan.com

*Attorneys for* ACACIA RESEARCH CORPORATION, CELLULAR COMMUNICATIONS
EQUIPMENT LLC, CELLULAR COMMUNICATIONS EQUIPMENT GMBH, SAINT
LAWRENCE COMMUNICATIONS LLC, and SAINT LAWRENCE COMMUNICATIONS
GMBH

JAMES KRESS (admitted *pro hac vice*)
BAKER BOTTS
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Telephone:     (202) 639-7700
Facsimile:     (202) 639-7890
James.Kress@bakerbotts.com

1  STUART PLUNKETT (Bar No. 187971)
   BAKER BOTTS
2  101 California Street, Suite 3600
   San Francisco, California 94111
3  Telephone:     (415) 291-6200
   Facsimile:     (415) 291-6300
4  Stuart.Plunkett@bakerbotts.com

5  *Attorneys for* CONVERSANT INTELLECTUAL PROPERTY MANAGEMENT INC., CORE
   WIRELESS LICENSING, S.A.R.L., and CORE WIRELESS LICENSING LTD.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                    **Case No. 5:16-cv-7266**

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES .................................................................................. ii

NOTICE OF MOTION AND MOTION TO DISMISS ..................................................1

STATEMENT OF ISSUES TO BE DECIDED ..........................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................2

I.      SUMMARY OF APPLE'S ALLEGATIONS ..................................................5

II.     ARGUMENT ........................................................................................11

      A.      Apple Fails Adequately to Allege Any Proper Relevant Antitrust Market. ..........12

            1.      Apple Has Not Alleged Any Properly Defined Product Market. .............13

            2.      Apple's Allegations Regarding Market Power Are Deficient. .................17

      B.      Apple Fails to State a Section 7 Clayton Act Claim. .............................................19

      C.      Apple Fails to State a Section 1 Sherman Act Claim. ...........................................22

      D.      Apple Fails to State a Section 2 Sherman Act Claim. ...........................................27

            1.      Apple Has Failed Adequately to Plead Monopolization By Nokia. ..........28

            2.      Apple Has Failed Adequately to Plead Conspiracy to Monopolize. .........30

      E.      Apple Fails to Adequately Allege Antitrust Injury. ................................................34

      F.      Apple Fails to State a Claim for Breach of Contract. ............................................39

            1.      Apple Fails to State a Breach of Contract Claim Against Nokia. .............40

            2.      Apple Fails to State a Breach of Contract Claim Against Either Acacia or Conversant. .................................................................................42

      G.      Apple Fails to State a Claim for Violation of California's UCL. .........................45

III.    CONCLUSION......................................................................................47

1

## TABLE OF AUTHORITIES

2

PAGE(S)

3

## CASES

4

*49er Chevrolet, Inc. v. General Motors Corp.*,
5     803 F.2d 1463 (9th Cir. 1986) ..................................................................... 24

6  *Abbott Laboratories v. Brennan*,
      952 F.2d 1346 (Fed. Cir. 1991) ................................................................... 16
7

*Adobe Systems, Inc. v. Coffee Cup Partners, Inc.*,
8     No. C 11-2243 CW, 2012 WL 3877783 (N.D. Cal. Sept. 6, 2012) ............. 38

9  *Alaska Airlines, Inc. v. United Airlines, Inc.*,
      948 F.2d 536 (9th Cir. 1991) ....................................................................... 39
10

*Alatraqchi v. Uber Technologies, Inc.*,
11     No. C-13-03156 JSC, 2013 WL 4517756 (N.D. Cal. Aug. 22, 2013) .......... 23

12  *American Professional Testing Service, Inc., v.*
      *Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*,
13     108 F.3d 1147 (9th Cir. 1997) ..................................................................... 28

14  *Analogix Semiconductor, Inc. v. Silicon Image, Inc.*,
      No. C 08-2917 JF (PVT), 2008 WL 8096149 (N.D. Cal. Oct. 28, 2008) ...... 15, 17, 18
15

*Apple Inc. v. Motorola, Inc.*,
16     757 F.3d 1286 (Fed. Cir. 2014) ............................................................. 44, 45

17  *Apple, Inc. v. Motorola Mobility, Inc.*,
      No. 11-cv-178-bbc, 2012 WL 5416941 (W.D. Wis. Oct. 29, 2012) ............ 44
18

*Ashcroft v. Iqbal*,
19     556 U.S. 662 (2009) ......................................................................... 11, 25, 26

20  *Atlantic Richfield Co. v. USA Petroleum Co.*,
      495 U.S. 328 (1990) ..................................................................................... 37
21

*Beatrice Foods Co. v. F.T.C.*,
22     540 F.2d 303 (7th Cir. 1976) ....................................................................... 47

23  *Bell Atlantic Corp. v. Twombly*,
      550 U.S. 544 (2007) ............................................................................. passim
24

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
25     182 F.3d 1096 (9th Cir. 1999) ............................................................. 12, 14

26  *Brown Shoe Co. v. United States*,
      370 U.S. 294 (1962) ........................................................................ 12, 13, 37
27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
28     429 U.S. 477 (1977) ..................................................................................... 34

-ii-

*Brunswick Corp. v. Riegel Textile Corp.*,
752 F. 2d 261 (7th Cir. 1984) ................................................................. 21, 27, 29, 35

*Careau & Co. v. Security Pacific Business Credit, Inc.*,
222 Cal. App. 3d 1371 (1990) ................................................................................ 40

*Carefusion Corp. v. Medtronic, Inc.*,
No. 10-CV-01111-LHK, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ................. 21, 33, 35

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986) ............................................................................................... 34

*Cel-Tech Communications, Inc. v. L.A. Cellular Telephone Co.*,
20 Cal. 4th 163 (1999) .................................................................................... 46, 47

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 ( 2001) ................................................................................. 46

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
No. C 05-3465-PJH, 2006 WL 13058 (N.D. Cal. Jan. 3, 2006) ................................. 36

*ChriMar Systems, Inc. v. Cisco Systems, Inc.*,
72 F. Supp. 3d 1012 (N.D. Cal. 2014) ......................................................... 14, 29, 30, 37

*Colonial Medical Group., Inc. v. Catholic Health Care West*,
444 F. App'x 937 (9th Cir. 2011) ...................................................................... 14, 27

*Columbia River People's Utility District v. Portland General Electric Co.*,
217 F.3d 1187 (9th Cir. 2000) ..................................................................... 21, 23, 27, 35

*Delano Farms Co. v. California Table Grape Commission*,
655 F.3d 1337 (Fed. Cir. 2011) ................................................................ 12, 14, 15, 17

*Digital Sun v. The Toro Co.*,
No. 10-CV-4567-LHK, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) ............... passim

*DocMagic, Inc. v. Ellie Mae, Inc.*,
745 F. Supp. 2d 1119 (N.D. Cal. 2010) ................................................................. 46

*Edstrom v. Anheuser-Busch Inbev SA/NV*,
647 F. App'x 733 (9th Cir. 2016) ........................................................................ 20

*Erickson v. Pardus*,
127 S. Ct. 2197 (2007) ........................................................................................ 16

*Ericsson Inc. v. D-Link Systems, Inc.*,
No. 6:10-CV-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013) ................... 43, 44, 45

*Gilead Sciences, Inc. v. Merck & Co, Inc.*,
No. 13-CV-04057-BLF, 2016 WL 3143943 (N.D. Cal. June 6, 2016) ...................... 41

*Golden Gate Pharmacy Services., Inc. v. Pfizer, Inc.*,
433 F. App'x 598 (9th Cir. 2011) ...................................................................... 14, 17

*Golden Gate Pharmacy Services., Inc. v. Pfizer, Inc.*,
No. C-09-3854 MMC, 2010 WL 1541257 (N.D. Cal. Apr. 16, 2010) ........ 13, 14, 17, 27

-iii-

*Handgards, Inc. v. Ethicon, Inc.*,
   601 F.2d 986 (9th Cir. 1979) ........................................................................................ 36

*Hernandez v. Select Portfolio, Inc.*,
   No. CV 15-01896 MMM AJWX, 2015 WL 3914741 (C.D. Cal. June 25, 2015)...................... 24

*Hicks v. PGA Tour, Inc.*,
   165 F. Supp. 3d 898 (N.D. Cal. 2016) ...................................................................... 46, 47

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
   547 U.S. 28 (2006) ................................................................................................ 16, 17

*In re Musical Instruments and Equipment Antitrust Litigation*,
   798 F.3d 1186 (9th Cir. 2015) ...................................................................................... 25

*InfoStream Grp., Inc. v. PayPal, Inc.*,
   No. C 12-748 SI, 2012 WL 3731517 (N.D. Cal. Aug. 28, 2012) .................................. 39

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
   2013 U.S. Dist. LEXIS 177836 (E.D. Va. Dec. 18, 2013) .......................................... 22

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) .......................................................................... 11, 22, 24

*Les Shockley Racing, Inc., v. National Hot Rod Ass'n*,
   884 F.2d 504 (9th Cir. 1989) ........................................................................................ 37

*Lucas Auto. Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
   275 F.3d 762 (9th Cir. 2001) .................................................................................. 12, 34

*Mahroom v. Best Western International, Inc.*,
   No. C 07-2351JFHRL, 2009 WL 2216578 (N.D. Cal. July 22, 2009) ......................... 40

*Malaney v. UAL Corp.*,
   434 F. App'x 620 (9th Cir. 2011) ................................................................................ 14

*McCabe Hamilton & Renny Co., Ltd. v. Matson Terminals, Inc.*,
   No. 08-00080 JMS/BMK, 2008 WL 2437739 (D. Haw. June 17, 2008) .............. 15, 16, 19

*Microsoft Corp. v. Motorola, Inc.*,
   No. C10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) ................................ 43

*Microsoft Corp. v. Motorola, Inc.*,
   854 F. Supp. 2d 993 (W.D. Wash. 2012) ..................................................................... 44

*Newcal Industries, Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) .......................................................................... 12, 13, 14, 17

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
   202 F.3d 1088 (9th Cir. 2000) ...................................................................................... 32

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998).................................................................................................... 32

*Perry v. Cashcall, Inc.*,
   No. 14-16581, 2016 WL 4137640 (9th Cir. 2016) .................................................... 41

*Prime Healthcare Services, Inc. v. Service Employees International Union*,
   642 F. App'x 665 (9th Cir. 2016) ..................................................................... 13

*Prime Healthcare Services, Inc. v. Service Employees International Union*,
   No. 11-cv-26520-GPC-RBB, 2013 WL 3873074
   (S.D. Cal. Jul. 25, 2013) .................................................. 30, 32, 36, 38

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) ....................................................................... 24

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
   508 U.S. 49 (1993) ........................................................................................... 36

*Qualcomm Inc. v. Broadcom Corp.*,
   548 F.3d 1004 (Fed. Cir. 2008) ....................................................................... 41

*Qualcomm Inc. v. Broadcomm Corp.*,
   No. CIV. 05CV1958-B(BLM), 2007 WL 1031373 (S.D. Cal. Mar. 21, 2007) ........................... 41

*Radiancy, Inc. v. Viatek Consumer Products Group, Inc.*,
   138 F. Supp. 3d 303 (S.D.N.Y. Mar. 28, 2014) ................................................. 36

*Rambus, Inc. v. FTC*,
   522 F.3d 456 (D.C. Cir. 2008) .......................................................... 28, 31, 32

*Realtek Semiconductor Corp. v. LSI Corp.*,
   946 F. Supp. 2d 998 (N.D. Cal. 2013 ............................................................... 45

*Rebel Oil Co., v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .......................................................... 13, 18, 19, 34

*Rheumatology Diagnostics Laboratory, Inc. v. Aetna, Inc.*,
   No. 12-cv-05847-WHO, 2013 WL 5694452, (N.D. Cal. Oct. 18, 2013) ......................... 33, 38

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
   532 F.3d 963 (9th Cir. 2008) ............................................................................ 17

*Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*,
   786 F. Supp. 2d 1190 (S.D. Tex. 2009) ............................................................ 24

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*,
   491 F. Supp. 1199 (D. Haw. 1980) .............................................................. 32, 33

*Rose v. Plastikon Inc.*,
   No. C 13-05973 WHA, 2014 WL 1230511 (N.D. Cal. Mar. 21, 2014) ........................... 9

*Rutman Wine Co. v. E&J Gallo Winery*,
   829 F.2d 729 (9th Cir. 1987) ............................................................................ 33

*SCM Corp. v. Xerox Corp.*,
   463 F. Supp. 983 (D. Conn. 1978) .............................................................. 19, 20

*Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*,
   No. 09-CV-102H (WMC), 2010 WL 6675046 (S.D. Cal. Apr. 20, 2010) ...................... 15, 17

*Seungtae Kim v. BMW Financial Services NA, LLC,*
  142 F. Supp. 3d 935 (C.D. Cal. 2015) ........................................................... 9

*Shroyer v. New Cingular Wireless Services, Inc.,*
  622 F.3d 1035 (9th Cir. 2010) ..................................................................... 46

*SmileCare Dental Group v. Delta Dental Plan of California, Inc.,*
  88 F.3d 780 (9th Cir. 1996) .......................................................... 13, 28, 34

*Spindler v. Johnson & Johnson Corp.,*
  No. C 10-01414 JSW, 2011 WL 12557884 (N.D. Cal. Aug. 1, 2010) ............ 15, 17, 27

*Sprewell v. Golden State Warriors,*
  266 F.3d 979, 988 (9th Cir. 2001) ............................................................... 36

*Standfacts Credit Services, Inc. v. Experian Information Solutions, Inc.,*
  405 F. Supp. 2d 1141 (C.D. Cal. 2006) ...................................................... 30

*Surface Supplied, Inc. v. Kirby Morgan Dive Systems, Inc.,*
  No. C-13-0575 MMC, 2013 WL 5496961 (N.D. Cal. Oct. 3, 2013) ............ 18

*Sutherland v. Francis,*
  647 F. App'x 686 (9th Cir. 2016) ................................................................ 42

*Tanaka v. University of Southern California,*
  252 F.3d 1059 (9th Cir. 2001) ...............................................................passim

*TCL Communications Technology Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson,*
  No. SACV 14–0341 JVS (DFMx), 2016 WL 7049263
  (C.D. Cal. Aug. 9, 2016) ............................................................................ 46

*The Arbitron Co. v. Tropicana Prod. Sales, Inc.,*
  No. 91 Civ. 3697 (PKL), 1993 U.S. Dist. LEXIS 5587
  (S.D.N.Y. Apr. 28, 1993) ................................................................ 28, 29, 34

*The Jeanery, Inc. v. James Jeans, Inc.,*
  849 F.2d 1148 (9th Cir. 1988) ..................................................................... 22

*Times-Picayune Pub. Co. v. U.S.,*
  345 U.S. 594 (1953) .................................................................................... 32

*Toscano v. PGA Tour, Inc.,*
  70 F. Supp. 2d 1109 (E.D. Cal. 1999) ........................................................ 24

*Transparent-Wrap Machine Corp. v. Stokes & Smith Co.,*
  329 U.S. 637 (1947) .................................................................................... 41

*U.S. Philips Corp. v. KXD Technology, Inc.,*
  No. CV-05-8953 ER (PLAx), 2006 WL 8421895
  (C.D. Cal. Sept. 14, 2006) .................................................................... 18, 33

*United States v. E. I. Du Pont De Nemours & Co.,*
  353 U.S. 586 (1957) .................................................................................... 13

*United States v. Marine Bancorporation, Inc.,*
  418 U.S. 602 (1974) .............................................................................. 12, 13

-vi-

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..................................................................19, 20

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ...................................................................................................31

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ...................................................................................29

*Vizio, Inc. v. Funai Electric Co.*,
    No. CV 09-0174 AHM RCX, 2010 WL 7762624
    (C.D. Cal. Feb. 3, 2010)......................................................................................passim

*Walker Process Equipment, Inc., v. Food Machine and Chemical Corp.*,
    382 U.S. 172 (1965).....................................................................................................13

*Zef Scientific Inc., v. Shimadzu Scientific Instruments, Inc.*,
    No. 14CV1758 JAH (RBB), 2016 WL 1255787 (S.D. Cal. Mar. 31, 2016)..............38


**STATUTES**

15 U.S.C. § 1 .......................................................................................................1, 12, 22

15 U.S.C. § 2 ............................................................................................................1, 12

15 U.S.C. § 15 ...............................................................................................................34

15 U.S.C. § 18 ..................................................................................................1, 12, 19

15 U.S.C. § 26 ...............................................................................................................34

35 U.S.C. § 261 .......................................................................................................40, 41

Cal. Bus. & Prof. Code § 17200 .............................................................................1, 45

Cal. Bus. & Prof. Code § 17204 ...................................................................................46


**RULES**

Fed. R. Civ. P. 12(b)(6).............................................................................................1, 11

Fed. R. Civ. P. 8(a) .......................................................................................................11

-vii-

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO PLAINTIFF AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT at 9:00 a.m. on August 31, 2017, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Edward J. Davila, located at 280 South 1st Street, Courtroom 4, 5th Floor, San Jose, CA 95113, Defendants Nokia Corporation, Nokia Solutions and Networks Oy, Nokia Technologies Oy, Acacia Research Corporation, Cellular Communications Equipment LLC, Saint Lawrence Communications LLC, Cellular Communications Equipment GmbH, Saint Lawrence Communications GmbH, Conversant Intellectual Property Management, Inc., Core Wireless Licensing, S.a.r.l., and Core Wireless Licensing Ltd. (together, "Defendants") will and hereby do move this Court to dismiss Plaintiff Apple, Inc.'s Amended Complaint (ECF 12-3) pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Request for Judicial Notice in Support of Defendants' Motion to Dismiss (hereinafter, "RJN") and the Declaration of James J. Elacqua and accompanying exhibits in support thereof (hereinafter, the "Elacqua Declaration"), the record in this action and such further evidence and argument that the Court may consider.

**STATEMENT OF ISSUES TO BE DECIDED**

Whether Apple's Complaint should be dismissed because it fails to state a claim under Section 7 of the Clayton Act (15 U.S.C. § 18), Sections 1 and 2 of the Sherman Act (15 U.S.C. §§1, 2), California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), or for breach of contract.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff Apple, Inc. ("Apple") has a long history of using others' intellectual property for its own enrichment without paying fair compensation. This lawsuit is simply an extension of that corporate policy.  The fundamental flaw underlying all of Apple's arguments is that its real grievance is with the patent laws and the lawful exercise of rights thereunder, which in no way violates the antitrust laws.  At bottom, Apple is unhappy that other firms obtained patents to protect the fruits of their innovation and seek fair compensation for Apple's use of that patented technology in its devices.  Apparently Apple believes that it is entitled to ignore or discount the intellectual property rights of others, and that any patent holder seeking to enforce its rights in the face of Apple's unlawful infringement (and unwillingness to license) acts in violation of the antitrust laws.  In furtherance of Apple's disregard of others' patented inventions, Apple now concocts a novel antitrust theory—without legal precedent—that turns competition principles on their head.

Defendant Nokia,[1] through massive and sustained investment in research and development, has developed a broad array of products used in many aspects of wireless telephony and wireless communication, and in the course of that effort has built a substantial portfolio of intellectual property.  Many other companies also have developed products and portfolios of intellectual property in this area through their own innovation.  Still other entities, including Conversant and Acacia, hold intellectual property rights that they have primarily acquired from others.  All of these

---

[1]  Apple refers to Defendants Nokia Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy collectively as "Nokia."  (Amended Complaint ("Compl.") ¶ 1) (ECF 12-3.)  While the Nokia defendants dispute that they collectively engaged in the alleged conduct, consistent with Apple's pleading they are referred to collectively herein as "Nokia," unless specifically noted otherwise.  Similarly, Apple refers to Defendants Acacia Research Corporation, Cellular Communications Equipment LLC ("CCE"), Saint Lawrence Communications LLC ("SLC"), Cellular Communications Equipment GmbH ("CCE Germany"), and Saint Lawrence Communications GmbH ("SLC Germany") collectively as "Acacia."  (*Id.*)  While the Acacia defendants dispute that they collectively engaged in the alleged conduct, they are referred to collectively herein as "Acacia," unless otherwise noted.  Finally, Apple refers to Defendants Conversant Intellectual Property Management, Inc., Core Wireless Licensing, S.a.r.l., and Core Wireless Licensing Ltd. collectively as "Conversant."  (*Id.*)  While the Conversant defendants also dispute that they collectively engaged in the alleged conduct, they are referred to herein collectively as "Conversant," unless otherwise noted.

1  intellectual property holders have the lawful right to protect and enjoy their patents, including the

2  right to seek compensation for the use by others.

3       In the context of patents covering industry standards, patent owners may voluntarily

4  commit to a standard-setting organization ("SSO") to license a patent to implementers on fair,

5  reasonable, and non-discriminatory ("FRAND") terms if the patent is essential to practice the

6  standard and, of course, the patent holder must abide by that commitment.  Nokia has long been an

7  industry leader fully embracing FRAND licensing.  As recognized in the Intellectual Rights Policy

8  ("IPR Policy") of the European Telecommunications Standards Institute ("ETSI"), requiring

9  FRAND commitments for standard-essential patents ("SEPs") balances (i) providing patent holders

10  fair compensation for their investments and accomplishments (thereby encouraging further

11  innovation and contribution to open standards); against (ii) ensuring that willing licensees can get

12  access to the standardized technologies they need to develop their own products on FRAND terms.

13  Apple's successful commercial products, such as the iPhone and the iPad, rely heavily on the

14  innovations of pioneers like Nokia in the field of cellular and other mobile technologies and bear

15  testament to the value and availability of the cellular standards created by Nokia and others years

16  before Apple's entry.

17       As an implementer of others' inventions, Apple's commercial goal is no more complicated

18  than the desire to pay little or nothing to the owners of the intellectual property that have enabled

19  Apple to produce the devices that generate billions of dollars in profits every year.  In its

20  Complaint, however, Apple disingenuously seeks to portray itself as the victim of an antitrust

21  conspiracy to charge it monopoly prices for access to the technology on which it depends.  The

22  inadequacy of Apple's attempt to recast its commercial disputes into an antitrust case is apparent

23  both from what Apple omits from its Complaint and from what it includes.

24       Apple's contorted antitrust allegations omit its own history of free-riding on the

25  developments of other companies, violating the valid intellectual property rights of others at will,

26  engaging in licensing negotiations halfheartedly, if at all—including repeatedly rejecting offers to

27  license on FRAND terms—and reluctantly paying royalties for valid patents it exploits only after

28  having been forced to do so by court order, all in an effort to minimize the licensing fees it must

-3-

1  pay and maximize its own profits.  Apple's litigation history against patent holders makes clear that

2  in its view, "fair" licensing terms are not determined through negotiation between the parties, but

3  rather only as the result of exhaustive patent-by-patent litigation.

4          As for the tale spun in Apple's Complaint, at its heart is Apple's claim that the Defendants

5  committed antitrust violations merely because Nokia sold some of its patents to others, including

6  Acacia and Conversant.  Despite couching its story in the language of antitrust, with accusations of

7  "monopoly" and "conspiracy" liberally flung about, Apple cannot overcome the fundamental

8  insufficiency that nothing in the antitrust laws prohibits a patent holder from the good-faith

9  exercise of rights granted under the patent statute:  namely, the right to profit from its patented

10 inventions in order to ensure continued incentives for innovation, whether by preventing use of its

11 patented inventions by others, licensing its patents to others, or by divesting its patents to new

12 owners.  Indeed, nothing about Nokia's transfer of the patents changed the patents themselves or

13 the patent rights provided for under the law.  Perhaps realizing this problem, Apple claims

14 inconvenience and allegedly higher costs as a result of losing Nokia as a one-stop-shop for rights to

15 use Nokia's innovations.  Apple apparently believes that Nokia is obligated (at the risk of incurring

16 antitrust liability) to hold all its patents in perpetuity for Apple's convenience, rather than being

17 allowed to manage its patent portfolio as it sees fit.  However, Apple does not point to any rule that

18 precludes Nokia from freely disposing of the patents it holds.  Moreover, Apple's evident dislike

19 for the way that Acacia and Conversant protect and manage their respective patent portfolios does

20 not create an antitrust claim, and merely labeling the Defendants as "conspirators" because they

21 engaged in commonplace commercial transactions does not change this result.

22         At bottom, Apple is "dressing up in antitrust garb" its complaints about the patent system

23 and its desire to earn more money by paying little or nothing to patent holders on whose

24 technology Apple depends.  Apple's attempts to turn reality on its head and cast Defendants as the

25 wrongdoers can easily be disposed of because its Complaint fails to state any cognizable antitrust,

26 unfair competition, or breach-of-FRAND claims.  For the reasons set forth below, Defendants

27 respectfully request that the Court dismiss Apple's Complaint in its entirety for failure to state a

28 claim for relief.

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                    **Case No. 5:16-cv-7266**

1    I.    **SUMMARY OF APPLE'S ALLEGATIONS**

2         Apple alleges that Defendant Nokia Corporation is a major supplier of communications

3    products.[2]  (Compl. ¶ 10.)  Defendant Nokia Solutions and Networks Oy, a subsidiary of Nokia

4    Corporation, sells network infrastructure equipment and related services.  (*Id.*)  Defendant Nokia

5    Technologies Oy is also a subsidiary of Nokia Corporation, with a focus on patent licensing. (*Id.*)

6    Prior to 2011, Nokia was a major supplier of cell phones.  (*E.g*, *id.* ¶¶ 3, 10.)  In light of increased

7    competition in the smartphone space, Nokia's share of global smartphones fell to 12.2% in Q4

8    2011, and Nokia ultimately exited the cell phone market.  (*Id.* ¶¶ 3, 21.)  An early innovator in the

9    field of cellular technology, Nokia developed a portfolio of thousands of patents (*id.* ¶¶ 22, 23)—

10   patents covering many different areas of technology used in modern smartphones and tablets.

11        Standard-Setting.  Nokia is a participant in industry standard-setting organizations and was

12   actively involved in the standard-setting process used by ETSI and the Third Generation

13   Partnership Project ("3GPP") as they developed the standards that came to be used in many cellular

14   telecommunications systems worldwide.  (Compl. ¶¶ 28, 52.)  Standard-setting organizations

15   ("SSOs"), such as ETSI, "require participants to disclose the patents they own that might cover the

16   standard," and, "as a condition of having technologies that they claim are covered by their patents

17   standardized, to agree to license those patents on FRAND terms."  (*Id.* ¶ 56.)  According to Apple,

18   if an ETSI participant is unwilling to commit to licensing its patents on FRAND terms and

19   conditions, "the ETSI IPR Policy mandates that the participant's technologies be excluded from the

20   standard."  (*Id.* ¶ 59.)  Following standardization, such patents are then known as declared SEPs or

21   "Essential IPR".  (*Id.* ¶ 2, 53, 55.)  Clause 6.1*bis* of the ETSI IPR Policy acknowledges the

22   possibility of a transfer of ownership of "Essential IPR."  (*Id.* ¶ 64.)  FRAND commitments "are

23   binding on all subsequent patent owners."  (*Id.* ¶ 103.)  The standards promulgated by ETSI and

24   3GPP have been widely adopted.  (*Id.* ¶ 55.)

25   _____

[2]   Defendants acknowledge that, for purposes of this motion, the Court must take Apple's
26   allegations as true, although the Court is not required to accept as true allegations that are merely
     conclusory, unwarranted deductions of fact, or unreasonable inferences.  *See, e.g., Digital Sun*
27   *Corp. v. The Toro Co*., No. 10-CV-4567-LHK, 2011 WL 1044502, at *2 (N.D. Cal. Mar. 22, 2011).
     Unsurprisingly, Defendants in fact dispute the vast majority of Apple's spurious allegations.
28

1    When companies such as Apple decide to adopt a standard, they make investments in

2  designing their products and supply chains around that standard.  (Compl. ¶ 54.)  After a

3  technology is standardized, formerly competing technologies are no longer substitutes for any

4  product supplier wishing to comply with a standardized feature in the relevant standard.  (*Id*. ¶ 55.)

5  Here, Apple claims that it and other manufacturers are "locked into" "these ETSI standards."  (*Id*.

6  ¶¶ 55, 124, 130.)  Apple asserts that Nokia, as an ETSI member, was and is "contractually bound to

7  abide by ETSI's IPR Policy," that Nokia "submitted hundreds of declarations to ETSI identifying

8  patents and patent applications that Nokia claimed were essential to the various standards adopted

9  by ETSI and 3GPP" (but without specifying any particular declaration, standard, or version of the

10  ETSI IPR Policy) and that "Nokia's declarations committed to licensing those patents on FRAND

11  terms."  (*Id*. ¶ 66.)  Despite conceding that Nokia "has long acknowledged that a FRAND

12  commitment applies to all future owners of the patent," (*id*. ¶ 63), Apple baldly asserts that certain

13  unidentified Nokia undertakings to the SSOs were "false," that for these unidentified undertakings

14  Nokia "never intended to make its patents available on FRAND terms, and always sought

15  excessive, non-FRAND royalties."  (*Id*. ¶¶ 28, 62, 70.)  Without pleading supporting facts, Apple

16  makes the conclusory claim that "[b]ut for Nokia's false FRAND commitments, the relevant

17  standard-setting organizations would have refused to standardize technologies that Nokia has

18  claimed are covered by its current and former declared SEPs."  (*Id*. ¶ 82.)  Apple claims that it is an

19  intended third-party beneficiary of Nokia's FRAND commitments made under the ETSI IPR

20  Policy.  (*Id*. ¶¶ 65, 105.)

21    <u>Nokia's Sale of Patents</u>.  Nokia has asserted its patents against Apple in the past and that

22  litigation resulted in Apple taking a license to certain of Nokia's patents in 2011 ("the 2011

23  License").  (Compl. ¶¶ 19-20.)  In the 2011 License, Nokia expressly disclosed to Apple that the

24  2011 License excluded certain patents that Nokia had recently divested.  (*Id*. ¶ 20.)  Beginning in

25  2011, when Nokia's business prospects were "dire", Nokia supposedly "launched a secret plan"

26  and sold <u>thousands</u> of patents to at least nine entities that Apple characterizes as "patent assertion

27  entities," or "PAEs," including to Defendants Acacia and Conversant.  (*Id*. ¶¶ 1, 3, 5, 20, 80.)

28  Apple asserts that through these various patent sales, Nokia retains an "interest" in revenues

-6-

1   generated by the PAEs, including the right to receive a "large" portion of "royalties and

2   settlements" that Acacia and Conversant obtain through licensing and enforcement of the acquired

3   former-Nokia patents.[3]  (*Id.* ¶¶ 4, 6, 40 & n.10.)  As a result of these sales, Apple can no longer

4   obtain a license to Nokia's patents from a single licensor, but must now negotiate with several

5   different licensors.  (*Id.* ¶¶ 25, 29, 36.)  Apple contends that post-sale, those negotiations are more

6   difficult because the PAEs do not themselves produce products and, therefore, do not need to a

7   cross-license from Apple.  (*Id.* ¶¶ 4, 24.)

8        Apple argues that although the PAEs, like Nokia, cannot "avoid the obligation to

9   demonstrate on the merits of each patent in their respective portfolios for which they seek a

10  royalty," they are able to "impose separate litigation, transaction, and royalty costs," which

11  supposedly enables them to "inflate the cost of a license" beyond what Nokia would have been able

12  to obtain.  (Compl. ¶ 25.)  As a result, Apple complains that it is "impossible" for a product

13  supplier "to obtain a license to the entire former Nokia portfolio at anything like the same price that

14  it would have paid" when Nokia still owned the entire portfolio.[4]  (*Id.*)  Apple also makes the

15  sweeping assertion that Nokia's decision to sell some of its patents "undermines standard-setting's

16  procompetitive purposes in facilitating wide adoption of industry standards on economically

17  reasonable terms."  (*Id.* ¶ 29.)

18       Apple claims that "Nokia has breached its FRAND commitments" and acted illegally "by

19  transferring declared SEPs to a PAE that it well knew would refuse to license on FRAND terms,

---

20  [3]  To support this allegation, Apple relies on a generalized presentation summarizing three of
21  Acacia's "Financial Models," none of which identify Nokia (*see* Compl. ¶ 40 n.10), and relies on a
    MOSAID briefing paper for the assertion that Nokia receives licensing and enforcement revenue
22  from Conversant.  (*See id.* ¶ 84 n.24.)  However, the very sentence of the briefing paper on which
    Apple relies for its Conversant-Nokia revenue stream allegation states in full that "MOSAID solely
23  determines its licensing and enforcement plans and shares the success of those efforts by returning
    approximately two-thirds (2/3) of any such revenues to Nokia and Microsoft."  MOSAID, Briefing
24  Paper on Antitrust Issues Related to "Patent Assertion Entity" Business Models, at p. 4 (emphasis
    added), *available at* http://www.conversantip.com/wp-content/uploads/MOSAID-Antitrust-
25  Briefing_May-2013.pdf.
26  [4]   Apple's allegations as to the scope of the "entire Nokia portfolio" that Apple wants to access
    and the royalty rates Apple apparently believes it should enjoy are unclear, particularly where
27  Apple alleges that the 2011 License it negotiated with Nokia already expressly excluded a number
    of Nokia patents (the divestiture of which Apple is challenging here, *see* Compl. ¶ 20).
28

-7-

1    going so far as to base the structure and financial terms of its scheme with Acacia on that premise,"

2    and that "Acacia, for its own part, has breached FRAND undertakings and committed illegal

3    anticompetitive acts by demanding non-FRAND royalties, notwithstanding that it was bound by

4    Nokia's commitment to license on FRAND terms all implementers of the relevant cellular

5    standards."  (Compl. ¶ 81; *see also id*. ¶ 103.)  Similarly, Apple asserts that "Nokia has partnered

6    with Conversant with purposes and intent of increasing the royalties it can extract from former

7    Nokia patents," and that Conversant's subsidiary Core Wireless Licensing S.a.r.l. has demanded

8    royalties "amounting to billions of dollars from Apple," which "far exceeded a FRAND royalty

9    rate."  (*Id*. ¶ 85.)  Apple asserts that "as part of [the] transfers" of patents from Nokia to Acacia,

10   Conversant, and other PAEs, Nokia has "agreed" with each of the PAEs that they will enforce the

11   patents acquired so as "to maximize the aggregate royalties" to be obtained from alleged infringers

12   of the intellectual property rights.  (*Id*. ¶ 36; *see also id*. ¶ 110, 129.)  Apple asserts that Acacia and

13   Conversant have "conspired in Nokia's illegal monopolization scheme by entering into patent

14   transfer agreements designed to evade their FRAND commitments," (*id*. ¶¶ 88, 82; *see also, e.g.*, *id*.

15   ¶¶ 110, 113), and that Acacia and Conversant specifically intended to "extract non-FRAND

16   royalties beyond what Nokia could collect."[5] (*Id*. ¶ 129.)  Notably, however, Apple's Complaint

17   does <u>not</u> allege that Apple was refused an opportunity to license former Nokia patents or that

18   Apple, as an unlicensed implementer, demonstrated itself to be a willing licensee on FRAND terms

19   and negotiate for such a license in good faith from any of the Defendants.

20        <u>Apple Faces Patent Infringement Litigation</u>.  Apple has been accused of patent

21   infringement in lawsuits brought by Acacia and Conversant.  Acacia has sued Apple in the United

22   States and abroad based on patents acquired from Nokia "or others."  (Compl. ¶¶ 5, 38, 42.)

23   Conversant, through its subsidiary Core Wireless, has asserted over twenty-four former Nokia

24   

25   [5]  Apple's arguments are, at the very least, inconsistent with its simultaneous and specific
     allegations that Conversant has more than once acknowledged publicly—including under oath in
26   federal court—that it is in fact contractually obligated to abide by Nokia's prior FRAND
     commitments (Compl. ¶ 85 & n.25), and that Acacia has also acknowledged a contractual
27   obligation to make "all their patents subject to their FRAND licensing commitments available on
     FRAND terms."  (*Id*. ¶ 66.)
28   

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                      **Case No. 5:16-cv-7266**

1  patents against Apple.  (*Id*.)  Apple characterizes the PAEs' claims of infringement against Apple

2  premised upon the patents they own as "nuisance suits,"[6] (*id*. ¶¶ 4, 5, 24, 142), and complains only

3  that it must incur costs in defending against this litigation.[7]  (*Id*. ¶¶ 5, 24, 48.)

4         <u>"Patented Technology Markets" and "SEP Technology Markets."</u>  Apple contends that

5  there are "markets for functions performed by technology purportedly covered by former Nokia

6  patents," which Apple refers to as "Patented Technology Markets."  (Compl. ¶ 31.)  There are

7  "thousands" of "former Nokia patents"; indeed, Nokia has sold over 2,000 patents to Conversant,

8  and over 1,000 to Acacia alone.  (*Id*. ¶¶ 23, 119–20.)  Each of these "markets," according to Apple,

9  "consists of a technology covered by a patent that Nokia transferred to Acacia, Conversant, or

10  another PAE, and any other patented technologies that compete or competed to perform the same

11  function," which competing technologies "may be acquired from anywhere."  (*Id*. ¶ 31.)  Apple

12  does not specify which functions, which technologies, or which "markets" are at issue.  In addition,

13  Apple asserts that many of these "Patented Technology Markets" "encompass technology

14  purportedly covered by a declared SEP that Nokia transferred to Acacia, Conversant, or another

15  PAE."  (*Id*. ¶ 32.)  Apple refers to those alleged "Patented Technology Markets" that encompass

16  technology "purportedly" covered by a declared SEP that Nokia has sold, in turn, as "SEP

17

18  [6]  Noticeably absent from Apple's patent litigation discussion is Apple's recent loss to Core
     Wireless in an infringement action based on former Nokia patents, which undermines any
19  allegations that such actions are "nuisance suits".  *See* Elacqua Decl. Ex. 1 (Judgment, *Core
     Wireless Licensing Sarl v. Apple Inc.*, No. 5:15-cv-05008 (N.D. Cal Dec. 22, 2016) (ECF 473)).
20  The court can and should take judicial notice of this judgment entered against Apple because it is a
     matter of public record and cannot be credibly disputed.  *See Rose v. Plastikon Inc.*, No. C 13-
21  05973 WHA, 2014 WL 1230511, at *4 (N.D. Cal. Mar. 21, 2014) (taking judicial notice of entry of
     judgment, among other court documents, because "[u]ndisputed matters of public record may be
22  noticed under Federal Rules of Evidence 201(b)"); *Seungtae Kim v. BMW Fin. Servs. NA, LLC*,
     142 F. Supp. 3d 935, 941 (C.D. Cal. 2015) (taking notice of jury verdict forms "[b]ecause [they]
23  were] publicly filed documents").
24  [7]  Apple at one point in its Complaint alleges that it has the potential to suffer harm as a result of
     damages awarded by federal courts under the Patent Act, alleging that "Diffusion is profitable to
25  patent holders and especially burdensome to product suppliers, in part, because patent damages
     may erroneously include the value attributable to other aspects of the product not covered by the
26  asserted patent; and these dynamics increase patent holders' leverage in licensing negotiations."
     (Compl. ¶ 36).  In short, Apple is concerned that patent damages imposed by a federal court may
27  not comply with Apple's preferred view of what patent damages law should require.

28

-9-

1   Technology Markets." (*Id.*) In these alleged "SEP Technology Markets," Apple claims there are

2   "no substitutes for the technology purportedly covered by the former Nokia patent" in light of the

3   incorporation of that technology into the standard. (*Id.*) Nokia supposedly "acquired monopoly

4   power in each of the SEP Technology Markets when patented technologies were incorporated into

5   industry standards by 3GPP and ETSI"; and currently, post-transfer, Acacia, Conversant, and other

6   PAEs now apparently "hold monopoly power in the SEP Technology Markets."[8] (*Id.* ¶¶ 32, 123.)

7   The sale of the thousands of patents somehow "manufactured market power" and "dramatically

8   enhanced the market power" associated with each one of those thousands of SEP "monopolies"

9   transferred from Nokia to the PAE Defendants. (*Id.* ¶¶ 23, 26.) This alleged conduct has

10  purportedly "led to inflated prices in SEP Technology Markets associated with Nokia's declared

11  SEPs." (*Id.* ¶ 101.)

12          "<u>Cellular Device Markets</u>." Apple also claims that the alleged conduct by Nokia, Acacia,

13  and Conversant has led to "higher prices and reduced innovation and quality in the Cellular Device

14  Markets," which Apple describes as "the markets for cell phones and other devices with cellular

15  capability (such as tablets)." (Compl. ¶¶ 37, 101.) Apple does not allege the bounds of these

16  purported multiple "markets," but mentions in its complaint various devices including "cell

17  phones," "smart phones," "mobile products," "cellular handsets," and "tablets." (*E.g.*, ¶¶ 1, 17, 21,

18  37, 93, 95.) As to the dynamics of these "markets," Apple alleges only that: (i) Nokia allegedly

19  "attempt[ed] to compete" in the "Cellular Device Markets" as a supplier of cell phones but as of

20  2010 was no longer competitive, (*see id.* ¶¶ 18, 37); (ii) though Nokia was once a "major supplier

21  of cell phones," its "share of global smartphone sales fell from 50.9% in Q4 2007 to 12.2% in Q4

22  2011" (*id.* ¶¶ 21, 115); (iii) "traditional suppliers like Nokia were unable to compete with the

23  groundbreaking technologies [that] Apple brought to mobile products," (*id.* ¶ 17); (iv) Nokia has

24  recently announced a new business venture involving (as-yet unlaunched) "Nokia branded

25  smartphones and tablets," (*id.* ¶ 37 & n.8); and (v) Apple apparently competes in these "markets,"

26

27  ─────────────────────
    [8]  (*See also* Compl. ¶¶ 124, 130 ("Nokia has (or had) the power to charge Apple and other potential

28  licensees supracompetitive prices to license the Nokia (or former Nokia) declared SEPs.").)

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                    **Case No. 5:16-cv-7266**

1  as do unnamed others, but not the PAE Defendants, although the actual scope of products or

2  participants in these "markets" is not alleged.  (*Id.* ¶¶ 17, 89–97, 99, 110, 115.)

3      <u>Alleged Harms Flowing from The Conduct Alleged</u>.  Apple complains that the conduct

4  alleged "has resulted in inflated licensing royalties" and imposed "burdens, costs and uncertainties"

5  on Apple and its cellular device manufacturer competitors, including "expenses, uncertainties, and

6  burdens" in defending against patent infringement allegations.  (Compl. ¶¶ 99, 100, 108, 116, 121,

7  127, 134, 142.)  Apple also generally claims that as a result of being requested or ordered to pay

8  royalties for practicing the patented technologies of others, "U.S. and other end consumers have

9  been harmed and face a continuing threat of increased prices and reduced innovation and quality

10  for cell phones and other cellular devices." (*Id.* ¶¶ 99, 121, 127, 134, 141.)

11  **II.   ARGUMENT**

12      A complaint cannot survive a Rule 12(b)(6) motion to dismiss if it does not contain factual

13  allegations sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

14  *Twombly,* 550 U.S. 544, 570 (2007); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046–47

15  (9th Cir. 2008).  "Threadbare recitals of the elements of a cause of action, supported by mere

16  conclusory statements, do not suffice."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  "[A]

17  plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than

18  labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

19  do . . . ."  *Twombly*, 550 U.S. at 555 (second alteration in original) (citation omitted) (quoting Fed.

20  R. Civ. P. 8(a)).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's

21  liability, 'it stops short of the line between possibility and plausibility of "entitlement to relief"'."

22  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

23      Apple alleges that Defendants have violated federal antitrust laws (Counts II-V), breached

24  FRAND obligations (Count I), and violated California state law (Count VI).  None of these claims

25  meet the *Twombly* and *Iqbal* standards of pleading or plausibility.  Apple's antitrust claims fail for

26  a host of independent reasons.  Apple has failed to adequately define a coherent antitrust market or

27  establish that Defendants have improperly exercised market power in any relevant market. Apple

28  also fails to establish that the patent transfers breached any antitrust law or contractual FRAND

-11-

1  obligations, and because Apple's California state law unfair competition claim rises and falls with

2  its antitrust claims, it also fails.  Not only has Apple utterly failed to meet the pleading standard,

3  these deficiencies could not be cured by repleading because the claims themselves are

4  fundamentally flawed.  For these reasons and others discussed more fully below, Apple's

5  Complaint should be dismissed in its entirety.

6        **A.**     **Apple Fails Adequately to Allege Any Proper Relevant Antitrust Market.**

7        Apple contends that Defendants have violated various federal antitrust statutes: Clayton Act

8  Section 7 (15 U.S.C. § 18 (hereinafter "Section 7")); Sherman Act Section 1 (15 U.S.C. § 1

9  (hereinafter "Section 1")); and Sherman Act Section 2 (15 U.S.C. § 2 (hereinafter "Section 2")).

10  The touchstone of antitrust analysis is understanding the competitive effects of the alleged conduct

11  within a relevant product market.  *See, e.g., Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th

12  Cir. 2001) ("The plaintiff bears the initial burden of showing that the restraint produces significant

13  anticompetitive effects within a relevant market") (internal quotation marks and citation omitted);

14  *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104–05 (9th Cir. 1999); *Lucas Auto.*

15  *Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 766 (9th Cir. 2001) ("In a § 7 case, the

16  relevant market must be defined in order to evaluate the competitive consequences of an alleged

17  restraint of trade.").  Relevant product markets in which courts can evaluate the effects of alleged

18  conduct under the antitrust laws are defined in the first instance by substitutability and

19  interchangeability; products that are substitutes and compete are in the same market.  *See Delano*

20  *Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1351–52 (Fed. Cir. 2011) (citing*, inter*

21  *alia*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) and *Newcal Indus., Inc. v. Ikon*

22  *Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)) (applying Ninth Circuit law).

23        Accordingly, the definition of the relevant market is an essential element of each Apple

24  antitrust claim.  Section 7 requires Apple to identify a properly defined relevant product market in

25  which the alleged conduct reduces competition.  *See United States v. Marine Bancorporation, Inc.*,

26  418 U.S. 602, 618 (1974) (product market definition is a "necessary predicate" to evaluating

27  effects of a transaction).  Similarly, Section 1 and Section 2 require Apple to plausibly allege that

28  the respective Defendant(s) had market power in a properly defined relevant antitrust market.  *See*

1    *Tanaka*, 252 F.3d at 1063 (Section 1 rule of reason claim requires proof that "the restraint produces

2    'significant anticompetitive effects' within a 'relevant market'"); *SmileCare Dental Grp. v. Delta*

3    *Dental Plan of Cal., Inc.*, 88 F.3d 780 (9th Cir. 1996) (a Section 2 monopolization claim requires

4    possession of monopoly power in the relevant market); *Prime Healthcare Servs., Inc. v. Serv. Emp.*

5    *Int'l Union*, 642 F. App'x 665, 667 (9th Cir. 2016), *cert. denied*, 136 S. Ct. 2532 (2016) (to prevail

6    on Section 2 monopolization and conspiracy to monopolize claims, "a [S]ection 2 claimant must

7    show possession of monopoly power in the relevant market.").

8            Apple has identified several different categories of "markets" in which it alleges

9    competition has been reduced, but has made no effort to allege with any specificity what is

10   included within or excluded from those product market definitions, nor has Apple considered what

11   other products or technologies are substitutable and should be included in the alleged "markets"

12   Apple identifies.  In short, Apple has utterly failed to identify any plausible relevant markets in

13   which to assess the impact of the conduct that it alleges violates the antitrust laws, and thus, each of

14   its antitrust claims fails.

15                  **1.    Apple Has Not Alleged Any Properly Defined Product Market.**

16           Without a properly defined relevant market, "there is no way to measure [a defendant's]

17   ability to lessen or destroy competition."[9]  *Walker Process Equip., Inc., v. Food Mach. and Chem.*

18   *Corp.*, 382 U.S. 172, 177 (1965) (Section 2 claim); *see also Tanaka*, 252 F.3d at 1063 (Section 1

19   claim); *Marine Bancorporation*, 418 U.S. at 618 ("Determination of the relevant product and

20   geographic markets is 'a necessary predicate' to deciding whether a merger contravenes [Section 7

21   of the] Clayton Act.") (quoting *United States v. E. I. Du Pont De Nemours & Co.*, 353 U.S. 586,

22   593 (1957) and then quoting *Brown Shoe*, 370 U.S. at 324).[10]  Thus, a complaint may be dismissed

23   _____

24   [9]   The purpose of the market analysis in an antitrust action is to ascertain whether the antitrust
     defendant has market power, or "[t]he ability to control output and prices."  *Rebel Oil Co., v. Atl.*

25   *Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995).  Market power can be proven with either direct
     or circumstantial evidence.  *Id.* at 1434.  Apple's failure adequately to allege market power through

26   either direct or circumstantial evidence is addressed in Section II.A.2, *infra*.

     [10]  The relevant market inquiry "appl[ies] identically" under both Sections 1 and 2 of the Sherman

27   Act.  *Newcal*, 513 F.3d at 1044 n.3; *see also Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, No.

28   C-09-3854 MMC, 2010 WL 1541257, *2 (N.D. Cal. Apr. 16, 2010)  (applying identical market

                                                                                    *(cont'd)*

1    pursuant to Rule 12(b)(6) if its proposed relevant market definition is "facially unsustainable."

2    *Colonial Med. Grp., Inc. v. Catholic Health Care West*, 444 F. App'x 937, 938 (9th Cir. 2011);

3    *Newcal*, 513 F.3d at 1045; *ChriMar Sys., Inc. v. Cisco Sys., Inc.*, 72 F. Supp. 3d 1012, 1018 (N.D.

4    Cal. 2014); *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, No. C-09-3854 MMC, 2010 WL

5    1541257, *2 (N.D. Cal. Apr. 16, 2010).  Where the alleged product market is not "defined by

6    reference to the reasonable interchangeability in use among competing products or by reference to

7    the cross-elasticity of demand between a product and its substitutes," the complaint is facially

8    deficient.  *Delano Farms*, 655 F.3d at 1351; *see also Newcal*, 513 F.3d at 1045; *Tanaka*, 252 F.3d

9    at 1063; *Colonial Med. Grp.*, 444 F. App'x at 938; *Golden Gate Pharmacy Servs., Inc. v. Pfizer,*

10   *Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011); *Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th

11   Cir. 2011).

12        Here, Apple appears to allege three categories of relevant product markets: "Patented

13   Technology Markets" (*e.g.*, Compl. ¶ 31); "SEP Technology Markets" (*e.g.*, *id.* ¶ 32); and

14   "Cellular Device Markets." (*E.g.*, *id.* at ¶¶ 37, 112.)  None of these three categories of purported

15   product markets is adequately pled.[11]

16        "Patented Technology Markets."  Apple alleges the existence of "Patented Technology

17   Markets" within which Defendants' alleged conduct purportedly injured competition.  (Compl. ¶

18   31.)  These markets—however many there may be, which Apple does not allege—are vaguely

19   _____

*(cont'd from previous page)*

20   analysis to Section 1 Sherman Act and Section 7 Clayton Act claims), *aff'd*, 433 F. App'x 598 (9th
     Cir. 2011).
     [11]  Relevant antitrust markets have both a product dimension and a geographic dimension.  *Tanaka*,

21   252 F.3d at 1063.  The geographic dimension identifies the area of effective competition where

22   buyers can turn to alternative sources of supply.  *Id.*  Apple claims that the relevant geographic
     markets are "worldwide" because "competing technologies can be acquired from anywhere" and

23   "cell phones and other devices with cellular capability can be acquired from global suppliers."
     (Compl. ¶¶ 31, 37.)  However, the lack of adequate allegations as to the scope of the products in

24   the "Patented Technology Markets" and "Cellular Device Markets" makes it impossible to tell
     whether Apple's conclusory assertions as to geographic scope make any sense at all.  *See Big Bear*

25   *Lodging*, 182 F.3d 1096 at 1105 (dismissing complaint lacking adequate relevant geographic
     market allegations where "[p]laintiffs [did] not . . . allege that Big Bear Valley is the area of

26   effective competition in which buyers of these products can find alternative sources of supply, or
     that there are no other goods or services that are reasonably interchangeable with lodging

27   accommodations or ski packages within this geographic market."); *Tanaka*, 252 F.3d at 1063.

28

1    defined as "consist[ing] of a technology covered by a patent that Nokia transferred to Acacia,

2    Conversant, or another PAE, and any other patented technologies that compete or competed to

3    perform the same function."  (*Id.*)  Apple further asserts that "[e]ach technology purportedly

4    covered by former Nokia patents competes or formerly competed with other technologies to

5    perform functions associated with those technologies."  (*Id.*)  This purported market definition is

6    incomprehensible.  Apple offers <u>no</u> allegations as to which patents are at issue,[12] which

7    technologies are at issue, or who offers technologies that might compete or have competed with

8    each of these unspecified technologies.  Such general, vague, and conclusory allegations are

9    nothing more than a legal conclusion that assumes that such markets exist, and are facially

10   unsustainable.  *See Delano Farms,* 655 F.3d at 1351 ("Without a definition of the relevant market,

11   the anticompetitive effects of [the alleged conduct] are impossible to measure."); *Spindler v.*

12   *Johnson & Johnson Corp*., No. C 10-01414 JSW, 2011 WL 12557884, at *2–3 (N.D. Cal. Aug. 1,

13   2010) (dismissing complaint that lacked allegations regarding reasonable interchangeability);

14   *Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*, No. 09-CV-102H (WMC), 2010 WL 6675046,

15   *3 (S.D. Cal. Apr. 20, 2010) (dismissing complaint that lacked allegations regarding reasonable

16   interchangeability of use and cross-elasticity of demand; markets as pled could include "a variety

17   of other products that are not economic substitutes for the products at issue in this case"); *Analogix*

18   *Semiconductor, Inc. v. Silicon Image, Inc.*, No. C 08-2917 JF (PVT), 2008 WL 8096149, *5-6

19   (N.D. Cal. Oct. 28, 2008) (dismissing complaint premised on "legally inadequate" relevant market

20   that omitted allegations about other competing technology solutions); *McCabe Hamilton & Renny*

21   *Co., Ltd. v. Matson Terminals, Inc.*, No. 08-00080 JMS/BMK, 2008 WL 2437739, *7 (D. Haw.

22   June 17, 2008) (dismissing complaint that "[did] not even attempt to explain why [the alleged]

23   market is appropriate"; without factual allegations to support alleged market, plaintiff's assertion

24   was "merely a legal conclusion couched as a factual allegation") (internal quotation marks and

25   
26   
27   
28   

---

[12]  Because Apple fails to allege which patents are at issue and fails to adequately plead the bases of any of its causes of action, Nokia Defendants are unable to assess whether Apple's claims may be subject to arbitration pursuant to agreements between Apple and Nokia Defendants.  In light of the vagueness of Apple's complaint, Nokia Defendants preserve all arguments that arbitration is the appropriate forum for Apple's claims.

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                          **Case No. 5:16-cv-7266**

1    citation omitted).

2         Even had Apple bothered to identify any of the thousands of patents at issue, that would not

3    alleviate it of its burden to plead market definition.  It is axiomatic that patents do not automatically

4    delineate the product market (or equate to market power); the question is whether close substitutes

5    for the patented technology exist in a properly-defined market.  *See Illinois Tool Works Inc. v.*

6    *Indep. Ink, Inc.*, 547 U.S. 28, 44–45 (2006); *Abbott Labs. v. Brennan*, 952 F.2d 1346, 1355 (Fed.

7    Cir. 1991) (a patentee "has no market power . . . if there are close substitutes for the patented

8    product.") (citation omitted).  Apple's vague and conclusory allegations regarding these purported

9    "markets" impede any understanding of their bounds, and preclude even the simplest market

10   structure analysis, including assessment of each Defendant's market share and resultant ability to

11   affect competition.

12        "SEP Technology Markets."  Apple's identification of "SEP Technology Markets" is

13   equally incomprehensible.  Apple contends that these "SEP Technology Markets" are relevant

14   product markets that form a post-standardization subcategory of "Patented Technology Markets,"

15   namely "Patented Technology Markets that encompass technology purportedly covered by a

16   declared SEP that Nokia transferred to Acacia, Conversant, or another PAE."  (Compl. ¶ 32.)

17   Without offering any analysis, Apple suggests that every one of the "declared SEPs" held by

18   Defendants—and those held by every other company for that matter—automatically is a market

19   unto itself.  (*See id.*)  But again, without any information as to which patents are even at issue, it is

20   impossible to ascertain what "markets" are allegedly being restrained.  Moreover, Apple provides

21   no analysis of why each "declared SEP" is a relevant product market, nor does Apple make any

22   effort to explain why other technologies are not viable substitutes for any given "declared SEP."

23   Such deficient allegations do not even begin to put Defendants on "fair notice of what the . . . claim

24   is and the grounds upon which it rests," and any antitrust claim premised on these "markets" is

25   therefore facially unsustainable.  *McCabe*, 2008 WL 2437739 at *3 (alteration in original) (quoting

26   *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007)).

27        "Cellular Device Markets."  It is unclear from Apple's Complaint whether Apple is alleging

28   an effort to restrain trade in the so-called "Cellular Devices Markets" (*see* Compl. ¶ 112), but in

-16-

1   any event such "markets" are also facially unsustainable.  Here, again, Apple fails even to attempt

2   to address the requirements of interchangeability and cross-elasticity or define the metes and

3   bounds of these "markets." (*Cf. id.* ¶ 37.)  Are tablets substitutes for cell phones for people who

4   want to make telephone calls?  Are smartphones substitutes for cell phones without data plans and

5   internet access?  Although Apple identifies various "cellular device" products, Apple offers no

6   explanation as to interchangeability.  (*Compare Id.* ¶ 1, 8 (discussing "cell phones"), with *id.* ¶¶ 18,

7   37 (mentioning "tablets" and Nokia's current lack of such a product offering), with *id.* ¶ 21

8   (discussing Nokia's falling shares of "smartphone" sales), with *id.* ¶ 17 (mentioning "mobile

9   products," generally), with *id.* ¶¶ 93, 95 (referencing "cellular handsets").)  To the extent any of

10  Apple's antitrust claims are premised on these deficient allegations—which is indiscernible from

11  the Complaint—any such claims are facially unsustainable and should be dismissed.  *See, e.g.*,

12  *Golden Gate*, 433 F. App'x at 599 (affirming dismissal of complaint that "fail[ed] to state <u>any</u>

13  facts" to support the legal adequacy of the alleged relevant antitrust product market) (emphasis in

14  original); *Delano Farms*, 655 F.3d at 1351–52; *Spindler*, 2011 WL 12557884 at *2–3; *Seirus*, 2010

15  WL 6675046 at *3; *Analogix*, 2008 WL 8096149 at *3.

16              **2.    Apple's Allegations Regarding Market Power Are Deficient.**

17          Further, for Section 1 and Section 2 claims, a plaintiff must adequately allege not only a

18  relevant market, but one "within which the defendant has market power."  *Golden Gate*, 433 F.

19  App'x at 598 (citing *Newcal,* 513 F.3d at 1044); *Spindler*, 2011 WL 12557884, at *2 (same).

20          Apple's allegations of market power on the part of Nokia, Acacia, and/or Conversant are

21  both conclusory and nonsensical.  Because Apple has failed adequately to allege any properly-

22  defined relevant antitrust product market (*see* Section II.A.1, *supra*), any allegations premised on

23  circumstantial evidence of market power must fail as well.  *See Rick-Mik Enters., Inc. v. Equilon*

24  *Enters., LLC*, 532 F.3d 963, 972–73 (9th Cir. 2008) (affirming dismissal of complaint for failure to

25  allege [market power]; conclusory allegations that intellectual property rights conferred market

26  power "unaccompanied by supporting facts, [was] insufficient") (citing *Illinois Tool Works,* 547

27  U.S. at 42-43); *Golden Gate Pharmacy*, 2010 WL 1541257, at *4 ("the issue of 'market share' can

28  only be addressed after a cognizable product market has been identified"); *Analogix*, 2008 WL

-17-

1    8096149 at *6 ("sufficiency of market power allegations [was] unclear because of the vagueness of

2    the market to which they apply").  Apple's failure adequately to define any market makes any

3    structural assessment of the purported markets impossible.  Without a properly defined market,

4    there is no way to weigh the relative strength of the competing products, least of all to calculate

5    their market share.

6           Moreover, Apple makes only conclusory allegations that any Defendant directly possesses

7    (or possessed) the ability to increase price or reduce output, which is the definition of market

8    power.  *Rebel Oil Co., v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995).  Apple blithely

9    asserts that "[f]or both declared SEPs and non-SEPs, the exorbitant royalties that Acacia,

10   Conversant, and other PAEs have extracted from Apple and others is direct evidence that

11   competing suppliers of technology do not provide a significant constraint on the PAEs' ability to

12   extract supracompetitive royalties." (Compl. ¶ 33.)  But this allegation does nothing more than

13   restate the legal standard, and in the absence of allegations as to which patents are even at issue, or

14   any other facts to support its bare assertion, Apple's contentions are sorely deficient.  *Cf.  U.S.*

15   *Philips Corp. v. KXD Tech., Inc.*, No. CV-05-8953 ER (PLAx), 2006 WL 8421895, at *1 (C.D. Cal.

16   Sept. 14, 2006) ("to withstand a motion to dismiss an antitrust claim, a party must do more than

17   simply paraphrase the language of the federal antitrust laws or state conclusory terms that a

18   defendant has violated those laws.") (citation omitted); *Surface Supplied, Inc. v. Kirby Morgan*

19   *Dive Sys., Inc.*, No. C-13-0575 MMC, 2013 WL 5496961, at *6 (N.D. Cal. Oct. 3, 2013) (holding

20   that "bare assertion" of monopoly power "absent supporting factual allegations, is, in essence, a

21   legal conclusion, which the Court 'is not bound to accept as true.'") (citation omitted).  As to Nokia,

22   Apple alleges only that "Nokia acquired monopoly power in each of the SEP Technology Markets

23   when patented technologies were incorporated into industry standards by 3GPP and ETSI" (Compl.

24   ¶ 123), and that "Nokia has (or had) the power to charge Apple and other potential licensees

25   supracompetitive prices to license the Nokia (or former Nokia) declared SEPs." (*Id*. ¶ 124.)  The

26   bare and contradictory allegations of market power that Apple offers are plainly insufficient.[13]  *See*

27   ―――――――――――――――――――――

28   [13]  Again, to the extent Apple asserts an antitrust claim premised on diminution of competition in a
     supposed "Cellular Device Market" as a result of Defendants' conduct (*e.g.*, Compl. ¶ 112), such a

                                                                            *(cont'd)*

-18-

1  *McCabe*, 2008 WL 2437739 at *8 (mere assertions of "ab[ility] to control output and price" are

2  nothing but "labels and conclusions" which "will not do" (internal quotation marks omitted)).

3      In sum, because Apple fails to adequately allege a properly defined antitrust market or

4  establish that any Defendant has market power within those purported markets, Apple's antitrust

5  claims in Counts II-V should be dismissed.

6      **B.      Apple Fails to State a Section 7 Clayton Act Claim.**

7      In Count III (*see* Compl. ¶¶ 117–21), Apple contends that Nokia's transfers of patents to

8  Acacia or Conversant have lessened competition substantially and "tend to create a monopoly" in

9  the "Patented Technology Markets," (*Id.* ¶¶ 119–20), in violation of Section 7 of the Clayton Act.

10  Apple fails to state a Section 7 claim, not least because Apple has failed to adequately plead that

11  "Patented Technology Markets" are appropriate relevant antitrust markets.  Apple's claim fails for

12  the additional reason that Apple has not pled that the relevant acquisitions of patents led to any

13  substantial lessening of competition.  Section 7 of the Clayton Act "prohibits a person 'engaged in

14  commerce or in any activity affecting commerce' from acquiring 'the whole or any part' of a

15  business' stock or assets if the effect of the acquisition 'may be substantially to lessen competition,

16  or to tend to create a monopoly.'"  *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D.

17  Cal. 2004) (quoting 15 U.S.C. § 18).  That statute is concerned with "undue <u>concentrations</u> of

18  power and the anti-competitive effects of permitting one entity with market power to strengthen its

19  position by acquisition."  *SCM Corp. v. Xerox Corp.*, 463 F. Supp. 983, 1001–02 (D. Conn. 1978)

20  (emphasis added), *aff'd*, 645 F.2d 1195 (2d Cir. 1981).  Therefore, "there is no basis for permitting

21  a damage award for a § 7 violation by an acquirer of patents with no market power prior to the

22  _____

   *(cont'd from previous page)*

23  claim is undermined by Apple's own allegations that during the period of Nokia's challenged
   conduct, Nokia was a failing supplier of cell phones with a rapidly declining market share, unable

24  to compete with Apple's newly-introduced iPhone, and Nokia ultimately exited the market.  (*Id.* ¶¶
   1, 3, 18, 39.)  It is utterly implausible that in such circumstances, Nokia could have had market

25  power to control prices or exclude competitors in any market for cellular devices, however defined.

26  *Rebel Oil*, 51 F.3d at 1441 ("expansion by competitors would suggest that the defendant during
   that expansion lacked the market power to control marketwide output in the first place").  Apple

27  alleges that Acacia or Conversant do not compete in the "Cellular Device Markets." (Compl. ¶¶ 4,

28  23–26, 28.)

1  acquisition," as Apple attempts to seek here.  *Id.* at 1001.

2       Turning Section 7 on its head, Apple advances a theory premised not on a concentration of

3  assets via acquisition, but on transactions that "diffuse" and "disperse" Nokia's patents.  (*See*

4  Compl. ¶¶ 2, 7, 23–30).  In other words, Apple is unhappy about the fact that Nokia may have

5  divested some of its patents.  But Apple's allegations establish that the patent transfers <u>decreased</u>

6  concentration of ownership, which is precisely the opposite of what Section 7 is intended to redress.

7  Accordingly, this theory cannot form the basis of a Section 7 claim as a matter of law.

8       In order to make out a Section 7 claim, a plaintiff "must first establish a prima facie case

9  that a merger is anticompetitive."  *Edstrom v. Anheuser-Busch Inbev SA/NV*, 647 F. App'x 733,

10  735 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 258 (2016).  Such a prima facie case can be established

11  if the plaintiff shows "that the challenged transaction would increase the concentration of firms in

12  the relevant market."  *Id.*; *see also Oracle*, 331 F. Supp. 2d at 1110 (a prima facie Section 7 case is

13  established "by 'show[ing] that the merger would produce "a firm controlling an undue percentage

14  share of the relevant market, and [would] result [ ] in a significant increase in the concentration of

15  firms in that market."'" (alterations in original)) (citations omitted)).

16       Here, Apple contends that the patent transfers from Nokia to Acacia and Conversant

17  "increased market power" and "tend to create a monopoly."  (Compl. ¶¶ 36, 119–20.)  But Apple

18  fails to allege <u>any facts</u> in support of these bald assertions that the patent transfers increased

19  concentration in any relevant market, and indeed, contends that "Nokia acquired monopoly power

20  in each of the SEP Technology Markets when patented technologies were incorporated into

21  industry standards by 3GPP and ETSI" (Compl. ¶ 123)—years prior to any PAE transfers

22  commencing in 2011.  In similar circumstances, courts have not hesitated to dismiss Section 7

23  claims on the basis of such deficient allegations.  *See Edstrom*, 647 F. App'x at 735; *Vizio, Inc. v.*

24  *Funai Elec. Co.*, No. CV 09-0174 AHM RCX, 2010 WL 7762624, at *4 (C.D. Cal. Feb. 3, 2010);

25  *see also SCM Corp.*, 463 F. Supp. at 1001–02 (no basis for awarding damages pursuant to Section

26  7 where acquirer of patents had "no market power prior to the acquisition," and indeed "ha[d] no

27  share at all of [the relevant market].").

28       *Vizio, Inc. v. Funai Electric Co.* is illustrative: in that case, the court found that a patent

-20-

1    transfer did not increase market power, observing that "the patent—and therefore the market power

2    deriving from it—existed prior to the transfer," and largely based its dismissal of the complaint on

3    plaintiff's failure to allege "a consolidation of competition in which one firm that already had a

4    sizeable share of the market acquired additional market power." *Vizio*, 2010 WL 7762624 at *4.

5    Similarly here, the Complaint makes no mention of market concentration in the purported Patented

6    Technology Markets, let alone contain an allegation that the patent transfers increased

7    concentration in those markets.  In fact, as noted in Section II.A.1, *supra*, the Complaint contains

8    <u>no</u> allegations whatsoever as to the competitive state of those markets.  Without such allegations,

9    as in *Vizio*, Apple does not—and cannot—allege that Acacia or Conversant had any existing

10   market share in that market prior to the patent transfers.  *See id.*  The Complaint thus cannot

11   plausibly plead that the patent transfers caused a "consolidation of competition", thereby creating

12   or enhancing market power.

13         At bottom, Apple alleges nothing more than the transfer of whatever market power exists in

14   a patent from Nokia to Acacia or Conversant via the patent transfers.  But courts, including the

15   Ninth Circuit, have held as a general matter that the shift of market power from one company to

16   another "creates no monopoly power" in violation of antitrust laws.  *See Columbia River People's*

17   *Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190 (9th Cir. 2000) (holding choice for

18   state-approved monopolist for an electrical plant had no antitrust significance because the

19   monopoly would exist either way); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F. 2d 261, 266

20   (7th Cir. 1984) (holding no harm to competition resulted when one rival obtained a valid patent

21   monopoly rather than another because the patent monopoly would exist either way).  Indeed,

22   numerous courts have plainly stated the controlling, common-sense proposition: the mere transfer

23   of a valid patent has "no antitrust significance."  *Vizio*, 2010 WL 7762624 at *4 (quoting

24   *Brunswick*, 752 F. 2d at 266); *see also Digital Sun v. The Toro Co.*, No. 10-CV-4567-LHK, 2011

25   WL 1044502, *2 (N.D. Cal. Mar. 22, 2011); *Carefusion Corp. v. Medtronic, Inc.*, No. 10-CV-

26   01111-LHK, 2010 WL 4509821, at *8 (N.D. Cal. Nov. 1, 2010).

27         Finally, to the extent Apple's Section 7 claim is based on post-acquisition conduct of

28   Acacia and Conversant, the claim is untenable and this Section 7 theory has been roundly rejected.

-21-

1  "[Section] 7 addresses only those situations in which the *acquisition* of a patent substantially

2  lessens competition, and not situations in which anticompetitive effects arise at some point after the

3  acquisition." *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 2013 U.S. Dist. LEXIS

4  177836, *29 (E.D. Va. Dec. 18, 2013) (holding that effects of litigation assertions post-dating

5  patent acquisition did not give rise to antitrust claim under Section 7).  Thus, Apple's allegations

6  related to Acacia's and Conversant's post-patent-transfer conduct cannot sustain a Section 7 claim.

7  **C.   Apple Fails to State a Section 1 Sherman Act Claim.**

8  Apple contends in Count II that Nokia and Acacia, and Nokia and Conversant, respectively,

9  engaged in unlawful restraints of trade in violation of Section 1.[14]  To state a claim under Section 1

10  of the Sherman Act, Apple must plead "evidentiary facts which, if true, will prove: (1) that there

11  was a "contract, combination, or conspiracy"; (2) that "the agreement unreasonably restrained trade

12  under either a per se rule of illegality or rule of reason analysis"; and (3) "that the restraint affected

13  interstate commerce." *Tanaka,* 252 F.3d at 1062 (internal quotation marks and citations omitted);

14  *see also Kendall v. Visa U.S.A, Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

15  Here, Apple simply does not allege facts sufficient to support the contention that Nokia and

16  Acacia or Nokia and Conversant have entered into any agreement that runs afoul of Section 1.  The

17  notion that the patent transfers in and of themselves somehow restrain trade is untenable, for the

18  mere transfer of a patent does not create market power, exclude competitors, eliminate competition

19  between the transferor and transferee, or otherwise restrain trade.  Nothing in Apple's Complaint

20  offers a basis to conclude otherwise.  Indeed, Apple does not explain how Acacia or Conversant

21  owning patents instead of Nokia has any effect on competition in any technology market(s).  Apple

22  thus fails to meet its Section 1 pleading burden on multiple grounds, including because it fails to

23  establish any concerted action,[15] or that trade in any market has been "unreasonably restrained."

24  ───────────────

[14] Apple alleges in the heading of Count II that the alleged restraints of trade occurred in "Cellular

25  Technology Licensing" (Compl. at p. 39), which is not defined anywhere in the Complaint; this

26  Motion assumes that, given the allegations in Paragraph 112, Apple intends to allege restraints of trade in "Patented Technology Markets."

[15]  Courts interpret Section 1's requirement of a "contract, combination. . ., or conspiracy"

27  interchangeably simply to require "concerted action."  *See, e.g., The Jeanery, Inc. v. James Jeans,*

28  *Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988) (alteration in original) (quoting 15 U.S.C. § 1 (1982)).

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                    **Case No. 5:16-cv-7266**

1    <u>Concerted Action Is Inadequately Pled</u>.  Apple accuses Nokia, Acacia, Conversant, and

2    others of entering into patent transfer agreements that are designed to evade Nokia's FRAND

3    commitments.  (*E.g.*, Compl. ¶¶ 1, 5, 80, 82.)  It is unclear whether Apple means to allege that the

4    written sales contracts expressly reflect this supposed "agreement" to evade FRAND commitments,

5    or whether Apple is alleging that the alleged conspirators had a "meeting of the minds" beyond the

6    written sale agreements—*i.e.*, a tacit understanding that the patents would be enforced and/or

7    licensed in a manner inconsistent with FRAND obligations.  In any event, as a general matter,

8    Apple's attempt to allege that the SEP transfers in and of themselves somehow violate Section 1

9    fails as a matter of law.  *See Columbia River*, 217 F.3d at 1190 (dismissing Section 1 claim because

10   it was irrelevant to the antitrust laws which company held a state-approved monopoly).

11   To the extent Apple is alleging that the written contracts contain the supposed "agreement"

12   to evade FRAND commitments, Apple's own allegations are contradictory and therefore

13   undermine the notion that any of the written patent sale agreements themselves could constitute a

14   Section 1 "conspiracy" between Nokia and PAEs pursuant to which the PAEs allegedly will charge

15   non-FRAND royalty rates.  Apple clearly and specifically alleges that Conversant has more than

16   once acknowledged publicly—including under oath in federal court—that it is in fact contractually

17   obligated to abide by Nokia's prior FRAND commitments (Compl. ¶ 85 & n. 25), and that Acacia

18   also has acknowledged a contractual obligation to make "all their patents subject to their FRAND

19   licensing commitments available on FRAND terms."  (*Id*. ¶ 67.)  Such fundamental contradictions

20   undermine Apple's conclusory allegations of unlawful agreements whereby Nokia supposedly

21   transferred patents to Acacia and Conversant in order to evade FRAND commitments, and thus

22   merit dismissal of Apple's Section 1 claim.[16]  *See Alatraqchi v. Uber Techs., Inc.*, No. C-13-03156

23

---

24   [16]  The plausibility of these allegations is further undermined by Apple's apparent blanket assertion
     that *every* patent sale agreement between Nokia and a PAE—and according to Apple, there are
25   many patents, many agreements, and many PAEs—is an identical restraint of trade.  Such
     generalities fail to satisfy the plausibility requirements of *Twombly*.  *See Twombly*, 550 U.S. at 557
26   (allegations devoid of "factual enhancement" are not plausible).  Moreover, Apple's conclusory
     allegations of conspiracy are further undercut by the *res judicata* issues identified in Core
27   Wireless's Supplemental Memorandum of Points and Authorities, filed separately ("Core Wireless
     Supp. Brief"), namely that Apple has already litigated and lost the claim that Core Wireless

28   *(cont'd)*

1   JSC, 2013 WL 4517756, *5 (N.D. Cal. Aug. 22, 2013) (granting motion to dismiss claim where

2   allegations regarding key element were contradictory); *see also Hernandez v. Select Portfolio, Inc.*,

3   No. CV 15-01896 MMM AJWX, 2015 WL 3914741, at *10 (C.D. Cal. June 25, 2015)

4   ("Contradictory allegations . . . are inherently implausible, and fail to comply with Rule 8,

5   *Twombly*, and *Iqbal*.").

6        To the extent Apple's conspiracy claim is instead premised upon some tacit understanding

7   between Nokia and any given PAE that, post-acquisition, the new owner of a patent would charge

8   non-FRAND royalties, this also has not been plausibly pled.  *Cf. Twombly*, 550 U.S. at 555;

9   *Kendall*, 518 F.3d at 1047.  As an initial matter, the mere fact that the parties entered into a

10  contractual arrangement—here, a sale of patents—is, without more, insufficient to infer that the

11  parties conspired to charge non-FRAND royalties.  *See 49er Chevrolet, Inc. v. Gen'l Motors Corp.*,

12  803 F.2d 1463, 1467 (9th Cir. 1986) (declining to infer an antitrust conspiracy from "[o]rdinary

13  sales contracts," for "the antitrust laws are not offended by agreements as such, but only by those

14  with an anticompetitive content") (citation omitted); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072,

15  1081 (11th Cir. 2016) (declining to accept that "the simple existence of a contract . . . standing

16  alone, is enough to satisfy the concerted action requirement," for "although Section 1 specifically

17  references contracts . . . a contract can serve as the basis for a Section 1 claim only if it embodies

18  an agreement to unlawfully restrain trade"); *Rio Grande Royalty Co., Inc. v. Energy Transfer*

19  *Partners, L.P.,* 786 F. Supp. 2d 1190, 1198–99 (S.D. Tex. 2009) (dismissing Section 1 claim

20  premised upon mere sales contracts where plaintiff "[failed to make] sufficient allegations to raise

21  a reasonable expectation that discovery would reveal evidence of an illegal agreement"); *Toscano v.*

22  *PGA Tour, Inc.*, 70 F. Supp. 2d 1109, 1114–15 (E.D. Cal. 1999) (mere existence of written contract

23  was insufficient to demonstrate an agreement to restrain trade), *aff'd*, 258 F.3d 978 (9th Cir. 2001).

24  Putting aside Apple's repetition of buzzwords such as "conspiracy" and "collusion," the only

25  "facts" that Apple actually alleges are: (i) that Nokia sold patents (*e.g.*, Compl. ¶¶ 1, 39, 71, 84, 89);

26  _____

27  *(cont'd from previous page)*
    breached its FRAND obligations with respect to its licensing and enforcement regarding the former

28  Nokia SEPs.

1    (ii) that Nokia receives compensation from the new owners of those patents (*e.g.*, *id.* ¶¶ 6, 71, 84,

2    91); and (iii) that Apple can no longer license from a single owner and is dissatisfied with the

3    licensing terms being offered by the new owners.  (*E.g.*, *id.* ¶¶ 25, 73.)  While Apple contends that

4    Nokia transferred the patents "knowing" that the PAEs would charge higher-than-FRAND rates,

5    Apple fails adequately to allege any meeting of the minds regarding such an arrangement, instead

6    pointing only to allegations of *unilateral* conduct by the PAEs and by Nokia.  (*See, e.g.*, *id.* ¶¶

7    72–73, 77–79); *cf. Twombly*, 550 U.S. at 556–57 (observing that "a bare assertion of conspiracy

8    will not suffice"; to make out a Section 1 claim, allegations "must be placed in a context that raises

9    a suggestion of a preceding agreement, not merely parallel conduct that could just as well be

10   independent action."); *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1193,

11   1198 (9th Cir. 2015) (affirming Rule 12(b)(6) dismissal where, in the absence of direct evidence

12   showing agreement, plaintiffs failed plausibly to allege non-conclusory facts sufficient to "'point[]

13   toward a meeting of the minds' of the alleged conspirators") (quoting *Twombly*, 550 U.S. at 557,

14   560).

15        Apple fails to allege any facts indicating that post-sale, Nokia has any input or control over

16   the terms on which PAEs license to third parties.[17]  And, like in *Twombly*, it is equally plausible to

17   infer that the PAEs are acting independently in their own self-interest to maximize—within the

18   boundaries of their FRAND commitments—their licensing revenues from Apple, as opposed to

19   doing so pursuant to some agreement with Nokia.  *Twombly*, 550 U.S. 553–57; *Iqbal*, 556 U.S.

20   662, 668 ("where a complaint pleads facts that are merely consistent with a defendant's liability, it

21   stops short of the line between possibility and plausibility of entitlement to relief") (internal

22   quotation marks omitted).  Indeed, Apple alleges that the PAE Defendants are in the patent

23   licensing and litigation business.  (Compl. ¶¶ 23–25, 46–47.)  As such, the PAE Defendants have

24   every incentive to maximize the value of their portfolios—consistent with legal constraints

25   (including FRAND commitments)—to recoup their investment in the patents, independently of

26   whatever Nokia might wish for them to do, and seeking a maximum FRAND royalty is not

27   _____

     [17]  Indeed, Apple relies on external documents suggesting that Nokia does <u>not</u> exercise such control.

28   (*See* n.3, *supra*.)

1   inconsistent with FRAND.[18]  Simply put, Apple's generalized and conclusory allegations are

2   insufficient to plausibly allege the existence of a conspiracy between Nokia and the PAEs to charge

3   non-FRAND royalty rates on patents that Nokia no longer owns.

4          Apple's conspiracy claim is further undermined by the allegation that the supposed

5   conspiracies between Nokia and Acacia and Nokia and Conversant to charge Apple higher

6   royalties are in fact dependent on the PAEs' enforcement of "other," unspecified non-Nokia

7   patents.[19]  But the complaint is bereft of *any* allegations as to these "other" patents that Nokia

8   allegedly was aware of and which apparently are central to carrying out the purported conspiracy;

9   whether these "other" patents are FRAND-encumbered; or allegations that might, if proven, show

10  that the supposed "royalty stack" that Apple allegedly faces from the purported "diffusion" scheme

11  is in fact attributable to the former Nokia patents as opposed to these unknown "other" patents.  In

12  the absence of any plausible, non-conclusory factual allegations about Nokia's knowledge of these

13  "other" patents, or to demonstrate that the *former Nokia patents*, as opposed to patents of other

14  origin, are what enable the PAEs to demand supposedly "exorbitant" royalties from Apple, the

15  alleged conspiracies are simply not plausible.  *See Iqbal*, 556 U.S. at 679 (plausibility analysis is

16  "context-specific" and "requires the reviewing court to draw on its judicial expertise and common

17  sense.").  As Apple fails to plausibly allege any conspiracy, its Section 1 claim must be dismissed.

18          No Plausible Allegations That Trade in Any Market Was Restrained.  The second element

19  of a Section 1 claim requires Apple to prove that the agreement unreasonably restrained trade.

20  *Tanaka,* 252 F.3d at 1062.  In light of Apple's deficient market definition and market power

21

---

22  [18]   Apple's suggestion that the PAE Defendants' real motivation is some secret scheme to assist
    Nokia's cell phone business makes no economic sense.  PAE Defendants make money by licensing,
23  not refusing to license.  If Nokia were to eliminate competition in the cellular device market, the
    PAE Defendants would have fewer opportunities to market their patents.
24  [19]   *See* Compl. ¶ 110 ("Nokia and Acacia intended that, through their conspiracy, Acacia would
25  extract royalties from cell phone and other cellular device makers—like Apple—far beyond what
    Nokia could collect itself . . . using former Nokia patents in conjunction with other patents acquired
26  by Acacia[,]" and "Nokia and Conversant intended that, through their conspiracy, Conversant
    would extract royalties from cell phone and other cellular device makers—like Apple—far beyond
27  what Nokia could collect itself . . . using former Nokia patents in conjunction with other patents
    acquired by Conversant." (emphases added)).
28

-26-

1  allegations (*see* Section II.A, *supra*), it is impossible to ascertain the effect of the alleged restraint

2  on competition, and the Section 1 claim can independently be dismissed on that basis.  *See*

3  *Colonial Med. Grp*., 444 F. App'x at 938 (on Section 1 claim, the inappropriately defined relevant

4  market "would, if accepted, distort the subsequent determination of [defendant's] market power.");

5  *Golden Gate*, 2010 WL 1541257, at *2–5 (N.D. Cal. Apr. 16, 2010) (dismissing Section 1 claim on

6  basis of "facially unsustainable" relevant market allegations); *see also Spindler*, 2011 WL

7  12557884, at *2 (same).  Further, the mere transfer of a patent does not create market power or

8  otherwise restrain trade.  *See Columbia River*, 217 F.3d at 1190 (on Section 1 claim, favorably

9  citing *Brunswick*, 752 F.2d at 264, 66–67, for proposition that "the question of who owns the patent

10  monopoly is a 'matter of indifference' to the antitrust laws" where the market remained "just as

11  competitive as before" the defendant's theft of plaintiff's patent).

12       **D.**      **Apple Fails to State a Section 2 Sherman Act Claim.**

13       Apple alleges that Defendants engaged in unlawful conduct in the so-called "SEP

14  Technology Markets," thereby violating Section 2 of the Sherman Act, in two ways: (i) unlawful

15  monopolization of the "SEP Technology Markets" by Nokia only (*see* Count IV, Compl. ¶¶ 122-

16  27); and (ii) conspiracy to monopolize the "SEP Technology Markets" by Nokia and Acacia, and

17  by Nokia and Conversant, respectively.  (*See* Count V, *id*. ¶¶ 128–34.)  Neither theory has merit.[20]

18  As discussed above, as a preliminary matter, Apple's failure to adequately plead a relevant market,

19  or market power within that market, is fatal to both Section 2 claims.  But these claims also fail for

20  other independent reasons.  Apple's claim of unlawful monopolization boils down to the contention

21  that Nokia monopolized the purported "SEP Technology Markets" by selling the patents that it

22  owned in those markets.  This is nonsensical; Nokia certainly did not—and could not—acquire or

23  maintain monopoly power in a market by *exiting* that market.  Indeed, even accepting for purposes

24  of argument Apple's own allegations that each "declared SEP" is its own market (*see id*. ¶ 32), the

25  transfer of these SEPs did not and could not lead to the acquisition of more power than already

26  _____

27  [20]  Apple's pleading failures as to relevant market or any defendant's market share therein (*see* Section II.A, *supra*) or antitrust injury (*see* Section II.E, *infra*) are fatal to its monopolization and

28  Section 2 conspiracy independently of whether the other elements have been adequately pled.

1    attendant to the patents, nor could Nokia maintain its market position by divesting the assets that

2    conferred that position.  As for Apple's conspiracy to monopolize claim, it fails for much the same

3    reason as Apple's Section 1 claim—Apple fails to adequately plead any plausible conspiracy.

4    Apple also has not pled the requisite facts sufficient to show a specific intent to monopolize.

5    <u>**1.      Apple Has Failed Adequately to Plead Monopolization By Nokia.**</u>

6            To prevail on a Section 2 monopolization claim—which addresses the conduct of a single

7    firm acting unilaterally—a plaintiff must prove that the defendant "(i) possessed monopoly power

8    in the relevant markets; (ii) willfully acquired or maintained its monopoly power through

9    exclusionary conduct; and (iii) caused antitrust injury." *American Prof'l Testing Serv., Inc., v.*

10   *Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997);

11   *accord SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996).

12   Apple's failure adequately to allege the first element of this claim is addressed in Section II.A.2,

13   *supra*, and its failure adequately to allege the third element is addressed in Section II.E, *infra*.  The

14   second element of a monopolization claim requires adequate allegations of "intentional predatory

15   or anticompetitive conduct." *SmileCare*, 88 F.3d at 783.  To be condemned as exclusionary, "a

16   monopolist's act must have anticompetitive effect.  That is, it must harm the competitive *process*

17   and thereby harm consumers." *Rambus, Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) (internal

18   quotation marks omitted).  Apple's Complaint founders on this second element as well.

19           Apple claims that Nokia unlawfully monopolized the "SEP Technology Markets" by

20   "transferring patents to Acacia, Conversant, and other PAEs."  (Compl. at p. 43, ¶ 126.)  Thus,

21   according to Apple, Nokia unlawfully exercised monopoly power in the (unspecified) "SEP

22   Technology Markets" by <u>selling</u> the very patents from which that purported monopoly power

23   derives.  (*Id.*)  Apple's novel theory defies logic and turns antitrust law on its head.  Not

24   surprisingly, the notion that a firm can be guilty of monopolizing a market by exiting that market

25   has been flatly rejected.  *See The Arbitron Co. v. Tropicana Prod. Sales, Inc.*, No. 91 Civ. 3697

26   (PKL), 1993 U.S. Dist. LEXIS 5587, *24–29 (S.D.N.Y. Apr. 28, 1993).  In *Arbitron*, defendant

27   Tropicana was a purchaser of data tracking services from plaintiff Arbitron's SAMI division.

28   Arbitron sold SAMI to a third party (IRI).  Following the sale of SAMI to IRI, Arbitron sued

-28-

1  Tropicana seeking return of property and for breach of contract, and Tropicana counterclaimed

2  with its own breach-of-contract claims against Arbitron.  Tropicana thereafter sought leave to

3  amend to add a proposed antitrust claim alleging that Arbitron, through its transaction divesting

4  SAMI to IRI, violated Section 2 of the Sherman Act and Section 7 of the Clayton Act.  Applying a

5  Federal Rule of Civil Procedure 12(b)(6) analysis to evaluate futility of amendment, the court

6  rejected Tropicana's "attempt[] to dress a breach of contract [claim] in the garb of an antitrust

7  claim."  *Id*. at *37.  Critically, the court found Tropicana to have "concede[d] . . . that, after [the

8  divestiture], Arbitron had no portion of the relevant market," and that in light of these allegations

9  "it appears that Tropicana cannot allege any set of facts which would entitle it to relief against

10 Arbitron for actual monopolization under [S]ection 2 of the Sherman Act."  *Id*. at *25.  Here,

11 Apple's claim of Section 2 monopolization against Nokia fails for the same reason: Apple

12 concedes that post-divestiture, Nokia no longer holds the patents that purportedly gave it market

13 power in the alleged relevant markets (*e.g.*, Compl. ¶¶ 32–33); as such, there is no set of facts

14 pursuant to which Nokia could monopolize any "SEP Technology Market" by selling out of that

15 market.  Indeed, as noted above, the mere transfer of a patent is "of no antitrust significance"

16 because it "merely shifts a lawful monopoly to different hands."  *Digital Sun*, 2011 WL 1044502,

17 at *2 (quoting *Brunswick Corp.*, 752 F.2d at 266); *see also Vizio*, 2010 WL 7762624, at *5

18 (same).[21]

19         Separate and apart from the obvious deficiencies of Apple's divestiture-as-monopolization

20 theory, to the extent any aspect of Apple's Section 2 claim relies on purportedly fraudulent conduct

21 in connection with Nokia's *ex ante* representations to a standard-setting organization (*see, e.g.*,

22 Compl. ¶ 126), the Complaint is deficient on the independent ground that such fraud has not been

23 pled with particularity and therefore fails to satisfy Federal Rule of Civil Procedure 9(b).  "Where a

24 plaintiff alleges fraud, Federal Rule of Civil Procedure 9(b)) . . . requires the plaintiff to state with

25 particularity the circumstances constituting fraud, including the who, what, when, where, and how

26 of the charged misconduct."  *ChriMar*, 72 F. Supp. 3d at 1017 (citing, *inter alia*, *Vess v. Ciba-*

27 ───────────────────────
   [21]  Apple does not allege anywhere in its complaint that Nokia committed to any standard-setting
28 organization that it would not sell its patents, or that Nokia was otherwise prohibited from doing so.

1   *Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted)).  Here,

2   Apple claims that Nokia "submitted hundreds of declarations to ETSI" (Compl. ¶ 61), that Nokia's

3   FRAND commitments were (generally) "false" (*id.* ¶ 82), and that Nokia "never intended to make

4   its patents available on FRAND terms." (*Id.* ¶¶ 61–62.)  Nowhere in the Complaint, however, does

5   Apple specifically identify any declaration, any technology, or any patent as to which Nokia

6   purportedly misled any standard-setting organization.  Apple's generalized conclusory assertions as

7   to Nokia's conduct vis-à-vis standard-setting organizations are far from "specific enough to give

8   [Nokia] notice of the particular misconduct … so that [Nokia] can defend against the charge and

9   not just deny that [it has] done anything wrong."  *ChriMar*, 72 F. Supp.3d at 1017 (second

10  alteration in original) (quoting *Vess*, 317 F.3d at 1106); *Digital Sun,* 2011 WL 1044502, at *2

11  (fraud was insufficiently pled under Rule 9(b) where complaint did not "specifically identify which

12  promises were false," or "identify any false representations that were made," but rather contained

13  only conclusory allegations).  The Section 2 monopolization claim must therefore be dismissed.

14  ## 2.   Apple Has Failed Adequately to Plead Conspiracy to Monopolize.

15  Apple additionally alleges that Nokia and Acacia, and Nokia and Conversant, conspired to

16  monopolize the "SEP Technology Markets" in violation of Section 2.  (*See* Count V, Compl. ¶¶

17  128–34.)  A Section 2 conspiracy to monopolize claim requires a plaintiff to show: "(1) the

18  existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the

19  conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury."  *Prime*

20  *Healthcare Servs., Inc. v. Serv. Emp. Int'l Union*, No. 11-cv-26520-GPC-RBB, 2013 WL 3873074,

21  *16 (S.D. Cal. Jul. 25, 2013) (internal quotation marks and citation omitted), *aff'd*, 642 F. App'x

22  665 (9th Cir. 2016), *cert denied*, 136 S. Ct. 2532 (2016).[22]  Apple's failure to specify which "SEP

23  Technology Markets" are supposedly being monopolized is, as discussed in Section II.A.1, *supra*,

24

25  [22]  Apple's Section 2 conspiracy allegations must be understood as a conspiracy to enable a single
    actor to monopolize a relevant market.  *Standfacts Credit Servs., Inc. v. Experian Info. Sol., Inc.*,
26  405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2006) ("Since [S]ection 2 prohibits only monopolization by
    a single entity, as opposed to shared monopolization, an allegation of conspiracy to create a shared
27  monopoly does not plead a claim of conspiracy under [S]ection 2.") (citation omitted)), *aff'd in*
    *part by* 294 F. App'x. 271 (9th Cir. 2008).
28

1    fatal to this claim, and its failure to adequately allege causal antitrust injury is also independently

2    fatal, *see* Section II.E, *infra*.  Apple's conspiracy to monopolize claim also fails because Apple has

3    not, and cannot, explain how transfers of Nokia's existing "monopolies" in the SEP Technology

4    Markets to the PAE Defendants could exclude or foreclose market access to other competing

5    alternative technologies.  Nor, as addressed with respect to its Section 1 claims, does Apple

6    adequately allege unlawful conspiracy or specific intent to monopolize.

7         With respect to unlawful conspiracy, Apple baldly asserts that, "[a]s Nokia knew, intended,

8    and agreed with them that they would do, Acacia and Conversant have demanded non-FRAND

9    royalties and have threatened to enjoin Apple's products based on SEPs to increase its leverage,

10    thereby enhancing and exercising Nokia's wrongfully obtained monopoly power."  (Compl. ¶ 132.)

11    As an initial matter, as explained above, Apple does not adequately allege that Nokia deceived any

12    standard-setting organization.[23]  And even assuming, for the sake of argument only, that the

13    transfers may enable Nokia to evade its prior FRAND commitments (which they do not), ordinarily,

14    where a monopoly is lawfully obtained, the mere exploitation of monopoly power or charging of

15    monopoly prices does not violate Section 2.  *See Verizon Comm'cns, Inc. v. Law Offices of Curtis*

16    *V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the

17    concomitant charging of monopoly prices, is not only not unlawful; it is an important element of

18    the free-market system.").  Moreover, as the D.C. Circuit made clear in *Rambus,* the mere evasion

19    of a FRAND commitment to allow the patent holder to charge more money, but without showing

20    of deceptive exclusion of rival technologies at the time of standardization, is not a Section 2

21    violation.[24]  *Rambus*, 522 F.3d at 466 (rejecting the "supposition that there is a cognizable violation

---

[23]  Moreover, to the extent that Apple's theory is premised on the notion that years before Nokia entered into the patent transfers, it had already decided that it would eventually sell its patents to PAEs and conspire with them to charge non-FRAND royalty rates, and thus that it would need to have its patents declared standard-essential and make false FRAND declarations to accomplish that result, such a theory is utterly implausible.

[24]  Here, Apple does not adequately allege that ETSI or 3GPP would have excluded Nokia's technology from any standards, but-for the supposedly false FRAND promises.  *See Rambus,* 522 F.3d at 466–67 ("[I]f [the SSO] in the world that would have existed but for Rambus's deception, would have standardized the very same technologies, Rambus's alleged deception cannot be said to have had an effect on competition in violation of the antitrust laws . . . .").  Apple alleges, generally,

*(cont'd)*

-31-

1  of the Sherman Act when a lawful monopolist's deceit has the effect of raising prices (without an

2  effect on competitive structure)"); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998)

3  (holding that agreements that may have allowed defendants to raise prices, but did not "harm the

4  competitive process" could not "amount to a conspiracy to monopolize.").

5       Beyond these deficiencies, Apple's failure to adequately allege a conspiracy for Section 1

6  purposes (*see* Section II.C, *supra*) also is fatal to its Section 2 conspiracy claim.[25]  *See Nova*

7  *Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("Because [plaintiff's]

8  claim under §1 fails, its claim of conspiracy to monopolize under §2 based on the same conduct

9  necessarily fails as well"); *Prime Healthcare*, 2013 WL 3873074 at *16.

10       With respect to the element of specific intent, Apple simply parrots the legal standard with

11  no supporting factual allegations.  Apple claims that Nokia and Acacia, on the one hand, and Nokia

12  and Conversant on the other hand, "have violated Section 2 of the Sherman Act by coordinating

13  and conspiring with the specific intent of monopolizing the SEP Technology Markets in ways that

14  would not have been possible but for the patent transfer scheme."  (Compl. ¶ 133)  For a

15  conspiracy to monopolize claim, "a specific intent to destroy competition or build monopoly is

16  essential."  *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 626 (1953).  Specific intent "can either

17  be shown by direct proof, or by inference from proof of . . . predatory or anticompetitive conduct

18  directed to accomplishing the unlawful purpose."  *Robert's Waikiki U-Drive, Inc. v. Budget Rent-*

19

20  _____

*(cont'd from previous page)*

21  that "[i]f Nokia had not committed to license its patents on FRAND terms, or Nokia's commitment
has [*sic*] been known to be false, 3GPP and ETSI would not have incorporated those technologies

22  in the standard."  (Compl. ¶ 125.)  But this blanket assertion is simply conclusory, *cf. Twombly*,
550 U.S. at 561–62, and hopelessly vague (which "standard" is even at issue?); thus it does not

23  plausibly establish that ETSI or 3GPP would have eschewed Nokia's technology but-for Nokia's
supposedly false representations.  *See Rambus*, 522 F.3d at 466–67; *Vizio*, 2010 WL 7762624 at *5.

24  Apple has utterly failed to include sufficient factual allegations that but-for Nokia's allegedly false
FRAND promises, an alternative technology with the same functionality would have been

25  incorporated, or, alternatively, that no such technology would have been standardized.

26  [25]  Both the Section 1 and Section 2 conspiracy claims are premised upon the patent transfer
agreements.  (Compl. ¶¶ 110–12; 129.)  Apple's Section 1 conspiracy claim appears to address the

27  broader "Patented Technology Markets" (*id.* ¶ 112), of which the "SEP Technology Markets" that

28  are the subject of the Section 2 conspiracy claim are purportedly a subset.  (*Id.* ¶¶ 31–32.)

1   *A-Car Sys., Inc.*, 491 F. Supp. 1199, 1217 (D. Haw. 1980).[26]  However, "in the absence of

2   anticompetitive conduct from which such specific intent may be inferred," the allegation of specific

3   intent "is conclusory."[27]  *Digital Sun*, 2011 WL 1044502, at *2 (internal quotation marks and

4   citation omitted); *see also Rutman Wine Co. v. E&J Gallo Winery*, 829 F.2d 729, 735–36 (9th Cir.

5   1987) (allegation of specific intent was conclusory due to absence of anticompetitive conduct).

6           Apple fails to allege anticompetitive conduct from which specific intent may be inferred,

7   instead conclusorily positing that "Nokia and Acacia specifically intended that, by evading Nokia's

8   FRAND commitments, Acacia would extract from cellular device suppliers—such as Apple—

9   royalties far beyond what Nokia could collect itself," and that "the patent transfers from Nokia to

10  Conversant were similarly motivated by the parties' specific intent that Conversant would extract

11  non-FRAND royalties beyond what Nokia itself could collect."  (Compl. ¶ 129.)  The only conduct

12  alleged is the transfer of patents followed by the subsequent, allegedly conspiratorial, charging of

13  supposedly non-FRAND rates; as explained in Section II.C, *supra*, these "agreements" are

14  inadequately pled and thus are insufficient as a basis for inferring specific intent to monopolize.  *Cf.*

15  *Carefusion Corp.*, 2010 WL 4509821, at *10 (where "allegations of specific intent are not

16  connected to sufficient allegations of anticompetitive conduct. . . . the Court will not infer specific

17  intent based only on [plaintiff's] conclusory allegations"); *U.S. Philips Corp.*, 2006 WL 8421895,

18  at *2–3 (where anticompetitive conduct had been inadequately pled, declining to infer specific

19  intent from participation in standard-setting and royalty collection, as these acts were not

20  anticompetitive).  Not only is Apple's assertion of specific intent conclusory, however, it also is

21  illogical: "since [Apple] alleges that [Nokia] was no longer in the relevant market as a result of the

22

23  [26] "The test for specific intent is no different when a conspiracy to monopolize claim, as
24  distinguished from an attempt to monopolize claim, is being considered."  *Robert's Waikiki U-Drive*, 491 F. Supp. at 1223; *see also Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-
25  cv-05847-WHO, 2013 WL 5694452, *16 (N.D. Cal. Oct. 18, 2013) (applying same specific intent analysis in dismissing both attempt to monopolize and conspiracy to monopolize claims).
26  [27] Apple's failure adequately to allege any relevant market is also fatal here, for in considering a claim of restraint of trade from which to infer specific intent, "injury to competition is determined
27  by reference to a particular market, and by reference to market shares held by the alleged
28  conspirators."  *Robert's Waikiki U-Drive*, 491 F. Supp. at 1219.

1  [transactions], it defies common sense and applicable law to suggest that . . . [Nokia] engaged in

2  the transaction with the specific intent to monopolize the market . . . ."  *Arbitron*, 1993 U.S. Dist.

3  LEXIS 5587, at *28–29 (denying leave to include conspiracy to monopolize claim where purported

4  conspiracy was premised on agreement pursuant to which purported co-conspirator exited the

5  market).

6          Apple's claim for conspiracy to monopolize must therefore be dismissed.

7          **E.      <u>Apple Fails to Adequately Allege Antitrust Injury.</u>**

8          Beyond its inability to make out the foregoing substantive elements of its antitrust claims,

9  each of Claims II-V can also be dismissed for the independent reason that Apple fails adequately to

10 allege the requisite antitrust injury flowing from the alleged conduct and/or fails to plausibly allege

11 harm to competition.

12         Causal antitrust injury "is an element of all antitrust suits brought by private parties seeking

13 damages under Section 4 of the Clayton Act."[28] *Rebel Oil*, 51 F.3d at 1433 (citing *Brunswick Corp.*

14 *v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Antitrust claims for injunctive relief are

15 governed by Section 16 of the Clayton Act, and also require a showing of antitrust injury.  *Cargill,*

16 *Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986).  In order to show antitrust injury, "a

17 plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendants'

18 behavior . . . ."  *Rebel Oil*, 51 F.3d at 1433; *see also Lucas Auto. Eng'g, Inc. v.*

19 *Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998).  "If the injury flows from aspects

20 of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust

21 injury . . . ."  *Rebel Oil*, 51 F.3d at 1433.  Moreover, the "failure to allege injury to competition," as

22 opposed to harm to a single competitor, "is a proper ground for dismissal on the pleadings."

23 *Tanaka*, 252 F.3d at 1064 (citation omitted).  This requirement of pleading antitrust injury and

24 harm to competition applies equally to Apple's Section 1, Section 2, and Section 7 claims.  *See*

25 *Tanaka*, 252 F.3d at 1064 (Section 1); *Smilecare*, 88 F.3d at 783 (Section 2); *Brunswick*, 429 U.S.

26

27 [28]  Apple invokes Section 4 of the Clayton Act (15 U.S.C. § 15; *see* Compl. ¶ 13), which provides a
   private right of action for damages under the antitrust laws.  The statutory basis for a private action
28 seeking injunctive relief for alleged antitrust violations is Clayton Act Section 16.  (15 U.S.C. § 26.)

1   at 489 (Section 7).

2        Apple appears to allege three sources of harm purportedly flowing from the conduct alleged

3   in the Complaint: (i) that the transfers resulted in an "increas[ed] … cost and likelihood of

4   litigation," (Compl. ¶¶ 119–120; *see also id.* ¶¶ 116, 127); (ii) that the "agreements" and patent

5   transfers harmed competition by "evading FRAND requirements" which result in Apple having to

6   pay "supracompetitive licensing rates" (*id.* ¶ 82; *see also id.* ¶¶ 115, 119–120, 127, 135);  and (iii)

7   that the patent transfers harm competition by raising costs for past and future rivals of Nokia in

8   downstream "Cellular Device Markets."  (*Id.* ¶¶ 115, 119–120.)  None of these purported harms

9   adequately plead antitrust injury and/or harm to competition.

10        As a preliminary matter, Apple does not suffer antitrust injury here because all of its

11   theories of injury are premised on the transfer of patents, yet numerous courts—including the Ninth

12   Circuit—have recognized that the mere transfer of a valid patent "is of no antitrust significance."

13   *See Columbia River*, 217 F.3d at 1190; *Brunswick Corp.*, 752 F.2d at 266; *Vizio*, 2010 WL

14   7762624, at *4; *Digital Sun*, 2011 WL 1044502, at *2; *Carefusion*, 2010 WL 4509821, at *8.  As

15   discussed in Section II.B, *supra*, where, as here, a patent is transferred to an entity that has no

16   existing position in the purported relevant market, the transfer does nothing more than shift market

17   power from one entity to another.  Such a shift does not result in competitive harm because "the

18   question of who owns the patent monopoly is a 'matter of indifference' to the antitrust laws."

19   *Columbia River*, 217 F.3d at 1190 (citing *Brunswick*, 752 F.2d at 267).  Apple does not allege that

20   the patent transfers reduced the number of relevant competitors, restricted or hindered any

21   competitor in any of the Complaint's ill-defined "markets," or otherwise affected the competitive

22   process in those purported "markets."  Instead, Apple alleges dissatisfaction with how Acacia and

23   Conversant manage their patent portfolios because it purportedly increases Apple's costs.  But

24   Apple has not adequately pled harm to itself as a result of the patent transfers, nor has it adequately

25   pled any harm to competition.  *Tanaka*, 252 F.3d at 1064.  Unfortunately for Apple, as *Columbia*

26   *River* makes clear, Apple's concern about who owns the patents is irrelevant to the antitrust laws,

27   and the purported "harms" that Apple identifies do not suffice to establish the requisite injury here.

28

First, Apple alleges that the patent transfers resulted in an "increas[ed] … cost and likelihood of litigation." (Compl. ¶¶ 119–120.)  But "enforc[ement of] a patent does not constitute harm to competition unless the enforcement action is brought in bad faith." *Vizio*, 2010 WL 7762624 at *5 (citing *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979)); *see also Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) (litigation is petitioning conduct that is immune from antitrust liability unless it is both objectively baseless and brought with an improper subjective motivation) ("*PRE*").  While Apple repeatedly alleges that it must defend against patent litigations in connection with the former Nokia patents, resulting in significant costs (*see, e.g.*, Compl. ¶¶ 5, 24, 48, 101), it does not make any effort to plausibly allege that those patent litigations are "sham" or "bad faith" litigations.[29]  Therefore, Apple's allegations about litigation costs fail to plead harm to competition.  *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465-PJH, 2006 WL 13058, at *5 (N.D. Cal. Jan. 3, 2006) (claim of injury in form of attorneys' fees in defending patent infringement suit "is not an injury to 'competition'"); *Prime Healthcare*, 2013 WL 3873074 at * 13 (conclusory assertion that defendant brought "sham" counterclaims against plaintiff, which supposedly increased plaintiff's costs, was insufficient to allege antitrust injury).

Second, Apple alleges that the patent transfers harmed it and competition generally by "evading FRAND requirements" which resulted in supposedly "supracompetitive licensing rates." (Compl. ¶¶ 82, 119–120.)  Here, Apple claims that "consumers in the Cellular Device Markets

[29]  Though Apple describes the former Nokia patents—of which there are thousands—*en masse* as "weak," and sweepingly characterizes the PAEs' claims of infringement against Apple premised upon these patents as "unsupported" and/or as "nuisance suits," (Compl. ¶¶ 4, 5, 24, 142), these generalized conclusory allegations are a far cry from satisfying the Supreme Court's stringent requirement of pleading allegedly sham litigation by reference to both objective baselessness and improper subjective motivation.  *See PRE*, 508 U.S. at 60–61; *Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*, 138 F. Supp. 3d 303, 326 (S.D.N.Y. Mar. 28, 2014) ("Patents are presumptively valid and Viatek pleads no facts to support its sham litigation claim other than its subjective belief that Radiancy is deliberately pursuing a strategy to push Viatek out of the market.").  Further, these allegations are belied by recent patent infringement verdicts against Apple.  *See* n.6, *supra*.  Courts, of course, need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."  *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds,* 275 F.3d 1187 (9th Cir. 2001).

1    have suffered or are threatened with higher prices and reduced innovation and quality."  (*E.g.*, *id*. ¶

2    134.)  But the only harm pled (conclusorily) is harm to Apple; Apple does not plausibly plead that

3    Nokia's agreements with any PAE harm competition writ large, however the "Cellular Device

4    Market" may be defined.  Apple claims that the PAEs seek to charge Apple above-FRAND royalty

5    rates, and generally asserts that the patent transfers "inflate[] prices and decrease[] innovation and

6    quality by raising the costs and burdens associated with product suppliers' licensing technologies

7    purportedly covered by Nokia's patents and discouraging them from making the large investments

8    required to innovate effectively."  (*Id.* ¶ 37.)  Apple mentions in passing two suppliers of "cellular

9    handsets" who have supposedly had to defend against patent litigation brought by the PAEs Vringo

10   and Sisvel, ostensibly premised upon former Nokia patents.[30]  (*Id.* ¶¶ 91–95.)  But the Complaint

11   makes no effort to provide plausible allegations that <u>other</u> suppliers of "cellular devices" (*i.e.*, apart

12   from Apple) face non-FRAND royalties in licensing the former Nokia patents, or to allege any

13   facts about the nature of any agreements between Nokia and Vringo, or Nokia and Sisvel regarding

14   the royalty rates they charge.  Further, the Complaint does not indicate whether, even if Apple,

15   ZTE, and the "Chinese cellular handset manufacturer" (*id.* ¶¶ 93, 95) all have to pay

16   "supracompetitive" licensing fees, there is any appreciable effect on competition.  *Cf. Tanaka*, 252

17   F.3d at 1064 (plaintiff's mere allegation of injury to herself, as opposed to "injury to a definable

18   market," was fatal, for the antitrust laws "'were enacted for 'the protection of competition, not

19   competitors.'"") (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)

20   (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962))); *Les Shockley Racing, Inc., v.*

21   *Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508–09 (9th Cir. 1989) ("Although proof of plaintiffs'

22   allegations would establish harm to their business interests, such proof would not, standing alone,

23   show injury to competition in the market as a whole."); *ChriMar*, 72 F. Supp. 3d at 1019 (failure to

24   allege "any <u>facts</u>, which, if true, would demonstrate antitrust injury," was fatal; conclusory

---

[30]   As noted in Section II.A.1, *supra*, it is not entirely clear whether "cellular handsets" are
encompassed in the "Cellular Device Market."  Apple also mentions Sonus having been harmed by
the use of former Nokia patents by the PAE Inventergy, but Sonus allegedly supplies
"communications equipment," and so presumably operates outside of the market where
competition was supposedly harmed.  (Compl. ¶¶ 96–97.)

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                          **Case No. 5:16-cv-7266**

1 allegations were insufficient) (emphasis in original); *Adobe Sys., Inc. v. Coffee Cup Partners, Inc.*,

2 No. C 11-2243 CW, 2012 WL 3877783, at *10 (N.D. Cal. Sept. 6, 2012) (conclusory allegations of

3 antitrust injury failed where plaintiff "had not alleged any facts that suggest that the relevant

4 market is both narrow and discrete and the market participants are few.") (internal quotations and

5 citation omitted); *Rheumatology Diagnostics*, 2013 WL 5694452, at *11 (plaintiff failed to allege

6 harm to competition where complaint offered no allegations as to which of the relevant markets

7 was affected by the challenged agreement; how large that market was; what market participants

8 there were; how the agreement affected the plaintiffs' shares, defendant's share, or any other

9 participant's shares; or whether there were other purchasers in the relevant market to which market

10 participants could turn).

11        <u>Third</u>, Apple alleges that the patent transfers harm competition by raising costs for past and

12 future rivals of Nokia in downstream "Cellular Device Markets." (Compl. ¶¶ 119–120.) This

13 theory can be dismissed for the very simple reason that Apple has not sufficiently pled that any

14 increased "costs" ever harmed competition. *Cf. Zef Sci., Inc., v. Shimadzu Sci. Instruments, Inc.*,

15 No. 14CV1758 JAH (RBB), 2016 WL 1255787, at *5 (S.D. Cal. Mar. 31, 2016) (mere allegation

16 "that other competitors also suffer undue costs" from defendant's conduct without factual

17 allegations to show how consumers were injured were insufficient legal conclusions); *Prime*

18 *Healthcare*, 2013 WL 3873074, at *13 (allegation that plaintiff incurred costs in response to

19 defendant's alleged conduct showed only potential harm to plaintiff and failed to show injury to

20 competition). Apple alleges that consumers in the "Cellular Device Markets" were harmed through

21 decreased innovation and increased prices (*see, e.g.*, Compl. ¶¶ 29, 89, 99), but these allegations

22 are wholly conclusory. The only actual reduction in consumer choice alleged here with any

23 specificity is Nokia's own exit from the cell phone business. (*Id.* ¶ 3.) Similarly, Apple makes no

24 attempt to explain how prices for cellular devices have changed as a result of the purportedly

25 higher costs for cellular device manufacturers.

26        Further, this purported injury did not occur in any relevant market that Nokia allegedly

27 monopolized or attempted to monopolize and therefore cannot constitute antitrust injury. The law

28 in the Ninth Circuit is clear that a plaintiff cannot sustain a Section 2 claim based on the theory that

1    an alleged upstream monopolist caused injury in a downstream market, absent proof that the

2    defendant monopolized or attempted to monopolize that downstream market.  *See Alaska Airlines,*

3    *Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991) ("[I]n the two-market situation, a

4    plaintiff cannot establish a violation of Section 2 without proving that the defendant used its

5    monopoly power in one market to obtain, or attempt to obtain, a monopoly in the downstream, or

6    leveraged, market.").[31]   Apple claims monopolization of and conspiracies to monopolize only the

7    "SEP Technology Markets."  Apple makes no such claims related to the "Cellular Device Markets",

8    nor could it.[32]

9         **F.     Apple Fails to State a Claim for Breach of Contract.**

10             In addition to its federal antitrust claims, Apple also asserts a deficient claim that

11    Defendants have breached contractual FRAND obligations.  As an initial matter, Apple does not

12    identify what law governs the contract (or contracts) that Apple claims Defendants have breached.

13    But under the law of this forum (where Apple has its principal place of business), its allegations are

14    insufficient.[33]  Under California law, "[t]o prevail on a breach of contract claim, a plaintiff must

---

[31] *See InfoStream Grp., Inc. v. PayPal, Inc.*, No. C 12-748 SI, 2012 WL 3731517, at *4 (N.D. Cal. Aug. 28, 2012) (rejecting plaintiffs' argument that "'[i]t is a violation of Section 2 of the Sherman Act for [defendant], a monopolist in one market, to exercise its market power to injure downstream markets'" because plaintiffs did not allege "that [defendant] has a monopoly or is attempting to attain a monopoly in the downstream . . . market" in which plaintiffs participated (citation omitted)).

[32] Apple harps on Nokia's exit from the cell phone business (Compl. ¶¶ 3, 21), which establishes that Nokia could not have market power in the "Cellular Device Market" (however defined) as required for a monopolization claim *see* Section II.A, *supra*, and that it could not have a dangerous probability of obtaining market power as required for an attempted monopolization claim.  *See Infostream* 2012 WL 3731517 at *4.

[33] Defendants reserve all arguments pertaining to the appropriate choice of law to apply to Apple's claims, including all arguments pertaining to the application of French law.  The ETSI IPR Policy states that it "shall be governed by the laws of France."  *See* Elacqua Decl., Exhibit 5 at Section 12 (*ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights Policy* (2016) ("ETSI IPR Policy"), *available at* http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf); *see also* Elacqua Decl. Ex. 4 at Section 12 (*ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights Policy* (2008) ("2008 ETSI IPR Policy"), *available at* http://www.etsi.org/WebSite/document/Legal/ETSI_IPR-Policy.pdf).  Articles 1231 to 1231-7 of the French Civil Code provide the basis for a breach of contract claim under French law.  *See* Elacqua Decl. Ex. 2 (English translation of Articles 1231 to 1231–7 of the French Civil Code). Under French law, "[t]hree conditions must be fulfilled in order for contractual liability to be

*(cont'd)*

---

-39-

1  show (1) the existence of a valid contract; (2) plaintiff's performance or an excuse for

2  nonperformance; (3) breach by the defendant; and (4) damages."  *Mahroom v. Best W. Int'l, Inc.*,

3  No. C 07-2351JFHRL, 2009 WL 2216578, at *1 (N.D. Cal. July 22, 2009) (citing *Careau & Co. v.*

4  *Sec. Pac. Bus. Credit, Inc.,* 222 Cal. App. 3d 1371, 1388 (1990)).  Here, Apple premises its breach

5  of contract claim on Nokia's commitment to ETSI that Nokia would license declared SEPs at

6  FRAND rates.  Apple alleges that this also binds Acacia and Conversant because any SEPs they

7  acquired from Nokia were obtained subject to Nokia's ETSI commitments.  (Compl. ¶¶ 64, 103,

8  104.)  Apple asserts that it is a third-party beneficiary of any such contractual commitments to

9  ETSI "as a member of ETSI and an implementer of ETSI standards."  (*Id.* ¶¶ 65, 105.)

10           1.    **Apple Fails to State a Breach of Contract Claim Against Nokia.**

11         Apple does not accuse Nokia of failing to offer to license its SEPs on FRAND terms

12  (Compl. ¶¶ 56–61), instead alleging that Nokia breached its contractual obligations to ETSI simply

13  by <u>transferring</u> certain of its SEPs to Acacia and Conversant.  (*Id.* ¶ 106.)  But Apple accuses

14  Nokia of breaching a FRAND "commitment" that is not found in the ETSI IPR Policy nor set forth

15  in the Complaint—*i.e.*, that Nokia was contractually obliged not to transfer its declared SEPs and

16  thus, that the mere act of <u>transferring</u> certain SEPs to others, including Acacia and Conversant,

17  constituted a breach of contract.  (*Id.*)[34]

18         Yet Apple does not allege that Nokia ever committed to ETSI that it would not sell or

19  transfer its declared SEPs.  Indeed, there is no such obligation in ETSI's IPR Policy, and any such

20  prohibition on transferring patents would be contrary to fundamental patent rights on alienability.

21  The Patent Act expressly recognizes that patents are a form of intangible property that "shall have

22  the attributes of personal property."  35 U.S.C. § 261.  The right to transfer (*i.e.*, "assign") a patent

23  _____
*(cont'd from previous page)*

24  invoked: the non-performance of a contractual obligation, the causing of damages and a causal link between the former and the latter."  *See* Elacqua Decl. Ex. 3 (Bertrand Fages, *Droit Des*

25  *Obligations* 367, ¶ 314 (L.G.D.J., 6e ed. 2016)).  If Apple's breach of contract claim were to be analyzed under French law, the outcome is the same as under California law, namely that Apple

26  fails adequately to allege breach of contract.

27  [34] Apple's assertion that Nokia "always sought excessive, non-FRAND royalties" (Compl. ¶ 62) is not supported by facts and pre-dates the alleged transfers on which Apple purports to base its

28  contract theory.

1   is an expressly enumerated right provided for in the patent statute.  *Id.* ("Applications for patent,

2   patents, or any interest therein, shall be assignable in law by an instrument in writing."); *see also*

3   *Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 643 (1947) ("A patent is a

4   species of property.  It gives the patentee or his assignee the 'exclusive right to make, use, and

5   vend the invention or discovery' for a limited period." (citation omitted)).[35]  Moreover, Apple's

6   own allegations regarding the terms of ETSI's IPR Policy (Compl. ¶ 64) expressly contradict this

7   theory of breach.  By addressing the terms of SEP transfers, the transferor's obligations, and the

8   resultant impact on the FRAND encumbrance in a section of the IPR Policy entitled "Transfer of

9   ownership in ESSENTIAL IPR," ETSI makes clear that patent holders are entitled to transfer

10  ownership of their declared SEPs.  (*Id.* (citing ETSI IPR Policy Clause 6.1*bis*).)  Indeed, that same

11  IPR Policy provision that Apple ignores as to the transferor (Nokia), is the apparent source of the

12  FRAND obligations that Apple claims must bind Acacia and Conversant, as the transferees and

13  successors in interest to certain Nokia SEPs.  (*Id.* ¶ 104.)

14          In short, Apple has not alleged—and cannot allege—facts establishing that Nokia was

15  contractually obligated to retain all of its patents or to maintain a portfolio of all such declared

16  SEPs available for a "one-stop" license to any and all implementers whenever and wherever they

17  may request it.  Apple can scarcely state a claim for breach of contract when the "contract" at issue

18  expressly permits the very act alleged to constitute breach.  Apple's failure to adequately plead the

19  fundamental "breach" element is thus fatal to Apple's claim.[36]  *Perry v. Cashcall, Inc.*, No. 14-

20

_____

21  [35] While patent owners may contractually waive certain patent rights, waiver is found only "when a
    patentee 'with full knowledge of the material facts, intentionally relinquished its rights'" attendant

22  to those patents.  *Gilead Scis., Inc. v. Merck & Co*, No. 13-CV-04057-BLF, 2016 WL
    3143943, at *21 (N.D. Cal. June 6, 2016) (quoting *Qualcomm Inc. v. Broadcom Corp*., 548 F.3d

23  1004, 1019–20 (Fed. Cir. 2008)).  As a relinquishment of legal rights, waiver cannot be presumed;
    it "must be proven by clear and convincing evidence."  *Qualcomm Inc. v. Broadcomm Corp.*, No.

24  CIV. 05CV1958-B(BLM), 2007 WL 1031373, at *9 (S.D. Cal. Mar. 21, 2007).

25  [36] Because Apple fails to plead a breach of any obligation arising under the ETSI IPR Policy, the
    Court need not consider whether there was an enforceable policy in place or whether Apple was a

26  third-party beneficiary of any such contract.  (*See* Compl. ¶¶ 61, 65, 103, 105.)  Defendants reserve
    all arguments pertaining to those allegations.  In addition, to the extent the Court is inclined to

27  grant the instant motion only as to the federal claims, the Nokia Defendants preserve all arguments
    regarding personal jurisdiction in connection with any remaining state law claims.

28

-41-

1   16581, 2016 WL 4137640, at *1 (9th Cir. 2016) (affirming dismissal of breach of contract claim

2   where plaintiff failed to allege facts sufficient to show that defendant breached express terms of

3   agreement); *Sutherland v. Francis*, 647 F. App'x 686, 686–87 (9th Cir. 2016) (same).

4          Presumably because the ETSI IPR Policy expressly permits such SEP transfers (Compl.

5   ¶ 64), Apple adds the bare assertion that Nokia's transfers were made with the purported

6   "knowledge and intent" that the PAE transferees would not "abide by" FRAND commitments.  (*Id.*

7   ¶ 106.)  But to the extent Nokia's mental state is even relevant to Apple's breach of contract

8   claim—which Defendants do not concede—Apple has not plausibly alleged that the transfers were

9   made with knowledge and intent that Acacia and Conversant would not abide by the terms of

10  Nokia's FRAND commitments.  This assertion is, at best, conclusory and devoid of factual support.

11  More importantly, however, it is directly contradicted by Apple's own acknowledgement that

12  Nokia and Conversant both publicly stated their belief that the transferred SEPs would be licensed

13  subject to FRAND obligations, and that Nokia and Acacia have acknowledged that they are

14  contractually obligated to make all their patents subject to their FRAND licensing commitments

15  available on FRAND terms.[37]  (*Id.* ¶¶ 63, 85.)

16                    2.    **Apple Fails to State a Breach of Contract Claim Against Either**
                            **Acacia or Conversant.**
17

18         Apple alleges that Acacia and Conversant also breached FRAND commitments inherited

19  from Nokia "by refusing to offer licenses to their declared SEPs on FRAND terms and conditions,

20  and by seeking injunctions blocking Apple's products based on such patents."  (Compl. ¶ 107.)

21  Although it purports to lay out the patent enforcement history with both Acacia (*id.* ¶¶ 41–49,

22  72–79) and Conversant (*id.* ¶¶ 85–87), Apple fails to allege facts establishing breach of any

23  recognized FRAND obligation, or Apple's own performance.

24                    (a)   **Apple Fails to Identify the Patents at Issue or Any Facts**
                            **Demonstrating Breach.**
25

---

26  [37] Notably, Apple ignores other allegations of its own pleading setting forth entirely legitimate
    reason for Nokia's sale of certain SEPs.  Apple alleges that Nokia was in severe financial difficulty
27  and struggling to remain competitive with Apple and others. (Compl. ¶ 18.)  Raising funds by
    disposing of assets is not only entirely rational in this situation, but also entirely pro-competitive.
28

-42-

1   Apple's Complaint fails to provide even the most basic information to put Defendants on

2   notice of the alleged FRAND breaches at issue.  Apple alleges that "thousands" of patents were

3   transferred to "Acacia, Conversant, and the other PAEs," but fails to specify a single patent at issue

4   in its breach of contract claim or how the attempted licensing or litigation over any such

5   unidentified patents supports its breach of FRAND claims.  (*See* Compl. ¶¶ 23, 36.)

6   Apple's failures are most starkly demonstrated with reference to the Complaint's few

7   substantive paragraphs related to Conversant.  Apple alleges that Conversant "has asserted over

8   two dozen patents against Apple," out of the "[r]oughly 1,200" SEPs acquired from Nokia, but

9   gives no indications as to which patents were involved in any allegedly wrongful conduct.  (Compl.

10  ¶¶ 5, 84.)  Apple refers to a 2012 lawsuit during which Conversant allegedly "demanded royalties

11  amounting to billions of dollars," which demand Apple claims exceeded a FRAND royalty rate (*id.*

12  ¶ 85), but it supplies no facts as to how any such "demand" breached a FRAND commitment or

13  caused any harm to Apple.  The law is clear that a "patent holder does not violate its [F]RAND

14  obligations by seeking a royalty greater than its potential licensee believes is reasonable."  *Ericsson*

15  *Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 WL 4046225, at *25 (E.D. Tex. Aug. 6, 2013),

16  *aff'd in part, vacated in part, rev'd in part on other grounds*, 773 F.3d 1201 (Fed. Cir. 2014); *see*

17  *also Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 2111217, at *2 (W.D. Wash. Apr.

18  25, 2013) (FRAND contemplates a "range" of values; no negotiation commences with best offer;

19  and "initial offers do not have to be on [F]RAND terms" to avoid a violation of FRAND terms).[38]

20  With respect to Acacia, while Apple claims generally that Acacia breached ETSI contracts

21  by "refusing to offer licenses to [its] declared SEPs on FRAND terms and conditions" (Compl. ¶

22  107), Apple pleads only two instances of excessive royalty demands:  Paragraph 72 ("Acacia

23  demanded that Apple pay a manifestly non-FRAND, per device royalty for each SEP held by its

24  subsidiary CCE"); and Paragraph 77 ("Acacia demanded that Apple pay *over 20* times the effective

---

25  [38] Other Apple omissions regarding the Conversant and Core Wireless entities are more disturbing,
26  as set forth in the Core Wireless Supplemental Brief.  In particular, Apple omits mention of the fact
    that it has already litigated—and lost—the precise claim that Conversant breached its FRAND
27  obligations with respect to SEPs acquired from Nokia.  As set forth in that supplemental filing,
28  Apple's claims are barred by *res judicata*.

1   amount Apple had previously paid to license the same patents").  These allegations of unaccepted,

2   licensing offers cannot state a claim.  *Ericsson*, 2013 WL 4046225, at \*25.  And, where, as here,

3   the patent holder resorts to litigation to enforce its patent rights when a FRAND license could not

4   be reached is in no way inconsistent with any ETSI obligation.  *See Microsoft Corp. v. Motorola,*

5   *Inc.*, 854 F. Supp. 2d 993, 1002 (W.D. Wash. 2012) (noting that "reasonable parties may disagree

6   as to the terms and conditions of a RAND license, leaving the courthouse as the only viable arena

7   to determine the meaning of 'reasonable' under the circumstances.").

8
9   **(b)     Apple's Allegations that Conversant or Acacia May Have Sought an "Injunction" Does Not State a Claim.**

10      Apple's assertion that Acacia and Conversant breached FRAND commitments by "seeking

11  injunctions blocking Apple's products" (Compl. ¶ 107) also does not state a claim.  The ETSI IPR

12  Policy—the source of the claimed "contract" right asserted by Apple—does not prohibit an SEP

13  holder from seeking injunctive relief, and Apple's allegations are silent as to any such obligation.

14  Merely seeking an SEP injunction does not constitute a breach of any FRAND obligation under the

15  ETSI IPR Policy.  *See Apple, Inc. v. Motorola Mobility, Inc*., No. 11-cv-178-bbc, 2012 WL

16  5416941, at \*15 (W.D. Wis. Oct. 29, 2012) (no breach of ETSI FRAND obligations "simply by

17  requesting an injunction").  Indeed, as the Federal Circuit recently held, there could be no "*per se*

18  rule that injunctions are unavailable for SEPs." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1331

19  (Fed. Cir. 2014), *overruled on other grounds, Williamson v. Citrix Online, LLC,* 792 F.3d 1339

20  (Fed. Cir. 2015).

21      Given that there is no ETSI contractual obligation and no *per se* rule against such

22  injunctions, Apple's Complaint fails to supply the necessary factual support to allege a breach.

23  Indeed, despite Apple's broad claims of repeated attempts by Acacia to obtain injunctions, it

24  identifies only two such instances (Compl. ¶¶ 72, 77–78):  proceedings based on patents *not*

25  acquired from Nokia and enforcement proceedings brought under German, not U.S., law.[39]

26
_____

27  [39] Paragraphs 77 concerns patents (not originated and not declared essential by Nokia) that Acacia acquired from a third party, *VoiceAge*.  The Acacia Parties are only alleged to have acquired

28  FRAND obligations through *Nokia*.  (*See* Compl. ¶¶ 103–04.)

-44-

1    Apple also alleges that Core Wireless breached its FRAND commitments by seeking an

2    injunction to "coercively to try to extract its non-FRAND demands."  (Compl. ¶¶ 107, 85.)  But

3    Apple omits that the request for an injunction was plainly stated as an alternative form of relief that

4    was expressly contingent on the court's threshold finding that Apple was an unwilling licensee.[40]

5    Had the Northern District of California reached this question and made a threshold determination

6    that Apple was "unwilling" to accept a license on FRAND terms, any resulting injunction would

7    have been consistent with the law.  *See Apple Inc.*, 757 F.3d at 1332 ("an injunction may be

8    justified where an infringer unilaterally refuses a FRAND royalty or unreasonably delays

9    negotiations to the same effect"); *Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998,

10   1007 (N.D. Cal. 2013) ("[a]n injunction may be warranted where an accused infringer of a

11   standard-essential patent outright refuses to accept a RAND license . . . .").

12        (c)    **Apple Fails to Allege that It Performed the FRAND Contract.**

13   Finally, as the supposed beneficiary of the FRAND contract, Apple never alleges that it

14   performed its side of the FRAND bargain, including fulfilling its own obligation to engage in good

15   faith negotiations for a FRAND license.  This failure applies equally with respect to Nokia,

16   Conversant and Acacia.  *See Ericsson*, 2013 WL 4046225, at * 25 ("[F]RAND licensing also

17   includes an obligation to negotiate in good faith.  This obligation is a two-way street.  As potential

18   licensees in a [F]RAND negotiation, Defendants possessed an obligation to negotiate in good faith

19   and earnestly seek an amicable royalty rate.").  Indeed, Apple's efforts to avoid an adjudicated

20   FRAND license rate for use of others' SEPs is well-documented.

21   For all these reasons, Apple's breach of contract allegations fail to state a claim.

22   **G.    Apple Fails to State a Claim for Violation of California's UCL.**

23   In Count VI, Apple alleges that Nokia and Acacia, and Nokia and Conversant, engaged in

24   unfair competition in violation of Cal. Bus. & Prof. Code § 17200, et seq. (the "Unfair Competition

25   Law," or "UCL").  (Compl. ¶¶ 135–42.)  As an initial matter, Apple lacks standing to pursue a

26   UCL claim, for the UCL only allows suits by a person who "has lost money or property as a result

27   ─────────────────────

28   [40] *See* Core Wireless Supp. Brief.

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                    **Case No. 5:16-cv-7266**

1   of the unfair competition."  Cal. Bus. & Prof. Code § 17204.  Apple's only allegations of direct

2   injury are "litigation costs."  (Compl. ¶ 142.)  However, the costs of defending against good-faith

3   patent infringement suits "cannot be the basis for [Apple's] 'economic injury' due to the *Noerr-*

4   *Pennington* doctrine."  *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,

5   No. SACV 14–0341 JVS (DFMx), 2016 WL 7049263, at *2 (C.D. Cal. Aug. 9, 2016) (holding that

6   TCL did not have standing to assert UCL claim because cost of defending against injunctions

7   brought by SEP holder was not economic injury).  Here, Apple only alleges harm in the form of

8   litigation costs and makes no effort to plausibly allege any exception to the *Noerr-Pennington*

9   doctrine; therefore, it has not alleged economic injury and lacks standing to bring a UCL claim.

10          Further, Apple's conclusory and unsupported allegations do not establish entitlement to

11   relief under the UCL.  *See Twombly*, 550 U.S. at 557.  The UCL allows a cause of action for "any

12   unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading

13   advertising."  Cal. Bus. & Prof. Code § 17200.  Apple claims violations of both the "unlawful"

14   the "unfair" prongs of the UCL.  (Compl. ¶ 136.)  The California Supreme Court has held that

15   "[a]n act or practice may be actionable as 'unfair' under the unfair competition law even if it is not

16   'unlawful.'"  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 374 ( 2001) (citing *Cel-Tech*

17   *Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)).  But, where conduct alleged to

18   be "unfair" under the UCL is also a violation of another law, "the UCL claim rises or falls with the

19   other claims."  *Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 911 (N.D. Cal. 2016).  This

20   requirement is necessary because allowing "separate inquiry into essentially the same question

21   under the unfair competition law would . . .  invite conflict and uncertainty."  *Chavez*, 93 Cal. App.

22   4th at 375 (2001).

23          Apple has not sufficiently alleged any unlawful conduct.  As explained in Sections II.B–D,

24   *supra*, it has not stated a claim under either the Sherman or Clayton Acts; these deficient claims

25   therefore cannot form the basis of a UCL claim under the "unlawful" prong.  The breach of

26   FRAND allegation is similarly conclusory and is also inadequate as a matter of law because "a

27   common law violation such as breach of contract is insufficient" to state a claim under the

28   "unlawful" prong.  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir.

-46-

1 2010) (citation omitted).  Nor is Apple aided by its invocation of Section 5 of the Federal Trade

2 Commission Act ("FTC Act"), which Apple contends renders Defendants' conduct "unlawful"

3 under the UCL because the UCL is supposedly modeled upon Section 5.  (*Cf.* Compl. ¶¶ 136,

4 139–40 (invoking Section 5 of the FTC Act, 15 U.S.C. § 45 ("Section 5")).)  Apple cites two

5 negotiated FTC consent decrees (*i.e.*, settlements) as purported authority that Apple claims would

6 bring Defendants' alleged conduct within the ambit of Section 5, and by extension, within the

7 ambit of the UCL's "unlawful" prong.  (Compl. ¶ 139–40.)  But these consent decrees are not

8 informative here.  Neither one is an adjudicated determination as to the scope of Section 5; indeed,

9 it is clear that the mere "entering of a consent decree . . . is not a decision on the merits and

10 therefore does not adjudicate the legality of any action by a party thereto." *Beatrice Foods Co. v.*

11 *F.T.C.*, 540 F.2d 303, 312 (7th Cir. 1976).  Moreover, as the California Supreme Court has

12 recognized, it is the "federal courts [that] are the ultimate arbiters of the meaning and scope of

13 section 5 and the FTC's authority under it." *Cel-Tech*, 20 Cal. 4th at 186.  As such, these consent

14 decrees cannot support Apple's claim of a violation of the UCL's "unlawful" prong.

15       Apple also fails to state a claim under the "unfair" prong of Cal. Bus. & Prof. Code §17200.

16 Under the UCL, an "unfair" act is "conduct that threatens an incipient violation of an antitrust law,

17 or violates the policy or spirit of one of those laws because its effects are comparable to or the

18 same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-*

19 *Tech*, 20 Cal. 4th at 186–87.  Because the "unfair" element is purportedly satisfied here by Nokia's

20 supposed violations of other laws, Apple's failure adequately to allege such claims dooms its

21 claims under the UCL's "unfair" prong. *Hicks*, 165 F. Supp. 3d at 911.

22       Thus, Apple's allegations fail to plead an unfair competition claim and should be dismissed.

23 **III.   <u>CONCLUSION</u>**

24       For the foregoing reasons, Defendants Nokia, Acacia, and Conversant respectfully request

25 that the Court grant their Motion and dismiss the Complaint in its entirety for failure to state a

26 claim.

27

28

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**      **Case No. 5:16-cv-7266**

1    DATED: March 28, 2017            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

2

3
                                      By:  _____ /s/ James J. Elacqua _____
4

5                                          *Attorneys for* NOKIA CORPORATION,
                                           NOKIA SOLUTIONS AND NETWORKS OY, and
6                                          NOKIA TECHNOLOGIES OY

7
     DATED:  March 28, 2017                      LECLAIRRYAN
8

9
                                      By:  _____ /s/ Patricia L. Peden _____
10

11                                         *Attorneys for* ACACIA RESEARCH CORPORATION,
                                           CELLULAR COMMUNICATIONS EQUIPMENT
12                                         LLC, CELLULAR COMMUNICATIONS
                                           EQUIPMENT GMBH, SAINT LAWRENCE
13                                         COMMUNICATIONS LLC, and SAINT LAWRENCE
                                           COMMUNICATIONS GMBH
14

15   DATED:  March 28, 2017                      BAKER BOTTS

16

17
                                      By:  _____ /s/ Stuart C. Plunkett _____
18

19                                         *Attorneys for*  CONVERSANT INTELLECTUAL
                                           PROPERTY MANAGEMENT INC., CORE WIRELESS
20                                         LICENSING, S.A.R.L., and CORE WIRELESS
                                           LICENSING LTD.
21

22                      **SIGNATURE ATTESTATION**

23          Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that I have obtained the concurrence

24   in the filing of this document from all the signatories for whom a signature is indicated by a

25   "conformed" signature (/s/) within this e-filed document and I have on file records to support this

26   concurrence for subsequent production for the court if so order or for inspection upon request.

27   DATED: March 28, 2017            _____ /s/ James J. Elacqua _____
                                                     James J. Elacqua
28

                                             -1-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2017, I electronically filed the foregoing documents using he CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.


DATED: March 28, 2017                              /s/ James J. Elacqua
                                                          James J. Elacqua

**MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**                    **Case No. 5:16-cv-7266**