Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100

*Attorney for Plaintiff*
APPLE INC.

Additional Counsel Listed on Next Page

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>NOKIA CORPORATION, NOKIA SOLUTIONS AND NETWORKS OY, NOKIA TECHNOLOGIES OY, ACACIA RESEARCH CORPORATION, CELLULAR COMMUNICATIONS EQUIPMENT LLC, SAINT LAWRENCE COMMUNICATIONS LLC, CELLULAR COMMUNICATIONS EQUIPMENT GMBH, SAINT LAWRENCE COMMUNICATIONS GMBH, CONVERSANT INTELLECTUAL PROPERTY MANAGEMENT INC., CORE WIRELESS LICENSING S.A.R.L., AND CORE WIRELESS LICENSING LTD.<br><br>               Defendants. | Case No.5:16-cv-07266-EJD<br><br>**APPLE INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: August 31, 2017<br>Time: 9:00 a.m.<br>Judge: Honorable Edward J. Davila<br><br>Complaint Filed: December 21, 2016 |

1  William F. Lee (admitted *pro hac vice*)
   william.lee@wilmerhale.com
2  Joseph J. Mueller (admitted *pro hac vice*)
   joseph.mueller@wilmerhale.com
3  Timothy Syrett (admitted *pro hac vice*)
   timothy.syrett@wilmerhale.com
4  WILMER CUTLER PICKERING
     HALE AND DORR LLP
5  60 State Street
   Boston, MA 02109
6  Telephone: +1 617 526 6000
   Facsimile: +1 617 526 5000
7
   Leon B. Greenfield (admitted *pro hac vice*)
8  leon.greenfield@wilmerhale.com
   Nina S. Tallon (admitted *pro hac vice*)
9  nina.tallon@wilmerhale.com
   WILMER CUTLER PICKERING
10   HALE AND DORR LLP
   1875 Pennsylvania Avenue, N.W.
11 Washington, DC 20006
   Telephone: +1 202 663 6000
12 Facsimile:  +1 202 663 6363

13

14 *Attorneys for Plaintiff*
   APPLE INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

I.      INTRODUCTION ................................................................................................ 1

II.     NATURE OF PROCEEDING AND STATEMENT OF ISSUES TO BE DECIDED ...... 2

III.    STATEMENT OF FACTS ....................................................................................... 3

IV.     ARGUMENT ........................................................................................................ 6

        A.      Standard of Review ...................................................................................... 6

        B.      Apple Has Adequately Alleged Relevant Antitrust Markets and Market Power ... 7

                1.      Apple Has Adequately Alleged Relevant Antitrust Markets ..................... 7

                2.      Apple Has Adequately Alleged Market or Monopoly Power in the
                        Relevant Markets ........................................................................... 12

        C.      Apple Has Properly Alleged Its Section 7 Claim (Count III) ............................. 14

        D.      Apple Has Properly Pled Its Section 1 Claim (Count II) .................................... 18

                1.      Apple Has Alleged Concerted Action ................................................ 19

                2.      Apple Plausibly Alleges that Trade Was Restrained ............................. 24

        E.      Apple Has Adequately Alleged Its Section 2 Claims (Count V) ......................... 25

                1.      Apple Has Adequately Pled Its Monopolization Claim Against Nokia ... 25

                2.      Apple Adequately Alleges that Defendants Have Engaged in a Conspiracy
                        to Monopolize SEP Technology Markets ........................................... 27

        F.      Apple Has Adequately Pled Antitrust Injury ................................................... 30

        G.      Apple Has Adequately Alleged Its Breach of Contract Claim (Count I) ............. 35

                1.      Apple States a Breach of Contract Claim Against Nokia ....................... 36

                2.      Apple States Breach of Contract Claims Against Acacia and Conversant 36

                3.      Apple's Claims Against Conversant Are Not Barred by Res Judicata ..... 43

        H.      Apple Has Adequately Pled Its Claim for Violation of California's UCL (Count
                VI) ............................................................................................................ 46

        I.      PAE Defendants' Wrongdoing Is Not Immunized by the *Noerr-Pennington
                Doctrine* .................................................................................................... 47

V.      CONCLUSION ................................................................................................... 50

1
2
3
4

# TABLE OF AUTHORITIES

## CASES

Page(s)

5  *49er Chevrolet, Inc.* v. *General Motors Corp.*, 803 F.2d 1463 (9th Cir. 1986) ...........................22

6  *Adobe Sys. Inc. v. Coffee Cup Partners, Inc.*, No. 11-2243, 2012 WL 3877783
7      (N.D. Cal. Sept. 6, 2012) .................................................33

8  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) ...............................35

9  *American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781 (9th Cir. 1996)...............................31

10  *American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
       Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir.1997)...........................................25

11
12  *Apple Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901 (N.D. Ill. 2012), *aff'd in part,
       rev'd in part and remanded on other grounds*, 757 F.3d 1286 (Fed. Cir.
13      2014) ......................................................................40

14  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014) ......................................39

15  *Apple Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wis. 2012) .........................38

16  *Apple Inc. v. Motorola Mobility, Inc.*, No. 11-178, 2011 WL 7324582 (W.D. Wis.
17      June 7, 2011)..................................................................9, 10, 38, 43

18  *Apple Inc. v. Samsung Electronics Co.*, No. 11-01846, 2012 WL 1672493 (N.D.
       Cal. May 14, 2012) ...........................................................9, 10, 14, 39, 43

19
20  *Apple Inc. v. Samsung Electronics Co.*, No. 11-01846, 2012 WL 2571719 (N.D.
       Cal. June 30, 2012) ...........................................................31, 47

21  *Arbitron Co. v. Tropicana Product Sales, Inc.*, No. 91-03697, 1993 U.S. Dist.
22      LEXIS 5587 (S.D.N.Y. Apr. 28, 1993) .............................................26

23  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).........................................................6

24  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)............................................33

25  *Baker v. Aegis Wholesale Corp.*, No. 09-5280, 2010 WL 2853915 (N.D. Cal. July
       21, 2010)......................................................................48

26
27
28

---

iv                    MEMORANDUM IN OPPOSITION
TO MOTION TO DISMISS

*Barnes & Noble, Inc. v. LSI Corp*, 849 F. Supp. 2d 925 (N.D. Cal. 2012) ...................................42

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................6, 22

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) ...........................8

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ....................................... *passim*

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..............................................................15

*Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir. 1984) .....................................32

*Cargill Inc. v. Budine*, No. 07-349, 2007 WL 2506451 (E.D. Cal. Aug. 30, 2007)......................8

*Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-cv-1143, 2013 WL
    6247594 (N.D. Cal. Dec. 3, 2013) ............................................................................22, 23

*Chabra v. Southern Monterey County Memorial Hospital, Inc.*, No. 94-20335,
    1994 WL 564566 (N.D. Cal. Oct. 3, 1994)........................................................................12

*Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. 05-3465, 2006 WL 13058 (N.D.
    Cal. Jan. 3, 2006) ...............................................................................................................32

*ChriMar Systems, Inc. v. Cisco Systems, Inc.*, 72 F. Supp. 3d 1012 (N.D. Cal.
    2014) ..............................................................................................................................27, 34

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240 (9th
    Cir. 1982) ............................................................................................................................48

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495 (9th Cir.
    2010) .............................................................................................................................31, 33

*Columbia River People's Utility District v. Portland General Electric Co.*, 217
    F.3d 1187 (9th Cir. 2000) ..................................................................................................32

*Core Wireless Licensing S.a.r.l. v. Apple Inc.*, No. 12-100, 2015 WL 4775973
    (E.D. Tex. Aug. 11, 2015) ........................................................................................41, 44, 46

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*, Case No. 15-cv-05008, 2016 WL
    1258989 (N.D. Cal. Mar. 31, 2016)...................................................................................46

*Craigslist, Inc. v. Autoposterpro, Inc.*, No. 08-05069, 2009 WL 890896 (N.D. Cal.
    Mar. 31, 2009)....................................................................................................................27

*Dang v. San Fancisco Forty Niners*, 964 F. Supp. 2d 1097 (N.D. Cal. 2013) ..............................6

*Delano Farms Co. v. California Table Grape Commission*, 655 F.3d 1337 (Fed. Cir. 2011) ................................................................................................11

*Digital Sun v. Toro Co.*, No. 10-4567, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) ........................................................................................................27

*E & E Co., Ltd. v. Kam Hing Enterprises, Inc.*, 429 Fed. Appx. 632 (9th Cir. 2010) ........................................................................................................10

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435 (4th Cir. 2011) ..........................................................................................................7

*Erickson v. Pardus*, 551 U.S. 89 (2007) ......................................................................7

*Ericsson Inc. v. D-Link Sys., Inc.*, No. 10-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013), *aff'd in part, vacated in part, rev'd in part*, 773 F.3d 1201 (Fed. Cir. 2014) ........................................................................................................37

*Facciola v. Greenberg Traurig, LLP*, 81 F. Supp. 2d 913 (D. Ariz. 2011)................................27

*FTC v. Cement Institute*, 333 U.S. 683 (1948) ............................................................48

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ....................................................15

*Funai Electric Co. v. LSI Corp.*, No. 16-01210, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017)................................................................................ *passim*

*Griffiths v. Blue Cross & Blue Shield of Alabama*, 147 F. Supp. 2d 1203 (N.D. Ala. 2001) ........................................................................................................12

*Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.*, 433 F. App'x 598 (9th Cir. 2011) ..........................................................................................................8

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 2451 (2016)................................................51

*Herrera v. Countrywide KB Home Loans*, No. 11-03591, 2012 WL 901340 (N.D. Cal. Mar. 15, 2012)................................................................................46

*HTI Health Services, Inc. v. Quorum Health Group, Inc.*, 960 F. Supp. 1104 (S.D. Miss. 1997) ........................................................................................................14

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980) ............................30

*Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. 2007)................................................................................31, 47, 48, 49

*In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224 (D. Conn. 2015) ...........................................13

*In re Cathode Ray Tube Antitrust Litigation*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..................................................................................................................................7

*In re Cybernetic Services, Inc.*, 252 F.3d 1039 (9th Cir. 2001)...................................................42

*In re Niaspan Antitrust Litigation*, 42 F. Supp. 3d 735 (E.D. Pa. 2014) ......................................33

*In re Novon International, Inc.*, No. 98-0677E, 2000 WL 432848 (W.D.N.Y. Mar. 31, 2000) .............................................................................................................................42

*In re Particle Drilling Technologies, Inc.*, No. 09-33744, 2009 Bankr. LEXIS 2151 (Bankr. S.D. Tex. July 29, 2009) ...........................................................................42

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) .............................................................................................................................21

*Intellectual Ventures I LLC v. Capital One Financial Corp.*, 99 F. Supp. 3d 610 (D. Md. 2015) ..................................................................................................................18

*Intellectual Ventures I LLC v. Capital One Financial Corp.*, No. 13-00740, 2013 U.S. Dist. LEXIS 177836 (E.D. Va. Dec. 18. 2013) ...............................................17

*Keystone Type Foundry v. Fastpress Co.*, 272 F. 242 (2d Cir. 1921) ...........................................42

*Les Shockley Racing, Inc. v. NationalHot Rod Ass'n*, 884 F.2d 504 (9th Cir. 1989) ...................33

*Love v. United States*, 915 F.2d 1242 (9th Cir. 1989) ....................................................................6

*MetroPCS Wireless, Inc. v. Virgin Mobile USA, L.P.*, No. 08-1658, 2009 U.S. Dist. LEXIS 88527 (N.D. Tex. Sept. 25, 2009)...................................................42

*Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012)...............................................39

*Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023 (W.D. Wash. 2012)...........................37

*Microsoft Corp. v. Motorola, Inc.*, No. 10-1823, 2011 WL 11480223 (W.D. Wash. June 1, 2011)......................................................................................................37, 39, 40

*Microsoft Corp. v. Motorola, Inc.*, No. 10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 201).................................................................................................................37

*Microsoft Mobile Inc. v. Interdigital, Inc.*, No. 15-723, 2016 WL 1464545 (D. Del. Apr. 13, 2016) .......................................................................................... *passim*

*New Jersey Wood Finishing Co. v. Minnesota Mining & Manufacturing Co.*, 332 F.2d 346 (3d Cir. 1964) ............................................................................47

*Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) .........7, 8, 9, 11, 12

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ............................................29

*Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ........................28

*Poblete Mendoza v. Holder*, 606 F.3d 1137 (9th Cir. 2010) ..........................................44

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ..................................................30

*Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-03451, 2012 WL 4845628 (N.D. Cal. Oct. 10, 2012) ...................................................37, 38, 40

*Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ..............................7, 12

*Research In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008) .........31, 34, 37

*Rheumatology Diagnostics Laboratory, Inc. v. Aetna, Inc.*, No. 12-05847, 2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ....................................33

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) .......................................................9

*Spectators' Communication Network Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001) ...............................................................24

*Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308 (D.D.C. 2011) .........................................34

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) .......................................................24

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064 (9th Cir. 2003) ...........................................................44, 45

*Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001) ........................8, 33

*TCL Communications Technology. Holdings, Ltd., v. Telefonaktiebolaget LM Ericsson*, No. 14-0341, 2016 WL 7049263 (C.D. Cal. Aug. 9, 2016) .............................47

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ......................................13

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ................................15, 18

*United States v. Liquidators of European Federal Credit Bank*, 630 F.3d 1139 (9th Cir. 2011) ...........................................................44, 45

*United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004) ...............................................8

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ...................................................13

*United States v. Parke, Davis & Co.*, 362 U.S. 29 (1960) ...........................................................22

*United States v. Rockford Memorial Corp.*, 898 F.2d 1278 (7th Cir. 1990)................................19

*United States v. Singer Manufacturing Co.*, 374 U.S. 174 (1963) ..........................................19, 23

*United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc*, 637 F.3d
    1047 (9th Cir. 2011)................................................................................................................9

*USS-POSCO Industries v. Contra Costa County Building & Construction Trades
    Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994) ...............................................................49

*Vizio, Inc. v. Funai Electric Co.*, No. 09-0174, 2010 WL 7762624 (C.D. Cal. Feb.
    3, 2010) ...................................................................................................................15, 19, 42

*Waugh Chapel South, LLC v. United Food & Commercial Workers Union Local
    27*, 728 F.3d 354 (4th Cir. 2013) .......................................................................................49

*YES Entertainment & Sports Network, LLC v. Cablevision Systems Corp.*, 224 F.
    Supp. 2d 657 (S.D.N.Y. 2002)............................................................................................34

## DOCKETED CASES

*Apple Inc. v. Samsung Electronics Co.*, No. 11-01846 (N.D. Cal.)..............................................47

*Core Wireless v. Apple*, No. 12-100 (E.D. Tex.) .......................................................................43

*Core Wireless v. Apple*, No. 14-752 (E.D. Tex.) .......................................................................45

*TCL Communications Technology Holdings, Ltd., v. Telefonaktienbolaget LM
    Ericsson*, No. 14-0341 (C.D. Cal.).....................................................................................47

## STATUTES AND RULES

15 U.S.C.
    § 18.......................................................................................................................................14
    § 45.......................................................................................................................................47

Cal. Bus. & Prof. Code § 17200, et seq. ...................................................................................46

Fed. R. Civ. P. 8(a)(2)....................................................................................................................9

# OTHER AUTHORITIES

American Bar Association Section of Antitrust Law, *Presidential Transition Report:  The State of Antitrust Enforcement* (Jan. 2017)..................................................2, 18

Carrier, Michael A., *Patent Assertion Entities:  Six Actions the Antitrust Agencies Can Take*, CPI Antitrust Chronicle,  (Jan. 2013), )...........................................18

Department of Justice, *Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigation of Google's Acquisition of Motorola Mobility Holdings Inc. and the Acquisitions of Certain Patents by Apple Inc., Microsoft Corp. and Research In Motion Ltd.* (Feb. 13, 2012) .........................................................................................................18

Department of Justice & Federal Trade Commission, *Antitrust Guidelines for the Licensing of Intellectual Property* (2017).........................................11

Deparment of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* (Aug. 10, 2010).............................................................16

## I.    INTRODUCTION

Apple Inc. (Apple) has alleged, in a detailed 50-page Amended Complaint, a continuing anticompetitive scheme by which Nokia[1] has conspired with patent assertion entities (PAEs) Acacia[2] and Conversant[3] (and their shell affiliates) (collectively, the "Defendant PAEs," and together with Nokia, the "Defendants") to disperse thousands of cellular patents to the Defendant PAEs.  Through their collusion, Defendants avoid constraints on exercising market power that Nokia would otherwise have faced—with the PAEs agreeing to share with Nokia the inflated royalties they extract from serial, abusive patent assertions against cell phone makers like Apple and, ultimately, end consumers.  Nokia's collusion with Acacia and Conversant is especially pernicious because it employs the PAEs to evade commitments that Nokia made to standard-setting organizations (SSOs) to license patents according to fair, reasonable, and non-discriminatory (FRAND) principles.

Seeking to avoid accountability for their misconduct, Defendants assert that Apple is trying "to pay little or nothing to the owners of intellectual property" and that Defendants' conduct is exempt from antitrust scrutiny.[4]  Apple always has been willing to—and does—license patents covering technologies it uses.  Moreover, far from being immune from scrutiny, the type of patent disaggregation Apple has alleged is of such immediate antitrust concern that the American Bar Association's Section of Antitrust Law in its Presidential Transition Report for the new Administration recommends that:

> The [U.S. antitrust] Agencies should also consider harm to competition that could result from disaggregating complementary patents. . . .  Enforcement actions based on the Sherman Act could be warranted depending on factors including contract terms . . . and

---

[1] Nokia Corporation, Nokia Solutions and Networks Oy, Nokia Technologies Oy (collectively, "Nokia").

[2] Acacia Research Corporation, Cellular Communications Equipment GMBH, Cellular Communications Equipment LLC, Saint Lawrence Communications GMBH, and Saint Lawrence Communications LLC (collectively, "Acacia").

[3] Conversant Intellectual Property Management Inc., Core Wireless Licensing Ltd., and Core Wireless Licensing S.a.r.l. (collectively, "Conversant").

[4] (Defs' Mem. at 2-4.)

the increased likelihood that the disposition of the patents will lead
to higher aggregate prices for technology users without evident
procompetitive justification.[5]

To argue for dismissing Apple's Amended Complaint, the Defendants either ignore facts alleged in the Amended Complaint, draw inferences in their favor contrary to the standard of review on a motion to dismiss, or insist that Apple plead an impracticable and unnecessary level of detail regarding facts that are *in their own control*.  The Court should not permit Defendants to evade accountability for their continuing anticompetitive scheme and should deny the motion.

## II.    NATURE OF PROCEEDING AND STATEMENT OF ISSUES TO BE DECIDED

Apple filed its original Complaint on December 20, 2016.  On December 21, 2016, Apple filed its Amended Complaint ("Am. Complaint") against Nokia, Acacia, and Conversant, asserting breach of contract, unlawful agreements to restrain trade under Section 1 of the Sherman Act, unlawful asset acquisition under Section 7 of the Clayton Act, monopolization under Section 2 of the Sherman Act, conspiracy to monopolize under Section 2 of the Sherman Act, and violation of the California Unfair Competition Law.

On March 28, 2017, Defendants moved to dismiss all claims in Apple's Amended Complaint.  *See* Defendants' Motion to Dismiss Plaintiff's First Amended Complaint; Memorandum of Points and Authorities in Support Thereof ("Defs' Mem.").  On the same day, Acacia and Conversant each filed a Supplemental Memorandum in support of Defs' Mem. ("Acacia Mem." and "Conversant Mem.").  The issue before the court is whether Apple's Amended Complaint should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[5] American Bar Association Section of Antitrust Law, *Presidential Transition Report:  The State of Antitrust Enforcement*, at 45 (Jan. 2017) (citations omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   STATEMENT OF FACTS

### A.   Nokia Resorted to an Illegal Patent Transfer Scheme Because It Could Not Compete in the Marketplace

Nokia was at one time a major cell phone supplier but found itself falling behind as Apple and others invented groundbreaking smartphones.  (Am. Complaint ¶¶ 3, 10, 17.)  Apple's introduction of the iPhone in 2007, the resulting disruption of the cell phone industry, and Nokia's failure to innovate led to Nokia's demise as a cell phone supplier.  (*Id.* ¶ 17.)  In 2010, Nokia's then Chief Executive Officer Stephen Elop compared the state of Nokia's business to a man standing on a burning oil platform in the North Sea, acknowledging that Nokia had fallen behind and had "missed big trends" after Apple "disrupted the market by redefining the smartphone."  (*Id.* ¶ 18.)

From fourth quarter 2007 to second quarter 2011, Nokia's share of global smartphone sales plummeted from 50.9 percent to 12.2 percent.  (*Id.* ¶ 21.)  Nokia exited in 2014 by selling its cell phone business to Microsoft.  (*Id.*)  In 2016, Nokia disclosed its intent to reenter the cellular device market by announcing a strategic agreement with HMD Global Oy.  (*Id.* ¶ 37 & n.8.)

In 2011, Nokia launched plans to dramatically increase monetization of its patents and exploit the cell phone suppliers that had outcompeted Nokia by offering better and more innovative products.  (*Id.* ¶ 20.)  Nokia had traditionally licensed its patents through its "industry leading" in-house patent licensing business.  (*Id.* ¶¶ 10, 26.)  But growing increasingly desperate, Nokia began to lay the groundwork for a new strategy.  It excluded certain patents from cross-license agreements with companies like Apple in order to transfer those patents to PAEs.  (*Id.* ¶ 20.)  And Nokia began enlisting PAEs to assert patents it had transferred and to split the exorbitant royalties they extract from product suppliers.  (*Id.* ¶¶ 20, 22.)  Nokia continued to disperse thousands of patents from its cellular patent portfolio over several years to at least five different PAEs.  (*Id.* ¶ 3.)

### B.    PAEs Are Uniquely Situated to Anticompetitively Exploit Product Suppliers

PAEs are entities that make nothing and generate revenues solely from asserting patents. (*Id.* ¶ 11.)  PAEs are ideal co-conspirators for Nokia because they face no risks to their reputation or their ongoing business relationships by adopting aggressive licensing or litigation practices.  (*Id.* ¶ 24.)  Nor do they face the risk of counter-assertions of their targets' patents. (*Id.*)  Indeed, Acacia and Conversant have cultivated a reputation for brazen and ruthless patent assertion tactics precisely to attract operating companies like Nokia to partner with them to tax innovators based on weak patents.  (*Id.*)  And because Acacia, Conversant, and other PAEs had no role in developing the claimed inventions in the former Nokia patents, their litigation discovery exposure and costs are a fraction of those Nokia would have faced if it had asserted the patents itself.  (*Id.*)

Because PAEs' litigation costs and risks are trivial in comparison with those of the operating companies they sue, they can afford to bring serial suits based on weak or low-value patents under the theory that even a modest settlement will be profitable with minimal risk.  (*Id.* ¶ 50.)  As Acacia's former CEO Marvin Key put it:  Acacia's "volume licensing business" is based on the principle that "it will make more financial sense for [its targets] to settle smaller opportunities rather than litigate every single one."  (*Id.*)

### C.    Nokia Deceived Standard-Setting Organizations

Many of the patents that Nokia transferred to PAEs were declared by Nokia as essential to cellular standards developed by the European Telecommunications Standards Institute (ETSI) through the Third Generation Partnership Project (3GPP).  (*Id.* ¶¶ 32, 52.)  In many parts of the world, the significant telecommunications networks support only ETSI/3GPP standards.  (*Id.* ¶ 32.)  Standard-setting allows manufacturers of many different devices to invest in the design and marketing of their products knowing that those products will interoperate effectively with other manufacturers' devices.  (*Id.* ¶ 53.)

When companies decide to implement a standard, they make significant investments in designing their products and supply chains around the standard. (*Id*. ¶ 54.) Once they have made those investments, they are "locked in" to the standard because it would be extremely expensive to start over with a new technology, even if that other technology is just as good or better. (*Id*.) The risk potential implementers face is that a patentee will engage in "patent hold-up" after they have become locked into the standard. (*Id*.) This can occur when a patent owner waits until a standard has become widely adopted and then seeks to extort far more in royalties than its technology is worth, which it is able to do because implementers are already locked in to the standardized technology. (*Id*.)

To constrain the potential abuse of standard-setting activity, ETSI's Intellectual Property Rights Policy (IPR Policy) requires ETSI members to disclose during the standing-setting process patents or patent applications that may cover technology to be included in the standard, and as a condition of having their technology considered for inclusion, to promise to license those patents on FRAND terms. (*Id*. ¶¶ 56-60.) If an ETSI participant is unwilling to commit to license its patents on FRAND terms, the IPR Policy mandates that the participant's technologies are excluded from the standard. (*Id*. ¶ 59.)

Nokia was actively involved in the standard-setting process used by ETSI and the 3GPP. (*Id*. ¶ 52.) It submitted hundreds of declarations to ETSI identifying patents and patent applications that Nokia claimed were essential to the various standards adopted by ETSI and the 3GPP and committed to license those patents on FRAND terms. (*Id*. ¶ 61.) Despite these commitments, Nokia never intended to make its patents available on FRAND terms. (*Id*. ¶ 62.)

### D.  The Defendants Conspired to Inflate Royalties and Evade FRAND

Nokia's cellular patent portfolio included both declared standard-essential patents (SEPs) and non-SEPs. (*Id*. ¶¶ 31-33.) Nokia was fully able to license those patents itself in an open and transparent way. Indeed, Nokia has publicly stated that its subsidiary, Nokia Technologies, conducts "Nokia's industry leading patent licensing business." (*Id*.) Accordingly, Nokia's

1   diffusion of patents to PAEs did not unlock fair value or otherwise achieve efficiencies.  Instead,

2   Nokia outsources licensing and enforcement of the transferred Nokia patents to Acacia,

3   Conversant, and other PAEs for obvious anticompetitive reasons:  unbounded by the market

4   constraints facing Nokia, the PAEs are able to obtain inflated royalties (i.e., higher prices) from

5   product suppliers that Nokia could not obtain itself and share the spoils of that exploitation with

6   Nokia through revenue-sharing agreements.  (*Id.* ¶ 26.)

7       The Defendants' scheme has achieved its intended results.  The PAEs have exploited the

8   inefficiencies created by the patent transfers to impose on Apple and other product suppliers

9   much higher royalties than Nokia could have obtained had it not diffused its patents—resulting

10  in anticompetitive effects in both upstream technology markets and downstream consumer

11  markets for cellular products.  (*Id.* ¶¶ 98-101.)  For declared SEPs, Nokia's patent transfer

12  scheme provides an additional illicit benefit by enabling Nokia to escape all the constraining

13  effects of its promise to license those patents on FRAND terms.  (*Id.* ¶ 27.)  And Nokia's sharing

14  of the supracompetitive fruits of this evasion with Acacia, Conversant, and its other PAE

15  conspirators drives the very economics of the conspiracies.  (*Id.*)

16  **IV.    ARGUMENT**

17      **A.    Standard of Review**

18      A complaint must contain "enough facts to state a claim to relief that is plausible on its

19  face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), so that the complaint "raise[s] a

20  right to relief above the speculative level."  *Id*. at 555.  A court should assume that all well-pled

21  factual allegations are true, and then determine whether they plausibly give rise to an entitlement

22  to relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  "A claim has facial plausibility

23  when the plaintiff pleads factual content that allows the court to draw the reasonable inference

24  that the defendant is liable for the misconduct alleged."  *Id*. at 678 (citing *Twombly*, 550 U.S. at

25  556).  A "court must also construe the alleged facts in the light most favorable to the plaintiff."

26  *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1103 (N.D. Cal. 2013) (citing *Love*

27

28  Case No. 5:16-cv-07266                    6        MEMORANDUM IN OPPOSITION TO
                                                        MOTION TO DISMISS

*v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989)).  "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests."  *In re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d 1011, 1017 (N.D. Cal. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (internal quotations omitted)).  Apple's Amended Complaint easily meets this standard.

### B.  Apple Has Adequately Alleged Relevant Antitrust Markets and Market Power

Market power may be alleged either through circumstantial evidence—i.e., defining a relevant market and alleging that the defendant has a high market share there—or through direct proof of market effects showing that the defendant holds market power.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (evidence of "restricted output and supracompetitive prices" directly establishes market power).  As discussed below, Apple has adequately alleged market power based on both approaches, *either one* of which would be sufficient.

### 1.  Apple Has Adequately Alleged Relevant Antitrust Markets

Contrary to Defendants' argument (Defs' Mem. at 12-17), Apple more than adequately alleges three categories of relevant antitrust markets: (1) SEP Technology Markets; (2) Patented Technology Markets; and (3) Cellular Device Markets.

A relevant market "encompass[es] the product at issue as well as all economic substitutes for the product."  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  "There is no requirement that [relevant markets] be pled with specificity."  *Id.*  And "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011); *see also Newcal*, 513 F.3d at 1045 ("[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.").  "Questions pertaining to proper market definitions are best answered after the benefit of

1   discovery." *Cargill Inc. v. Budine*, No. 07-349, 2007 WL 2506451, at *8 (E.D. Cal. Aug. 30,

2   2007).  All that is required at the pleading stage are allegations sufficient to put defendants on

3   notice of the rough contours of the relevant markets and plaintiff's claim.  *See United States v.*

4   *LSL Biotechnologies*, 379 F.3d 672, 699 (9th Cir. 2004) (plaintiffs' "short and plain statement"

5   defining the relevant market "was more than sufficient to put the defendants on fair notice of the

6   claim and relevant market and enable them to frame responsive pleadings").

7           Antitrust complaints may be dismissed for failure to allege a relevant market only if "it is

8   apparent from the face of the complaint that the alleged market suffers a fatal legal defect."

9   *Newcal*, 513 F.3d at 1045.  Courts typically find a fatal legal defect only when plaintiffs allege

10  markets that are so narrow as to defy common sense.[6]  For example, in *Tanaka v. University of S.*

11  *Cal.*, the plaintiff alleged that the relevant product market was the "UCLA women's soccer

12  program."  252 F.3d 1059, 1063 (9th Cir. 2001).  The Ninth Circuit found such a market

13  "especially unavailing insofar as the very existence of any given intercollegiate athletic program

14  is predicated upon the existence of a field of competition composed of other, similar programs."[7]

15  *Id.* at 1063-64.  In other words, the proposed market was fatally flawed on its face.  *See Newcal*,

16  513 F.3d at 1045.

17          In contrast, Apple's allegations concerning the relevant markets are logical and grounded

18  in accepted methods for market definition and the case law.  Defendants' arguments amount to

19

20  [6] In some instances, however, the alleged market may be manifestly too broad on its face.  For
    example, in *Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, the Ninth Circuit held that a market
21  defined as "the pharmaceutical industry" was facially unsustainable because the complaint failed
    to allege "any facts indicating that all pharmaceutical products are interchangeable for the same
22  purpose."  433  Fed. Appx. 598, 599 (9th Cir. 2011).  Here, the scope of each relevant Patented
    Technology and SEP Technology Market is limited to Nokia's patented technology and
23  substitutes that "compete or competed to perform the same function" as Nokia's patented
    technology.  (Am. Complaint ¶ 31.)  Apple's allegation that the products must "perform the same
24  function" is an allegation that the "products are interchangeable for the same purpose."  *See id.*
    [7] Similarly, in *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir.
25  1999), the plaintiffs tried to limit the market to "lodging accommodations" and "ski packages,"
    but did not explain why there were "no other goods or services that [were] reasonably
26  interchangeable with lodging accommodations or ski packages."  Here, far from seeking
    narrowly to limit the relevant markets, Apple alleges that Patented Technology Markets include
27  all substitutes that "compete or competed to perform the same function."  (Am. Complaint ¶ 31.)

28  Case No. 5:16-cv-07266                      8          MEMORANDUM IN OPPOSITION TO
                                                            MOTION TO DISMISS

1   nothing more than a claim that Apple needs to allege with particularity details supporting *every*

2   *one* of the individual markets implicated by Defendants' patent transfer scheme.  Such specificity

3   is not required by the Federal Rules of Civil Procedure, *Newcal*, 513 F.3d at 1045, and would

4   serve only to impose needless burdens on the courts and plaintiffs.  *See* Fed. R. Civ. P. 8(a)(2) (a

5   pleading must contain "a short and plain statement of the claim showing that the pleader is

6   entitled to relief"); *United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d

7   1047, 1058-59 (9th Cir. 2011) (denying leave to serve overly-long amended complaint and

8   emphasizing importance of adherence to Rule 8's "short and plain statement" standard); *Roth v.*

9   *Jennings*, 489 F.3d 499, 512 (2d Cir. 2007) ("the pleading of additional evidence, beyond what is

10  required to enable the defendant to respond, is not only unnecessary, but in contravention of

11  proper pleading procedure") (alterations and quotations omitted).

12      **SEP Technology Markets**.  Defendants disregard that Apple has alleged SEP

13  Technology Markets using an approach that courts, including in this District, have repeatedly

14  endorsed.  SEP Technology Markets are defined by technologies competing "to perform each of

15  the various functions covered by each of [Nokia's] purported essential patents" before the

16  standard was adopted.  *Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846, 2012 WL 1672493,

17  at *5 (N.D. Cal. May 14, 2012) (accepting allegations of markets defined as "the various markets

18  for technologies that—before the standard was implemented—were competing to perform each

19  of the various functions covered by each of Samsung's purported essential patents"); *Apple Inc.*

20  *v. Motorola Mobility, Inc.*, No. 11-cv-178, 2011 WL 7324582, at *13 (W.D. Wis. June 7, 2011)

21  ("The relevant markets include the various technologies competing to perform the functions

22  covered by Motorola's declared-essential patents for each of the relevant standards.").  Once the

23  standard has been adopted, "the relevant market may be defined as 'congruent with the scope of

24  the defendant's patents." *Funai Elec. Co. v. LSI Corp.*, No. 16-cv-01210, 2017 WL 1133513, at

25  *7 (N.D. Cal. Mar. 27, 2017); *see Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 315 (3d Cir.

2007); *Microsoft Mobile Inc. v. Interdigital, Inc.*, No. 15-723, 2016 WL 1464545, at *2 (D. Del. Apr. 13, 2016).

Here, Apple alleges that the "Patented Technology Market consists of a technology covered by a patent that Nokia transferred to Acacia, Conversant, or another PAE, and any other patented technologies that compete or competed to perform the same function." (*Id.* ¶ 31.) SEP Technology Markets are Patented Technology Markets that "encompass technology purportedly covered by a declared SEP." (Am. Complaint ¶ 32.) "[O]nce the relevant standard is established, any technologies that formerly competed with that technology are no longer viable substitutes," resulting in the declared holder of the SEP gaining a monopoly, i.e., a 100 percent share, in the relevant market. (Am. Complaint ¶¶ 32, 55, 124.) As many courts have held, such allegations are plainly sufficient to plead relevant SEP Technology Markets. *See, e.g., Broadcom*, 501 F.3d at 315; *Funai*, 2017 WL 1133513, at *7; *Interdigital*, 2016 WL 1464545, at *2; *Samsung*, 2012 WL 167493, at *5; *Motorola Mobility*, 2011 WL 7324582, at *13.

Given that Apple has alleged relevant markets based on established, well-accepted approaches, Defendants are essentially reduced to arguing that Apple's Amended Complaint should be dismissed for failure to allege every patent by number. As explained above, such a level of particularity is not required. Defendants' complaint that Apple's allegations regarding SEP Technology Markets are insufficient to provide them with adequate notice of the relevant markets (Defs' Mem. at 16) is particularly untenable because information regarding those patents that Nokia declared essential and that the Defendant PAEs hold is fully within the Defendants' control. *See E & E Co., Ltd. v. Kam Hing Enterprises, Inc.*, 429 Fed. Appx. 632, 633 (9th Cir. 2010) (even in fraud cases pleading standards "may be relaxed as to matters within the opposing party's knowledge").[8]

---

[8] Defendants' objections to Apple's geographic market allegations are entirely derivative of its objections to Apple's definition of the relevant product markets. (Defs' Mem. at 14 n.11.) Because Apple adequately defines the relevant product markets, Defendants' objections to Apple's alleged geographic markets lack merit.

**Patented Technology Markets**.  Defendants assert that the Patented Technology Markets defined in the Complaint are "incomprehensible."  (Defs' Mem. at 15.)  But as with its argument regarding the SEP Technology Markets, Defendants complain that Apple has not pled particularized individual details regarding every market alleged.  Apple alleges that the relevant Patented Technology Markets are "markets for functions performed by technologies purportedly covered by former Nokia patents" and "any other patented technologies that compete or competed to perform the same function." [9]  (Am. Complaint ¶ 31.)  In other words, the alleged Patented Technology Markets "encompass the product at issue as well as all economic substitutes for the product," *Newcal*, 513 F.3d at 1045, and are therefore defined in a well-established and entirely appropriate way.[10]  *See* DOJ & FTC, Antitrust Guidelines for the Licensing of Intellectual Property, 9 & n.34 (Jan. 12, 2017) ("When rights to intellectual property are marketed separately from the products in which they are used, the Agencies may analyze the competitive effects of a licensing arrangement in a technology market.").[11]  Unlike the rare cases in which courts have dismissed complaints for failure to allege markets with particularity, *see supra* Section IV.B.1, there is nothing inherently implausible about the Patented Technology Markets Apple has alleged here.

---

[9]  Apple agrees that a relevant technology market is not necessarily limited to the patented technology.  (Defs' Mem. at 16.)  That is why Apple alleges that substitute technologies that provide the same functionality as that purportedly covered by a former Nokia patent are also in the Patented Technology Markets.  (Am. Complaint ¶ 31.)  As discussed above, however, for declared SEPs, once a given technology purportedly covered by the declared SEP has been standardized, alternatives to those technologies are eliminated, and the technology allegedly covered by the patent has a monopoly in that market.

[10] Defendants rely substantially on *Delano Farms Co. v. California Table Grape Commission*, 655 F.3d 1337 (Fed. Cir. 2011), in which the Federal Circuit affirmed the dismissal of an antitrust complaint because the plaintiff had improperly defined the relevant market as "coterminous" with "characteristics . . . taken directly from the patent" for the defendant's product.  *Id.* at 1351-52.  The court observed, however, that if the plaintiff had made "some allegation that, if proved, would define the market . . . with reference to consumer demand for the product and consumer demand for its reasonable substitutes," the complaint would have survived, *id.* at 1352, and that the plaintiff "did not have to . . . define the market with precision." *Id.*  Here, Apple provides the allegations that were missing in *Delano*.  It alleges that the relevant markets include technologies purportedly covered by former Nokia patents and all substitute technologies that provide the functionality demanded by consumers.  (Am. Complaint ¶ 31.)

[11] *Available at* https://www.ftc.gov/system/files/documents/public_statements/1049793/ip_guidelines_2017.pdf.

**Cellular Device Markets**.  Defendants' conduct also has resulted in anticompetitive effects in downstream Cellular Device Markets,[12] which are markets for "cell phones and other devices with cellular capability."  (Am. Complaint ¶ 37.)  Similar to the SEP Technology and Patented Technology markets, these allegations put the Defendants on notice of the general contours of the relevant market at issue and are thus sufficient.  *See, e.g.*, *Chabra v. Southern Monterey Cty. Mem'l Hosp., Inc.*, No. 94-20335, 1994 WL 564566, at *4 (N.D. Cal. Oct. 3, 1994) (defining market as "radiological services" sufficient to give defendants notice); *Griffiths v. Blue Cross & Blue Shield of Ala.*, 147 F. Supp. 2d 1203, 1213-14 (N.D. Ala. 2001) (alleging a "chiropractic services" market sufficient to survive a motion to dismiss because it provided Defendants with notice).

\* \* \* \* \*

The Amended Complaint contains all the required allegations to provide Defendants with notice of the relevant markets in this case.  The precise boundaries of the individual markets can be fleshed out through discovery.  *See Newcal*, 513 F.3d at 1045; *LSL*, 379 F.3d at 699.

## 2.     Apple Has Adequately Alleged Market or Monopoly Power in the Relevant Markets

As discussed above, market power can be demonstrated based on either circumstantial or direct proof.  *See supra* Section IV.B; *Rebel* Oil, 51 F.3d at 1434.  Defendants argue that Apple has failed to allege circumstantial evidence of market power because Apple supposedly does not adequately allege relevant antitrust markets.  (Defs' Mem. at 17-18.)  Because, as demonstrated *supra* in Section IV.B.1, Apple has plainly alleged relevant markets, Defendants' argument fails.

Defendants also argue that Apple has made only conclusory allegations regarding direct evidence of Defendants' "ability to increase prices or reduce output, which is the definition of market power."  (Defs' Mem. at 18.)  Defendants are incorrect.

---

[12] As discussed below, Defendants do not need to have market power in the Cellular Device Markets for Apple to prevail on its claims.  As a result, allegations of the precise contours of the relevant market are even less necessary here.

The Supreme Court "defines monopoly power as 'the power to control prices or exclude competition.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power." *Broadcom*, 501 F.3d at 307. Here, Defendants ignore Apple's detailed allegations that Acacia and Conversant have extracted supracompetitive royalties for patents acquired from Nokia. (*E.g.*, Am. Complaint ¶¶ 8, 33, 89, 97.) Specifically, the Amended Complaint alleges that for "both declared SEPs and non-SEPs," Acacia, Conversant, and other PAEs have extracted "exorbitant royalties from Apple and others," (*id.* ¶¶ 33, 35-36) "far beyond what Nokia could collect itself" (*id.* ¶¶ 110-113), and that the Defendants' illegal scheme "has resulted in inflated licensing royalties—i.e., higher prices" in Patented Technology and SEP Technology Markets. (*Id.* ¶¶ 99, 100.) Apple further alleges that "Acacia and its subsidiaries have made exorbitant royalty demands on Apple, filed waves of lawsuits against Apple, and threatened to continue asserting patents until Apple pays Acacia's extortionate price." (*Id.* ¶ 41.) Apple alleges many specific examples of Acacia or Conversant demanding supracompetitive royalties for former Nokia patents. (*Id.* ¶¶ 41, 71-73, 77-78, 81, 85, 89, 92, 97.) Apple's allegations more than adequately plead direct proof of market power. *See Microsoft*, 253 F.3d at 51; *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246 (D. Conn. 2015) ("when direct evidence is available that a party profitably charges supracompetitive prices, the existence of market power can be established from that fact alone").

As to monopoly power in SEP Technology Markets specifically, Apple alleges that "Nokia submitted hundreds of declarations to ETSI identifying patents and patent applications that Nokia claimed were essential to the various standards adopted by ETSI and 3GPP." (Am. Complaint ¶ 61.) Nokia's declarations of essentiality have conferred monopoly power on the owner of those patents. (*Id.* ¶¶ 101, 123-124.) In addition, the Amended Complaint contains specific examples of Nokia-declared SEPs that have been transferred to the PAE Defendants.

1    (*Id.* ¶¶ 68, 69, 71, 84, 86.)  Under well-established case law, these allegations are sufficient to

2    allege monopoly power in SEP Technology Markets.  *See, e.g.*, *Broadcom*, 501 F.3d at 315;

3    *Interdigital*, 2016 WL 1464545, at *2; *Samsung*, 2012 WL 167493, at *6.

4         **Cellular Device Markets**.  Apple's claims do not require Defendants to have market

5    power in the downstream Cellular Device Markets.  That is because Apple is alleging harm to

6    competition and consumers in those markets based on Defendants' illegal conduct in upstream

7    Patented Technology and SEP Technology Markets, where they have market power.  As to the

8    former Nokia patents, Apple and Defendants are in a vertical supplier-customer, not horizontal,

9    relationship.  And "because [Apple] has alleged vertical injury" in the Cellular Device Markets,

10   "market share calculations are inapplicable" there.  *See HTI Health Servs., Inc. v. Quorum*

11   *Health Grp., Inc.*, 960 F. Supp. 1104, 1126 (S.D. Miss. 1997); Am. Complaint ¶¶ 112, 115, 120.

12        **C.    Apple Has Properly Alleged Its Section 7 Claim (Count III)**

13        Apple has adequately alleged that Nokia's transfers of patents to Acacia and Conversant

14   were asset acquisitions that may "substantially . . . lessen competition, or . . . tend to create a

15   monopoly" in violation of Section 7 of the Clayton Act.  15 U.S.C. § 18.  Defendants' arguments

16   to the contrary lack merit.

17        *First*, Defendants repeat their argument that Apple has failed to allege relevant Patented

18   Technology and SEP Technology Markets.  But, as discussed in Section IV.B above, Apple's

19   allegations regarding those markets are more than sufficient.

20        *Second*, Defendants argue that Apple fails to state a Section 7 claim because it does not

21   allege that the PAE Defendants already owned patents that competed with Nokia's patents before

22   the acquisitions.  (Defs' Mem. at 19-21.)  To begin, Defendants disregard the factual allegations

23   in the Amended Complaint that the patent transfers combined thousands of former Nokia patents

24   with the Defendant PAEs' existing portfolio of other cellular patents.  For example, Apple has

25   alleged that Acacia already owned large portfolios of declared SEPs (including the Adaptix and

26   St. Lawrence portfolios) before acquiring Nokia declared SEPs.  (Am. Complaint ¶ 38.)

27

28

1    More importantly, Defendants' argument fails as a legal matter: it has long been

2  recognized that an acquisition can violate Section 7 by substantially lessening competition

3  whether or not the acquirer competed with the seller before the acquisition.  Indeed, a vertical or

4  conglomerate merger, in which the acquirer is not even in the relevant market, can be unlawful

5  under Section 7.  The Supreme Court has recognized that when Congress amended the Clayton

6  Act in 1950, one of its objectives was "to make plain that [Section] 7 applied not only to mergers

7  between actual competitors, but also to vertical and conglomerate mergers whose effect may tend

8  to lessen competition in any line of commerce in any section of the country."  *Brown Shoe Co. v.*

9  *United States*, 370 U.S. 294, 317 (1962); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577

10  (1967) ("All mergers are within the reach of § 7, and all must be tested by the same standard,

11  whether they are classified as horizontal, vertical, conglomerate or other."); *see also*, *e.g.*, *United*

12  *States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) (downstream firm's purchase of

13  stock in supplier violated Section 7 based on vertical theory).  Defendants' reliance on *horizontal*

14  merger cases, therefore, misses the mark.

15    Defendants find no more success with their suggestion that an acquisition that is merely a

16  lawful "shift of market power from the hands of one company to another" does not violate

17  Section 7.  (Defs' Mem. at 20-21 (citing *Vizio, Inc. v. Funai Elec. Co.*, No. 09-0174, 2010 WL

18  7762624, at *4 (C.D. Cal. Feb. 3, 2010)).)  In *Vizio*, unlike here, the plaintiff failed to allege how

19  the transfer of two patents from one owner to another—standing alone—could substantially

20  lessen competition.  *Id.* at *4-5.  Here, by contrast, Apple has alleged in detail how Acacia's and

21  Conversant's acquisition of patents has substantially lessened competition through their ability

22  and incentive to extract inflated royalties from product suppliers in ways that Nokia cannot.

23  (Am. Complaint ¶¶ 119-20.)  Through the patent transfers, Nokia and the PAE Defendants

24  exploit multiple types of inefficiencies that the transfers create, including the following:

25    • PAEs can aggressively and serially assert weak patents because, unlike Nokia (which

26      markets communications infrastructure products), they produce nothing and thus do

27

28

not face reputational harm from patent assertions and have no desire to achieve patent peace through cross-licensing.  (*Id.* ¶ 24.)

- By scattering Nokia's portfolio across multiple PAEs, Nokia and its conspiring PAEs undermine courts' ability to police royalty stacking of their demands in the aggregate. (*Id.* ¶ 25.)  As a result, the PAEs that Nokia has enlisted encounter neither the same litigation constraints that Nokia faces nor the same constraints of bargaining for patent licenses.  (*Id.* ¶¶ 25, 35.)

- By asserting pieces of the former Nokia portfolio through multiple, separate entities, Nokia and its PAE conspirators impose inflated negotiation and litigation costs on licensees and thus drive up settlement values, artificially inflating the royalties that Nokia would have been able to obtain had the entire portfolio remained in its hands. (*Id.* ¶¶ 4, 36, 50.)

- PAEs have advantages in asserting weak patents that Nokia does not enjoy.  For example, because they were not involved in the creation of the claimed inventions, they are less likely to have weak patents in their possession found invalid or unenforceable (given constraints on third-party discovery from Nokia) and face lower litigation costs than Nokia would confront.  (*Id.* ¶ 24.)

- PAEs have disputed that they are bound by the FRAND commitments of the previous patent owner (*id*. ¶ 66), as Acacia is doing in this very suit.  (*See* Acacia Mem. at 2.)

As the U.S. antitrust agencies have stated, a merger or acquisition "enhances market power if it is likely to encourage one or more firms to raise prices, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives."[13]  The scheme involving the patent transfers here is not just *likely* to encourage anticompetitive effects; it has *already* unleashed them.  By diffusing Nokia's patents to the PAE Defendants, the conspirators have materially increased (and employed) their ability and incentive

---

[13] DOJ & FTC, Horizontal Merger Guidelines § 2 (Aug. 19, 2010).

1   to exercise market power in ways that Nokia alone simply could not.  Acacia and Conversant

2   have demanded and obtained above-market royalties and have pursued serial litigation against

3   Apple and other product suppliers to drive up settlement values.  (*Id.* ¶¶ 4, 5, 30, 41, 45.)  Nokia

4   has benefitted from these attacks by receiving a large portion of the royalties and settlements that

5   the PAE Defendants extract.  (*Id.* ¶¶ 6, 23.)

6          *Third*, Defendants' argument that Apple's Section 7 claim fails insofar as it is based on

7   post-acquisition conduct of Acacia and Conversant (Defs' Mem. at 21-22) is beside the point.

8   Apple grounds its Section 7 claim in allegations that the *effect* of the patent acquisitions has been

9   substantially to lessen competition and tend to create a monopoly in violation of Section 7.  (Am.

10  Complaint ¶ 120.)  But that does not mean that Apple's Section 7 claim is *based on* post-

11  acquisition conduct rather than the patent acquisitions themselves and the anticompetitive effects

12  of the acquisitions.

13         Defendants rely on *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13-cv-

14  00740, 2013 U.S. Dist. LEXIS 177836 (E.D. Va. Dec. 18. 2013), but the court in that case found

15  that the plaintiff had failed to allege that the patent "acquisitions, standing alone, have lessened

16  competition."  *Id.* at *29.  Here, in contrast, Apple has alleged how the acquisitions have

17  lessened competition.  *See supra* at 15-16.  As the Supreme Court has held, Section 7 proscribes

18  anticompetitive acquisitions in their infancy:  The "Senate declared the objective of the Clayton

19  Act to be . . . to arrest the creation of . . . monopolies *in their incipiency* . . . 'Incipiency' in this

20  context denotes not the time the [asset] was acquired, but any time when the acquisition threatens

21  to ripen into a prohibited effect."  *E.I. du Pont de Nemours & Co.*, 353 U.S. at 597 (emphasis in

22  original).  The anticompetitive patent acquisitions that Apple has identified not only meet the

23  incipiency standard but also reach far beyond it; in fact, they have *already* caused demonstrable

24  harm both to licensees in the Patented Technology and SEP Technology Markets and to

25  downstream consumers and, unless stopped and remedied, will continue to do so.  (Am.

26  Complaint ¶¶ 6-8, 29, 37, 89, 98-101.)  Apple has thus alleged direct evidence of a Section 7

27

28  Case No. 5:16-cv-07266               17        MEMORANDUM IN OPPOSITION TO
                                                   MOTION TO DISMISS

1    violation.  *See, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957)

2    (determining that acquisition violated Section 7 based on evidence of post-acquisition effects).

3    Defendants' erroneous, constricted view that Section 7 cannot reach Defendants' patent

4    diffusions (Defs' Mem. at 20) flies in the face of the growing recognition that patent diffusion

5    can bring competitive harm, and that such conduct is an appropriate target for Section 7

6    enforcement.  Indeed, in the context of reviewing transfers of SEPs to PAEs, the Antitrust

7    Division of the U.S. Department of Justice has announced that it "will not hesitate to take

8    appropriate enforcement action to stop any anticompetitive use of SEP rights."[14]  Similarly, the

9    American Bar Association's Section of Antitrust Law's recent Transition Report for the new

10   Administration recommended that the Federal Trade Commission and the Department of Justice

11   consider in their enforcement approach "harm to competition that could result from

12   disaggregating complementary patents"—which is *exactly* the type of conduct that Apple

13   complains about here.[15]

14   **D.    Apple Has Properly Pled Its Section 1 Claim (Count II)**

15   Defendants argue that Apple has failed to allege violations of Section 1 because it has not

16   adequately pled concerted action or that trade has been restrained.  (Defs' Mem. at 22-27.)  But

17   on both these fronts, Apple's allegations are more than sufficient.

18   At the outset, as discussed in Section IV.C above, Apple has adequately alleged that

19   Nokia's agreements with Acacia and Conversant caused actual anticompetitive effects that

20   significantly outweighed any procompetitive benefits.  In fact, there are no such procompetitive

21   benefits at all, given that the arrangements actually are "designed to create inefficiencies."  (Am.

22   Complaint ¶ 114.)  These allegations, by themselves, are more than enough to allege an

23

24   [14] *See* DOJ, *Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigation of Google's Acquisition of Motorola Mobility Holdings Inc. and the Acquisitions of Certain Patents by Apple Inc., Microsoft Corp. and Research in Motion Ltd.*

25   (Feb. 13, 2012); *see also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d 610 (D. Md. 2015) (refusing to dismiss Section 7 claim based on patent acquisitions).

26   [15] American Bar Association Section of Antitrust Law, *Presidential Transition Report:  The*

27   *State of Antitrust Enforcement*, 45 (2017); *see also* Michael A. Carrier, *Patent Assertion Entities: Six Actions the Antitrust Agencies Can Take*, CPI Antitrust Chronicle (Jan. 2013).

unreasonable restraint of trade for purposes of Section 1. *See, e.g.*, *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990) (finding that both Section 1 and Section 7 "as currently understood prevent transactions likely to reduce competition substantially").

### 1.    Apple Has Alleged Concerted Action

Defendants contend that Apple has not adequately alleged the first element of a Section 1 claim—a contract, combination, or conspiracy. (Defs' Mem. at 22-26.) Defendants' arguments lack merit.

*First*, Defendants claim that agreements to transfer patents—standing alone—do not restrain trade in violation of Section 1. (*Id.* at 23-25.) But Apple has alleged far more than just the fact of patent transfer agreements:  As discussed below, it has pled in detail that the parties entered those agreements with a common purpose of illegally enlisting the PAE Defendants to exploit Apple and other potential licensees in ways that Nokia could not by itself, and that the transfers had those anticompetitive effects.

The Supreme Court has long recognized the potential for patent transfers to violate Section 1.  In *United States v. Singer Manufacturing Co.*, 374 U.S. 174, 194-95 (1963), the Court found that an agreement to transfer a patent for the "common purpose to suppress the Japanese machine competition in the United States through the use of the patent" contravened Section 1. In *Singer*, like here, the objective of the transfer was to put the patent in the hands of a new owner that could evade constraints on the original patent owner's ability to enforce the patent to anticompetitive ends.  *Id.* at 184.

In a context particularly similar to the one here, the court in *Vizio v. Funai Electric Co.*, 2010 WL 7762624, denied a motion to dismiss a Section 1 claim.  There, a potential licensee alleged that the holder of multiple FRAND-committed SEPs (Thomson)—which formerly licensed its SEPs as a portfolio—divested one of its SEPs to Funai.  *Id.* at *2.  And, when they agreed to the transfer, "Thompson and Funai shared a commitment to a common scheme to circumvent Thomson's RAND commitment to the [standard-setting organization] by agreeing

that Funai would collect a second royalty for the same technology, and to share the proceeds of the second royalty." *Id.* at *6 (quoting complaint). In finding the allegations sufficient, the court observed that "[t]he Section 1 claim does not rest solely on Funai's acquisition [of] the [SEP]." *Id.*

Here, Apple has alleged in detail the circumstances, incentives, and economic rationale demonstrating that Nokia and the PAE Defendants shared a common objective—that is, had a meeting of the minds—to use patent transfers to extract exorbitant royalties from Apple and other potential licensees that Nokia could not obtain unilaterally. In fact, Defendants' common objective not only encompassed evasion of Nokia's FRAND commitments but went far beyond that. Relevant allegations in the Amended Complaint include the following:

- Nokia was a struggling cellular device maker when it began to conspire with PAEs Acacia and Conversant for the purpose of raising its product competitors' patent licensing costs. (Am. Complaint ¶¶ 3, 17-22, 115.) Now that it is re-entering the cell phone business, Nokia has that objective once again. (*Id.* ¶ 115.)

- Although Nokia is the self-proclaimed holder of the "industry leading patent licensing business" (*id.* ¶¶ 10, 26), it colluded to vest licensing with Acacia and Conversant. As Nokia knew, Acacia and Conversant—whose sole business is patent licensing and ligation (*id.* ¶ 23)—have cultivated reputations for exploitation and abusive litigation tactics (*id.* ¶¶ 24, 38-39, 74), and at least Acacia and its affiliates have at times even questioned whether royalties charged for declared SEPs must be on FRAND terms. (*Id.* ¶¶ 66, 74.) The only conceivable purpose of Defendants' patent transfers was to exploit potential licensees. (*Id.* ¶ 26.)

- Nokia and the PAE Defendants agreed to separately enforce their portions of the diffused portfolio to maximize the royalties they could extract from product companies. (*Id.* ¶ 35.)

- Nokia's and the PAE Defendants' plain objective for the patent transfers was to evade the constraints on Nokia's own ability to charge exorbitant royalties (including on FRAND-committed patents) by "outsourc[ing] enforcement to a network of uninhibited PAEs willing to demand anticompetitive royalties."  (*Id.* ¶ 26; *see also* ¶¶ 4, 67, 70, 72, 85, 88.)

- Reflecting the parties' expectation that their coordinated conduct in transferring patents would enable exploitation of licensees far beyond what Nokia could do unilaterally, Nokia agreed with Acacia and Conversant to remit to Nokia a substantial portion of the royalties the PAE Defendants were able to extract.  (*Id.* ¶¶ 4, 6, 23, 67, 71, 84.)

- While Nokia was in the midst of transferring patents to Acacia and Conversant, the PAE Defendants were engaged in serial, abusive patent assertions and litigations and evasions of FRAND commitments (*id.* ¶¶ 5, 41-44, 46, 48-49, 68, 72, 77-79, 85-86), thereby reconfirming to Defendants that additional transfers would continue to result in anticompetitive effects.

- Given Nokia's own claimed licensing expertise, the patent transfers generated no efficiencies and in fact were designed to create inefficiencies that Nokia, Acacia, and Conversant could exploit to harm Apple, other potential licensees, and end-product consumers.  (*Id.* ¶ 114.)

Based on these allegations, Apple has easily alleged "enough factual matter (taken as true) to suggest that [agreements were] made." *Twombly*, 550 U.S. at 556; *see also*, *e.g.*, *Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-cv-1143, 2013 WL 6247594, at *9 (N.D. Cal. Dec. 3, 2013) (denying motion to dismiss where alleged facts, "if true, would tend to discount entirely innocent explanations and plausibly suggest an economic benefit to be derived from conspiring"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184-85 (N.D.

---

1  Cal. 2009) (denying motion to dismiss a "complex, multinational" conspiracy and observing that

2  *Twombly* does not require "elaborate fact pleading").

3  Defendants contend that Apple has failed adequately to plead illegal agreements because

4  "the mere fact that the parties entered into a contractual arrangement—here, a sale of patents—is

5  without more, insufficient to infer that the parties conspired to charge non-FRAND royalties."

6  (Defs' Mem. at 24.)  But Defendants ignore Apple's allegations that the parties *did* conspire to

7  charge non-FRAND royalties, among other illegal objectives.  (Am. Complaint ¶¶ 2, 20, 27-29,

8  62, 66-67, 70-74, 77-79, 81-82, 85, 90, 92-93, 95, 106-107, 110-113.)  As the Ninth Circuit

9  stated in *49er Chevrolet, Inc.* v. *General Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986), on

10  which Defendants rely, although the "antitrust laws are not offended by agreements as such,"

11  they *are* violated by "those with an anticompetitive content."  Apple has plainly alleged that the

12  agreements here have such content.  *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 46

13  (1960) (otherwise unobjectionable conduct may be "tainted with the vice of illegality" when

14  used as the "vehicle" to effectuate an anticompetitive scheme) (internal citations and quotations

15  omitted).

16  *Second,* Defendants suggest that Apple's allegations of Section 1 agreements somehow

17  depend on the written patent transfer contracts having explicitly specified that the PAE

18  Defendants would evade FRAND commitments.  (Defs' Mem. at 23.)  Apple does not plead such

19  a theory, nor is this type of contract required.  The contours of Defendants' conspiracies are not

20  constrained by what they put in writing.  *E.g., Parke, Davis & Co.*, 362 U.S. at 44 ("[J]udicial

21  inquiry is not to stop with a search of the record for evidence of purely contractual arrangements.

22  The Sherman Act forbids combinations of traders to suppress competition.").

23  Defendants argue that there is a "fundamental contradiction" in Apple's allegations

24  because Apple pleads that both Acacia and Conversant have publicly acknowledged that they are

25  bound by Nokia's FRAND commitments.  (Defs' Mem. at 23-24.)  But there is no such

26  contradiction.  That the PAEs made those public statements says nothing about whether—as the

27

28

facts Apple has alleged suggest—they agreed with Nokia in private, and without reducing the

agreement to writing, to disregard FRAND commitments (which they have done).  *See Singer*,

374 U.S. at 195 ("[W]hether an unlawful combination or conspiracy is proved is to be judged by

what the parties actually did rather than by the words they used."); *Cascades*, 2013 WL 6247594,

at *11 (finding allegations sufficient to demonstrate agreement inconsistent with express contract

terms among alleged conspirators where the parties' conduct and the purpose of the alleged

scheme "support the inference of a second, 'off-the-books' agreement or understanding" among

defendants).[16]

*Third*, Defendants argue that Apple has failed to allege that, after the patent transfers,

Nokia controlled the terms on which the PAEs would license the former Nokia patents.  (Defs'

Mem. at 25-26.)  But Apple's Section 1 claim does not require post-transfer control.  Rather, the

patent *transfers*—individually and as part of a larger collusive scheme to enable the Defendants

to charge inflated royalties and evade FRAND commitments by diffusing Nokia's patents—

violate Section 1.

Nor does it help Defendants that it supposedly is "equally plausible to infer [from

Apple's allegations] that the PAEs are acting independently in their own self-interest to

maximize . . . their licensing revenues from Apple, as opposed to doing so pursuant to some

agreement with Nokia."  (*Id.* at 25.)  Even if that were so, as the Ninth Circuit has made clear in

interpreting *Twombly* and *Iqbal*:  "If there are two alternative explanations, one advanced by

defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint

survives a motion to dismiss under Rule 12(b)(6)" and "Plaintiff's complaint may be dismissed

only when defendant's plausible alternative explanation is so convincing that the plaintiff's

---

[16] Defendants argue that Apple's allegations are somehow implausible because it challenges all the patent transfers from Nokia to Acacia and Conversant.  (Defs' Mem. at 23 n.16.)  But it is entirely logical that, as Apple has alleged, the series of patent transfers collectively formed part of an illicit scheme.  Moreover, Apple has made detailed allegations regarding individual patent transfers—including massive transactions like the over 2,000 patents transferred from Nokia to Core Wireless in 2011 and the at least 500 patents transferred to Acacia since 2013.  (Am. Complaint ¶¶ 39-40, 84.)  Once again, Defendants are seeking to exploit the very pervasiveness of their illegal conduct to avoiding being held accountable.

1    explanation is *im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).[17]  In any event,

2    the PAE Defendants' own incentives to extract exorbitant royalties post-transfer is fully

3    consistent with Nokia conspiring with them to do so; indeed, Nokia colluded with the PAEs for

4    the very purpose of taking advantage of the exploitive business model they offered Nokia.  (*E.g.*,

5    *id*. ¶¶ 24, 38-39.)

6         *Finally,* Defendants argue that Apple's Section 1 claim is implausible because the

7    allegations regarding other non-Nokia patents held by Defendant PAEs are conclusory.  Not so.

8    Apple has pled, for instance, detailed facts regarding Acacia's acquisition and assertion of

9    declared SEPs from VoiceAge, including EP 315, EP 276, EP 284, EP 285, EP 286, and EP 494,

10   in which Nokia owns an interest in the royalties.  (Am. Complaint ¶ 75.)

11              **2.      Apple Plausibly Alleges that Trade Was Restrained**

12         Defendants' claim that Apple has not plausibly alleged that trade was restrained (Defs'

13   Mem. at 27) repeats prior flawed arguments.  They argue once again that Apple's market

14   definition and market power allegations are deficient.  (*Id*. at 26-27.)  But as discussed in Section

15   IV.B above, Apple has more than adequately pled both market definition and market power.

16   And as shown in Section IV.D.1 above, Defendants' claim that the "mere transfer of a patent

17   does not create market power" or otherwise restrain trade (Defs' Mem. at 22) is not persuasive

18   given that Apple has alleged much more than mere patent transfers.

19

20

21

22

—————————————————

23   [17] Moreover, Defendants' assertion (Defs' Mem. 26 n.18) that it would make no economic sense for PAEs to assist Nokia in harming Nokia's cell phone rival does nothing to undermine the plausibility of Apple's conspiracy allegations.  The PAEs are amply rewarded for conspiring

24   with Nokia through their shares of the inflated royalties that the patent transfer schemes have facilitated.  *See, e.g., Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d

25   215, 221 (5th Cir. 2001) ("Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when

26   they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman Act."); *see also id.* at 220 ("Antitrust law has

27   never required identical motives among conspirators. . . .").

1

2

**E.      Apple Has Adequately Alleged Its Section 2 Claims (Count V)**

**1.      Apple Has Adequately Pled Its Monopolization Claim Against Nokia**

3

To state a Section 2 monopolization claim, a plaintiff must allege (1) monopoly power in

4

a relevant market, (2) exclusionary conduct, and (3) causal antitrust injury. *See American Prof'l*

5

*Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147,

6

1151 (9th Cir. 1997). As discussed elsewhere, Apple has adequately alleged monopoly power in

7

relevant markets and causal antitrust injury. *Supra* Section IV.B; *infra* Section IV.F. Apple has

8

also adequately alleged exclusionary conduct.

9

Apple alleges that Nokia unlawfully obtained monopoly power in SEP Technology

10

Markets by making false FRAND commitments to ETSI, a standard-setting organization for

11

cellular communications. (Am. Complaint ¶¶ 61-62, 125.) As courts have consistently held, the

12

acquisition of monopoly power through false FRAND commitments constitutes illegal

13

exclusionary conduct under Section 2 of the Sherman Act. *See, e.g., Broadcom*, 501 F.3d at 314;

14

*Funai*, 2017 WL 1133513, at *5; *Interdigital, Inc.*, 2016 WL 1464545, at *2.

15

Defendants do not meaningfully dispute that false FRAND commitments can constitute

16

anticompetitive conduct. Instead, they seek to recast Apple's Section 2 claims. Defendants first

17

argue that Apple relies not on Nokia's false FRAND commitments, but rather exclusively on

18

Nokia's transfer of declared SEPs to the PAE Defendants and other PAEs. (Defs' Mem. at 28-

19

29.) To the contrary, the Amended Complaint alleges that Nokia illegally obtained monopoly

20

power in SEP Technology Markets by making false FRAND commitments to ETSI. (Am.

21

Complaint ¶¶ 123-26.)[18] Apple clearly alleges that Nokia then breached those FRAND

22

23

24

25

26

27

---

[18] Nokia's collusion with Acacia and Conversant is the subject of Apple's conspiracy to monopolize claim. *See infra* Section IV.E.2. Moreover, contrary to Nokia's assertion (Defs' Mem. at 31 n.23), Apple does not rest its allegations regarding Nokia's false FRAND commitments solely on Nokia knowing at the time of the commitments that it would someday transfer FRAND-committed patents to PAEs. Rather, Apple alleges that Nokia never intended to abide by its FRAND commitments (Am. Complaint ¶¶ 61-62), and Nokia's manifestly non-FRAND conduct following its commitments—including its own licensing conduct and its patent transfer scheme—is evidence that Nokia never intended to fulfill those commitments. Further, Defendants cannot explain why it is "utterly implausible" that Nokia intended to transfer is patents to PAEs when it made false FRAND commitments (Defs' Mem. at 31 n.23) given

28

1  commitments by coordinating with Acacia, Conversant, and other PAEs to transfer declared

2  SEPs with knowledge and intent that the PAEs would disregard Nokia's FRAND commitments.

3  (*Id.* ¶¶ 62, 85, 106, 126, 129.)[19]  Defendants' reliance on *Arbitron Co. v. Tropicana Prod. Sales,*

4  *Inc.*, No. 91-cv-03697, 1993 U.S. Dist. LEXIS 5587, at *24-29 (S.D.N.Y. Apr. 28, 1993), is

5  therefore inapposite.  (Defs' Mem. at 28.)  In *Arbitron*, the defendants' alleged monopolizing act

6  was the sale of its business to a competitor, so the defendant necessarily could not have illegally

7  obtained a monopoly; the allegedly illegal conduct was its exiting of the market.  *Arbitron*, 1993

8  U.S. Dist. LEXIS 5587, at *25.  Here, in contrast, Nokia first illegally obtained monopolies in

9  the relevant SEP Technology Markets by making false FRAND undertakings and *only later*

10  transferred the associated declared SEPs to exploit Apple and other product suppliers by

11  enlisting the Defendant PAEs.[20]

12      Defendants also complain that Apple's allegations regarding Nokia's false FRAND

13  declarations are not sufficiently specific.  But again, Defendants seek to benefit from the sheer

14  magnitude of their wrongdoing by insisting on an unnecessary level of pleading detail.  In fact,

15  Defendants know exactly which Nokia FRAND commitments Apple has alleged were false

16  because Apple specifically alleges that all of Nokia's FRAND declarations to ETSI were false:

17      Nokia submitted hundreds of declarations to ETSI identifying patents and patent
       applications that Nokia claimed were essential to the various standards adopted by
18      ETSI and 3GPP.  Nokia submitted its first declaration on April 3, 2000, and has
       continued to submit additional declarations regularly, including most recently on
19      October 12, 2016. . . .

20      Nokia never intended to make its patents available on FRAND terms, and always
       sought excessive, non-FRAND royalties.

21

22  Apple's allegations that many of Nokia's false FRAND commitments came *after* Nokia had
    already begun to transfer declared SEPs to PAEs to evade earlier FRAND commitments. (Am.
23  Complaint ¶¶ 22, 41, 61, 68, 86, 116.)
    [19] Contrary to Defendants' suggestion (Defs' Mem. at 29 n.21), Apple does not allege that a
24  mere transfer of a declared SEP is a breach of FRAND commitments.  As detailed in the
    Amended Complaint, the patent transfers here breach FRAND commitments because they were
25  made with the purpose and intent of avoiding those commitments.
    [20] In addition, Apple alleges that Nokia maintains a significant interest in the transferred patents
26  because of its right to receive royalties from those patents.  (Am. Complaint ¶¶ 23, 26, 71, 80-81,
    89, 98, 110-111, 113.)  Therefore, rather than exiting the market, Nokia has a vested interest in
27  the SEP Technology Markets.

28

(*Id*. ¶¶ 61-62.)  Moreover, Apple has identified the specifics of the fraud as best as it is able and is practicable given its long and continuing nature.  *See Facciola v. Greenberg Traurig, LLP*, 781 F. Supp. 2d 913, 919 (D. Ariz. 2011) ("Plaintiffs need not allege, in detail, all facts supporting each and every instance of fraud over a multi-year period.").  Defendants have more than adequate notice of the "particular misconduct" at issue and are able to "defend against the charge." (Defs' Mem. at 30.)  In any event, the Amended Complaint also provides many specific examples of patents as to which Nokia made false FRAND commitments to ETSI—including EP 2,550,762 (Am. Complaint ¶ 68); U.S. Patent No. 8,738,075 (*id*. ¶ 69); and U.S. Patent No. 7,631,037 (*id*. ¶ 86).  Apple is under no obligation to engage in a needless exercise of enumerating every such patent, which the Defendants are in a better position to identify than Apple.[21]  *See Craigslist, Inc. v. Autoposterpro, Inc*., No. 08-05069, 2009 WL 890896, at *3-4 (N.D. Cal. Mar. 31, 2009) (finding sufficient particularity where plaintiff alleged that defendant had made thousands of misrepresentations and noting that the pleading standard is relaxed for information in defendant's control).

### 2. Apple Adequately Alleges that Defendants Have Engaged in a Conspiracy to Monopolize SEP Technology Markets

Apple alleges that Nokia conspired with Acacia and Conversant, respectively, to monopolize SEP Technology Markets.  Nokia first unlawfully obtained monopoly power in SEP Technology Markets through false FRAND commitments.  *Supra* Section IV.B.2.  Then, Nokia and Acacia and Nokia and Conversant "reached agreements to transfer declared SEPs from Nokia to Acacia and from Nokia to Conversant to increase the total royalties obtained from

---

[21] The cases Defendants cite (Defs' Mem. at 29-30) do not suggest that Apple's pleading is insufficient.  The court in *ChriMar Sys., Inc. v. Cisco Sys., Inc.*, faulted the plaintiff for failing to allege that the SSO would have adopted "an alternative standard had it known about" the defendant's false FRAND commitments.  72 F. Supp. 3d 1012, 1019 (N.D. Cal. 2014).  Apple's Complaint contains these allegations.  (Am. Complaint ¶ 125.)  In *Digital Sun v. The Toro Company*, the plaintiff claimed that the defendant had engaged in "promissory fraud," but did not "identify which promises were false."  No. 10-4567, 2011 WL 1044502, at *5 (N.D. Cal. Mar. 22, 2011).  Here, Apple specifically alleges that all of Nokia's promises to license its declared SEPs on FRAND terms were false.  (Am. Complaint ¶¶ 61-62.)

licensing those patents." (Am. Complaint ¶ 129.) "As Nokia knew, intended, and agreed with

them that they would do, Acacia and Conversant have demanded non-FRAND royalties and have

threatened to enjoin Apple's products based on SEPs to increase its leverage, thereby enhancing

and exercising Nokia's wrongfully obtained monopoly power." (*Id*. ¶ 132.) Nokia, Conversant,

and Acacia shared and continue to share the specific intent to "extract non-FRAND royalties

beyond what Nokia itself could collect, thus enhancing ill-gotten monopoly power associated

with those patents in the SEP Technology Markets." (*Id*. ¶ 129.) These allegations are sufficient

to plead the elements of a conspiracy to monopolize. *See Paladin Assoc., Inc. v. Montana Power

Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (listing conspiracy and specific intent to monopolize

among the four required elements).

Defendants make a series of meritless arguments (Defs' Mem. at 30-31), some of which

are already addressed in other parts of this Opposition. Those include Defendants' failed

arguments that Apple: did not adequately plead SEP Technology Markets, *supra* Section IV.B.1;

alleges that the patent transfers, themselves, excluded rivals (which is not what Apple alleges),

*supra* Section IV.C; and failed to plead conspiracies, *supra* Section IV.D.1. Defendants'

additional arguments concerning Apple's conspiracy to monopolize claim are also unavailing.

*First*, Defendants suggest that the entirety of Apple's allegations concerning a conspiracy

to monopolize appear in paragraph 132 of the Amended Complaint. (Defs' Mem. at 31 (citing

Am. Complaint ¶ 132).) But paragraph 132 is a summary of the detailed allegations set forth in

the body of the Amended Complaint. The Amended Complaint contains other, specific

allegations regarding (i) Nokia's unlawful acquisition of monopoly power in SEP Technology

Markets (Am. Complaint ¶¶ 61-65), (ii) Defendants' coordinated patent diffusion scheme (*id.* ¶¶

17-30, 34-50), and (iii) the diffusion scheme's effect of allowing Defendants to avoid FRAND

commitments on declared SEPs and otherwise exploit product suppliers in ways that Nokia could

not have done by itself. (*Id.* ¶¶ 66-88.) In short, Nokia's assertion that Apple's conspiracy to

monopolize claim consists of a single "bald" allegation is simply false.

1      *Second*, Defendants argue that "where a monopoly is lawfully obtained, the mere

2   exploitation of monopoly power or charging of monopoly prices does not violate Section 2."

3   (Def's Mem. at 31.)  But because Apple alleges that Nokia acquired monopolies *illegally*, *supra*

4   Section IV.E.1, not that Defendants merely exploited monopoly power or charged monopoly

5   prices based on lawful monopolies, this argument misses the point.  Apple further pleads that

6   Defendants' coordinated scheme illegally enhanced Nokia's ill-gotten monopoly power and

7   imposed injury on Apple and other product suppliers by enabling Defendants collectively to

8   charge supra-FRAND royalties in ways that Nokia alone could not.  Am. Complaint ¶¶ 28-29,

9   66-82, 84-88; *see Broadcom*, 501 F.3d at 314-15 (breach of FRAND commitment is last step in

10  establishing monopolization claim); *Funai*, 2017 WL 1133513, at *2-3 (same); *Interdigital*, 2016

11  WL 1464545, at *3 (same).

12     *Third*, Defendants incorrectly argue that Apple has not alleged that Nokia engaged in

13  "deceptive exclusion of rival technologies at the time of standardization."  (Defs' Mem. at 31.)

14  But Apple has alleged that.  (Am. Complaint ¶¶ 59, 123-125, 130.)  As discussed above, the

15  Amended Complaint alleges Nokia made false FRAND commitments to ETSI.  (*Id.* ¶¶ 61-62.)  It

16  further alleges: "Nokia acquired monopoly power in each of the SEP Technology Markets when

17  patented technologies were incorporated into industry standards by 3GPP and ETSI.  In each

18  SEP Technology Market, the standard-setting organization's standardization of Nokia's

19  technology excluded alternative technologies for performing similar functionality."  (*Id.* ¶ 123.)

20  In addition, ETSI could have chosen not to standardize the function at all.[22]  (*Id.* ¶¶ 59, 124,

21

22  ───────────────────
    [22] Defendants' reliance (Defs' Mem. at 31-32) on *Rambus Inc. v. FTC*, 522 F.3d 456, 467 (D.C.
23  Cir. 2008), and *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998), is unavailing.  Apple
    alleges that but for Nokia's deception, ETSI would have standardized a different technology, or
24  would not have standardized any technology at all to perform the relevant function.  (Am.
    Complaint ¶¶ 59, 123-24, 130.)  In either case, Apple's injury arises from Nokia's deceptive,
25  anticompetitive conduct that illegally eliminated competition in SEP Technology Markets.
    Accordingly, Apple alleges the harm to the competitive process that the courts found wanting in
26  *Rambus* and *Discon*.  *Cf. Rambus*, 522 F.3d at 466-67 (if the standard-setting organization
    "would have standardized the very same technologies, Rambus's alleged deception cannot be
27  said to have had an effect on competition"); *NYNEX*, 525 U.S. at 139 (finding no harm to
    competitive process where defendant merely exercised lawfully obtained market power).

28

130.)  Notwithstanding Defendants' insistence on more detail (Defs' Mem. at 31-32 n.24), courts in this District and elsewhere have held that allegations similar to those Apple makes here are sufficient to plead that alternative technologies were eliminated in the standard-setting process. *See Broadcom*, 501 F.3d at 314 ("a standard, by definition, eliminates alternative technologies"); *Funai*, 2017 WL 1133513, at *2 ("Absent the licensing declarations, the ITU either would have revised the standard to employ alternative technologies instead of Defendants' technology or would have stopped working on the standard."); *Interdigital*, 2016 WL 1464545, at *2 (accepting allegations of exclusion of "all other alternative technologies").

*Fourth*, Defendants argue that Apple has not sufficiently alleged a specific intent to monopolize.  But Apple alleges in detail how Nokia submitted false FRAND declarations to ETSI and how Nokia colluded with Acacia and Conversant to extract supracompetitive royalties above levels that Nokia alone could obtain.  *See supra* Sections IV.D and IV.E.1.  Specific intent to monopolize can readily be inferred from these anticompetitive acts and agreements.  *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980) ("specific intent to monopolize" can be inferred "from the character of the actions taken.").

*Finally*, Defendants incorrectly argue that because Nokia transferred its SEPs to its co-Defendants, Nokia has no incentive to engage in a conspiracy to monopolize with Acacia and Conversant.  (Defs' Mem. at 33-34.)  Defendants' argument ignores Apple's allegations that Nokia retains a significant financial interest in royalties generated by its former patents (Am. Complaint ¶¶ 23, 26, 71, 80-81, 89, 98, 110-111, 113), and that its prior participation in, and pending reentry into, the Cellular Device Markets means that it had and continues to have incentives to harm its competitors in those markets.  (*Id*. ¶¶ 37, 89, 99, 101, 110-112, 115, 119, 120-121, 129, 134, 141.)

## F.    Apple Has Adequately Pled Antitrust Injury

Apple has alleged that Defendants' anticompetitive conduct dramatically increased the prices that Apple and other product suppliers—consumers in the Patented Technology and SEP

1   Technology Markets—must pay for licenses in those markets.  (Am. Complaint ¶¶ 99-100.)

2   "Harm to consumers in the form of higher prices resulting from competitive restraints has long

3   been held to constitute an actual injury to competition."  *Coalition for ICANN Transparency, Inc.*

4   *v. VeriSign, Inc.*, 611 F.3d 495, 504 (9th Cir. 2010).  Indeed, "it is difficult to imagine a more

5   typical example of anti-competitive effect than higher prices."  *American Ad Mgmt., Inc. v. GTE*

6   *Corp.*, 92 F.3d 781, 791 (9th Cir. 1996).  Defendants' anticompetitive scheme also has forced

7   Apple and other product suppliers to incur inflated litigation costs in those markets.  Am.

8   Complaint ¶ 100; *Interdigital*, 2016 WL 1464545, at *3; *Apple Inc. v. Samsung Elecs. Co.*, No.

9   11–cv–01846, 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012); *Hynix Semiconductor Inc. v.*

10  *Rambus, Inc.,* 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (litigation expenses can be recovered

11  "where the patent litigation is used to further the harm caused under a 'more traditional antitrust

12  theory'"). Nor are these the only harms.  Defendants' anticompetitive conduct has resulted in end

13  consumers suffering from the chilling of procompetitive standard-setting activity and decreased

14  innovation and quality for cellular devices.  (Am. Complaint ¶¶ 98-101.)  Apple's allegations

15  amply plead antitrust injury.[23]

16      With no persuasive argument, Defendants resort to mischaracterizing the nature of

17  Apple's Amended Complaint.  They contend that Apple is challenging "the mere transfer of a

18  valid patent" that "does nothing more than shift market power from one entity to another."

19  (Defs' Mem. at 35.)  But the Amended Complaint describes the multiple ways in which

20  Defendants' anticompetitive scheme, including the transfer of Nokia's patents, caused

21  anticompetitive effects.  *See supra* at IV.C-E.  For purposes of antitrust injury, the critical

22  distinction between Apple's Amended Complaint and the cases Defendants cite is that, unlike

23  Apple, the plaintiffs in those cases failed to allege any consumer harm.  *See Columbia River*

24

25  [23] Courts have repeatedly found allegations like Apple's here (Am. Complaint ¶ 101) sufficient
    to establish antitrust injury in the context of monopolization claims based on false FRAND
26  commitments to standard-setting organizations, as Apple alleges in Counts IV and V of the
    Amended Complaint.  *See Funai*, 2017 WL 1133513, at *7-8; *Interdigital*, 2016 WL 1464545, at
27  *3 (citing, among other authority, *Research In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d
    788, 793-96 (N.D. Tex. 2008)).

28

*People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190 (9th Cir. 2000)

("Consumers will suffer no harm as a result of enforcing the damages clause because the clause

itself does not restrain trade."); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th

Cir. 1984) ("Brunswick is complaining not because Riegel is gouging the consumer by charging

a monopoly price for antistatic yarn, but because Riegel took away a monopoly that rightfully

belonged to Brunswick as the real inventor.").

Defendants also argue that increased litigation and associated costs cannot constitute

antitrust injury unless Apple alleges sham litigation. (Defs' Mem. at 36.)  But as discussed *infra*

in Sections IV.H-I, litigation defense costs are compensable damages for a pattern of

anticompetitive conduct that encompasses patent assertions—whether or not the litigation, by

itself, was sham.[24]

Next, Defendants argue that Apple's allegations that Defendants' patent transfer schemes

have evaded FRAND commitments and led to supracompetitive licensing royalties are

insufficient to allege antitrust injury. (Defs' Mem. at 36-37.)  But Defendants choose not to

acknowledge that Apple and other product suppliers pay supracompetitive royalties as

*consumers* in the relevant markets and that inflated prices are the quintessential consumer

antitrust injury.  *See VeriSign*, 611 F.3d at 504*; GTE Corp.*, 92 F.3d at 791.  Contrary to

Defendants' assertion (Defs' Mem. at 37), the Complaint makes abundantly clear that the

unlawful asset acquisitions, conspiracies, and monopolization have allowed Defendants to charge

supracompetitive licensing royalties to Apple and other product suppliers.  (*E.g.*, Am. Complaint

¶¶ 89, 99-101.)  Defendants instead rely on multiple inapt cases. (Defs' Mem. at 37-38.)  In

most of the cases, the plaintiffs were *competitors*, not consumers, and had not alleged that the

plaintiff suffered from an injury of the type that the antitrust laws were designed to prevent, *see*

---

[24] We also show *infra* in Section IV.I that Apple has alleged that the Defendant PAEs' pattern of
serial, failed patent assertions falls within the sham exception to the *Noerr-Pennington* doctrine.
Defendants' reliance on *Chip-Mender, Inc. v. Sherwin-Williams Co.* is misplaced because, unlike
here, the relevant litigation in that case was not part of a broader anticompetitive scheme, nor
was there any allegation of market-wide harm.  No. 05-3465, 2006 WL 13058, at *5 (N.D. Cal.
Jan. 3, 2006).

1   *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338-39 (1990) (competitor does not

2   suffer antitrust injury from rival's high price), or that the harm to the plaintiff-competitor caused

3   injury to consumers in the relevant market, *see Les Shockley Racing, Inc. v. National Hot Rod*

4   *Ass'n*, 884 F.2d 504, 508-09 (9th Cir. 1989) (exclusion of plaintiff-competitors in relevant

5   market not alleged to have resulted in consumer injury); *Adobe Sys. Inc. v. Coffee Cup Partners,*

6   *Inc.*, No. 11-2243, 2012 WL 3877783, at *10 (N.D. Cal. Sept. 6, 2012) (harm to a single

7   competitor insufficient to establish injury to consumers); *Rheumatology Diagnostics Lab., Inc. v.*

8   *Aetna, Inc.*, No. 12-cv-05847, 2013 WL 5694452, at *12 (N.D. Cal. Oct. 18, 2013) (no antitrust

9   injury where "[a]ll that can be said is that three of Quest's alleged competitors were injured," but

10  not that competition or consumers were harmed).  In the other case, the defendant was alleged to

11  have harmed just one consumer, rather than consumers market-wide.  *See Tanaka*, 252 F.3d at

12  1064 (allegation that plaintiff was "singled out" alleges "nothing more than a personal injury to

13  herself, not an injury to a definable market").  In contrast to all of these cases, Apple alleges

14  examples of other consumers in the Patented Technology and SEP Technology Markets that

15  suffered injuries similar to Apple's.  (Am. Complaint ¶¶ 89, 91-97.)  Nor, contrary to

16  Defendants' argument (Defs' Mem. at 38), is Apple obliged to allege the precise details of other

17  product suppliers' injuries.  *See Funai*, 2017 WL 1133513, at *8 (rejecting argument that "Funai

18  must identify another entity that has been denied a license on FRAND terms or otherwise

19  harmed by Defendants' conduct"); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 756-57

20  (E.D. Pa. 2014) ("Plaintiffs . . . are not required to plead detailed evidentiary matter in order to

21  survive a motion to dismiss . . . particularly given that antitrust injury involves complex

22  questions of fact, ill-suited for resolution on a motion to dismiss." (internal citations and

23  quotations omitted)).[25]

24

25  [25] Defendants' comparison of Apple's allegations of antitrust injury to the allegations in
    *ChriMar*, 72 F. Supp. 3d at 1019, actually demonstrates the sufficiency of Apple's Complaint.

26  In *ChriMar*, the plaintiff simply alleged that the defendant's conduct "has caused and will
    directly and proximately cause antitrust liability."  *Id.*  Here, Apple alleges specific harms,

27  including supracompetitive prices and inflated litigation costs that Apple suffers as a result of the
    anticompetitive conduct detailed in the Complaint.  (*E.g.*, Am. Complaint ¶¶ 99-100.)

28

1          Apple has also made manifestly clear how Defendants' wrongdoing in the Patented

2    Technology and SEP Technology Markets results in substantial harm to end consumers in the

3    Cellular Device Markets through higher prices and reduced innovation and quality.  (Am.

4    Complaint ¶¶ 98-101.)  These allegations easily clear the threshold for pleading antitrust injury.

5    *See Funai*, 2017 WL 1133513, at *7 (finding sufficient allegations that "Defendants' wrongful

6    conduct has brought about and continues to threaten to bring about a significant threat of injury

7    for downstream price, quality, and innovation competition for devices"); *Interdigital*, 2016 WL

8    1464545, at *3 ("the downstream market is injured in the form of higher prices, reduced

9    innovation, and more limited choices for such [s]tandard-compliant products") (internal

10   quotations and alterations omitted).

11         In addition to all of these independently sufficient allegations, Apple points to its injury

12   as a competitor in the Cellular Device Markets.  (Am. Complaint ¶ 3, 37, 115, 119.)  The SEP

13   Technology Markets are inputs into products sold in the Cellular Device Markets.  (*Id.*)  In this

14   respect, Defendants and Apple are in a vertical supplier-customer relationship.  The competitive

15   significance of conduct affecting vertical relationships lies in "the degree, if any, to which it may

16   increase barriers to entry into the market or reduce competition by . . . foreclosing competitors . .

17   . from access to a potential source of supply, or from access on competitive terms." *YES Entm't*

18   *& Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002).

19   Apple has alleged that Defendants' anticompetitive conduct has foreclosed its and other product

20   suppliers' access to former Nokia patents "on competitive terms," *id.*, and that the inflated prices

21   in Patented Technology and SEP Technology Markets from Defendants' illegal conduct (*e.g.*,

22   Am. Complaint ¶¶ 3, 99-100) have raised rivals' costs in Cellular Device Markets.  *Id.* ¶¶ 3, 37,

23   115, 119; *see Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 321 (D.D.C. 2011)

24   ("[P]laintiff has stated a 'theory of competitor harm' that is cognizable under the antitrust laws

25   when it has alleged that its rival's anticompetitive acts will result in its paying more for

26   necessary inputs."); *Research in Motion Ltd*, 644 F. Supp. 2d at 794 (N.D. Tex. 2008) ("If

27

28   Case No. 5:16-cv-07266              34      MEMORANDUM IN OPPOSITION TO
                                                 MOTION TO DISMISS

Motorola licenses only at exorbitant rates, it will force its competitors to increase prices in the downstream market in order to make a profit.  This increase in prices for all products except Motorola's will harm competition.").[26]  Accordingly, Apple has alleged antitrust injury in Cellular Device Markets.

### G.    Apple Has Adequately Alleged Its Breach of Contract Claim (Count I)

Apple has alleged that Nokia contractually bound itself to make its declared SEPs available on FRAND terms by entering into contracts with ETSI for the benefit of ETSI members and others that supply products that support ETSI standards.  (Am. Complaint ¶¶ 61, 65.)  Nokia breached these contracts by transferring patents to Acacia and Conversant with knowledge and intent that Acacia and Conversant would not abide by the terms of Nokia's FRAND commitments.  (*Id.* ¶ 106.)  Acacia and Conversant, in turn, entered into contractual commitments to assume Nokia's FRAND obligations for declared SEPs acquired from Nokia and breached those contracts by refusing to offer licenses on FRAND terms and seeking injunctions to exclude Apple products based on those patents.  (*Id.* ¶¶ 104, 107.)

Defendants argue that Apple has not properly alleged a contract breach by Nokia or the PAE Defendants.  But Apple's allegations are plainly sufficient.[27]

---

[26] Defendants' suggestion (Defs' Mem. at 38-39) that Apple has not alleged monopolization or attempted monopolization of Cellular Device Markets does not address the question of whether Apple has alleged competitive harm in those markets.  In fact, the decision on which Defendants rely, *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991), does not even mention antitrust injury.  The opinion unsurprisingly holds that proof of a Section 2 violation *based on attempted monopolization* of a *downstream* market requires at least "a dangerous probability that a monopoly will be created" in that market.  *Id.* at 549.  By contrast, here the competitive harm to consumers in the downstream Cellular Device Markets is not based on monopolization or attempted monopolization of those markets.  Instead, Apple has alleged that consumers have been injured in the Cellular Device Markets as a result of Defendants' illegal conduct in the upstream Patented Technology and SEP Technology Markets.

[27] Defendants assess Apple's claims under California law but state that they would be equally deficient under French law. (Defs' Mem. 39 n.33.)  As it turns out, French law governs the ETSI IPR Policy, from which the relevant contracts arise. ETSI IPR Policy, Clause 12 ("The POLICY shall be governed by the laws of France.").  And Apple has referenced French law by citing to ETSI IPR Policy and commitments thereunder as the basis for Defendants' FRAND obligations. (*See, e.g.,* Am. Complaint ¶¶ 61-65.)  Defendants' arguments lack merit under both French and California law.

1

### 1.     Apple States a Breach of Contract Claim Against Nokia

2     Defendants' argument as to Nokia (Defs' Mem. at 40) is based on a misapprehension of

3 Apple's allegations.  Defendants assert that Apple is claiming that it is a breach of Nokia's

4 FRAND commitments merely to transfer patents, pointing out that the ETSI IPR Policy does not

5 prohibit (and in fact expressly permits) transfers of patents by parties that have made FRAND

6 commitments.  (Defs' Mem. at 40-41.)

7     But Apple never suggested that Nokia was contractually obligated to retain its patents.

8 Rather, Apple has alleged that Nokia was required to abide by its FRAND commitments and that

9 it breached those commitments by transferring declared SEPs to PAEs that it knew and intended

10 would not abide by the commitments.  (*See, e.g.*, Am. Complaint ¶ 81 ("Nokia has breached its

11 FRAND commitments and engaged in illegal anticompetitive activity by transferring declared

12 SEPs to a PAE that it well knew would refuse to license on FRAND terms, going so far as to

13 base the structure and financial terms of its scheme with Acacia on that premise.").)

14     Defendants argue that Apple's allegations regarding knowledge and intent are

15 conclusory.  (Defs' Mem. at 42.)  But in actuality, Apple has pled detailed allegations concerning

16 Nokia's knowledge of the PAE Defendants' (i) well-established reputations for breaching

17 FRAND (Am. Complaint ¶¶ 24, 74), (ii) abusive non-FRAND patent assertion conduct even

18 *before* the transfers (Am. Complaint ¶¶ 38, 39, 46, 74), and (iii) continuing non-FRAND conduct

19 involving transferred Nokia patents, specifically, *while* the transfers were continuing.  (*Id.* ¶¶ 39,

20 42-44, 68, 72, 77-78, 85-86.)  Apple has identified many facts showing that Nokia transferred

21 declared SEPs to Acacia and Conversant knowing and intending that the PAE Defendants would

22 disregard FRAND commitments; indeed, that was a central reason Nokia transferred the patents

23 in the first place.

24

### 2.     Apple States Breach of Contract Claims Against Acacia and Conversant

25

26     Defendants' arguments that Apple has failed to state breach of contract claims against

27 Acacia and Conversant also lack merit.

28

1    *First*, Defendants argue that making non-FRAND offers cannot constitute a breach of

2    FRAND.  (Defs' Mem. at 43; Acacia Mem. at 6-7.)  Apple has alleged far more than that the

3    PAE Defendants failed to make initial FRAND offers.  But in any event, courts have repeatedly

4    found allegations that a defendant refused to make an initial license offer on FRAND terms to be

5    sufficient to state a claim for breach of a FRAND commitment.  For example, in *Realtek*

6    *Semiconductor Corp. v. LSI Corp.*, No. 12-03451, 2012 WL 4845628 (N.D. Cal. Oct. 10, 2012),

7    the court rejected the same argument Defendants make here, finding that under the liberal

8    pleading standards of a motion to dismiss, a complaint asserting that an initial offer was not

9    made on FRAND terms is sufficient to state a claim for breach of contract.  *Id.* at *4.[28]  In

10   *Research in Motion*, the court found that the plaintiff had adequately pled that the defendant

11   breached its FRAND commitment under the ETSI IPR Policy by alleging that the defendant

12   "refused to extend FRAND . . . licensing terms to [plaintiff] for any of [defendant's] purportedly

13   essential patents . . . and . . . instead demanded of [plaintiff] terms that are unfair, unreasonable,

14   and, on information and belief, discriminatory."  644 F. Supp. 2d at 797.  The court rejected the

15   defendant's argument that the parties' failure to agree to licensing terms did not constitute a

16   breach of FRAND.  *Id.*  The court observed that the argument "merely contradicts the factual

17

18   [28] The court in *RealTek* expressly distinguished *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp.
19   2d 1023 (W.D. Wash. 2012) (summary judgment on breach of RAND)—the same case
     Defendants cite here (Defs' Mem. at 43 (quoting *Microsoft*, 2013 WL 2111217 (W.D. Wash.
20   Apr. 25, 2013) (findings of fact and conclusions of law on RAND licensing rate)))—on the
     question of whether an initial licensing offer must be on FRAND terms.  *Realtek* observed that
21   the court in *Microsoft* found that "any offer by Motorola (be it an initial offer or an offer during a
     back-and-forth negotiation) must comport with the implied duty of good faith and fair dealing
22   inherent in every contract" and thus that it was possible "for an initial offer to be so blatantly
     unreasonable as to breach that duty of good faith."  *Realtek*, 2012 WL 4845628, at *4.  *Realtek*
23   held that the plaintiff's allegations resembled those made by other plaintiffs claiming a breach of
     FRAND obligations, including in *Microsoft*.  *Id.*  The court in *Microsoft* had denied a motion to
24   dismiss a claim grounded in failure to offer RAND licenses and initiating patent actions seeking
     injunctive relief, like Apple's breach allegations here.  *See Microsoft*, 2011 WL 11480223, at *3
25   (W.D. Wash. June 1, 2011).  Defendants also rely on *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-
     CV-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013), *aff'd in part, vacated in part, rev'd in*
26   *part*, 773 F.3d 1201 (Fed. Cir. 2014), but that case stands only for the proposition that the mere
     fact that a potential licensee believes a license offer is not reasonable does not constitute a breach
27   of FRAND.  *Id.* at 25.  *Ericsson* does not provide guidance on whether the type of licensing
     misconduct that Apple alleges here constitutes a breach of FRAND.

28                            37          MEMORANDUM IN OPPOSITION TO
                                                                    MOTION TO DISMISS

1    accuracy" of the plaintiffs' claims and thus was not grounds for a Rule 12(b)(6) dismissal. *Id.*

2    Similarly, in *Apple Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1087 (W.D. Wis.

3    2012) (summary judgment opinion), after refusing to dismiss a breach of FRAND claim based

4    on Motorola's FRAND commitment under the ETSI IPR Policy, the court found there to be a

5    factual question on the issue of whether Motorola's initial license offer and negotiating posture

6    were non-FRAND. *See also Apple v. Motorola Mobility*, 2011 WL 7324582, at *11 (motion to

7    dismiss opinion).

8         Apple's allegations go far beyond Acacia and Conversant making a single initial

9    licensing offer that was not on FRAND terms. It has alleged that the PAE Defendants engaged

10   in an extended course of non-FRAND conduct. This array of activity includes commencing

11   serial litigation after repeated failures to offer FRAND license terms during extended

12   negotiations with Apple and several instances in which they have sought to enjoin Apple

13   products as leverage to extract non-FRAND royalties. (Am. Complaint ¶¶ 72, 78-79, 85.) The

14   PAE Defendants have, among other things: repeatedly refused to license their declared SEPs on

15   FRAND terms (*id.* ¶¶ 70, 77-78, 85); made exorbitant demands that would result in extreme

16   royalty stacking (*id.* ¶¶ 72, 77-78, 85); tied licensing of declared SEPs to non-SEPs (*id.* ¶ 72);

17   sought injunctions on declared SEPs (*id.* ¶¶ 72, 77-79, 85); and tried to extract a license for

18   patents dismissed from litigation with prejudice. (*Id.* ¶ 72.)

19        *Second*, and relatedly, Defendants argue that "[m]erely seeking an SEP injunction does

20   not constitute a breach of any FRAND obligation under the ETSI IPR Policy." (Defs' Mem. at

21   44; Acacia Mem. at 7.) A court in this District has explained that "the act of seeking injunctive

22   relief . . . is inherently inconsistent and a breach of defendants' promise to license the patents on

23   [F]RAND terms." *Realtek*, 946 F. Supp. 2d at 1006. Similarly, in *Apple v. Samsung Electronics

24   Co.*, No. 11-cv-01846, 2012 WL 1672493 (N.D. Cal. May 14, 2012), the court found that

25   seeking an injunction based on FRAND-committed patents could constitute a breach of FRAND

26   commitments under the ETSI IPR Policy: "Samsung certainly had the right to refuse to license

27

28   Case No. 5:16-cv-07266              38        MEMORANDUM IN OPPOSITION TO
                                                    MOTION TO DISMISS

1    its patents, but arguably relinquished that right when it submitted its FRAND declaration." *Id.* at

2    *12; *see also Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 885 (9th Cir. 2012) (considering

3    FRAND commitments made to a standard-setting body with intellectual property policies similar

4    to ETSI's and finding that "injunctive relief against infringement is arguably a remedy

5    inconsistent with the licensing commitment").[29]

6         Moreover, as detailed above, Apple's allegations go beyond seeking an injunction in

7    isolation.  Apple alleges that Conversant and Acacia sought injunctions as part of a broader

8    course of non-FRAND conduct.  Apple has alleged that the PAE Defendants, which make no

9    products and therefore have no interest in protecting products in the marketplace, have

10   coercively used litigation and the threat of injunctions to try to force Apple into taking licenses at

11   exorbitant rates.  (Am. Complaint ¶¶ 72, 78-79, 85.)  Such conduct plainly states a claim for

12   breach of a FRAND promise.  In *Microsoft*, for example, the court held that factual allegations

13   that Motorola breached its FRAND commitment by "failing to offer licenses to Microsoft on

14   [F]RAND terms and by initiating patent actions seeking improperly to enjoin or exclude

15   Microsoft from using the technology" of the SEPs at issue were "sufficient to state a claim for

16   breach of contract." *Microsoft Corp. v. Motorola Inc.*, 2011 WL 11480223, at *3.

17        *Third*, Defendants argue that Apple has failed to provide sufficient information to "put

18   Defendants on notice of the alleged FRAND breaches at issue" because Apple supposedly does

19   not identify the specific patents relevant to its contract claim.  (Defs' Mem. at 43; *see also*

20   Acacia Mem. at 5.)  Once again, Defendants ignore Apple's allegations.  In fact, Apple has

21   specifically alleged that Conversant and Acacia have failed to offer FRAND terms for *any* of the

22   declared SEPs they acquired from Nokia.  (Am. Complaint ¶¶ 103-04, 107.)  Apple, moreover,

23

24   [29] The Defendants cite *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014), for the
     proposition that there is no "per se rule that injunctions are unavailable for SEPs." (Defs. Mem.

25   at 44.)  That case, however, does not hold that seeking an injunction based on a FRAND-
     committed SEP cannot breach a FRAND obligation in specific circumstances (including when

26   the potential licensee has indicated its willingness to negotiate a FRAND license), like those
     Apple has alleged here.  *See* 757 F.3d at 1331-32 (holding that Motorola was not entitled to an

27   injunction for infringement of its SEP).

28     39   MEMORANDUM IN OPPOSITION TO
     MOTION TO DISMISS

1  has alleged that the PAE Defendants have breached FRAND with respect to various specific

2  portfolios of declared SEPs.  (*Id.* ¶¶ 72, 78 (Acacia/CCE-held declared SEP portfolio), ¶¶ 75-77

3  (Acacia/SLC-held declared SEP portfolio), ¶ 85 (Conversant/Core Wireless-held declared SEP

4  portfolio).); *see also Microsoft v. Motorola*, 2011 WL 11480223, at *2-3 (denying motion to

5  dismiss breach of FRAND claims premised on licensing conduct related to entire portfolios of

6  declared SEPs).

7          *Fourth*, equally unavailing is Defendants' argument that Apple "never alleges that it

8  performed its side of the FRAND bargain, including fulfilling its own obligation to engage in

9  good faith negotiations for a FRAND license." (Defs' Mem. at 45.)  To begin, Apple *does* allege

10  that it negotiated in good faith with the Defendant PAEs for a license.  (Am. Complaint ¶¶ 42-43,

11  79.)  Second, courts have rejected the argument that potential licensees must engage in

12  prescribed conduct for the licensor's FRAND obligations to be enforceable.  In *Apple, Inc. v.*

13  *Motorola, Inc.*, 869 F. Supp. 2d 901, 914 (N.D. Ill. 2012), *aff'd in part, rev'd in part and*

14  *remanded on other grounds*, 757 F.3d 1286 (Fed. Cir. 2014), the court refused to find that a

15  declared SEP holder could be excused from its FRAND obligations under the ETSI IPR Policy

16  because the plaintiff potential licensee purportedly refused to negotiate after rejecting an initial

17  offer:  "[The defendant] agreed to license its standards-essential patents on FRAND terms as a

18  quid pro quo for their being declared essential to the standard. . . . It does not claim to have

19  conditioned agreement on prospective licensees' making counteroffers in license negotiations."

20  *See also Realtek*, 2012 WL 4845628, at *3 (case law suggests that FRAND obligations do not

21  turn on whether licensee engaged in active negotiations over a license).  Indeed, in *Core Wireless*

22  *Licensing S.a.r.l. v. Apple Inc.*, No. 12- 100, 2015 WL 4775973 (E.D. Tex. Aug. 11, 2015),

23  regarding which Conversant has requested the Court take judicial notice, the court dismissed the

24  breach of contract claim against Apple with respect to the Core Wireless portfolio, finding that

25  the ETSI IPR Policy did not impose any obligation on Apple as a potential licensee to "negotiate

26  a FRAND royalty in good faith."  *Id.* at 2, 4.

27

28

*Fifth*, Acacia argues that Apple fails to allege that the PAE Defendants owe contractual duties to meet FRAND obligations for the former Nokia patents they acquired.  (Acacia Mem. at 1-3.)  In the first instance, that the PAE Defendants would seek to escape their FRAND commitments is at odds with Acacia's concession that the "PAE Defendants openly acknowledge their FRAND obligations."  (*Id.* at 1.)  Indeed, Acacia's fellow PAE Defendant Conversant has admitted in this Court that it has "contractual obligations both to ETSI and to Apple" to abide by FRAND commitments covering patents that it acquired from Nokia.  Conversant Request for Judicial Notice, Ex. C ¶ 20 [ECF No. 78-4].

In any event, Acacia's argument ignores Apple's allegations and logic.  Acacia's argument is premised on the claim that "Apple does not allege that ETSI and the PAE Defendants formed their own direct contracts."  (Acacia Mem. at 2.)  But Apple *does* allege precisely that (Am. Complaint ¶¶ 105, 107-08), *and Conversant has admitted as much*.  That allegation is dispositive of Acacia's argument.  As Acacia admits (Acacia Mem. at 3), Apple alleges that it is an intended beneficiary of Nokia's promises to ETSI, which continue to bind Nokia, Acacia, and Conversant.  (Am. Complaint ¶ 105.)

Moreover, Acacia admits that "certain PAE Defendants signed contacts with Nokia obliging them to offer licenses to the former Nokia-declared SEPs on FRAND terms inasmuch as Nokia would be required to do."  (Acacia Mem. at 1.)  This is consistent with Apple's allegations that Nokia stated that when it transferred declared SEPs, "the FRAND obligations passed to the new owners."  (Am. Complaint ¶ 63.)  Yet, Acacia claims that those obligations are not operative because Apple alleges that Nokia *breached* its obligations to ETSI to bind any successors to its declared SEPs.  (*Id.*)  But Apple nowhere alleges that Nokia failed to formally bind the PAE Defendants to assume Nokia's FRAND commitments as it promised ETSI it would do; rather, it pleads that Nokia and the PAE Defendants shared an understanding that the PAE Defendants would breach those obligations post-transfer.  (Am. Complaint ¶¶ 67, 106.)

1   In addition, Acacia's argument that Apple cannot be a third-party beneficiary of the PAE

2   Defendants' contractual undertaking to abide by Nokia's FRAND commitments because the

3   transfer agreements harmed Apple (Acacia Mem. at 3) is unavailing.  That the agreements—on

4   the whole—harmed Apple does not mean that Apple is not a third-party beneficiary of a

5   provision in that agreement that was intended to benefit Apple (though it was breached).  At

6   bottom, Acacia's position is untenable:  it cannot be that the PAE Defendants escape the

7   consequences of their contract breach *because* they have schemed with Nokia to violate their

8   (self-acknowledged) obligations to license on FRAND terms.

9        Even if the PAE Defendants were not bound by their direct contractual commitments to

10   license on FRAND terms, Nokia's FRAND commitments would bind them by operation of

11   patent law.  While relying on trial court cases from Texas to argue otherwise, Acacia ignores

12   precedent from the Ninth Circuit and this District holding the opposite. (Acacia Mem. at 2-3).[30]

13   As Judge Chen has held in the context of evaluating FRAND commitments on transferred

14   patents, "any of 'the patentee's previous acts' that have 'legal consequences' flow to the new

15   assignee of a patent."  *Barnes & Noble, Inc. v. LSI Corp.*, 849 F. Supp. 2d 925, 932 (N.D. Cal.

16   2012) (quoting *In re Novon Int'l, Inc.*, No. 98-cv-0677E, 2000 WL 432848, at *5 (W.D.N.Y.

17   Mar. 31, 2000)); *see also In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1052 (9th Cir. 2001) ("'It

18   had long passed into the text-books that . . . an assignee acquired title subject to prior licenses of

19   which the assignee must inform himself as best he can, and at his own risk.'" (quoting *Keystone*

20   *Type Foundry v. Fastpress Co.*, 272 F. 242, 245 (2d Cir. 1921))).[31]

21

22   [30] The Texas cases are inapposite in any event.  One case involved a claim of tortious
     interference with a contract (unrelated to any patents), and another involved a claim for royalties
23   agreed to in a previous patent transfer.  *See MetroPCS Wireless, Inc. v. Virgin Mobile USA, L.P.*,
     No. 08-1658, 2009 U.S. Dist. LEXIS 88527 (N.D. Tex. Sept. 25, 2009); *In re Particle Drilling*
24   *Techs.*, No. 09-33744, 2009 Bankr. LEXIS 2151 (Bankr. S.D. Tex. July 29, 2009).

25   [31] Acacia's reliance on *Vizio* is also misplaced (Acacia Mem. at 3 n.5).  As the court in *Barnes &*
     *Noble* observed, the discussion of *Vizio* that Acacia cites concerns an entirely separate question
26   of whether an acquirer of a patent automatically assumes *antitrust liability* that attached to the
     prior owner, not whether the acquirer of a patent takes the patent subject to *commitments* that its
27   predecessor made.  849 F.Supp.2d at 930-31.  Moreover, unlike the ETSI IPR Policy, the "ATSC
     Patent Policy" at issue in *Vizio* "require[d] only that *participants* provide a written agreement to

28

*Sixth*, Acacia wrongly argues that Apple must plead that the patents are *actually* essential to state a FRAND breach claim.  (Acacia Mem. at 1 n.2, 3-4.)  The FRAND obligation attaches to patents that have been declared essential by the patentee, requiring the patent holder to be "prepared to grant irrevocable licenses" to those patents on FRAND terms.  ETSI IPR Policy Clause 6.1, Annex 6 of Rules of Procedure (Apr. 5, 2017).  Not surprisingly, the courts considering this issue have rejected the argument Acacia makes here.  *See Apple v. Motorola Mobility*, 2011 WL 7324582, at *9 (refusing to dismiss breach of contract claim based on allegations that patents declared essential to ETSI are subject to FRAND obligations); *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 WL 1672493, at *40-43 (N.D. Cal. May 14, 2012) (refusing to grant dismissal of claim that Apple was entitled to a license on FRAND terms for patents *declared* essential to ETSI standards).

Even if Acacia were correct on the law, which it is not, Acacia ignores Apple's factual allegations and draws inferences in its favor rather than against the moving party.  Apple has alleged that CCE, one of Acacia's subsidiaries holding former Nokia declared SEPs, has prevailed on one patent at trial.  (Am. Complaint ¶ 49).  If the court affirms the infringement verdict, it will have deemed the patent to be actually essential.  Apple has alleged more than sufficient facts to make its breach claim plausible.

### 3.     Apple's Claims Against Conversant Are Not Barred by Res Judicata

Conversant argues that the claims against it for breach of contract (Count I) and violation of California's Unfair Competition Law (Count VI) are barred by res judicata.  (Conversant Mem. at 1.)

Conversant's argument that res judicata precludes consideration of these claims is based on a previous ruling in *Core Wireless v. Apple*, No. 6:12-cv-100 (E.D. Tex.) ("*Core Wireless I*").  But Conversant mischaracterizes the procedural history and facts of that litigation.

---

license on FRAND terms" and did not purport to cover acquirers of FRAND-committed patents. 2010 WL 7762624, at *6 (emphasis in original).

1

In *Core Wireless I,* Core Wireless had asserted infringement of fourteen declared SEPs,

2

five of which went to trial, and Apple had counterclaimed on June 21, 2013, for breach of

3

FRAND with respect to those specific patents.  (Conversant Request for Judicial Notice, Ex. B

4

[ECF No. 78-3].)  Core Wireless counterclaimed in reply that Apple breached a purported

5

contract to negotiate in good faith and pay Core Wireless a royalty for a license to its entire

6

portfolio of declared SEPs.  (Conversant Request for Judicial Notice, Ex. C [ECF No. 78-4].)

7

The court stayed Core Wireless′s counterclaims-in-reply related to the entire portfolio but

8

allowed each parties' breach of contract claims based on the five patents in suit to proceed to

9

trial.  *See Core Wireless I*, 2015 WL 4775973, at *1.  At trial, the jury found Core Wireless had

10

not committed a FRAND breach with respect to the five patents-in-suit (Conversant Request for

11

Judicial Notice, Ex. D, at 9 [ECF No. 78-5]), and the court dismissed Core Wireless's contract

12

claims with regard to the patents-in-suit after Core Wireless failed to present "a *prima facie* case

13

of the existence of a contract" imposing the purported obligations on Apple.  *See Core Wireless*

14

*I*, 2015 WL 4775973, at *2-3.  The court subsequently dismissed Core Wireless's portfolio

15

claims premised on the same alleged contract for lack of evidence such a contract exists.  *Id.* at

16

*4.

17

Res judicata "bars further litigation on a claim where there is (1) an identity of claims, (2)

18

a final judgment on the merits, and (3) privity between parties."  *Poblete Mendoza v. Holder*, 606

19

F.3d 1137, 1140 (9th Cir. 2010).  Courts have explained that there is an identity of claims when

20

the earlier and present actions arise from the "same transactional nucleus of facts," which

21

requires that the claims at issue *could* have been brought in the earlier action.  *Tahoe-Sierra*

22

*Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1078 (9th Cir. 2003); *see*

23

*also United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1151 (9th Cir.

24

2011).

25

Apple's claims here are not identical to those litigated in *Core Wireless I*, where Apple

26

alleged breach of FRAND based on Core Wireless' failures (i) "by refusing to offer Apple a

27

28

1  FRAND license for the Core Wireless Asserted Patents" (ii) "by failing to provide Apple with

2  FRAND license terms for each of the Core Wireless Asserted Patents." (Conversant Request for

3  Judicial Notice, Ex. B, at 9.) By contrast, Apple has alleged in this suit that Conversant breached

4  its FRAND obligations by refusing to license its *entire portfolio* of former Nokia declared SEPs

5  on FRAND terms and by seeking injunctions based on declared SEPs. (Am. Complaint ¶¶ 107.)

6  Key events underlying Apple's current claims had not even occurred until long after Apple

7  brought its counterclaims in *Core Wireless I*. For example, Conversant did not bring the claim

8  for injunctive relief until August 2015 (more than two years after Apple filed its *Core Wireless I*

9  counterclaim) when Conversant filed its amended complaint in *Core Wireless v. Apple*, No. 6:14-

10  cv-752 (E.D. Tex.) ("*Core Wireless II*"). (Conversant Request for Judicial Notice, Ex. F [ECF

11  No. 78-7].) Moreover, Conversant holds former Nokia patents that it did not at the time of

12  Apple's counterclaims in *Core Wireless I*, has demanded non-FRAND royalties for its entire

13  portfolio, and filed additional lawsuits since *Core Wireless I* to force Apple to capitulate to its

14  unreasonable demands. (Am. Complaint ¶¶ 85-86.)

15      That the conduct underlying Apple's claims in this case had not even occurred until long

16  after Apple filed its *Core Wireless I* counterclaims in June 2013 is fatal to Conversant's res

17  judicata argument. As the Ninth Circuit has found, "[i]f the harm arose at the same time, then

18  there was no reason why the plaintiff could not have brought the claim in the first action" but

19  "[i]f the harm arose from different facts at a different time . . . then the plaintiff could not have

20  brought the claim in the first action." *United States v. Liquidators*, 630 F.3d at 1151. *See also*

21  *Tahoe-Sierra*, 322 F.3d at 1076 (assessing plaintiff's opportunity to litigate in the prior action

22  and finding that res judicata applied because there were no "new injuries caused by new acts");

23  *Herrera v. Countrywide KB Home Loans*, No. 5:11-cv-03591, 2012 WL 901340, at *4 (N.D.

24  Cal. Mar. 15, 2012) (assessing whether the conduct alleged stems "from the same transactional

25  nucleus of facts that occurred prior to Plaintiffs' filing of the first action, and therefore could

26  have been brought in the earlier suit").

27

28

1
2
3
4
5
6
7
8
9
10
11
12

Finally, Conversant misconstrues Judge Grewal's reasoning in dismissing Core Wireless's breach of FRAND claims on res judicata grounds in *Core Wireless II*. (Conversant Mem. at 6.) As Judge Grewal's opinion recites, in *Core Wireless I*, the court dismissed Core Wireless's *portfolio-wide* breach of contract claims against Apple because Core Wireless had failed to present a "'prima facie case of the existence of a contract,'" *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, Case No. 15-cv-05008, 2016 WL 1258989, at *2-3 (N.D. Cal. Mar. 31, 2016) (quoting *Core Wireless I*, 2015 WL 4775973, at *3-4). Thus, Core Wireless's portfolio claim in *Core Wireless I* was identical to the one it brought in *Core Wireless II* with the same factual allegations. More fundamentally, Judge Grewal found that having lost its portfolio-wide claim in *Core Wireless I*, Core Wireless did not identify any relevant evidence that it would present in *Core Wireless II* that it had not presented in *Core Wireless I*. *Id.* at *5. That is plainly not the case here. *See supra* at 46-47.

13
14
15
16

Because Apple had no opportunity to and did not litigate the same FRAND breaches alleged here, its breach of contract claim cannot be barred by res judicata. Nor can res judicata bar Apple's UCL claim against Conversant, which is based on conduct going far beyond anything Apple could have litigated in *Core Wireless I*.

17
18
19
20
21
22
23
24
25
26
27

### H.    Apple Has Adequately Pled Its Claim for Violation of California's UCL (Count VI)

None of Defendants' arguments regarding Apple's claim under Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL") has merit. (Am. Complaint ¶¶ 135-42.) Defendants wrongly argue that Apple lacks standing to complain about Defendants' UCL violations because it supposedly has alleged injury to itself based only on "the costs of defending against good-faith patent infringement suits." (Defs' Mem. at 45-46.) Defendants ignore Apple's allegations that it has been injured as a result of their illegal conduct by being compelled to pay inflated licensing royalties. (Am. Complaint ¶¶ 99-101.) Moreover, the costs of defending against litigation resulting from an anticompetitive scheme constitute cognizable injury—regardless of whether the litigation aspects of the overall scheme constitute sham litigation. *See Apple Inc. v. Samsung*

28

46    MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

1    *Elecs. Co.*, No. 11-cv-01846, 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012) ("litigation

2    expenses may establish damages for an antitrust claim"); *Funai,* 2017 WL 1133513, at *6

3    ("[W]here the patent litigation is used to further the harm caused under a 'more traditional

4    antitrust theory,' a plaintiff should be allowed a full recovery." (quoting *Hynix*, 527 F. Supp. 2d

5    at 1097)). [32]

6         Defendants also claim that Apple has alleged neither "unlawful" nor "unfair" conduct

7    under the UCL because it has supposedly failed to allege any antitrust violations.  (Defs' Mem.

8    at 46-47.)  As demonstrated in Sections IV.C-E above, however, Apple has alleged violations of

9    the Sherman and Clayton Acts.

10        Moreover, contrary to Defendants' argument, Apple has alleged not only underlying

11    violations of the Sherman and Clayton Acts,[33] but also violations of Section 5 of the Federal

12    Trade Commission Act.  *See* Am. Complaint ¶¶ 139-40; 15 U.S.C. § 45 (prohibiting "[u]nfair

13    methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or

14    affecting commerce").  Where "allegations are sufficient to adequately plead 'unfair' conduct

15    under the FTC Act," they are also sufficient to plead "'unlawful' conduct under the [California

16    UCL]."  *Baker v. Aegis Wholesale Corp.*, No. 09-5280, 2010 WL 2853915, at *8 (N.D. Cal.

17    July 21, 2010).

18    **I.**     **PAE Defendants' Wrongdoing Is Not Immunized by the *Noerr-Pennington* Doctrine**

19

20        Acacia argues that the PAE Defendants' "litigation and related activities are

21    presumptively immune from antitrust liability under the *Noerr-Pennington* doctrine."  (Acacia

---

22    [32] Defendants' citation to *TCL Commc'ns Tech. Holdings, Ltd., v. Telefonaktiebolaget LM*

23    *Ericsson*, No. 14-0341, 2016 WL 7049263 (C.D. Cal. Aug. 9, 2016), disregards Apple's allegations that the PAE Defendants' serial litigation was an essential part of Defendants' much

24    broader overall anticompetitive schemes.  Thus Apple's allegations are not barred by *Noerr-Pennington*, as detailed *infra* at Section IV.I. The court in *TCL* did not consider the authority of

25    the Ninth Circuit and this District holding that the *Noerr-Pennington* doctrine does not immunize patent litigation that is one component of a wider-ranging anticompetitive scheme.

26    [33] *See FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948) (FTC Act proscribes violations of Sections 1 and 2 of the Sherman Act); *New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co.*,

27    332 F.2d 346, 352 (3d Cir. 1964) (FTC Act proscribes violations of Section 7 of the Clayton Act), *aff'd*, 381 U.S. 311 (1965).

1    Mem. at 8.)  *Noerr-Pennington*, however, does not immunize a pattern of anticompetitive

2    conduct of which litigation is only one part, as Apple alleges here.  *See Clipper Exxpress v.*

3    *Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1263 (9th Cir. 1982) ("[W]hen there is a

4    conspiracy prohibited by the antitrust laws, and the otherwise legal litigation is nothing but an act

5    in furtherance of that conspiracy, general antitrust principles apply, notwithstanding the

6    existence of *Noerr* immunity.").

7         In *Hynix*, the court held that the *Noerr-Pennington* doctrine does not apply to a series of

8    anticompetitive acts that includes non-sham litigation if (1) the "other aspects of the scheme

9    independently produce anticompetitive harms" and (2) "the accused patent litigation was

10   causally connected to these anticompetitive harms." 527 F. Supp. at 1097.  In *Hynix*, Rambus

11   was alleged to have intentionally failed to disclose pending patent applications essential to a

12   standard under development, only to spring a "patent trap" once the industry became locked into

13   using the standard.  *Id.* at 1088-89.  Rambus demanded royalties on the undisclosed patents and

14   brought infringement litigation.  *Id.* at 1089.  In holding *Noerr-Pennington* inapplicable, the

15   court found that the anticompetitive standard-setting conduct was an independent anticompetitive

16   harm under Section 2 of the Sherman Act and that the patent litigation was causally linked to that

17   behavior because "a patent 'ambush' or 'hold-up' is ineffective without the threat of litigation."

18   *Id.* at 1098.  Similarly, in *Funai*, the court applied *Hynix* and found that false FRAND

19   commitments independently caused anticompetitive harm and that the defendant's patent

20   litigation was linked to that harm because it "effectuate[d] Defendants' 'hold-up power' to

21   demand supracompetitive royalties."  2017 WL 1133513, at *6.

22        Likewise here, Apple has alleged that patent litigation was just one component of a much

23   wider-ranging anticompetitive scheme perpetrated by Nokia and the PAE Defendants.  Apple

24   alleges that, in violation of Section 2, Nokia illegally obtained monopolies in SEP Technology

25   Markets by making false FRAND commitments to ETSI, and then enlisted Acacia and

26   Conversant to use the relevant declared SEPs to extract non-FRAND royalties from Apple and

27

28   Case No. 5:16-cv-07266                 48      MEMORANDUM IN OPPOSITION TO
                                                    MOTION TO DISMISS

1   other suppliers of products that support cellular standards.  (Am. Complaint ¶¶ 129-30.)

2   Moreover, Apple alleges that Nokia and the PAE Defendants violated Section 7 of the Clayton

3   Act through patent transfers that substantially lessened competition and Section 1 of the Sherman

4   Act by conspiring to illegally exploit product suppliers.  (*Id.* ¶¶ 110, 119-20.)  Because patent

5   litigation is just one component of Apple's antitrust (and UCL) claims, the *Noerr-Pennington*

6   doctrine does not immunize Defendants' conduct from antitrust liability.  *See Hynix*, 527 F.

7   Supp. 2d at 1097 ("[W]here the patent litigation is used to further the harm caused under a 'more

8   traditional antitrust theory,' a plaintiff should be allowed a full recovery.").

9          Moreover, even if Apple's allegations were based solely on Acacia's and Conversant's

10  litigation tactics, Apple has alleged a pattern of litigation that was filed "not out of a genuine

11  interest in redressing grievances, but as part of a pattern or practice of successive filings

12  undertaken essentially for purposes of harassment." *USS-POSCO Indus. v. Contra Costa Cty.*

13  *Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994).  The Amended

14  Complaint alleges that Conversant's and Acacia's litigation track records have been exceedingly

15  poor.  (*Id.* ¶ 49 (out of more than six lawsuits filed, Acacia subsidiary Cellular Communications

16  Equipment LLC prevailed at trial on only one patent), ¶ 87 (Conversant prevailed on only two

17  patents out of nineteen it has asserted).)  Those allegations are sufficient to plead a sham

18  exception to the *Noerr-Pennington* doctrine.  *See USS-POSCO*, 31 F.3d at 811 ("[T]he fact that a

19  small number in the series of lawsuits turn[s] out not to be frivolous will not be fatal . . . even a

20  broken clock is right twice a day."); *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,

21  806 F.3d 162, 181 (3d Cir. 2015) ("A high percentage of meritless or objectively baseless

22  proceedings . . . will tend to support a finding that the filings were not brought to redress any

23  actual grievances."), *cert. denied*, 136 S. Ct. 2451 (2016); *Waugh Chapel S., LLC v. United Food*

24  *& Commercial Workers Union Local 27*, 728 F.3d 354, 363-65 (4th Cir. 2013) ("[T]he fact that

25  there may be moments of merit within a series of lawsuits is not inconsistent with a campaign of

26  sham litigation.").

27

28

1

2   **V.      CONCLUSION**

3          For the reasons set forth above, the Court should deny Defendants' Motion to Dismiss

4   Apple's Amended Complaint.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    DATED: April 25, 2017                    Respectfully submitted,

2

3                                             By:    /s/ Mark D. Selwyn

4                                             Mark D. Selwyn (SBN: 244180)
                                              mark.selwyn@wilmerhale.com
5                                             WILMER CUTLER
                                                PICKERING HALE AND
6                                                DORR LLP
                                              950 Page Mill Road
7                                             Palo Alto, CA 94304
                                              Telephone: +1 650 858 6000
8                                             Facsimile:  +1 650 858 6100

9                                             William F. Lee
                                              william.lee@wilmerhale.com
10                                            Joseph J. Mueller
                                              joseph.mueller@wilmerhale.com
11                                            Timothy Syrett
                                              timothy.syrett@wilmerhale.com
12                                            WILMER CUTLER
                                                PICKERING HALE AND
13                                               DORR LLP
                                              60 State Street
14                                            Boston, MA 02109
                                              Telephone: +1 617 526 6000
15                                            Facsimile:  +1 617 526 5000

16                                            Leon B. Greenfield
                                              leon.greenfield@wilmerhale.com
17                                            Nina S. Tallon
                                              nina.tallon@wilmerhale.com
18                                            WILMER CUTLER
                                                PICKERING HALE AND
19                                               DORR LLP
                                              1875 Pennsylvania Avenue, N.W.
20                                            Washington, DC 20006
                                              Telephone: +1 202 663 6000
21                                            Facsimile:  +1 202 663 6363

22

23                                            *Attorneys for Plaintiff*
                                                APPLE INC.

24

25

26

27

---

28   Case No. 5:16-cv-07266              51    MEMORANDUM IN OPPOSITION TO
                                               MOTION TO DISMISS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2017, I electronically filed the foregoing documents using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

DATED: April 25, 2017                                   */s/* Mark D. Selwyn
                                                                  Mark D. Selwyn