*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br>          Plaintiff,<br>      v.<br>ACACIA RESEARCH CORPORATION, SAINT LAWRENCE COMMUNICATIONS LLC, SAINT LAWRENCE COMMUNICATIONS GMBH, AND VOICEAGE CORPORATION,<br>          Defendants. | Case No. 5:16-cv-07266-EJD<br><br>**SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**_REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED_**

William F. Lee (*pro hac vice*)
william.lee@wilmerhale.com
Joseph J. Mueller (*pro hac vice*)
joseph.mueller@wilmerhale.com
Timothy Syrett (*pro hac vice*)
timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000

Leon B. Greenfield (*pro hac vice*)
leon.greenfield@wilmerhale.com
Nina S. Tallon (*pro hac vice*)
nina.tallon@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile:  +1 202 663 6363

*Attorneys for Plaintiff*
APPLE INC.

**_REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED_**

## INTRODUCTION

1. Apple Inc. (Apple) brings this action to end and remedy Defendants' anticompetitive conduct. Acacia Research Corporation, along with its subsidiaries Saint Lawrence Communications LLC and Saint Lawrence Communications GmbH (collectively, "Acacia"), has conspired with VoiceAge Corporation (VoiceAge) in an anticompetitive scheme to transfer hundreds of patents declared essential to cellular industry standards (SEPs) from VoiceAge to Acacia and then circumvent VoiceAge's promises to license its patents on fair, reasonable, and non-discriminatory (FRAND) terms. Once armed with VoiceAge's patents, Acacia has demanded exorbitant royalties many times above FRAND and, in contravention of its FRAND obligations, and sought injunctions to coerce cellular product suppliers to accept licenses on those royalty terms.

2. VoiceAge obtains no efficiencies from transferring its patents to Acacia. Indeed, it had previously demonstrated its ability to obtain fair value for its patents. VoiceAge transferred its patents to and conspired with Acacia to take advantage of Acacia's ability, as a patent assertion entity (PAE), to engage in brazen and exploitive patent assertion conduct, including demanding and receiving exorbitant non-FRAND royalties. VoiceAge could not have engaged in similar conduct because, as an operating technology company, it faced constraints on its conduct that Acacia does not.

3. Defendants' conduct has imposed extraordinary costs and burdens not only on Apple but on the cellular device industry more broadly. Apple and other victims of the Defendants' conduct have paid excessive royalties and spent millions of dollars defending against the barrage of patent litigation brought by Acacia as part of its conspiracy with VoiceAge. Apple seeks to recover its damages and halt the illegal conduct. Unless enjoined, the Defendants' conduct will persist and continue to injure Apple, other participants in industries that are vital to the national economy, and consumers in the United States and elsewhere.

## THE PARTIES

4. Plaintiff Apple designs and sells innovative, iconic consumer electronics such as the iPhone, iPad, and MacBook. Apple is a corporation organized and existing under the laws of the

1  State of California with its principal place of business at 1 Infinite Loop, Cupertino, California 95014.

5. Defendant Acacia Research Corporation is a publicly-traded corporation that describes itself as "an intermediary in the patent marketplace."[1] Acacia Research Corporation has a bewildering array of shell subsidiaries that "generate revenues and related cash flows from the granting of intellectual property rights for the use of patented technologies that our operating subsidiaries control or own."[2] Acacia Research Corporation is a Delaware corporation having its principal place of business at 500 Newport Center Drive, Suite 700, Newport Beach, California 92660. Defendant Saint Lawrence Communications LLC (SLC) is a subsidiary of Acacia Research Group LLC, which is in turn a wholly-owned subsidiary of Acacia Research Corporation. SLC is a Texas limited liability company, having its principal place of business at 2400 Dallas Parkway, Suite 200, Plano, Texas 75093. Saint Lawrence Communications GmbH (SLC GmbH) is a German limited liability company that is a subsidiary of Acacia, with its principal place of business at Pettenkoferstrasse 4, 80336 Munich, Germany.

6. Defendant VoiceAge is a privately-held Canadian corporation headquartered at 750 Lucerne Road, Suite 250, Montreal (Quebec), Canada, H3R 2H6. VoiceAge is "engaged in the development, integration, and marketing of digital speech and audio compression solutions and services."[3]

**JURISDICTION AND VENUE**

7. Apple brings this action under Sections 4 and 7 of the Clayton Act, 15 U.S.C. §§ 15 and 18; Section 1 of the Sherman Act, 15 U.S.C. § 1; for breach of contract; and under Cal. Bus. & Prof. Code § 17200 et seq.

8. This Court has jurisdiction over the federal claims alleged under 28 U.S.C. §§ 1331 and 1337(a). This Court has jurisdiction over the breach of contract and unfair competition claims arising under state law pursuant to 28 U.S.C. § 1367(a).

---

[1] Acacia Research Corporation 2015 Form 10-K, 1.
[2] *Id.*
[3] VoiceAge Corporation, "Company," http://www.voiceage.com/COMPANY.html.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

9. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. §§ 15, 22, because, during the relevant period, Acacia and VoiceAge resided, transacted business, were found, or had agents in this District, and because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**INTRADISTRICT ASSIGNMENT**

10. The appropriate intradistrict assignment is the San Jose Division. Under Civil Local Rule 3-2(c), a civil action shall be assigned to the division "serving the county in which the action arises." An action "arises in the county in which a substantial part of the events or omissions which give rise to the claim occurred." Civ. L.R. 3-2(c). Here, a substantial part of those events or omissions occurred in Santa Clara County, where Apple is headquartered and where a substantial portion of the events set forth in this Complaint has a locus. Civil actions arising in Santa Clara County "shall be assigned to the San Jose Division." *Id.* at 3-2(e).

**ACACIA'S AND VOICEAGE'S ILLEGAL CONDUCT**

**I.   VoiceAge Promised To License On FRAND Terms Declared SEPs It Transferred To Acacia.**

11. Acacia acquired declared SEPs from VoiceAge, which was involved in the European Telecommunications Standards Institute (ETSI) and the Third Generation Partnership Project (3GPP), particularly in the development of a voice coding and decoding codec known as AMR-WB. AMR-WB is part of the cellular standards adopted by 3GPP/ETSI.

12. Standard-setting activities create significant benefits for the industry and consumers at large, allowing manufacturers of many different devices to invest in the design and marketing of their products knowing that those products will interoperate effectively with other manufacturers' devices.

13. When companies decide to implement a standard, they make significant investments in designing their products and supply chains around the standard. Once they have made those investments, they are "locked in" to the standard—it can become much more complicated, expensive, or impossible due to industry adoption to start over with a new technology, even if that other technology is just as good. The risk potential implementers face is that a patentee will engage

in "patent hold-up" after they have become locked in to the standard. In a patent hold-up, a patent owner waits until a standard has become widely adopted and then seeks to extort far more in royalties than its technology is worth, because implementers are already locked in and therefore cannot avoid exorbitant royalty demands.

14. The cellular standards promulgated by 3GPP and ETSI have been widely adopted and are deployed for the consistent use of cellular networks around the world. Apple and other manufacturers have made massive investments to comply with these ETSI standards.

15. In an effort to constrain the exercise of monopoly power in markets that encompass standardized technology, standard-setting organizations require participants to disclose the patents they own that might cover the standard and to agree to license those patents on FRAND terms. In particular, ETSI's Intellectual Property Rights Policy (IPR Policy) requires its members to disclose their patents or patent applications during the standard-setting process (i.e., before the technology is or might be incorporated into the standard) and to promise to license those patents on FRAND terms if they are essential to the standard.

16. With regard to disclosure of potentially essential patents, Clause 4.1 of the IPR Policy states:

> Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

17. Clause 6.1 of the IPR Policy requires that "[w]hen an ESSENTIAL [Intellectual Property Right] relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory [FRAND] terms and conditions under such IPR."[4]

---

[4] 2008 IPR Policy, Clause 6.1; *see also* 2001 ETSI IPR Policy.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED**

18. If an ETSI participant is unwilling to commit to licensing its patents on FRAND terms and conditions, the ETSI IPR Policy mandates that the participant's technologies be excluded from the standard. Clause 8.1.1 of the 2008 ETSI IPR Policy states: "Where prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION an IPR owner informs ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION in accordance with Clause 6.1 above, the General Assembly shall … satisfy itself that a viable alternative technology is available …." In those instances in which, in the opinion of the General Assembly, no viable alternative technology exists, Clause 8.1.2 further provides that work on the standard or technical specification at issue "shall cease." These terms make clear that in deciding to incorporate technology into its standards, ETSI relies on its members' FRAND commitments regarding potentially essential patents and patent applications. Clause 12 of the ETSI IPR Policy states that it shall be governed by the laws of France.

19. 3GPP did not adopt its own intellectual property rights policy but instead decided that members of each of its Organizational Partners (of which ETSI is one) would abide by the respective Organizational Partners' intellectual property rights policies.

**II. FRAND Commitments Are Binding Contractual Obligations That Transfer With SEPs**

20. As a member of ETSI, VoiceAge is (and was at all relevant times) contractually bound to abide by ETSI's IPR Policy (including during its participation in 3GPP). VoiceAge submitted numerous declarations to ETSI identifying patents and patent applications that it claimed were essential to the various standards adopted by ETSI and 3GPP. VoiceAge's declarations committed to licensing those patents on FRAND terms.

21. Acacia has acknowledged in presentations to investors that it is bound by VoiceAge's FRAND commitments, observing that the FRAND obligations applicable to its former VoiceAge patents would present "legal and regulatory challenges."[5]

22. Indeed, the current version of the ETSI IPR Policy explicitly states that FRAND commitments are encumbrances on patents that bind all successors-in-interest. In particular, Clause 6.1bis states:

---

[5] Acacia Research Group, LLC, 2014 Analyst and Investor Day Presentation, at 31.

> FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest. Recognizing that this interpretation may not apply in all legal jurisdictions, any Declarant who has submitted a FRAND undertaking according to the POLICY who transfers ownership of ESSENTIAL IPR that is subject to such undertaking shall include appropriate provisions in the relevant transfer documents to ensure that the undertaking is binding on the transferee and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding all successors-in-interest. The undertaking shall be interpreted as binding on successors-in-interest regardless of whether such provisions are included in the relevant transfer documents.

23. ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other parties that implement an ETSI standard. In particular, the stated objective of the policy, described in Clause 3.1, is to "reduce the risk" to those implementing the standards "that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable." Apple, as a member of ETSI and an implementer of standards that ETSI adopted, is an intended third-party beneficiary of VoiceAge's FRAND commitments made under the ETSI IPR Policy.

### III. VoiceAge Conspires With Acacia To Transfer Patents Previously Licensed To Apple And Obtain Grossly Inflated Royalties And Breach FRAND Commitments

24. Before transferring declared SEPs to Acacia, VoiceAge had licensed the patents through the W-CDMA patent pool formerly administered by Sipro Lab Telecom, as did many other sophisticated declared SEP holders. One of the goals of the Sipro patent pool was to ensure "access to worldwide patents that are essential to W-CDMA FDD 3GPP Standard under fair, reasonable and non-discriminatory [FRAND] terms and conditions."[6] Through the pool, Apple paid a royalty for a license to VoiceAge patents until December 2015. Moreover, before the transfers, Apple amicably entered into multiple bi-lateral licensing agreements with VoiceAge. Thus, VoiceAge was demonstrably capable of obtaining FRAND royalties for its declared SEPs.

25. VoiceAge, however, sought to obtain above-FRAND royalties for its declared SEPs. It removed them from the Sipro patent pool and has conspired with Acacia to take advantage of

---

[6] Sipro Lab Telecom, *W-CDMA*, *previously available at* http://www.sipro.com/W-CDMA.html.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED**

Acacia's status as a PAE and its abusive patent enforcement strategies to exploit potential licensees. As part of the conspiracy, in December 2013, VoiceAge transferred to Acacia a portfolio of declared SEPs.[7] Acacia claims to own a portfolio of over 225 U.S. and international "standards essential voice coding patents that were developed by VoiceAge Corporation."[8] Exhibit A attached hereto contains a non-exhaustive list of the former VoiceAge patents that Acacia acquired. On information and belief, VoiceAge and Acacia also agreed to share the ill-gotten proceeds from Acacia's licensing efforts of the former VoiceAge patents in which VoiceAge and Acacia split the royalties for the patents.

26. After acquiring the VoiceAge patents, Acacia immediately raised the license price for the patents and began to demand above-FRAND royalties. [ █████████████████████████████████████████████████████████████████████████████████████ .] Apple explained this to Acacia, and [█████████████████████████ ], and despite Apple's stated willingness to license the patents on FRAND terms, Acacia sued Apple through its subsidiary, SLC GmbH, in Germany, seeking an injunction against the sale of Apple's iPhones and iPads based on six VoiceAge Patents. The suit came without warning—on December 21, 2015, [█████████████████████████████████████████████████████████████████████████████████████] Instead, Acacia secretly filed the German suit nine days later on December 30, 2015, even before Apple's license had expired. Acacia, through SLC LLC, also sued Apple in the United States on January 27, 2016, asserting declared SEPs. Apple has made a [██████] offer to license SLC GmbH's patents, [█████████████████████████████████████████] to license SLC's patents worldwide, which Acacia also rejected.

27. Acacia has successfully exploited its status as a PAE to coerce cellular device suppliers to pay exorbitant, non-FRAND royalties for the former VoiceAge patents. Through its subsidiary SLC GmbH, Acacia has sought and obtained injunctions against HTC, Motorola,

---

[7] On December 29, 2013, VoiceAge transferred at least ten patents and applications to SLC, including U.S. Patent Nos. 6,807,524; 7,260,521; 7,672,837; 8,036,885; 6,795,805; 7,151,802; 7,191,123; and 7,280,959; and U.S. Patent Application Nos. 10965795 and 10964752.
[8] SLC website, *available at* http://web.saintlawrencegmbh.com/.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Deutsche Telekom, and Vodafone in Germany on declared SEPs acquired from VoiceAge. On information and belief, certain licensees have settled and agreed to pay supra-FRAND royalties for the former VoiceAge patents.

28. Acacia's conduct is a quintessential example of "patent hold-up" that implicates the very anticompetitive dangers of standard-setting the ETSI IPR Policy was designed to avoid. Acacia has breached FRAND undertakings and committed illegal acts by demanding non-FRAND royalties, notwithstanding that it has at all relevant times been bound by VoiceAge's commitments to license on FRAND terms all implementers of the relevant cellular standards.

IV. **VoiceAge's and Acacia's Patent Transfers Have Lessened Competition**

29. VoiceAge's transfer of patents to Acacia has lessened competition and created and enhanced market power in SEP Technology Markets (defined below) because Acacia, as a PAE, has used the acquired patents to exploit product suppliers in ways VoiceAge could not. Indeed, the patent transfers were designed to have that effect. The lessening of competition and creation and enhancement of market power is reflected in, among other things, Acacia's breaches of FRAND commitments.

30. Acacia's acquisitions of the former VoiceAge patents created and enhanced market power that does not derive from the value of the patents, but rather from the fact that the constraints on the conduct of operating technology companies like VoiceAge do not apply to Acacia's conduct. PAEs like Acacia can afford to bring suits regardless of the merits because their litigation costs and risks are trivial in comparison with the technology companies that they sue, and the risk of penalty is practically non-existent. They do not develop their own technology and have minimal documents, making their litigation discovery costs a fraction of those that a technology company would have faced. Acacia also does not face any risks to its reputation or business relationships from aggressive demands or litigation. To the contrary, its benefits from a reputation for brazen and ruthless patent assertion tactics, which intimidates targets into settling to avoid the repeated harassment for which Acacia is well known.

31. Acacia has every incentive to and does demand excessive royalties untied to the value of the patents. By seeking in litigation more money than the patent in suit is worth, it also exploits

the risk of error in the judicial process. Acacia pressures its targets to settle to avoid facing the risk of an exorbitant damages award if they choose to defend themselves through trial, while Acacia stands only to gain a windfall from an erroneously high award.

32. Courts are limited in their practical ability to police erroneous awards due to the structure of PAEs. Critical information to assess the merits and value of the patents may be unavailable in litigation because Acacia did not develop the patented technology. VoiceAge is headquartered abroad, outside the subpoena power of the U.S. courts. Incomplete information increases the likelihood of a mistaken verdict of infringement or failure to find invalidity or unenforceability.

33. Acacia's acquisitions do not create efficiencies that VoiceAge could not generate through direct and transparent licensing. PAEs can demand higher payments and disregard FRAND commitments because they do not face the same structural constraints as operating companies, which is what makes them an attractive co-conspirator to VoiceAge.

## V. Defendants' Abuses Harm Apple, The Cellular Industry, And Consumers

34. VoiceAge has illegally conspired with Acacia to transfer patents to Acacia, which then breaches FRAND commitments, otherwise exploits those patents in ways VoiceAge could not, and then shares with VoiceAge the exorbitant royalties created by the FRAND breaches and other types of exploitation. The conspiracy has resulted in the parties illegally obtaining or enhancing market power and injuring competition in the markets for functions performed by technologies purportedly covered by declared SEPs acquired from VoiceAge (SEP Technology Markets). Each SEP Technology Market consists of a technology covered by a patent acquired by Acacia from VoiceAge and any other technologies that compete or formerly competed to perform the same function. Acacia offers to license the patents in its SEP Technology Markets to companies located all over the world, so the market is worldwide.

35. In SEP Technology Markets, when the relevant standard was established, the particular technology covered by the SEP was selected over formerly competing technologies that no longer compete (or do not compete closely) once the standard is set. Because product suppliers

design and make enormous sunk investments in products that support standards developed by ETSI, and the only significant telecommunications networks in many parts of the world support only ETSI standards, makers of products that support ETSI standards have no economically viable option to switch to supplying products that support other standards rather than ETSI standards. Accordingly, Acacia holds monopoly power in the SEP Technology Markets.

36. The exorbitant royalties that Acacia has extracted from Apple and others are direct evidence that Acacia has monopoly power in the relevant markets and that the market does not provide a significant constraint on its ability to extract supracompetitive royalties. That monopoly power is independent of whether the patents asserted are actually valid and infringed.

37. VoiceAge's transfer of patents to Acacia has manufactured market power that derives not from any inventive value of the patents, but rather from Acacia's incentives and ability, as a PAE, to exploit Apple and other product suppliers in ways that VoiceAge could not. Put another way, the acquisitions do not "unlock" fair value that VoiceAge could not obtain. As described in Paragraph 26, VoiceAge is fully capable of extracting fair values for its patents. Acacia, however, can extort exorbitant value from the transferred patents because it does not face the same structural constraints or incentives as VoiceAge. As a result of that wrongfully-obtained or enhanced market power, Acacia has inflated royalties in licensing markets. While Acacia tries to tax Apple because of its significant revenue generated from innovations entirely unrelated to the fomer VoiceAge patents, it is extracting exorbitant royalties from other suppliers of products that support the relevant standards, and creating a barrier to entry for new suppliers of standards-compliant products.

38. Acacia's and VoiceAge's conspiracy has resulted in inflated licensing royalties—i.e., higher prices—and imposed burdens, costs, and uncertainties for Apple and potential licensees in the SEP Technology Markets, including cellular product suppliers. In addition, U.S. and other end consumers have been harmed and face a continuing threat of increased prices and reduced innovation and quality for cell phones and other cellular devices.

39. This illegal conduct causes obvious harm to potential licensees such as Apple—i.e., customers in the SEP Technology Markets—when they are compelled to pay inflated, non-FRAND royalties. Potential licensees are also harmed, even when they do not acquiesce to an inflated

royalty, by being forced to incur substantial expenses, uncertainty, and burdens in resisting the patent litigations and injunction threats. For example, Apple has spent millions to date on outside resources (including counsel, experts, and vendors) due to Acacia's exorbitant demands and injunction threats. Apple has also been harmed by the enormous amounts of time its employees have been forced to spend on these litigations, including collecting information and documents and preparing for depositions, rather than doing their jobs. Acacia's acquisitions and misuse of patents obtained from VoiceAge, as well as its disregard for its FRAND commitments, has enabled it to impose these costs on licensees and potential licensees in the SEP Technology Markets.

40. Acacia's and VoiceAge's conduct has also harmed end consumers who purchase cell phones and other devices with cellular capability (such as tablets). Acacia's acquisitions inflate prices and decrease innovation and quality for those cellular products by raising the costs and burdens associated with product suppliers' licensing of declared SEPs and by discouraging suppliers from making the large investments required to innovate effectively.

41. Moreover, Acacia's abuse of its declared SEPs has chilled, and, if not enjoined, will continue to chill, procompetitive standard-setting, to the detriment of industry and American and other consumers alike.

## COUNT I

### BREACH OF CONTRACT

42. Apple repeats and realleges each allegation above as if fully set forth herein.

43. VoiceAge contractually committed to make its declared SEPs available on FRAND terms and conditions. FRAND commitments are binding on all subsequent patent owners, including Acacia, which agreed to be bound by VoiceAge's FRAND commitments at the time it purchased VoiceAge's patents.

44. When Acacia acquired these declared SEPs, it entered into or was assigned the express or implied contractual commitments with ETSI.

45. Apple, as a member of ETSI and an implementer of ETSI standards, is an intended third-party beneficiary of VoiceAge's and Acacia's contracts with ETSI to license declared SEPs on

FRAND terms. Each third party that would potentially implement ETSI/3GPP standards such as AMR-WB, including Apple, was an intended beneficiary of VoiceAge's agreement with ETSI (which continues to bind Acacia).

46. VoiceAge breached these contracts by transferring them to Acacia with the knowledge and intent that Acacia would not abide by the terms of VoiceAge's FRAND commitment.

47. Acacia breached its FRAND obligations by demanding above-FRAND royalties for its declared SEPs acquired from VoiceAge, and by seeking injunctions blocking Apple's products based on such patents.

48. As a direct result of Acacia's and VoiceAge contractual breaches, Apple has suffered harm to its business and property, and, absent an injunction, Apple will continue to suffer from these effects. Apple's past and continuing harm includes litigation costs, supracompetitive licensing rates, business uncertainty, and business resources lost in dealing with the consequences of Defendants' contractual breaches.

## COUNT II

### UNLAWFUL ASSET ACQUISITION

### (SECTION 7 OF THE CLAYTON ACT)

49. Apple repeats and realleges each allegation above as if fully set forth herein.

50. The relevant markets for this claim are the SEP Technology Markets.

51. Acacia, through SLC, has acquired hundreds of patents from VoiceAge, which are assets under Section 7 of the Clayton Act. The effects of these acquisitions by Acacia have been to lessen competition substantially, and to tend to create monopolies in the SEP Technology Markets due to the changes in the licensing market structure described above. Put differently, Acacia's acquisitions resulted in significantly enhanced ability and incentives to harm competition through Acacia's assertions and coercive litigation designed to extract exorbitant royalties from Apple and other operating technology companies far above what the transferor of the patents, VoiceAge, had obtained and could have continued to obtain itself.

52. Acacia's patent acquisitions do not result in efficiencies because, among other things, VoiceAge was fully capable of obtaining reasonable royalties itself. Insofar as the acquisitions resulted in any efficiencies, those efficiencies are outweighed by the anticompetitive effects of the acquisitions.

53. As a direct result of Acacia's patent acquisitions from VoiceAge, Apple has suffered harm to its business and property, and, absent injunctive relief, Apple will continue to suffer from these effects. Apple's past and continuing harm includes litigation costs, supracompetitive licensing rates, business uncertainty, and business resources lost in dealing with the consequences of Acacia's assertion of its acquired VoiceAge patents. As a result of Acacia's acquisitions, consumers for end cellular devices have suffered or are threatened with higher prices and reduced innovation and quality.

## COUNT III

**ILLEGAL AGREEMENT RESTRAINT OF TRADE**
**(SECTION 1 OF THE SHERMAN ACT)**

54. Apple repeats and realleges each allegation as if fully set forth herein.

55. VoiceAge conspired with Acacia to transfer declared SEPs to Acacia for the purpose and with the effect of evading VoiceAge's FRAND commitments and exploiting the patents in ways that VoiceAge could not by acting alone.

56. VoiceAge's agreement with Acacia was expressly intended to enable and had the effect of enabling Acacia to extract exorbitant royalties from cell phone and other cellular device suppliers (like Apple) based on FRAND-committed patents, far beyond what VoiceAge could extract itself. As they intended in reaching this agreement, VoiceAge and Acacia share in the fruits of the non-FRAND royalties Acacia demands from product suppliers through VoiceAge's interest in the royalties Acacia obtains.

57. The conspiracy between VoiceAge and Acacia raised prices and resulted in other anticompetitive effects in the SEP Technology Markets, and for cellular devices sold to end consumers.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

58. The patent transfers from VoiceAge to Acacia generated no efficiencies, and in fact were designed to create inefficiencies in licensing that VoiceAge and Acacia could exploit to harm Apple, other potential licensees, and end cellular product consumers. Any conceivable efficiencies that the agreement may have created were significantly outweighed by their anticompetitive effects.

59. As a direct result of the unlawful agreement between VoiceAge and Acacia, Apple has suffered harm to its business and property, and, absent injunctive relief, Apple will continue to suffer from these effects. Apple's past and continuing harm includes litigation costs, supracompetitive licensing rates, business uncertainty, and business resources lost in dealing with the consequences of the unlawful agreement. Consumers for end cellular products have suffered or are threatened with higher prices and reduced innovation and quality.

## COUNT IV

### UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200

60. Apple repeats and realleges each allegation above as if fully set forth herein.

61. Acacia and VoiceAge have engaged and continue to engage in unfair competition in violation of Cal. Bus. Prof. Code § 17200, et seq. As set forth above, Acacia has engaged in illegal conduct by violating the Clayton Act, and Acacia and VoiceAge have engaged in illegal conduct by violating the Sherman Act. Additionally, as discussed below, Acacia has violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. That conduct is also unfair in that it violates the spirit and policy of the antitrust laws.

62. Acacia's and Voice Age's unfair business practices include their conspiracy to evade VoiceAge's FRAND commitments by transferring declared SEPs to Acacia. Acacia has subsequently demanded non-FRAND royalties and has sought injunctions in violation of those FRAND commitments.

63. The United States Federal Trade Commission (FTC) enforces Section 5 of the Federal Trade Commission. The FTC has brought an action under Section 5 where, like here, an acquiring

**_REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED_**

firm refused to abide by licensing commitments that its predecessor made in connection with industry standard-setting activities.[9]

64. The FTC has also brought actions under Section 5 where, like here, a holder of FRAND-committed patents sought to obtain an injunction against a standard implementer.[10]

65. As a direct result of Acacia's and VoiceAge's wrongful conduct, competition has been injured in the SEP Technology Markets as alleged above. Moreover, this conduct threatens injury to downstream competition for price, innovation, and quality in markets for cellular devices, thereby injuring consumers in California and elsewhere. These threatened injuries include the passing on to consumers of improperly inflated royalties, and reductions in innovation and quality for cellular devices that comply with relevant standards by raising costs for innovators to bring products to market.

66. As a direct result of Acacia's and VoiceAge's illegal conduct, Apple has suffered economic harm in the form of litigation costs and diversion of resources away from innovation.

**RELIEF SOUGHT**

Apple respectfully requests the following relief:

A. That Acacia's' unlawful conduct as alleged herein be declared a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

B. That Acacia's and VoiceAge's unlawful conduct as alleged herein be declared a violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C. That Acacia's and VoiceAge's unlawful and unfair conduct as alleged herein be declared a violation of Cal. Bus. Prof. Code § 17200, et seq.;

D. That Acacia's and VoiceAge's conduct as alleged herein be judged a breach of contract;

---

[9] *See* Decision and Order, In the Matter of Negotiated Data Solutions LLC, File No. 051-0094 (Jan. 23, 2008), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2008/01/080122do.pdf.

[10] *See, e.g.*, Decision and Order, In the Matter of Motorola Mobility LLC, File No. 121-120 (July 24, 2013), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2013/07/130724googlemotorolado.pdf.

E. That Apple recover damages against Acacia and VoiceAge, including incidental and consequential damages, in an amount to be determined and multiplied to the extent provided by law;

F. That all contracts or agreements that VoiceAge and Acacia entered into in violation of the Sherman Act, Clayton Act, Cal. Bus. Prov. Code § 17200, et seq., or in breach of VoiceAge's or Acacia's FRAND obligations be declared void and the patents covered by those transfer agreements be transferred back from Acacia (or its subsidiaries) to VoiceAge;

G. That all patents Acacia (or its subsidiaries) has acquired from VoiceAge be declared unenforceable;

H. That Acacia be enjoined from seeking injunctions against Apple based on declared SEPs obtained from VoiceAge;

I. That Apple be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

J. That Apple be awarded such additional relief as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Apple demands a trial by jury on all issues triable by jury.

**_REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED_**

| | |
|---|---|
| DATED: October 11, 2017 | Respectfully submitted, |

By:   /s/ Mark D. Selwyn

Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile:  +1 650 858 6100

William F. Lee (*pro hac vice*)
william.lee@wilmerhale.com
Joseph J. Mueller (*pro hac vice*)
joseph.mueller@wilmerhale.com
Timothy Syrett (*pro hac vice*)
timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile:  +1 617 526 5000

Leon B. Greenfield (*pro hac vice*)
leon.greenfield@wilmerhale.com
Nina S. Tallon (*pro hac vice*)
nina.tallon@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile:  +1 202 663 6363


*Attorneys for Plaintiff*
 APPLE INC.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2017, I electronically filed the foregoing documents using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

DATED:     October 11, 2017                    */s/* Mark D. Selwyn
                                                Mark D. Selwyn