NELSON BUMGARDNER PC
Ed Nelson III (*pro hac vice*)
ed@nelbum.com
Ryan P. Griffin (*pro hac vice*)
ryan@nelbum.com
3131 West 7th Street, Suite 300
Fort Worth, TX 76107
Telephone: (817) 377-9111

CALDWELL CASSADY & CURRY
Bradley W. Caldwell (*pro hac vice*)
bcaldwell@caldwellcc.com
John A. Curry (*pro hac vice*)
acurry@caldwellcc.com
2101 Cedar Springs Road, Suite 1000
Dallas, TX 75201
Telephone: (214) 888-4848

Attorneys for Defendants Acacia Research
Corporation, Cellular Communications
Equipment LLC,  Cellular Communications
Equipment GmbH, Saint Lawrence
Communications  LLC, and Saint Lawrence
Communications GmbH

LECLAIRRYAN LLP
Patricia L. Peden (SBN 206440)
patricia.peden@leclairryan.com
44 Montgomery St., Thirty-First Floor
San Francisco, CA  94104
Telephone: 415-391-7111
Facsimile:  415-391-8766

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

APPLE INC.,

Plaintiff,

v.

ACACIA RESEARCH CORPORATION, *et al*.,

Defendants.

Case No. 5:16-cv-07266-EJD

**NOTICE OF MOTION AND ACACIA PARTIES' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

DATE:  February 22, 2018
TIME:  10:00 a.m.
JUDGE:  Honorable Edward J. Davila

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF ISSUES TO BE DECIDED ......................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 2

ARGUMENT ............................................................................................................. 2

I.    Apple's SAC Should Be Dismissed Under the First-to-File Rule. ................... 2

      A.    Apple's Delay in Filing This Action Supports Dismissal. ................... 3

      B.    This Case and the EDTX Case Involve Similar Parties. ..................... 4

      C.    This Case and the EDTX Case Involve Similar Issues. ...................... 5

II.   Apple's Breach of Contract Claim Fails. .......................................................... 6

      A.    Apple Fails to Plead the Formation of Any Contract to License Declared SEPs on FRAND Terms that Apple Can Enforce Against Acacia. ....... 7

            1.    If VoiceAge failed to bind Acacia to license on FRAND terms, Apple cannot enforce a breach of contract claim against Acacia because Acacia has no contractual obligation to license on FRAND terms. ............................................................................ 8

            2.    If VoiceAge bound Acacia to license on FRAND terms, Apple cannot enforce a breach of contract claim against Acacia because it is not in privity of contract with Acacia. .................................. 9

            3.    FRAND obligations do not run with the patent. ..................... 11

      B.    Apple Fails to Adequately Identify the Existence and Terms of a Breached Contract. ....................................................................................... 12

      C.    Apple Fails to Allege Plaintiff's Performance or Excuse for Nonperformance. ...................................................................................... 13

      D.    Apple Fails to Plead Breach of Any Contractual Duty. ..................... 14

            1.    Apple fails to allege that any patents Acacia acquired from VoiceAge are subject to FRAND commitments. ...................... 14

            2.    Acacia's licensing offers breach no FRAND commitments. ..... 18

            3.    Acacia's decision to sue and seek injunctions does not breach any FRAND commitment. ....................................................... 19

III.  Apple's Antitrust Claims Fail. ........................................................................ 21

      A.    Apple Has Not Properly Defined Any Relevant Market. ................... 22

1.      Apple's failure to define a relevant market necessitates dismissal............22

2.      Apple's "SEP Technology Markets" are insufficient to state an antitrust claim......................................................................................24

B.      Apple Fails to Allege Antitrust Injury. ................................................25

1.      Transfer of a patent monopoly cannot constitute antitrust injury .............26

2.      Apple's SAC challenges constitutionally-protected activity. ...................26

C.      Apple Fails to State a Section 7 Claim. ...............................................29

D.      Apple Fails to State a Section 1 Claim. ...............................................32

IV.    Apple Fails to State a Claim for Violation of California's UCL. ......................................36

CONCLUSION..........................................................................................................38

# TABLE OF AUTHORITIES

**Cases:**

*49er Chevrolet, Inc. v. Gen'l Motors Corp.,*
    803 F.2d 1463 (9th Cir. 1986) ........................................................ 34

*Adobe Sys. Inc. v. A & S Elecs., Inc.,*
    153 F. Supp. 3d 1136 (N.D. Cal. 2015) ......................................... 13

*Alatraqchi v. Uber Techs., Inc.,*
    2013 U.S. Dist. LEXIS 119642 (N.D. Cal. Aug. 22, 2013)............. 34

*Alltrade, Inc. v. Uniweld Prods., Inc.,*
    946 F.2d 622 (9th Cir. 1991) ...................................................... 3, 4

*Analogix Semiconductor, Inc. v. Silicon Image, Inc.,*
    2008 U.S. Dist. LEXIS 118508 (N.D. Cal. Oct. 28, 2008)........... 22, 24

*Apple Inc. v. Motorola Mobility, Inc.,*
    2012 U.S. Dist. LEXIS 187878 (W.D. Wis. Nov. 8, 2012)............. 13

*Apple, Inc. v. Motorola Mobility, Inc.,*
    2011 U.S. Dist. LEXIS 72745 (W.D. Wis. June 7, 2011) .............. 16, 17

*Apple Inc. v. Motorola Mobility, Inc.,*
    886 F. Supp. 2d 1061 (W.D. Wis. 2012) ...................................... 18

*Apple, Inc. v. Motorola Mobility, Inc.,*
    2012 U.S. Dist. LEXIS 181854 (W.D. Wis. Oct. 29, 2012)........... 20

*Apple Inc. v. Motorola, Inc.,*
    757 F.3d 1286 (Fed. Cir. 2014)................................................... 20

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................ 12, 34

*Aventis Pharma S.A. v. Amphastar Pharms. Inc.,*
    2009 U.S. Dist. LEXIS 132345 (C.D. Cal. Feb. 17, 2009)............ 29

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
    166 F. Supp. 3d 988 (N.D. Cal. 2015) ......................................... 26

*Beatrice Foods Co. v. F.T.C.,*
    540 F.2d 303 (7th Cir. 1976) ...................................................... 38

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................... 12, 23, 25, 34, 35

*Bement v. National Harrow Co.*,
    186 U.S. 70 (1902) ........................................................................................................ 31

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) .................................................................................. 22, 23

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ...................................................................................... 25

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ...................................................................................................... 23

*Brulotte v. Thys Co.*,
    379 U.S. 29 (1964) ........................................................................................................ 26

*Brundage-Bone Concrete Pumping, Inc. v. Concord Commer. Div. of HSBC Bus. Loans, Inc.*,
    45 F. App'x 595 (9th Cir. 2002) ..................................................................................... 8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ................................................................................................. 25, 26

*Brunswick Corp. v. Riegel Textile Corp.*,
    752 F. 2d 261 (7th Cir. 1984) .................................................................................. 30, 31

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
    222 Cal. App. 3d 1371 (1990) ........................................................................................ 6

*CareFusion Corp. v. Medtronic Spine LLC*,
    2010 U.S. Dist. LEXIS 122004 (N.D. Cal. Nov. 1, 2010) ........................................... 31

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986) ...................................................................................................... 25

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ............................................................................................. 36, 37

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) .......................................................................................... 36

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
    2006 U.S. Dist. LEXIS 2176 (N.D. Cal. Jan. 3, 2006) .................................................. 28

*ChriMar Systems, Inc. v. Cisco Systems, Inc.*,
    72 F. Supp. 3d 1012 (N.D. Cal. 2014) ..................................................................... 22, 23

*Colonial Med. Grp., Inc. v. Catholic Health Care West*,
444 F. App'x 937 (9th Cir. 2011) .................................................................... 22, 23

*Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*,
217 F.3d 1187 (9th Cir. 2000) ...................................................................... 30, 31

*Datatreasury Corp. v. Wells Fargo & Co.*,
522 F.3d 1368 (Fed. Cir. 2008) ........................................................................ 11

*Delano Farms Co. v. Cal. Table Grape Comm'n*,
655 F.3d 1337 (Fed. Cir. 2011).............................................................. 22, 23, 24

*Digital Sun v. The Toro Co.*,
2011 U.S. Dist. LEXIS 30222 (N.D. Cal. Mar. 22, 2011).................................. 31

*DocMagic, Inc. v. Ellie Mae, Inc.*,
745 F. Supp. 2d 1119 (N.D. Cal. 2010) ............................................................ 36

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)......................................................................... 27, 29, 37

*Edstrom v. Anheuser-Busch Inbev SA/NV*,
647 F. App'x 733 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 258 (2016)................ 29

*Erickson v. Pardus*,
551 U.S. 89 (2007).......................................................................................... 25

*Ericsson, Inc. v. D-Link Sys.*,
773 F.3d 1201 (Fed. Cir. 2014)......................................................................... 12

*Ericsson Inc. v. D-Link Sys., Inc.*,
2013 U.S. Dist. LEXIS 110585 (E.D. Tex. Aug. 6, 2013), *aff'd in part, vacated in part, rev'd in part*, 773 F.3d 1201 (Fed. Cir. 2014).................................................. 18

*FTC v. Qualcomm Inc.*,
2017 U.S. Dist. LEXIS 98632 (N.D. Cal. June 26, 2017) .................................. 18

*F.T.C. v. Actavis, Inc.*,
133 S. Ct. 2223 (2013)..................................................................................... 26

*GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JP Morgan Chase Bank, N.A.*,
671 F.3d 1027 (9th Cir. 2012) .......................................................................... 10

*Golden Gate Pharmacy Services., Inc. v. Pfizer, Inc.*,
433 F. App'x 598 (9th Cir. 2011) ................................................................ 22, 23

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
    2010 U.S. Dist. LEXIS 47896 (N.D. Cal. Apr. 16, 2010), *aff'd*, 433 F. App'x 598 (9th Cir.
    2011) ...................................................................................................................................... 23

*Grant v. Pensco Tr. Co.*,
    2014 U.S. Dist. LEXIS 53224 (N.D. Cal. Apr. 15, 2014) ...................................................... 37

*Handgards, Inc. v. Ethicon, Inc.*,
    601 F.2d 986 (9th Cir. 1979) ................................................................................................. 27

*Hernandez v. Select Portfolio, Inc.*,
    2015 U.S. Dist. LEXIS 82922 (C.D. Cal. June 25, 2015) ...................................................... 34

*Hicks v. PGA Tour, Inc.*,
    165 F. Supp. 3d 898 (N.D. Cal. 2016) ................................................................................... 36

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) ........................................................................... 28, 29

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................................................................... 21

*Inherent.com v. Martindate-Hubbell*,
    420 F. Supp. 2d 1093 (N.D. Cal. 2006) ................................................................................... 5

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    2013 U.S. Dist. LEXIS 177836 (E.D. Va. Dec. 18, 2013) .............................................. 26, 32

*Intersearch Worldwide, Ltd. v. Intersearch Group, Inc.*,
    544 F. Supp. 2d 949 (N.D. Cal. 2008) ................................................................................. 4, 6

*In re Certain 3G Mobile Handsets*,
    Inv. No. 337-TA-613 (ITC Apr. 27, 2015) ........................................................ 14, 16, 19, 20

*In re Certain Wireless Devices with 3G and/or 4G Capabilities*,
    2014 WL 2965327 (June 13, 2014) ....................................................................................... 15

*In re Innovatio IP Ventures, LLC*,
    2013 U.S. Dist. LEXIS 144061 (N.D. Ill. Sep. 27, 2013) ..................................................... 12

*In re Innovatio IP Ventures, LLC Patent Litig.*,
    956 F. Supp. 2d 925 (N.D. Ill. 2013) ............................................................................... 15, 16

*In re Musical Instruments and Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ......................................................................................... 34, 35

*JES Props. v. USA Equestrian, Inc.*,
   253 F. Supp. 2d 1273 (M.D. Fla. 2003) ................................................................... 23

*Johnson v. University Health Servs.*,
   931 F. Supp. 1572 (S.D. Ga. 1996) ........................................................................ 32

*Jones v. Cooper Indus.*,
   938 S.W.2d 118 (Tex. App. Houston 14th Dist. 1996) ........................................ 11

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
   552 F.3d 1033 (9th Cir. 2009) ............................................................................... 29

*Kasperzyk v. Shetler Sec. Servs., Inc.*,
   2014 U.S. Dist. LEXIS 547 (N.D. Cal. Jan. 3, 2014) ............................................. 8

*Kendall v. Visa U.S.A, Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ............................................................................... 33

*Knutson v. Sirius XM Radio Inc.*,
   771 F.3d 559 (9th Cir. 2014) ................................................................................... 9

*Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*,
   787 F.3d 1237 (9th Cir. 2015) ................................................................................. 4

*LiveUniverse, Inc. v. MySpace, Inc.*,
   304 F. App'x 554 (9th Cir. 2008) .......................................................................... 25

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
   275 F.3d 762 (9th Cir. 2001) ................................................................................. 23

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) ............................................................................... 25

*Mahroom v. Best W. Int'l, Inc.*,
   2009 U.S. Dist. LEXIS 130357 (N.D. Cal. July 22, 2009) ...................................... 6

*Malaney v. UAL Corp.*,
   434 F. App'x 620 (9th Cir. 2011) .......................................................................... 22

*McCabe Hamilton & Renny Co., Ltd. v. Matson Terminals, Inc.*,
   2008 U.S. Dist. LEXIS 47428 (D. Haw. June 17, 2008) ................................. 22, 25

*McKeon Constr. v. McClatchy Newspapers*,
   1969 U.S. Dist. LEXIS 10593 (N.D. Cal. Nov. 24, 1969) .................................... 32

*Mercury Cas. Co. v. Maloney*,
   113 Cal. App. 4th 799, 6 Cal. Rptr. 3d 647 (2003) .............................................. 10

*Meru Networks, Inc. v. Extricom Ltd.*,
  2010 U.S. Dist. LEXIS 90212 (N.D. Cal. Aug. 31, 2010)...................................................... 6

*Microchip Tech., Inc. v. United Module Corp.*,
  2011 U.S. Dist. LEXIS 73276 (N.D. Cal. Jul. 7, 2011)........................................................ 4

*Microsoft Corp. v. Harmony Computers & Elecs., Inc.*,
  846 F. Supp. 208 (E.D.N.Y. 1994) ...................................................................................... 9

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011)............................................................................................................. 28

*Microsoft Corp. v. Motorola, Inc.*,
  2013 U.S. Dist. LEXIS 60233 (W.D. Wash. Apr. 25, 2013)........................................ 16, 18

*Microsoft Corp. v. Motorola, Inc.*,
  854 F. Supp. 2d 993 (W.D. Wash. 2012) ........................................................................... 19

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
  2016 U.S. Dist. LEXIS 49498 (D. Del. Apr. 13, 2016)...................................................... 28

*Mirafi, Inc. v. Murphy*,
  1991 U.S. App. LEXIS 1636 (Fed. Cir. Feb. 4, 1991) ...................................................... 28

*Motorola Mobility, LLC*,
  2013 WL 124100 (F.T.C. Jan. 3, 2013) ............................................................................. 38

*Negotiated Data Solutions LLC*,
  2008 WL 4407246 (F.T.C. Sept. 22, 2008) ....................................................................... 38

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ........................................................................................... 23

*Nobelpharma AB v. Implant Innovations, Inc.*,
  141 F.3d 1059 (Fed. Cir. 1998) (en banc).......................................................................... 29

*Nokia Corp. v. Apple Inc.*,
  2011 U.S. Dist. LEXIS 58773 (D. Del. June 1, 2011)........................................................ 20

*Norcia v. Samsung Telcoms. Am., LLC*,
  845 F.3d 1279 (9th Cir. 2017) ........................................................................................... 10

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  939 F. Supp. 2d 1002 (N.D. Cal. 2013) ............................................................................. 13

-viii-

*Otworth v. S. Pac. Transp. Co.*,
   166 Cal. App. 3d 452, 212 Cal. Rptr. 743 (1985) .................................................. 13

*Pacesetter Systems, Inc. v. Medtronic, Inc.*,
   678 F.2d 93 (9th Cir. 1982) ............................................................................... 2

*Paice LLC v. Hyundai Motor Co.*,
   2014 U.S. Dist. LEXIS 154254 (D. Md. Oct. 29, 2014), *aff'd* 2014
   U.S. Dist. LEXIS 154254 ................................................................................. 11

*Prime Healthcare Services, Inc. v. SEIU et al.*,
   2013 U.S. Dist. LEXIS 104511 (S.D. Cal. July 25, 2013) .................................. 28

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) ......................................................................... 34

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993)...................................................................................... 27, 28

*Proofpoint, Inc. v. InNova Patent Licensing, LLC*,
   2011 U.S. Dist. LEXIS 120343 (N.D. Cal. Oct. 17, 2011)..................................... 3

*Prouty v. Gores Tech. Grp.*,
   121 Cal. App. 4th 1225 (2004) ........................................................................... 8

*Radiancy, Inc. v. Viatek Consumer Products Group, Inc.*,
   138 F. Supp. 3d 303 (S.D.N.Y. Mar. 28, 2014)............................................ 22, 28

*Realtek Semiconductor Corp. v. LSI Corp.*,
   2012 U.S. Dist. LEXIS 146565 (N.D. Cal. Oct. 10, 2012).................................. 18

*Rebel Oil, Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................................ 25

*Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*,
   786 F. Supp. 2d 1190 (S.D. Tex. 2009) ............................................................ 34

*Saint Lawrence LLC v. Apple Inc.*,
   Case No. 2:16-cv-082 (E.D. Tex.) ....................................................... 2, 3, 5, 16

*Schreiber v. Estate of Knievel*,
   637 F. App'x 479 (9th Cir. 2016) ....................................................................... 8

*Schwartz v. Frito-Lay N. Am.*,
   2012 U.S. Dist. LEXIS 188186 (N.D. Cal. Sep. 11, 2012) ................................ 5, 6

ACACIA PARTIES' MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT
CASE NO. 5:16-CV-07266-EJD

*SCM Corp. v. Xerox Corp.*,
 463 F. Supp. 983 (D. Conn. 1978), *aff'd*, 645 F.2d 1195 (2d Cir. 1981) ........................ 30, 31

*SCM Corporation v. Xerox Corporation*,
 645 F.2d 1195 (2d Cir. 1981) .................................................................................... 32

*SEC v. Prudential Sec.*,
 136 F.3d 153 (D.C. Cir. 1998) .................................................................................. 10

*Segen v. Rickey*,
 2008 U.S. Dist. LEXIS 23226 (N.D. Cal. Feb. 29, 2008) ....................................... 8

*Seirus Innovative Accessories, Inc. v. Cabelas, Inc.*,
 2010 U.S. Dist. LEXIS 143106 (S.D. Cal. Apr. 20, 2010) ............................... 22, 24

*Shroyer v. New Cingular Wireless Servs., Inc.*,
 622 F.3d 1035 (9th Cir. 2010) .................................................................................. 37

*Simpson v. Union Oil Co.*,
 377 U.S. 13 (1964) .................................................................................................... 21

*Sky Techs. LLC v. SAP AG*,
 576 F.3d 1374 (Fed. Cir. 2009) ................................................................................ 12

*Smilecare Dental Group v. Delta Dental Plan*,
 88 F.3d 780 (9th Cir. 1996) ..................................................................................... 26

*Spindler v. Johnson & Johnson Corp.*,
 2011 U.S. Dist. LEXIS 158559 (N.D. Cal. Aug. 1, 2010) ............................... 22, 24

*Stevens v. United States*,
 2009 U.S. Claims LEXIS 408 (Fed. Cl. Oct. 28, 2009), *aff'd* 367 Fed. Appx. 158
 (Fed. Cir. 2010) ................................................................................................... 10, 16

*Tanaka v. Univ. of S. Cal.*,
 252 F.3d 1059 (9th Cir. 2001) .......................................................... 22, 23, 26, 33

*TCL Communs. Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*,
 2016 U.S. Dist. LEXIS 140566 (C.D. Cal. Aug. 9, 2016) ....................................... 37

*Toscano v. PGA Tour, Inc.*,
 70 F. Supp. 2d 1109 (E.D. Cal. 1999), *aff'd*, 258 F.3d 978 (9th Cir. 2001) ........................ 34

*United Mine Workers v. Pennington*,
 381 U.S. 657 (1965) ................................................................................... 27, 29, 37

*United States v. E. I. Du Pont De Nemours & Co.*,
  353 U.S. 586 (1957) ................................................................................................... 23

*United States v. Line Material Co.*,
  333 U.S. 287 (1948) ................................................................................................... 26

*United States v. Marine Bancorporation, Inc.*,
  418 U.S. 602 (1974) ................................................................................................... 23

*United States v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ................................................................... 29

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council, AFL-CIO*,
  31 F.3d 800 (9th Cir. 1994) ..................................................................................... 27

*Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.*,
  240 Cal. App. 4th 763, 192 Cal. Rptr. 3d 838 (2015) ................................................. 8

*Vizio, Inc. v. Funai Elec. Co.*,
  2010 U.S. Dist. LEXIS 30850 (C.D. Cal. Feb. 3, 2010) ..................................... 11, 27, 30, 31

*Wallerstein v. Dole Fresh Vegetables, Inc.*,
  967 F. Supp. 2d 1289 (N.D. Cal. 2013) ..................................................................... 5

*Walker Process Equip., Inc., v. Food Mach. and Chem. Corp.*,
  382 U.S. 172 (1965) ................................................................................................... 23

*Wi-LAN Inc. v. HTC Corp.*,
  2:11-cv-68-JRG (E.D. Tex. Oct. 11, 2013) ............................................................... 15

*Z-Line Designs, Inc. v. Bell'O Int'l LLC*,
  218 F.R.D. 663 (N.D. Cal. 2003) ............................................................................... 3

*Zef Sci., Inc., v. Shimadzu Sci. Instruments, Inc.*,
  2016 U.S. Dist. LEXIS 44123 (S.D. Cal. Mar. 31, 2016) ......................................... 26

**Rules and Statutes:**

15 U.S.C. § 1 ......................................................... 1, 21, 23, 26, 32, 33, 34, 35, 36, 37

15 U.S.C. § 2 ......................................................................................... 23, 26, 29

15 U.S.C. § 15 ................................................................................................ 25, 32

15 U.S.C. § 18 ............................................... 1, 21, 23, 26, 29, 30, 31, 32, 36

15 U.S.C. § 26 ..................................................................................................... 25

15 U.S.C. § 45 .......................................................................................... 36, 37, 38

35 U.S.C. § 261 .................................................................................................... 21

35 U.S.C. § 281 .............................................................................................. 11, 21

35 U.S.C. § 282(a) ............................................................................................... 21

35 U.S.C. § 283 .................................................................................................... 21

35 U.S.C. § 284 .................................................................................................... 21

CAL. BUS. & PROF. CODE § 17200, *et seq.* ............................................. 1, 36, 37

Federal Rule of Civil Procedure 8 ................................................................... 34

Federal Rule of Civil Procedure 12(b)(6) ................................................. 1, 23, 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION TO DISMISS

TO PLAINTIFF AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT at 10:00 a.m. on February 22, 2018, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Edward J. Davila, located at 280 South 1st Street, Courtroom 4, 5th Floor, San Jose, CA 95113, Defendants Acacia Research Corporation, Saint Lawrence Communications LLC, and Saint Lawrence Communications GmbH (together, "Acacia") will, and hereby do, move this Court to dismiss Plaintiff Apple, Inc.'s Second Amended Complaint (ECF 115) pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

This motion is based on this Notice of Motion and Motion, the attendant Memorandum of Points and Authorities, the record in this action, and such further evidence and argument that the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

Whether Apple's Second Amended Complaint should be dismissed because it fails to state claims for (1) breach of contract, (2) under Section 7 of the Clayton Act (15 U.S.C. § 18), (3) under Section 1 of the Sherman Act (15 U.S.C. § 1), and (4) under California's Unfair Competition Law (CAL. BUS. & PROF. CODE § 17200).

## MEMORANDUM OF POINTS AND AUTHORITIES

The significant flaws in Apple's complaint stem from its misguided attempt to transform an equitable limitation of patent infringement damages into a complex business tort that catches both Acacia[1] and VoiceAge in its net.  Apple asserted similar claims arising out of identical facts against Acacia as a counterclaim in prior-filed and currently-pending litigation in the Eastern District of Texas (the "EDTX Case").[2]  Dissatisfied with its assertion of FRAND obligations as a shield against patent infringement claims, Apple seeks to use them as a sword by asserting breach-of-contract, antitrust, and unfair competition here.  In so doing, Apple attempts to chill legitimate enforcement of declared-SEP portfolios to allow it to infringe with impunity while stonewalling FRAND licensing overtures—a classic "patent hold-out" scenario whereby a large multinational company starves a patentee of royalties while blatantly infringing its patents and prolonging litigation to force the patentee to accept an unreasonably small royalty rate.

Apple is strategically and vaguely pleading contract, antitrust and unfair competition law claims, despite knowing well that the only source for any Acacia FRAND obligations rests in equity or in its express contractual commitments to patent transferors.  This is Apple's third attempt to state a claim, and its third strike should be its last.

## ARGUMENT

**I.      Apple's SAC Should Be Dismissed Under the First-to-File Rule.**

Under the first-to-file doctrine, a district court should "decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district."[3]  In applying the rule, courts consider three factors: "(1) the chronology of the two

---

[1] In its Second Amended Complaint (or "SAC"), Apple refers to Defendants Acacia Research Corporation, Saint Lawrence Communications LLC ("SLC"), and Saint Lawrence Communications GmbH ("SLC Germany") collectively as "Acacia."  While the Acacia defendants dispute that they collectively engaged in the alleged conduct, they are referred to collectively herein as "Acacia," unless otherwise noted.

[2] *See Saint Lawrence LLC v. Apple Inc.*, No. 2:16-cv-082 (E.D. Tex. Jan. 27, 2016).

[3] *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982).

1    actions; (2) the similarity of the parties; and (3) the similarity of the issues."[4]  The first-to-file

2    rule "promotes judicial efficiency and prevents the risk of inconsistent decisions that would arise

3    from multiple litigations of identical claims."[5]  The facts underlying the breach of FRAND

4    arguments that form the basis of Apple's claims here will soon be evaluated in the EDTX Case,

5    and this Court should therefore decline jurisdiction.

6         **A. Apple's Delay in Filing This Action Supports Dismissal.**

7         The chronology of the two actions weighs in favor of dismissing Apple's Second

8    Amended Complaint.  The EDTX Case constitutes the first relevant litigation between Acacia

9    and Apple.  On January 27, 2016, following Apple's refusal to accept Acacia's license offer,

10   provide a counteroffer, or otherwise indicate a serious interest in negotiations, Acacia filed a

11   patent infringement suit against Apple in the Eastern District of Texas.  The patents-in-suit are

12   patents that: (1) VoiceAge declared to be essential to an ETSI standard; (2) VoiceAge agreed to

13   license on FRAND terms; and (3) VoiceAge transferred to Acacia in late 2013.  (*See*, *e.g.*,

14   EDTX Case Dkt. 92 ¶¶ 83-85, counterclaim ¶¶ 75-81.)[6]

15        Apple's FRAND claims were likewise first raised in the EDTX Case.  On November 16,

16   2016, a month before Apple filed its Original Complaint in this Court, Apple amended its

17   previously-filed answer in the EDTX Case to affirmatively raise a counterclaim for "breach of

18   contract."  (EDTX Case Dkt. 92 ¶¶ 75-81.)  Litigation has progressed substantially in the EDTX

19   Case.  Trial is ***only 3-months away***, and a final judgment will settle claims Apple raises in the

20   case here.  The parties in the EDTX Case have already deposed multiple VoiceAge, Acacia, and

21   Apple witnesses regarding patents presumably at issue in this action, produced hundreds of

---

[4] *Z-Line Designs, Inc. v. Bell'O Int'l LLC*, 218 F.R.D. 663, 665 (N.D. Cal. 2003); *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 625-26 (9th Cir. 1991).

[5] *Proofpoint, Inc. v. InNova Patent Licensing, LLC*, No. 5:11-cv-2288, 2011 U.S. Dist. LEXIS 120343, at *18 (N.D. Cal. Oct. 17, 2011); *see also Alltrade*, 946 F.2d at 625 (holding that importance of these goals means the doctrine "should not be disregarded lightly").

[6] Though Apple does not specifically identify the patents for which it claims Acacia did not make FRAND offers, as discussed below at II.B., the patents and enforcement actions Acacia discusses here resemble those referenced in SAC ¶¶ 24-26.  If, Apple's complaint refers to different patents, or different enforcement actions, this merely illustrates the deficiency of Apple's pleading in other regards.

1    thousands of documents and emails, and even exchanged expert reports specifically addressing

2    Apple's allegation that Acacia breached FRAND commitments.

3         Apple's late filing in this case is a blatant attempt to gain a second bite at the FRAND

4    apple.  When it loses the EDTX Case, it hopes to use this Court's ruling to contest the EDTX

5    proceedings.  Apple's substantial delay in filing here justifies dismissal.

6         **B.  This Case and the EDTX Case Involve Similar Parties.**

7         Apple is the only defendant in the EDTX Case and the only plaintiff here. Although

8    Apple sued entities in this case who are not parties in the EDTX Case, the parties are sufficiently

9    similar to invoke the first-to-file rule.  "The similar parties' requirement does not require 'exact

10   identity,' but instead is satisfied if the parties are substantially similar."[7]

11        Here, Saint Lawrence Communications LLC ("SLC") and Apple are parties to both cases.

12   In Apple's SAC, it fails to distinguish among Acacia entities, and adopts the convention of

13   referring to all parties as "Acacia."  (*See* SAC ¶¶ 1, 5; *supra* at n.1).  Despite the nonspecific

14   "Acacia" label, SLC is the only party engaging in the domestic litigation behavior allegedly

15   causing Apple injury: (1) Apple refers to Acacia Research Corporation only as the parent of

16   other Acacia parties;[8] and (2) SLC GmbH is accused only of suing on German patents in

17   Germany.  (SAC ¶¶ 5, 27.)  As a result, Apple's allegations that "Acacia" harmed competition

18   (or end consumers with whom U.S. antitrust law is concerned) necessarily refers to SLC, and its

19   claims against Acacia should therefore be dismissed under the first-to-file rule.[9]

20

21   [7] *Microchip Tech., Inc. v. United Module Corp.*, 2011 U.S. Dist. LEXIS 73276, at *12 (N.D. Cal.
22   Jul. 7, 2011); *see also Intersearch Worldwide, Ltd. v. Intersearch Group, Inc.*, 544 F. Supp. 2d
     949, 959 (N.D. Cal. 2008) (holding that "exact identity is not required to satisfy the first-to-file
23   rule"); *Alltrade*, 946 F.2d at 625 n.3 (noting presence of additional defendant but holding that
     this factor "clearly [has] been met.").
24   [8] **Acacia Research Corportation is misjoined.  It is party to no transaction concerning
25   patents at issue here, and Apple's SAC contains no allegation of single business enterprise
     or alter ego.  There is simply no pleaded basis for maintaining suit against Acacia Research
26   Corporation and it should be dismissed.**
     [9] *See Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1240-41 (9th Cir. 2015)
27   (holding that the parties and issues were both substantially similar when one party stands in the
28   shoes of another with respect to obtaining relief in the first-filed suit, despite the presence of

-4-

1    While Apple failed to join or implead VoiceAge in the EDTX Case, Apple obtained over

2    8,000 pages of VoiceAge documents regarding its FRAND claims.  Apple also deposed

3    VoiceAge's co-president, Mr. Laurent Amar, as well as VoiceAge engineers.[10]  Apple cannot

4    claim that it did not have the opportunity to obtain relevant testimony and discovery from

5    VoiceAge in the EDTX Case.  Apple's own decision to not amend its counterclaim and seek to

6    join VoiceAge as a party in the EDTX Case cannot justify disregarding the first-to-file rule.

7    **C.  This Case and the EDTX Case Involve Similar Issues.**

8    "The issues need not be precisely identical for the first-to-file rule to apply; the rule can

9    apply even if the later-filed action brings additional claims."[11]  Where the factual and legal issues

10   involved are similar, the fact that parties bring different causes of action arising from those facts

11   with different claim elements is insufficient to defeat similarity.[12]  Here, the fundamental issue is

12   identical: whether Acacia violated contractual FRAND obligations.

13   Apple's EDTX counterclaim asserted, as here, that "VoiceAge […] agreed to license the

14   Patents-in-Suit on FRAND terms" and that "SLC became bound by these contractual

15   commitments when it purchased the Patents-in-Suit from VoiceAge."  (EDTX Case Dkt. 92 ¶

16   79.)  Apple claimed that "SLC has breached these contractual commitments by failing to make a

17   FRAND offer for the Patents-in-Suit."  (*Id.* at ¶ 80.)

18   Here, Apple brought "a few additional claims […] but these claims are closely related to

19   the main claims in both cases."[13]  Each involves allegations of Acacia's increased ability to

20

21   different parties on the Plaintiff's and Defendant's side, when the interest of one party was
     derivative of the interest of another).

22   [10] Although Apple arranged to depose additional VoiceAge employees, including Mr. Sylvain
     Desjardins and Dr. Redwan Salami, Apple pulled these deposition dates and agreed to rely upon

23   previous depositions of these individuals taken in other cases.

24   [11] *Schwartz v. Frito-Lay N. Am.*, No. C-12-02740(EDL), 2012 U.S. Dist. LEXIS 188186, at *8
     (N.D. Cal. Sep. 11, 2012) (transferring claim under first-to-file rule); *Inherent.com v.*

25   *Martindate-Hubbell*, 420 F. Supp. 2d 1093, 1097 (N.D. Cal. 2006) ("The 'sameness'
     requirement does not mandate that the two actions be identical, but is satisfied if they are

26   'substantially similar.'").

27   [12] *See Wallerstein v. Dole Fresh Vegetables, Inc.*, 967 F. Supp. 2d 1289, 1296-97 (N.D. Cal.
     2013).

28   [13] *Schwartz*, 2012 U.S. Dist. LEXIS 188186, at *8.

1    extract royalties either based on or "reflected in […] Acacia's breaches of FRAND

2    commitments" as the primary or exclusive mechanism of harm.  (SAC ¶¶ 29; *see also* SAC ¶¶

3    33, 51 (referencing changes in market structure described in ¶ 29), 55-57, 62-64).  This is

4    particularly true with respect to Apple's UCL claim, since that "is a derivative claim" that

5    provides for remedies "only if defendant violated some *other* law."[14]  Moreover, since the mere

6    transfer of patents from a patent-practicing company to a PAE or holding company is not itself

7    illegal, and Apple's complaint is devoid of allegations that Acacia combined the patents acquired

8    from VoiceAge with other (non-VoiceAge) patents in a way that decreased competition in any

9    relevant market, the plausibility of Apple's pleading hinges *entirely* on the FRAND

10   commitments that purportedly attach to VoiceAge-acquired patents.  If Acacia had no such

11   commitment, or adhered to it, Apple's other legal theories are no longer viable.  Litigating the

12   issue here prior to the trial in the EDTX Case risks the judicial inefficiency and conflicting

13   verdicts that the first-to-file doctrine strongly discourages.[15]

14   **II.    Apple's Breach of Contract Claim Fails.**

15        Apple's Second Amended Complaint fails to correct the errors in its prior iterations,

16   substituting vague allusions to unpled contracts that transfer unpled patents on unpled terms, for

17   the definitive contract pleading required to obtain relief on a contract theory under California

18   law.  Under California law, "[t]o prevail on a breach of contract claim, a plaintiff must show (1)

19   the existence of a valid contract; (2) plaintiff's performance or an excuse for nonperformance;

20   (3) breach by the defendant; and (4) damages."[16]

21

22   [14] *Intersearch Worldwide*, 544 F. Supp. 2d at 960 (emphasis added).

23   [15] *See Meru Networks, Inc. v. Extricom Ltd.*, 2010 U.S. Dist. LEXIS 90212, at *2-3 (N.D. Cal. Aug. 31, 2010) (stating that the first-to-file rule "promotes judicial efficiency and prevents the risk of inconsistent decisions that would arise from multiple litigations of identical claims").

24   [16] *Mahroom v. Best W. Int'l, Inc.*, No. C 07-2351JFHRL, 2009 U.S. Dist. LEXIS 130357, at *6

25   (N.D. Cal. July 22, 2009) (citing *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,* 222 Cal. App. 3d 1371, 1388 (1990)).  Apple fails to identify the governing law for any contract(s) at issue and, as

26   discussed below, ETSI's IPR Policy contemplates that its commitments will be evaluated under the laws of different jurisdictions.  Acacia reserves all arguments pertaining to the appropriate

27   choice of law to apply to Apple's claims, including all arguments pertaining to the application of French law.  The ETSI IPR Policy states that it "shall be governed by the laws of France."  *See*

28

1    Apple's allegations that Acacia breached a contractual obligation to license declared

2    SEPs acquired from VoiceAge fails to plead a cause of action for breach of contract.  To the

3    extent Apple's allegations can be discerned at all, they rely on an incoherent theory of a

4    transferred contractual obligation that either leaves Acacia with no contractual obligation at all,

5    or leaves Apple without the right to enforce the contractual obligation that Acacia has.

6    **A.   Apple Fails to Plead the Formation of Any Contract to License Declared SEPs**

7    **on FRAND Terms that Apple Can Enforce Against Acacia.**

8    In order to plead a cause of action for breach of contract, Apple must first allege the

9    formation of a contract containing the breached term that it is entitled to enforce.  There are three

10   possible ways for Acacia to acquire a contractual obligation to license on FRAND terms that

11   Apple can enforce: (1) by entering into a direct contract with Apple to license on FRAND terms;

12   (2) by entering into a direct contract with ETSI to license on FRAND terms, with Apple as an

13   intended beneficiary of that contract; or (3) by entering into a contract with VoiceAge to license

14   on FRAND terms, with Apple as an intended beneficiary of that contract.

15   Apple does not plead, and could not plausibly plead, that Acacia directly formed a

16   contract with ETSI or Apple.  Rather, it pleads that Acacia acquired a contractual obligation via

17   its contract with VoiceAge.  Two possibilities exist regarding the terms of the Acacia-VoiceAge

18   contract: (1) Acacia and VoiceAge ***did agree*** that Acacia would license on FRAND terms; or (2)

19   Acacia and VoiceAge ***did not agree*** on such a term.  Whether VoiceAge and Acacia had a

20

---

21   Dkt. 76.9 at Section 12 (ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights

22   Policy (2016) ("ETSI IPR Policy"), *available at* http://www.etsi.org/images/files/IPR/etsi-ipr-
     policy.pdf); *see also* Dkt. 74.6 at Section 12 (ETSI Rules of Procedure, Annex 6: ETSI

23   Intellectual Property Rights Policy (2008) ("2008 ETSI IPR Policy"), *available at*
     http://www.etsi.org/WebSite/document/Legal/ETSI_IPR-Policy.pdf).  Articles 1231 to 1231-7 of

24   the French Civil Code provide the basis for a breach of contract claim under French law.  *See*
     Dkt. 74.3 (English translation of Articles 1231 to 1231-7 of the French Civil Code).  Under

25   French law, "contractual liability supposes the reunion of three conditions: the breach of a
     contractual obligation, a prejudice and a causal link between the two."  *See* BERTRAND FAGES,

26   DROIT DES OBLIGATIONS 367, n.314 (L.G.D.J., 6e ed. 2016) (Dkt. 74.4).  If Apple's breach of

27   contract claim were to be analyzed under French law, the outcome is the same as under
     California law, namely that Apple fails adequately to allege breach of contract.

28

ACACIA PARTIES' MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT
CASE NO. 5:16-CV-07266-EJD

meeting of the minds on this term is a factual question.[17]  Apple cannot plead (and has not pled)

this issue in the alternative,[18] and its pleadings fail to state a cause of action for breach of

contract against Acacia under either scenario.  Indeed, as discussed below, the facts that Apple

pleads in support of its breach of contract and antitrust claims against VoiceAge prevent Apple

from claiming that it is an intended beneficiary of the contract (if the former scenario), or that

Acacia breached any contractual obligation (if the latter scenario).

> **1. If VoiceAge failed to bind Acacia to license on FRAND terms, Apple cannot enforce a breach of contract claim against Acacia because Acacia has no contractual obligation to license on FRAND terms.**

Apple did not plead a contract claim based on VoiceAge contractually binding Acacia to

license SEPs on FRAND terms.  Instead, Apple pled the opposite: that VoiceAge and Acacia had

a meeting of the minds—despite the natural reading of the terms of any written contract—that

Acacia affirmatively *would refrain from* licensing SEPs acquired from VoiceAge on FRAND

terms.[19]  Apple pleads that VoiceAge "sought to obtain above-FRAND royalties for its declared

SEPs" by transferring declared SEPs to Acacia and sharing Acacia's license revenue.  (SAC ¶

25.)

To the extent the contract between Acacia and VoiceAge would even arguably allow this

goal (i.e., to the extent VoiceAge did not bind Acacia to license declared SEPs on FRAND

terms), then Acacia *performed* (i.e., *did not breach*) the Acacia-VoiceAge contract by refusing

---

[17] *Schreiber v. Estate of Knievel*, 637 F. App'x 479, 480 (9th Cir. 2016); *Brundage-Bone Concrete Pumping, Inc. v. Concord Commer. Div. of HSBC Bus. Loans, Inc.*, 45 F. App'x 595, 596 (9th Cir. 2002); *Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.*, 240 Cal. App. 4th 763, 771-72, 192 Cal. Rptr. 3d 838, 844-45 (2015).  Whether Apple is an intended beneficiary of such an agreement is also a fact question.  *Kasperzyk v. Shetler Sec. Servs., Inc.*, No. C-13-3383 EMC, 2014 U.S. Dist. LEXIS 547, at *49 (N.D. Cal. Jan. 3, 2014) (citing *Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225, 1233 (2004)).

[18] *Segen v. Rickey*, 2008 U.S. Dist. LEXIS 23226, *9 (N.D. Cal. Feb. 29, 2008) ("While pleading in the alternative is allowed, Plaintiff cannot plead contradictory versions of the facts.").

[19] It is black-letter law that where "the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning."  RESTATEMENT (SECOND) OF CONTRACTS § 201 (1981).

to license on FRAND terms.  That is the only agreement to which Acacia manifested assent; its assent was neither given nor required for any VoiceAge-ETSI contract.  "[U]nder California law, mutual assent is a required element of contract formation."[20]  The signing of an agreement with one's counterparty does not manifest assent to a contract that counterparty has with a third party.[21]

Apple may have pled a cause of action against VoiceAge for breach of the VoiceAge-ETSI agreement.[22]  But if so, then VoiceAge's breaching act (i.e., its failure to bind Acacia to license on FRAND terms in contravention of ETSI policy) necessarily means that Acacia has no *contractual* obligations to *anyone* to license on FRAND terms.  That is the nature of VoiceAge's alleged breach, the source of damages arising out of that breach (if any), and the motivation behind ETSI's policy requiring those in jurisdictions (like the United States, as discussed below at II.A.3.) that do not recognize contract-by-operation-of-law to bind all successors in interest.

### 2. If VoiceAge bound Acacia to license on FRAND terms, Apple cannot enforce a breach of contract claim against Acacia because it is not in privity of contract with Acacia.

In light of Apple's inability to plead a breach of contract theory if VoiceAge failed to bind Acacia to license patents on FRAND terms, Apple may try to construe its claim to allege that VoiceAge did so-bind Acacia.  But even if the VoiceAge-Acacia contract bound Acacia to

---

[20] *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

[21] *Id*. at 565-566.

[22] Apple premises its breach of contract claim on *VoiceAge's* purported obligations to abide by ETSI's IPR policy and its purported commitment to ETSI that *VoiceAge* would license declared SEPs at FRAND rates and require future patent assignees to do so.  (SAC ¶¶ 11, 20, 22-23, 28.)  Apple asserts that it is a third-party beneficiary of any such contractual commitments to ETSI "as a member of ETSI and an implementer of standards that ETSI adopted."  (SAC ¶¶ 23, 45.)  Acacia assumes that this is true, and sufficiently pled, for purposes of this brief, and takes no position on whether Apple could assert a claim against VoiceAge or advance an equitable defense to damages in a patent infringement action.  Whatever Apple pleads, it is not a breach of contract claim it can enforce against Acacia.  *Cf. Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F. Supp. 208, 214 (E.D.N.Y. 1994) ("Not being parties to any license agreement with Microsoft, defendants are 'complete strangers' to Microsoft, and their violations of the licensing restrictions must of necessity be seen as claims arising under the copyright laws rather than the law of contracts.").

1  license on FRAND terms, Apple still has not pled, as it must, facts sufficient to show that it is an

2  intended third-party beneficiary of ***that*** agreement.[23]

3        Rather, Apple pled the opposite: that the purpose of any agreement was to harm—not

4  benefit—Apple.  Apple pled that "VoiceAge's agreement with Acacia was expressly intended to

5  enable […] Acacia to extract exorbitant royalties from […] suppliers (like Apple) […] far

6  beyond what VoiceAge could extract itself."  (SAC ¶ 56.)  Apple cannot be an intended

7  beneficiary of a contract that intends it harm.[24]  And even if Apple can claim beneficiary status,

8  Apple's right to enforce the VoiceAge-Acacia contract is ***still*** dependent on the contracting

9  parties' ***intent*** to permit Apple to enforce it.  Accepting Apple's allegations as true, there is no

10  plausible reason that VoiceAge and Acacia would intend that Apple enforce a contract provision

11  that neither party intended to be enforced.[25]  In other words, if Acacia and VoiceAge did not

12  intend that VoiceAge be able to enforce a FRAND obligation, *a fortiori* Acacia and VoiceAge

13  did not intend to let ***Apple*** enforce that obligation, and Apple would lack standing to bring suit.[26]

14

15

16

17  ─────────────

18  [23] *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JP Morgan Chase Bank, N.A.*, 671 F.3d
    1027, 1033 (9th Cir. 2012) ("[O]nly a party to a contract or an intended third-party beneficiary

19  may sue to enforce the terms of a contract or obtain an appropriate remedy for breach.").  *See
    also* RESTATEMENT (SECOND) OF CONTRACTS § 302 ("Unless otherwise agreed between promisor

20  and promisee, a beneficiary of a promise is an intended beneficiary if […] the circumstances
    indicate that the promisee intends to give the beneficiary the benefit of the promised

21  performance."); *see also id.* at §§ 304 (*intended* beneficiaries *may* enforce contractual duties),
    315 (*other* beneficiaries *cannot* enforce contractual duties).

22  [24] *Stevens v. United States*, 2009 U.S. Claims LEXIS 408, *9 (Fed. Cl. Oct. 28, 2009), *aff'd* 367
    Fed. Appx. 158 (Fed. Cir. 2010) (holding that party allegedly harmed by contract cannot be third

23  party beneficiary of contract and lacks standing to enforce contractual obligations).
    [25] *See* 17A AM. J. JURIS. 2D CONTRACTS § 420; *SEC v. Prudential Sec.*, 136 F.3d 153, 159 (D.C.

24  Cir. 1998); RESTATEMENT (SECOND) OF CONTRACTS § 302(1).
    [26] *See Norcia v. Samsung Telcoms. Am., LLC*, 845 F.3d 1279, 1290 (9th Cir. 2017).  Apple's

25  right to enforce a breach of contract claim arising out of FRAND obligations is therefore entirely
    dependent on allegations sufficient to enable VoiceAge to enforce those terms.  *See Mercury

26  Cas. Co. v. Maloney*, 113 Cal. App. 4th 799, 803, 6 Cal. Rptr. 3d 647, 649 (2003) (finding it
    "settled law" that "a third party beneficiary cannot assert greater rights under the contract than

27  those of the actual contracting party").

28

1

### 3. FRAND obligations do not run with the patent.

2        Perhaps to evade the requirements of contract law, Apple suggests that FRAND

3   commitments are encumbrances binding all successors in interest—a non-contract claim that

4   would not require privity.  (SAC ¶¶ 22, 43.)  But Apple's only support for the proposition that

5   Acacia is bound to license on FRAND terms absent an express contractual provision comes not

6   from the text of any declaration (which Apple has not identified), but rather from ETSI's IPR

7   Policy.  (*See id.*)  As an initial matter, Apple does not allege that Acacia is a member of ETSI, or

8   otherwise offer facts that suggest that ETSI's IPR Policy binds Acacia.  But ETSI recognizes that

9   "this interpretation may not apply in all legal jurisdictions."  (*Id.* at ¶ 22.)  In the United States,

10   FRAND commitments do not run with a patent, as patents are personal property and servitudes

11   to personal property are disfavored in the law.[27]  Likewise, under federal law, the only

12   "encumbrances" that transfer with a patent are rights to practice the patent, not procedural terms

13   that limit the right to sue those practicing the patent without authorization for damages.[28]  Rather,

14   only express contractual commitments are sufficient to give Acacia an obligation to adhere to

15   FRAND terms.[29]  Apple's legal conclusion asserting otherwise should be ignored.[30]

16

17   _____

[27] *See* 35 U.S.C. § 281 ("[P]atents shall have the attributes of personal property."); *Jones v.

18   Cooper Indus.*, 938 S.W.2d 118, 123 (Tex. App. Houston 14th Dist. 1996) ("Since a patent is to
     be treated as personal property, there can be no covenants that 'run with' the patent."); Dkt. 76.7

19   National Research Council, *Transfers of Patents with Licensing Commitments*, in *Patent
     Challenges for Standard-Setting in the Global Economy* 88 (Keith Maskus & Stephen A. Merrill,

20   eds., 2013) (servitude theory of FRAND obligations is "unknown and speculative" because law
     is "against the imposition of servitudes on personal property").

21   [28] *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372-1373 (Fed. Cir. 2008)

22   ("However, the legal encumbrances deemed to 'run with the patent' […] involved the right to
     use the patented product, not a duty to arbitrate.  The cases do not support a conclusion that

23   procedural terms of a licensing agreement unrelated to the actual use of the patent (e.g. an
     arbitration clause) are binding on a subsequent owner of the patent."); *Paice LLC v. Hyundai

24   Motor Co.*, 2014 U.S. Dist. LEXIS 154254, *14-18 (D. Md. Oct. 29, 2014), *aff'd* 2014 U.S. Dist.
     LEXIS 154254, at *13-18 (holding that confidentiality provision in prior patent license

25   agreement did not bind patent assignee).  *See also* 8-21 Chisum on Patents § 21.01 (2017)

26   (discussing *Datatreasury Corp. v. Wells Fargo & Co.*).
     [29] *Vizio, Inc. v. Funai Elec. Co.*, 2010 U.S. Dist. LEXIS 30850, *16 (C.D. Cal. Feb. 3, 2010)

27   (FRAND commitment obligations under SSO policy do not pass to non-participants).  While
     state law determines patent ownership, "federal law is used to determine the validity and terms of

28

**B.  Apple Fails to Adequately Identify the Existence and Terms of a Breached Contract.**

Apple's SAC fails to provide even the most basic information to put Acacia on notice of the alleged FRAND breaches at issue.  Apple alleges that VoiceAge transferred "hundreds" of patents to Acacia, but fails to specify a single patent in its breach of contract claim.  (*See* SAC ¶¶ 1, 51.)  Alleging the particular patents at issue is important for several reasons.  Whether a rate for a patent is "fair" or "reasonable"—to the extent that these terms relate to the value or technological contribution of the invention—could vary greatly on a patent-by-patent basis.  "As with all patents, the royalty rate for SEPs must be apportioned to the value of the patented invention.[…]  [T]he royalty for SEPs should reflect the approximate value of the technological contribution[.]"[31]  Even if it were true that the relevant issue for fairness or reasonableness is the value of the Acacia portfolio taken as a whole, the precise contents (and use by Apple) of that portfolio would also be essential to determining what constitutes a fair rate, and thus whether Acacia breached the obligation to license its portfolio on a FRAND rate.[32]  Without further information at least identifying the patents at issue, Apple has not pled facts sufficient to illustrate that ***any*** royalty Acacia might demand would be unfair.

Apple likewise does not (1) plead the existence or terms of any particular contract between VoiceAge and Acacia that transferred VoiceAge's patents to Acacia and did (or did not) contain terms transferring VoiceAge's FRAND obligations to Acacia, or (2) identify which of the "numerous declarations to ETSI" that "committed [VoiceAge] to licensing […] patents on

---

an assignment [.]"  *Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009).  At least with respect to U.S. patents, Acacia's obligations are therefore determined by U.S. law.

[30] *Compare Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."), *and Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-556 (2007), *with* SAC ¶¶ 43-44 ("FRAND commitments are binding on all subsequent patent owners," so when "Acacia acquired these declared SEPs, it entered into or was assigned the express or implied contractual commitments with ETSI.").

[31] *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1232-33 (Fed. Cir. 2014).

[32] *In re Innovatio IP Ventures, LLC*, 2013 U.S. Dist. LEXIS 144061, at *54-55 (N.D. Ill. Sep. 27, 2013).

FRAND terms" (SAC ¶ 20) on which it is suing.  Failing to identify particular ETSI declarations leaves Acacia—who Apple acknowledges did not itself enter into the ETSI contracts and is thus not on notice of what "it" purportedly agreed to do—without an adequate basis to defend itself as required under federal pleading standards.[33]

Apple's failures in these respects are not mere technical pleading defects or oversights. As discussed below at II.D.1., Apple's identification of specific patents and attendant declarations would be an admission that Apple infringes.  And the vague pleading also prevents Acacia from knowing which theory of contractual obligation Apple is bringing, forcing Acacia to divide its attention among multiple theories (as it did above in II.A).  The Court should not reward Apple's tactical pleading.

### C.  Apple Fails to Allege Plaintiff's Performance or Excuse for Nonperformance.

Apple also fails to allege that it adhered to its own obligations under any relevant contract, including fulfilling its own obligation to engage in good faith negotiations for a FRAND license.[34]  Indeed, Apple's efforts to avoid a FRAND license rate for use of others' SEPs is well-documented,[35] and its purported "stated willingness to license the [unspecified] patents on FRAND terms" (SAC ¶ 26) is insufficient to meet its pleading obligations.  Apple even admits that it rejected Acacia's offer without countering.  (*Id.*)

---

[33] *See Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1012 (N.D. Cal. 2013).  Apple could have complied with this requirement by, for example, meeting its obligations under California law to state whether the contract is written or implied by conduct and attaching the contract to the complaint or reciting its terms.  *Otworth v. S. Pac. Transp. Co.*, 166 Cal. App. 3d 452, 458-59, 212 Cal. Rptr. 743, 747 (1985).

[34] *See Adobe Sys. Inc. v. A & S Elecs., Inc.*, 153 F. Supp. 3d 1136, 1146-47 (N.D. Cal. 2015); *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 U.S. Dist. LEXIS 110585, at *87-88 (E.D. Tex. Aug. 6, 2013), *aff'd in part, vacated in part, rev'd in part*, 773 F.3d 1201 (Fed. Cir. 2014) ("[F]RAND licensing also includes an obligation to negotiate in good faith.  This obligation is a two-way street.  As potential licensees in a [F]RAND negotiation, Defendants possessed an obligation to negotiate in good faith and earnestly seek an amicable royalty rate.").

[35] *See, e.g., Apple Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178-BBC, 2012 U.S. Dist. LEXIS 187878, at *11 (W.D. Wis. Nov. 8, 2012) (dismissing FRAND claims where "[i]f Apple succeeded in showing that a breach occurred but did not win the rate it wanted, it could walk away, leaving Motorola without a mechanism for obtaining compensation from Apple for the use of its patents except by filing infringement suits.").

**D.  Apple Fails to Plead Breach of Any Contractual Duty.**

Apple claims that "Acacia breached its FRAND obligations by demanding above-FRAND royalties for its declared SEPs acquired from VoiceAge, and by seeking injunctions blocking Apple's products based on such patents."  (SAC ¶ 47.)  Acacia has not sought injunctive relief against Apple in the United States.  Assuming arguendo that Acacia inherited the full extent of VoiceAge's obligations to ETSI and that Apple is entitled to enforce those obligations against Acacia as an intended beneficiary of each of those agreements, the behavior Apple identifies in its SAC does not adequately plead breach of contract.  First, only patents that are actually essential to implement standards are subject to FRAND commitments, and, for tactical reasons, Apple declined to allege that *any* of the patents are actually essential.  Second, the only specific allegations that Apple makes regarding Acacia's licensing behavior is insufficient to give rise to a claim for breach of contract, even if the patents at issue were all subject to FRAND commitments.  Finally, Apple's allegations regarding Acacia's litigation behavior are consistent with the terms of any contract.

**1.  Apple fails to allege that any patents Acacia acquired from VoiceAge are subject to FRAND commitments.**

Apple alleges that VoiceAge's (and thus Acacia's) contractual obligations stem from ETSI's IPR policy and declarations made thereunder.[36]  (SAC ¶¶ 11, 20, 44, 64.)  These do not require the licensing of *declared* SEPs on FRAND terms, and do not require litigants to refrain from seeking injunctions.  ETSI's IPR policy only requires licensing on FRAND terms if the patents are *actually* essential, meaning that practicing the standard necessarily infringes the patent.[37]  In order to plead Acacia's obligation to license any declared SEP on FRAND terms,

---

[36] This is itself a very generous interpretation of Apple's pleading.  As noted above, Apple does not identify any single patent (1) VoiceAge committed to license on FRAND terms, (2) VoiceAge transferred to Acacia, and (3) Acacia refused to license on FRAND terms.  As a result, Apple does not necessarily plead that any of the patents Acacia purportedly refused to license on FRAND terms are in fact even declared essential.

[37] *See* Dkt. 76.4, *In re Certain 3G Mobile Handsets*, Inv. No. 337-TA-613, at 39 (ITC Apr. 27, 2015) ("As the respondents have presented no evidence that the patents are standard essential, they have failed to prove they are standard essential, and that they are entitled to claim rights

1    Apple must therefore plead that each patent for which it claims a right to a FRAND license is

2    actually essential to the standard for which it was declared—tantamount to a declaration that

3    Apple infringes the patent in question.  For obvious tactical reasons, Apple has gone to great

4    lengths to avoid pleading in this case that Acacia has acquired or asserted any patents that are

5    actually essential.[38]

6          Declared essential patents are not necessarily essential.  Apple has argued that fewer than

7    half of declared SEPs are essential, that declared SEPs are often found invalid or not infringed,

8    and that ETSI policy virtually requires over-declaration of essential patents by requiring

9    members to identify and declare any patents that "*might be*" essential very early in the process,

10   often before the standard is set.[39]  In fact, Apple relies on the distinction between declared- and

11   _____

12   available under the ETSI FRAND policy."); *id*. at 36 ("By arguing that the products do not
     practice the patents, the respondents are arguing that the patents are not Standard Essential
13   Patents. This complicates the analysis, because if the patents in question are not SEPs, then IDC
     has no duty [under ETSI IPR Policy] to offer a license under FRAND terms."); *In re Innovatio*
14   *IP Ventures, LLC Patent Litig*., 956 F. Supp. 2d 925, 936 (N.D. Ill. 2013) (requiring proof of
     actual essentiality in order to prove entitlement to a FRAND license); Dkt. 76.3, *Wi-LAN Inc. v.*
15   *HTC Corp*., 2:11-cv-68-JRG, Pretrial Order, ECF 608, 8-9 (E.D. Tex. Oct. 11, 2013);  Dkt. 76.8,
     *In re Certain Wireless Devices with 3G and/or 4G Capabilities*, No. 337-TA-868, 2014 WL
16   2965327, at 110-11 (June 13, 2014); Dkt. 76.9, ETSI IPR Policy, at 41 (§ 15.6) (IPR is
     "ESSENTIAL" to ETSI *only* if "it is not possible on technical (but not commercial) grounds" to
17   implement a standard "without infringing that IPR") and 42 (IPR Licensing Declaration forms)
     (committing to license patents on FRAND terms *only* "to the extent that the IPR(s) are or
18   become, and remain ESSENTIAL") (emphasis added).  Acacia is not claiming here that any
     particular patent is (or is not) essential; it takes no position on that subject. Acacia's argument
19   exclusively relates to pleading requirements. Apple must take a position on actual essentiality to
     plead facts sufficient to give rise to a cause of action.
20
     [38] Apple never claims a single patent owned by VoiceAge or Acacia is an "SEP" or "essential" to
21   a standard.  Apple always modifies that statement specifically to avoid pleading this, typically
     referring to "declared SEPs."  (*See, e.g.*, SAC ¶¶ 1 ("declared essential"), 11, 20 ("claimed were
22   essential"), 24-27, 25 ("Acacia claims to own" SEPs), 34, 40-41, 43-45, 47, 55, 62.)  This Court
     would not be drawing an inference against Apple by refusing to assume that some unspecified
23   patent is essential; Apple avoided pleading essentiality on purpose, and is stuck with the
     consequences of its tactical decisions.
24
     [39] *See supra* at n.24.  *See also* SAC ¶ 15 (ETSI IPR Policy "requires its members to disclose their
25   patents or patent applications during the standard-setting process (i.e., *before the technology is or*
     *might be incorporated into the standard*) and to promise to license those patents on FRAND
26   terms *if they are essential to the standard*.") (emphasis added); Dkt. 76.10, Apple Statement to
     FTC, at 6 (discussing empirical evaluations of declared-essential patents and incentives to over-
27   declare, including requirements to identify patents before standards are finalized); Dkt. 76.9, at
28

1    actually-essential patents for its own purposes in related litigation; contending that it does not

2    infringe the declared SEPs that Acacia is asserting against it in the EDTX Case.  (Compare

3    EDTX Case Dkt. 92 at ¶¶ 68-70 with SAC ¶ 45.)  It follows that Apple's allegations that the

4    VoiceAge patents are **declared** SEPs do not suffice to allege that they are, **in fact**, SEPs.[40]

5          It is true that in *Apple, Inc. v. Motorola Mobility, Inc.*, a Wisconsin court denied

6    Motorola's motion to dismiss where Apple failed to allege actual essentiality.[41]  But the

7    arguments involved are different.  Acacia argues here that Apple has failed to **state a claim**

8    because its FRAND commitment (if any) is triggered by the **fact** of actual essentiality, which

9    Apple must plead and establish at trial.  In contrast, Motorola argued that Apple's claim was **not**

10   **yet ripe** because Motorola's FRAND commitment was triggered by the **establishment** of actual

11   essentiality, claiming that a determination of essentiality (i.e., an agreement of the parties or a

12   patent infringement suit) was a condition precedent to it having any obligation.[42]  Further, Acacia

13   supports its position with relevant ETSI IPR policy documents cited and referenced in Apple's

14   own complaint, along with case law and scholarly research,[43] while the Wisconsin court noted

---

16   35 (§ 4.1); Dkt. 76.4, Inv. No. 337-TA-613, at 37-39 (holding that the ETSI declaration "does
     not prove that patents so declared before ETSI are actually SEPs" and that "the declaration they
17   sign under the ETSI agreement doesn't state that each IPR declared is standard essential, only
     that it might be").  *See also*, Gregory Sidak, *The Meaning of Frand, Part I: Royalties*, 9 J. COMP.
18   L. & ECON. 931, III.C. (2013) (discussing reasons for over-declaration of essential patents,
     including substantial legal risks from failure to declare patents that turn out to be essential).
19   [40] Apple bears the burden to prove that the patents at issue are actually essential.  Daryl Lim,
     *Standard Essential Patents, Trolls, and the Smartphone Wars: Triangulating the End Game*, 119
20   PENN ST. L. REV. 1, 35-36 (2014) (discussing *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823
     JLR, 2013 U.S. Dist. LEXIS 60233 (W.D. Wash. Apr. 25, 2013)); *In re Innovatio IP Ventures,*
21   *LLC Patent Litig.*, 956 F. Supp. 2d 925, 936 (N.D. Ill. 2013).
22   [41] No. 11-cv-178-BBC, 2011 U.S. Dist. LEXIS 72745, *16-17 (W.D. Wis. June 7, 2011).
     [42] Motorola argued that its "obligation to offer licenses to its patents was contingent upon the
23   outcome of patent litigation[,]" *id*. at 18, because "it had no obligation to make a reasonable offer
     unless and until infringement or essentiality is *established*[,]" *id*. at *17 (emphasis added), and
24   the obligation to license on FRAND terms is "triggered only if there is an *agreement between the*
     *parties or a determination* that Motorola's patents are 'essential' to standards that Apple is
25   implementing in its products," *id*. at *16 (emphasis added).
26   [43] *See, e.g.*, J. Gregory Sidak, *International Trade Commission Exclusion Orders for the*
     *Infringement of Standard-Essential Patents*, 26 CORNELL J. L. & PUB. POL'Y 125, 149 (2016); D.
27   Daniel Sokol and Wentong Zheng, *FRAND in China*, 22 TEX. INTELL. PROP. L.J. 71, 71 (2013);
     Srivdhya Ragavan et al., *FRAND v. Compulsory Licensing: the Lesser of the Two Evils*, 14 DUKE

-16-

1  Motorola's inability to cite anything "in Apple's complaint, the relevant intellectual property

2  rights policies at issue or any case law to support its argument[.]"[44]  For these reasons, the

3  *Motorola* case does not operate to bless breach of FRAND claims that fail to allege actual

4  essentiality.  With the benefit of settled law interpreting the policy and declaration clauses at

5  issue, this Court need not credit Apple's legal conclusions on the extent of Acacia's FRAND

6  obligations.  The IPR undertaking, for instance, is unambiguous, and Apple has not advanced a

7  contrary interpretation of the document.

8      This is not a technical issue: it goes to the underlying rationale behind FRAND

9  obligations and the incentives for standard-setting.  The consideration a patentee receives for

10  making a FRAND commitment is the incorporation of its technology into a standard.  This

11  consideration has value because it means that all standards-implementers are using the patentee's

12  technology and thus must pay some royalty to the patentee for the privilege: constrained royalties

13  for mass infringement compensate for unconstrained royalties for limited infringement.[45]  If the

14  patentee's technology is not incorporated into the standard, it receives nothing for its FRAND

15  promise, which would therefore fail for lack of consideration. The existence of a FRAND

16  commitment, both under ETSI policy and under common law contract principles, is therefore

17  conditioned on actual essentiality.

18

19

20

21  L. & TECH. REV. 83, 90 (2015); David W. Long, *Litigating Standard Essential Patents at the*

22  *U.S. International Trade Commission*, 17 SEDONA CONF. J. 671 (2016) (describing ITC ruling
   that "FRAND declarations to ETSI were conditioned on the patents being essential to the

23  standard"); Megan M. La Belle, *Against Settlement of (Some) Patent Cases*, 67 VAND. L. REV.
   375, 435 (2014).

24  [44] *Apple, Inc. v. Motorola Mobility, Inc.*, 2011 U.S. Dist. LEXIS 72745, at *17.

25  [45] *Cf.* Richard A. Epstein & Kayvan B. Noroozi, *Why Incentives for 'Patent Holdout' Threaten
   to Dismantle FRAND, and Why it Matters*, 32 BERKELEY TECH. L.J. Special Symposium

26  Issue *8 (Forthcoming 2017) (discussing "mutuality of consideration" whereby innovators "seek
   assurances against 'patent holdout' and promises of adequate risk-adjusted and opportunity cost-

27  adjusted profits whenever their inventions become standard-essential"), available at
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2913105.

28

**2. Acacia's licensing offers breach no FRAND commitments.**

Apple complains that Acacia extended an offer to license patents for a higher per-unit rate than Apple alleges it paid previously. (SAC ¶ 26.) But Apple does not allege that the ***prior*** price was the upper limit on FRAND rates, or even that the prior price was a FRAND rate at all. Apple also fails to allege facts sufficient to infer that Acacia's license offers are non-FRAND. There are not, for example, any allegations regarding what a FRAND rate would be or how one is to be calculated.[46] A "patent holder does not violate its [F]RAND obligations by seeking a royalty greater than its potential licensee believes is reasonable."[47] Apple's bare assertion that Acacia charged more than Apple once paid is insufficient to infer a breach of contract.

Far from alleging that Acacia was unreasonable, Apple pleads facts sufficient to infer that Apple was an unwilling licensee engaged in patent hold-out. Apple pleads that others in the industry (i.e., Apple's competitors) paid "supra-FRAND" or "exorbitant" or "excessive" royalties that Apple refused to pay.[48] First, since Apple admits that others paid the royalties demanded by Acacia, Apple cannot claim Acacia's offers were so outrageous as to breach a duty of good faith and fair dealing.[49] Second, Apple's complaint demands that Acacia offer it a

---

[46] *Compare* SAC *with FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2017 U.S. Dist. LEXIS 98632, at *82 (N.D. Cal. June 26, 2017) ("FTC's Complaint contains numerous allegations regarding how FRAND rates are determined, and that courts play an important role in determining reasonable FRAND royalty rates.") (citing 14 paragraphs of FTC's Complaint).

[47] *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 U.S. Dist. LEXIS 110585, at *87 (E.D. Tex. Aug. 6, 2013), *aff'd in part, vacated in part, rev'd in part on other grounds*, 773 F.3d 1201 (Fed. Cir. 2014); *see also Microsoft Corp. v. Motorola, Inc.*, 2013 U.S. Dist. LEXIS 60233, at *15 (FRAND contemplates a "range" of values; no negotiation commences with best offer; and "initial offers do not have to be on RAND terms" to adhere to FRAND commitment).

[48] *See, e.g.*, SAC ¶¶ 3 ("other victims . . . have paid excessive royalties), 27 ("certain licensees have settled and agreed to pay supra-FRAND royalties for the former VoiceAge patents"), 36 ("exorbitant royalties that Acacia has extracted from Apple and others"), 37 ("While Acacia tries to tax Apple . . . it is extracting exorbitant royalties from other suppliers").

[49] In fact, Apple does not discuss "good faith" at all in its SAC. *Compare* SAC *with, e.g., Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-03451, 2012 U.S. Dist. LEXIS 146565 (N.D. Cal. Oct. 10, 2012); *Apple Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1087 (W.D. Wis. 2012)).

*different* rate (or rate schedule) than Acacia offered others, which necessarily means Apple was (contrary to its bare assertions) ***unwilling*** to pay a ***non-discriminatory*** rate.[50]

### 3. Acacia's decision to sue and seek injunctions does not breach any FRAND commitment.

Apple's complaint that Acacia sued and sought injunctions rather than engaging in protracted negotiations likewise fails to state a cause of action. ETSI acknowledges that only a court can determine whether a patent is essential or resolve disputes on FRAND rates,[51] and it would make no sense to oblige a patent owner to risk a breach of contract or declaratory judgment action in an infringer's chosen forum by delaying efforts to seek judicial resolution. A patent holder acts consistently with its obligations when it resorts to litigation to enforce its patent rights when a FRAND offer is not accepted.[52]

Seeking an injunction likewise does not breach obligations to ETSI.[53] The ETSI IPR Policy—the source of the claimed "contract" right asserted by Apple—does not prohibit an SEP

---

[50] *See* Dennis W. Carlton & Allan L. Shampine, *An Economic Interpretation of FRAND*, 9 J. COMPETITION L. & ECON. 531, 546 (2013) (defining "nondiscriminatory" in the FRAND context as requiring that similarly-situated licensees pay similar rates for portfolio licenses); Deborah L. Feinstein, Robert Skitol, Dennis Carlton, Gregory Leonard, Christine Meyer & Carl Shapiro, *Economists' Roundtable on Hot Patent-Related Antitrust Issues*, 27 ANTITRUST ABA 10, 14 (2013) (advocating that patentees offer similarly-situated licensees the same approximate royalty as a function of output); J. Gregory Sidak, *The Meaning of Frand, Part I: Royalties*, 9 J. COMP. L. & ECON. 931, V.B.2 (2013) (explaining difference).

[51] *See* Dkt. 76.4, Inv. No. 337-TA-613, at 41-42 (holding that under ETSI policies and contracts, the only way to ascertain a FRAND rate is judicial determination); Dkt. 76.11, ETSI Guide on IPRs, at 65 (§ 4.3) (offering mediation services to ETSI ***members***, but noting that "once an IPR (patent) has been granted, in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes"); *see also* Dkt. 76.10, at 7 (Apple arguing that patentees must prove patent infringement to obtain a ruling entitling it to FRAND royalties); John D. Harkrider, *Seeing the Forest Through the SEPs*, 27 ANTITRUST ABA 22, 24 (Summer 2013) (noting that only litigation of infringement claim can compel standard-implementer to take a license).

[52] *See Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 1002 (W.D. Wash. 2012) (noting that "reasonable parties may disagree as to the terms and conditions of a RAND license, leaving the courthouse as the only viable arena to determine the meaning of 'reasonable' under the circumstances.").

[53] **As noted previously, Acacia has not sought an injunction in the United States. Seeking an injunction is entirely proper in Germany**.

1    holder from seeking injunctive relief, and Apple's allegations are silent as to any such obligation

2    because ETSI's IPR policy is itself silent on those issues.  Merely seeking an SEP injunction

3    does not constitute a breach of any FRAND obligation under the ETSI IPR Policy.[54]  ETSI

4    specifically considered and rejected prohibiting injunctive relief, deleting its former requirement

5    that parties mediate and forego injunctions, instead deferring to judicial resolution of all

6    disputes.[55]  And as numerous courts have held (and scholars have noted), there is no *per se* rule

7    that injunctions are unavailable for SEPs or FRAND-committed patents.[56]

8        Significantly, Apple itself pled that it broke off licensing negotiations.  Under German

9    law, patentees are denied injunctions only where a putative licensee (1) makes an unconditional

10   offer to license that the patent owner could not reasonably refuse and (2) ***actually remits***

11   ***royalties*** under that proposed rate during the period of infringement (to the patentee or into

12   escrow).[57]  To the extent Apple alleges that Acacia's seeking injunctions in Germany[58]

13

14   [54] *See Apple, Inc. v. Motorola Mobility, Inc*., No. 11-cv-178-BBC, 2012 U.S. Dist. LEXIS
     181854, at *45 (W.D. Wis. Oct. 29, 2012) (no breach of ETSI FRAND obligations "simply by

15   requesting an injunction").
     [55] *See* Dkt. 76.4, Inv. No. 337-TA-613, at 54 ("Under the ETSI agreement, there is no duty not to

16   seek an exclusion order.  ETSI had mandatory mediation to determine FRAND rate in 1993, and
     removed it from their policy.  They considered barring parties from injunctive relief, but did not

17   do so.").

18   [56] *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1331-1332 (Fed. Cir. 2014) ("To the extent that
     the district court applied a *per se* rule that injunctions are unavailable for SEPs, it erred."); *Nokia*

19   *Corp. v. Apple Inc.*, 2011 U.S. Dist. LEXIS 58773, *7-8 (D. Del. June 1, 2011) (denying motion
     to dismiss counterclaim for injunctive relief for breach of FRAND-encumbered patent); Lin, 119

20   PENN ST. L. REV. at 59-62 (discussing efficiency rationale for injunctive relief and need for
     injunctions to prevent hold-out).  *See also* Joanna Tsai & Joshua D. Wright, *Standard Setting,*

21   *Intellectual Property Rights, and the Role of Antitrust in Regulating Incomplete Contracts*, 90
     ANTITRUST L.J. 157, 178-79 (2015) (finding that no major SSO's current policy prohibits

22   seeking injunctions).

23   [57] *See* Thomas F. Cotter, *Reining in Remedies in Patent Litigation: Three (Increasingly*

24   *Immodest) Proposals*, 30 SANTA CLARA HIGH TECH. L.J. 1 (2013) (noting that Germany—"the
     locus of up to 80% of all patent infringement lawsuits in Europe"—requires an infringer to prove

25   "First, that it 'made an offer, ready for acceptance, on contractual conditions, which the patent
     holder cannot refuse without thereby treating the party seeking a license unequally without good

26   cause as compared with similar enterprises.'") (quoting Bundesgerichtshof [BGH] [Federal
     Supreme Court] May 6, 2009, GRUR Int. 747 (Ger.), translated in 41 IIC 369, 369-75 (2010)

27   ("*Orange Book Standard*")).  "Second, the infringer must 'behave[] as if the patent holder had

28   already accepted his offer' by paying 'the consideration that the licensee would be obliged to pay

1    constitutes breach of contract (or unfair competition, or antitrust injury), then Apple must plead

2    that it made an offer at the upper bound of the FRAND range, which it failed to do.

3    **III.    Apple's Antitrust Claims Fail.**

4            Unable to articulate a plausible breach of contract claim, Apple seeks to invoke antitrust

5    law to limit Acacia's right to seek remedies for patent infringement in the courts.  Apple accuses

6    Acacia of violating Sherman Act Section 1 (15 U.S.C. § 1 (hereinafter, "Section 1")) and

7    Clayton Act Section 7 (15 U.S.C. § 18 (hereinafter, "Section 7")).  In order to survive a motion

8    to dismiss its antitrust claims, Apple must identify a relevant market and plead facts sufficient to

9    show a legally cognizable antitrust injury within that market.  Apple fails to define a relevant

10   market for antitrust purposes, and Apple's pleading demonstrates that Acacia could not have

11   decreased competition by any mechanism but engaging in litigation, which is immunized from

12   antitrust liability under the *Noerr-Pennington* doctrine.

13           At the outset, however, it is important to note that Apple involves the Court in a suspect

14   enterprise by asking it to find antitrust violations based on actions taken on lawfully-acquired

15   patents.  Where there is a conflict between the otherwise-lawful exercise of one's patent

16   monopoly and the antitrust laws, the patent right controls and antitrust law must give way.  "The

17   patent laws which give a […] monopoly on 'making, using, or selling the invention' are *in pari*

18   *materia* with the antitrust laws and modify them *pro tanto*."[59]  Congress explicitly authorizes the

19   transfer of patents, states that they shall be presumed valid, authorizes civil actions for

20   infringement, provides for injunctions, and sets the measure of damages for infringement.[60]

21

22   according to a non-discriminatory or non-obstructive licence contract.'"  *Id.* (quoting *Orange
     Book Standard*) (brackets in original).

23   [58] Apple does not appear to allege that Acacia has sought injunctions in the United States.

24   [59] *Simpson v. Union Oil Co.*, 377 U.S. 13, 24, 84 S. Ct. 1051, 1058 (1964); *see also Image Tech.
     Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1215 (9th Cir. 1997).

25   [60] 35 U.S.C. §§ 261 ("[P]atents shall have the attributes of personal property.  […]  [P]atents, or
     any interest therein, shall be assignable in law by an instrument in writing."), 281 ("A patentee

26   shall have remedy by civil action for infringement of his patent."), 282(a) ("A patent shall be
     presumed valid."), 283 ("The several courts having jurisdiction of cases under this title may

27   grant injunctions in accordance with the principles of equity to prevent the violation of any right
     secured by patent, on such terms as the court deems reasonable."), 284 ("Upon finding for the

28

### A.  Apple Has Not Properly Defined Any Relevant Market.

The only markets Apple identifies in its SAC are an (unknown) number of "markets for functions performed by technologies purportedly covered by declared SEPs acquired from VoiceAge (SEP Technology Markets).  Each SEP Technology Market consists of a technology covered by a patent acquired by Acacia from VoiceAge and any other technologies that compete or formerly competed to perform the same function."  (SAC ¶ 34.)  Apple does not specify which functions, which technologies, or which "markets" are at issue in this litigation, leaving Acacia without notice of the claims against which it must defend, and its SAC should be dismissed.

### 1.  Apple's failure to define a relevant market necessitates dismissal.

Courts routinely dismiss antitrust claims where the market definition is deficient for any reason, including: because the complaint defined markets too narrowly,[61] defined markets too broadly;[62] did not include plausible allegations that the products, services, or technologies to be included in the relevant market are reasonably interchangeable by consumers;[63] or inadequately pled the geographic market.[64]

---

claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.").

[61] *E.g.*, *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1351-52 (Fed. Cir. 2011); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001); *Colonial Med. Grp., Inc. v. Catholic Health Care West*, 444 F. App'x 937, 938 (9th Cir. 2011).

[62] *E.g.*, *Golden Gate Pharmacy Services., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011); *Seirus Innovative Accessories, Inc. v. Cabelas, Inc.*, No. 09-CV-102H (WMC), 2010 U.S. Dist. LEXIS 143106, *10 (S.D. Cal. Apr. 20, 2010); *Spindler v. Johnson & Johnson Corp*., No. C 10-01414 JSW, 2011 U.S. Dist. LEXIS 158559 (N.D. Cal. Aug. 1, 2010).

[63] *E.g.*, *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104-05 (9th Cir. 1999); *Golden Gate Pharmacy Servs.*, 433 F. App'x at 599*; Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th Cir. 2011); *ChriMar Systems, Inc. v. Cisco Systems, Inc.*, 72 F. Supp. 3d 1012, 1018 (N.D. Cal. 2014); *Radiancy, Inc. v. Viatek Consumer Products Group, Inc.*, 138 F. Supp. 3d 303, 323 (S.D.N.Y. Mar. 28, 2014); *McCabe Hamilton & Renny Co., Ltd. v. Matson Terminals, Inc.*, No. 08-00080 JMS/BMK, 2008 U.S. Dist. LEXIS 47428, *22-23 (D. Haw. June 17, 2008); *Analogix Semiconductor, Inc. v. Silicon Image, Inc.*, No. C 08-2917 JF (PVT), 2008 U.S. Dist. LEXIS 118508, *14-16 (N.D. Cal. Oct. 28, 2008).

[64] *E.g.*, *Big Bear Lodging*, 182 F.3d at 1104-05; *McCabe*, 2008 U.S. Dist. LEXIS 47428, at *22-23.

Market definition is a key element of each of Apple's antitrust claims. Apple's Section 1 claim requires that Apple plausibly allege that Acacia has market power in a properly-defined relevant antitrust market.[65] Apple's Section 7 claim likewise requires Apple to identify a properly-defined market where Acacia's behavior reduced competition.[66] Without a properly defined relevant market, "there is no way to measure [a defendant's] ability to lessen or destroy competition."[67] The adequacy of Apple's market definition is evaluated the same way for both claims.[68] Apple is not simply permitted to allege the existence of a market: the relevant market definition must be "facially sustainable" to survive a Rule 12(b)(6) motion to dismiss.[69] Courts define relevant markets in which they can evaluate the effects of alleged conduct under the antitrust laws by substitutability and interchangeability; products that are substitutes and compete are in the same market.[70]

---

[65] *See, e.g., Tanaka*, 252 F.3d at 1063 ("The plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within a relevant market.") (internal quotation marks and citation omitted); *Big Bear Lodging*, 182 F.3d at 1104-05.

[66] *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 766 (9th Cir. 2001) ("In a § 7 case, the relevant market must be defined in order to evaluate the competitive consequences of an alleged restraint of trade.").

[67] *Walker Process Equip., Inc., v. Food Mach. and Chem. Corp.*, 382 U.S. 172, 177 (1965) (Section 2 claim); *see also Tanaka*, 252 F.3d at 1063 (Section 1 claim); *Marine Bancorporation*, 418 U.S. at 618 ("Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes [Section 7 of the] Clayton Act.") (quoting *United States v. E. I. Du Pont De Nemours & Co.*, 353 U.S. 586, 593 (1957); *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)).

[68] The relevant market inquiry "appl[ies] identically" under both Sections 1 and 2 of the Sherman Act. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008); *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, No. C-09-3854 MMC, 2010 U.S. Dist. LEXIS 47896, *7-8 (N.D. Cal. Apr. 16, 2010), *aff'd*, 433 F. App'x 598 (9th Cir. 2011) (applying identical market analysis to Section 1 Sherman Act and Section 7 Clayton Act claims).

[69] *Colonial Med. Grp.*, 444 F. App'x at 938; *Newcal*, 513 F.3d at 1045; *Chri-Mar*, 72 F. Supp. 3d at 1018; *Golden Gate Pharmacy Servs.*, 2010 U.S. Dist. LEXIS 47896, at *7-8.

[70] *See Delano Farms*, 655 F.3d at 1351-52 (citing, *inter alia, Brown Shoe*, 370 U.S. at 325 and *Newcal Indus.*, 513 F.3d at 1045) (applying Ninth Circuit law); *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (market definition is a "necessary predicate" to evaluating effects of a transaction); *see also JES Props. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1282 (M.D. Fla. 2003) (even pre-*Twombly*, "Where an antitrust plaintiff fails to define its proposed relevant market with reference to rule of reasonable interchangeability and cross-elasticity of demand […] relevant market is legally insufficient and a motion to dismiss may be granted.").

1    **2.  Apple's "SEP Technology Markets" are insufficient to state an antitrust**

2        **claim.**

3        Apple's market definition is deficient for at least two reasons.  First, Apple alleges a

4    worldwide maket for each patent when each patent is instead geographically limited in scope.

5    Second, Apple pleads no facts regarding substitutibility that put Acacia on notice of which of the

6    potentially hundreds of markets are at issue in this case.

7        The first problem with Apple's market definition is that Apple's claims regarding the

8    geographic market is facially unsupportable.  Apple pleads that "Acacia claims to own a

9    portfolio of over 225 U.S. and international 'standards essential voice coding patents that were

10    developed by VoiceAge corporation.'"  (SAC ¶ 25.)  However, U.S. patents cannot be enforced

11    internationally, and the U.S. will not grant royalties (or injunctions) for infringement of foreign

12    patents.  It is thus facially implausible to allege that, for example, the market defined by a

13    German patent is having an anticompetitive effect in the U.S. market, where a domestic producer

14    and seller would be free to infringe that patent with impunity.

15        The more fundamental problem with Apple's market definition is that it does not

16    sufficiently identify any substitutes.  Apple defined the relevant market as both "markets for

17    function performed by technologies ***purportedly covered by*** declared SEPs" and as "a technology

18    ***covered by*** a patent acquired by Acacia from VoiceAge and any other technologies that compete

19    or formerly competed to perform the same function." (SAC ¶ 34.)  Apple's non-specific

20    inclusion of "other technologies that compete or formerly competed to perform the same

21    function" (SAC ¶ 34) is insufficient to state a claim, as there are no facts pled sufficient to show

22    whether any such technologies do or do not exist in any market.[71]  Indeed, this does nothing to

23    

---

[71] *See Delano Farms,* 655 F.3d at 1351 ("Without a definition of the relevant market, the anticompetitive effects of [the alleged conduct] are impossible to measure."); *Spindler*, 2011 U.S. Dist. LEXIS 158559, at *5-7 (dismissing complaint that lacked allegations regarding reasonable interchangeability); *Seirus Innovative Accessories*, 2010 U.S. Dist. LEXIS 143106, at *10 (dismissing complaint that lacked allegations regarding reasonable interchangeability of use and cross-elasticity of demand; markets as pled could include "a variety of other products that are not economic substitutes for the products at issue in this case"); *Analogix Semiconductor, Inc. v. Silicon Image, Inc.*, No. C 08-2917 JF (PVT), 2008 U.S. Dist. LEXIS 118508, at *14-16

1    ground Apple's market definition allegations in fact and is insufficient under *Twombly*. Acacia

2    is left without sufficient knowledge of the market to bring a defense. Such deficient allegations

3    do not even begin to put Acacia on "fair notice of what the ... claim is and the grounds upon

4    which it rests[.]"[72] This is particularly true where Apple may have pled facts from which, if true,

5    it is plausible to infer that there are hundreds of potential markets at issue. (*See* SAC ¶¶ 1, 25,

6    51.)

7        **B. Apple Fails to Allege Antitrust Injury.**

8        Causal antitrust injury "is an element of all antitrust suits brought by private parties

9    seeking damages under Section 4 of the Clayton Act."[73] Antitrust claims for injunctive relief are

10   governed by Section 16 of the Clayton Act, and also require a showing of antitrust injury.[74] In

11   order to show antitrust injury, "a plaintiff must prove that his loss flows from an anticompetitive

12   aspect or effect of the defendants' behavior...."[75] This antitrust injury must be a harm to

13   competition, as distinct from harm to one or more competitors.[76] Moreover, the "failure to allege

14   injury to competition," as opposed to harm to a single competitor, "is a proper ground for

15

16

17   (N.D. Cal. Oct. 28, 2008) (dismissing complaint premised on "legally inadequate" relevant
     market that omitted allegations about other competing technology solutions); *McCabe Hamilton*,
18   2008 WL 2437739, at *7 (dismissing complaint that "[did] not even attempt to explain why [the
     alleged] market is appropriate;" without factual allegations to support alleged market, plaintiff's
19   assertion was "merely a legal conclusion couched as a factual allegation") (internal quotation
     marks and citation omitted).
20   [72] *McCabe Hamilton*, 2008 U.S. Dist. LEXIS 47428, at *6 (elipses in original) (quoting *Erickson
     v. Pardus*, 551 U.S. 89, 93-94 (2007)).
21
     [73] *Rebel Oil, Inc. v. Atl. Richfield Co*., 51 F.3d 1421 (9th Cir. 1995) (citing *Brunswick Corp. v.
22   Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Apple invokes Section 4 of the Clayton
     Act (15 U.S.C. § 15; *see* SAC ¶ 7). The statutory basis for a private action seeking injunctive
23   relief for alleged antitrust violations is Clayton Act Section 16. (15 U.S.C. § 26.)
     [74] *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986).
24   [75] *Rebel Oil*, 51 F.3d at 1433; *see also Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
     140 F.3d 1228, 1233 (9th Cir. 1998).
25   [76] *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (antitrust claim
     requires "harm to the process of competition"). A harm to competition occurs through an
26   effective reduction in the number of competitors in a particular market. *See, e.g., Brantley v.
     NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (harm to competition occurs when it
27   prevents new entrants into a market, or precludes another competitor from competing on price).

28

-25-

1  dismissal on the pleadings."[77]  This requirement of pleading antitrust injury and harm to

2  competition applies equally to Apple's Section 2 and Section 7 claims.[78]

3       **1.  Transfer of a patent monopoly cannot constitute antitrust injury.**

4            As a preliminary matter, the mere transfer of the patent monopoly is of no antitrust

5  concern, and claims of harm to competitors (or customers) arising from the transfer of assets are

6  insufficient to allege antitrust injury, as discussed at length, below, at III.C.  Apple does not

7  plead facts showing that the patent transfers reduced the number of competitors, restricted or

8  hindered any competitor in any of its ill-defined "markets," or otherwise affected the ***structure*** of

9  these "markets"—all of which were, at worst, equally monopolistic before and after the transfer

10  to Acacia.  Instead, Apple alleges dissatisfaction with how Acacia manages its patent portfolio

11  because it purportedly increases Apple's costs.

12            For similar reasons, Apple's allegations that it and others paid higher licensing rates as a

13  result of the increased ability of Acacia to credibly pursue litigation also fails to state an antitrust

14  injury.[79]  Rather, Apple must allege facts sufficient to demonstrate that any purported price

15  increase flowed from a loss of competition.[80]

16       **2.  Apple's SAC challenges constitutionally-protected activity.**

17            More importantly, the supposed harm to competition that Apple identifies relates entirely

18  to protected litigation conduct.  While Apple generically alleges that "Acacia, as a PAE, has used

19

20  [77] *Tanaka*, 252 F.3d at 1064 (citation omitted).

21  [78] *See id.* (Section 1); *Smilecare Dental Group v. Delta Dental Plan*, 88 F.3d 780, 783 (9th Cir. 1996) (Section 2); *Brunswick*, 429 U.S. at 489 (Section 7).

22  [79] *See Intellectual Ventures*, 2013 U.S. Dist. LEXIS 177836, at *20-21 (holding that increased patent royalty payments as a result of increased ability of PAE to credibly pursue litigation are

23  not an antitrust injury) (citing *Brulotte v. Thys Co.*, 379 U.S. 29 (1964); *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2231 (2013); *United States v. Line Material Co.*, 333 U.S. 287, 308 (1948)).

24  [80] *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 997 (N.D. Cal.

25  2015) (bare allegation that consumers were harmed through higher prices because of decreased choice was a legal conclusion that did not adequately allege harm to competition); *Zef Sci., Inc.*,

26  *v. Shimadzu Sci. Instruments, Inc.*, No. 14CV1758 JAH (RBB), 2016 U.S. Dist. LEXIS 44123, at *13 (S.D. Cal. Mar. 31, 2016) (where plaintiff claimed harm from increased input costs, mere

27  allegation "that other competitors also suffer undue costs" due to defendant's conduct without factual allegations to show how consumers were injured were insufficient legal conclusions).

28

1   the acquired patents to exploit product suppliers in ways VoiceAge could not," (SAC ¶ 29), each

2   of the examples Apple gives relates to litigation.  According to Apple, "Acacia can afford to

3   bring suits regardless of the merits because their litigation costs and risks are trivial in

4   comparison with the technology companies that they sue," its "litigation discovery costs are a

5   fraction of those that a technology company would face," and it "does not face any risks to its

6   reputation or business relationships from aggressive demands or litigation."  (SAC ¶ 30.)  Acacia

7   also apparently seeks "in litigation more money than the patents are worth," and exploits the

8   inability of judges to see the truth of things with respect to damages and sanctions as clearly as

9   Apple, in its infinite wisdom, can.  (SAC ¶ 31-32.)  As a result of this, Apple experiences

10  "inflated, non-FRAND royalties"—along with "substantial expenses, uncertainty, and burdens in

11  resisting the patent litigations and injunction threats" and "time its employees have been forced

12  to spend on these litigations[.]"  (SAC ¶ 39.)

13       This conduct is protected from antitrust liability—or any state law claims of unfair

14  business practices—under the *Noerr-Pennington* doctrine.[81]  Under that doctrine, litigation is

15  immune from antitrust liability unless it is brought in bad faith—both (1) objectively baseless

16  and (2) brought with an improper subjective motivation.[82]

17       Apple does not allege that Acacia has brought any "sham" or 'bad faith" litigation.  Such

18  a claim requires allegations that the suits were brought "pursuant to a policy of starting legal

19  proceedings without regard to the merits and for the purpose of injuring a market rival."[83]  Apple

20

21  ───────────────

    [81] *See United Mine Workers v. Pennington*, 381 U.S. 657 (1965) (holding that lobbying efforts,
22  even if intended to destroy competition, are immune from antitrust liability); *Eastern R.R.
    Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (holding that publicity
23  campaign activities aimed at the passage of certain legislation are immune from antitrust liability
    under the Sherman Act).
24  [82] *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993)
    ("*PRE*"); *Vizio, Inc. v. Funai Elec. Co. Ltd.*, 2010 U.S. Dist. LEXIS 30850, at *13-14 (C.D. Cal.
25  Feb. 3, 2010) ("[E]nforc[ement of] a patent does not constitute harm to competition unless the
    enforcement action is brought in bad faith.") (citing *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d
26  986, 997 (9th Cir. 1979)).
27  [83] *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d
    800, 811 (9th Cir. 1994).
28

1    pleads no motive for the Acacia's assertions of its patents other than obtaining a royalty, and

2    does not allege that it competes in any market with Acacia that might induce it to harm Apple.

3    Courts have repeatedly held that allegations of costs arising from patent litigation cannot

4    constitute harm to competition unless the plaintiff pleads facts plausibly alleging that the

5    litigation was a sham.[84]

6        Nor does Apple plead that Acacia's litigation is objectively baseless.  The closest Apple

7    comes is pleading that "Acacia can afford to bring suits regardless of the merits," (SAC ¶ 32),

8    which is a far cry from pleading that Acacia has actually done so.[85]  Apple does not dispute that

9    Acacia has exclusively asserted presumptively valid patents that it owns.[86]  Additionally, as

10   discussed at length above, Acacia's assertion of SEPs cannot be baseless, since a patent is not

11   standard-essential unless practicing the standard necessarily infringes the patent.

12       It is not sufficient for Apple to plead the general existence of an anticompetitive scheme

13   involving litigation.  The line of antitrust authority refers only to what harms may be included in

14   damages calculations arising from anticompetitive conduct independent of litigation, not whether

15   the substantive element of an antitrust injury was satisfied.[87]  Additionally, the genesis of the

16

---

17   [84] *Chip-Mender, Inc. v. Sherwin-Williams Co*., No. C 05-3465-PJH, 2006 U.S. Dist. LEXIS

18   2176, at *14-15 (N.D. Cal. Jan. 3, 2006) (claim of injury in form of attorneys' fees in defending
     patent infringement suit "is not an injury to 'competition'"); *Prime Healthcare Services, Inc. v.*

19   *SEIU et al.*, No. 11-CV-2652, 2013 U.S. Dist. LEXIS 104511, at *13 (S.D. Cal. July 25, 2013)
     (conclusory assertion that defendant brought "sham" counterclaims against plaintiff, which

20   supposedly increased plaintiff's costs, was insufficient to allege antitrust injury).
     [85] *See PRE*, 508 U.S. at 60-61.

21   [86] *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 102 (2011) (patents presumed valid);

22   *Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*, 138 F. Supp. 3d 303, 326 (S.D.N.Y. Mar.
     28, 2014) ("Patents are presumptively valid and Viatek pleads no facts to support its sham

23   litigation claim other than its subjective belief that Radiancy is deliberately pursuing a strategy to
     push Viatek out of the market."); *Mirafi, Inc. v. Murphy*, 1991 U.S. App. LEXIS 1636, at *6-7

24   (Fed. Cir. Feb. 4, 1991) (patentee is entitled to rely on presumption of validity, belief in
     infringement and validity yields presumption of good faith, and proof of bad faith must be by

25   clear and convincing evidence).
     [87] *See Hynix Semiconductor, Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007);

26   *see also Microsoft Mobile Inc. v. Interdigital, Inc.*, No. 15-723, 2016 U.S. Dist. LEXIS 49498

27   (D. Del. Apr. 13, 2016) (only considering litigation costs as damages after antitrust injury was
     independently alleged).

28

1  "anticompetitive scheme" theory is not good law.[88]  Whether litigation is protected by *Noerr-*

2  *Pennington* immunity is governed by Federal Circuit law, and neither the Supreme Court nor the

3  Federal Circuit has upheld the overall scheme theory.[89]

### C.  Apple Fails to State a Section 7 Claim.

5      Even assuming Apple adequately pled that "Patented Technology Markets" are

6  appropriate relevant antitrust markets (which, as explained above, it has not), Apple fails to state

7  a Section 7 claim.  Section 7 of the Clayton Act "prohibits a person 'engaged in commerce or in

8  any activity affecting commerce' from acquiring 'the whole or any part' of a business' stock or

9  assets if the effect of the acquisition 'may be substantially to lessen competition, or to tend to

10  create a monopoly.'"[90]  In order to make out a Section 7 claim, a plaintiff "must first establish a

11  prima facie case that a merger is anticompetitive."[91]  Such a prima facie case can be established

12  if the plaintiff shows "that the challenged transaction would increase the concentration of firms

13  in the relevant market."[92]

14      Apple cannot do this because the market was as concentrated as possible prior to

15  Acacia's acquisition of subject patents.  The exclusion of erstwhile competitors was

16  accomplished **by ETSI** while ***VoiceAge*** held the market-defining patents; these patents were

17  transferred to Acacia afterwards.  As Apple pleads, "[i]n SEP Technology Markets, ***when the***

---

[88] *Aventis Pharma S.A. v. Amphastar Pharms. Inc.*, 2009 U.S. Dist. LEXIS 132345, at *30-31 (C.D. Cal. Feb. 17, 2009) ("*Hynix* was decided before *Kaiser*, where the Ninth Circuit's approach is incompatible with the *Hynix* test," and "the *Hynix* test conflates *Noerr-Pennington* immunity with the substantive § 2 element of antitrust injury.") (citing HOVENKAMP, IP AND ANTITRUST § 11.4f.).  *See also id.* at *8 n.7; *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1044-45 (9th Cir. 2009).

[89] *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (en banc) (whether conduct in enforcing a patent is "sufficient to strip a patentee of its immunity from the antitrust laws" is a question of Federal Circuit law).

[90] *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004) (quoting 15 U.S.C. § 18).

[91] *Edstrom v. Anheuser-Busch Inbev SA/NV*, 647 F. App'x 733, 735 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 258 (2016).

[92] *Id.*; *see also Oracle*, 331 F. Supp. 2d at 1110 (a prima facie Section 7 case is established "by 'show[ing] that the merger would produce 'a firm controlling an undue percentage share of the relevant market, and [would] result [ ] in a significant increase in the concentration of firms in that market.'"" (alterations in original) (citations omitted)).

*relevant standard was established*, the particular technology covered by the SEP was selected over formerly competing technologies that *no longer compete* (or do not compete closely) *once the standard is set*." (SAC ¶ 35 (emphasis added).) At the time the standard was set, Apple pleads, VoiceAge held and licensed the patents, only recently selling them to Acacia. (*See* SAC ¶¶ 24-26.) Apple does not plead, and could not possibly plead facts sufficient to show, that VoiceAge's transfers of patents to Acacia led to concentration in any particular market that Apple defines. Apple does not plead that Acacia previously held any patents that compete with patents VoiceAge transferred to Acacia, and therefore does not plead that Acacia had any market power in a relevant market prior to acquisition.

A patent transfer cannot increase power in a market defined by the transferred patent because "the patent—and therefore the market power deriving from it—existed prior to the transfer."[93] At most—assuming VoiceAge retained no patents that are substitutes for the patents sold to Acacia—Acacia is a "monopolist" in each patent-defined market in the same way that VoiceAge was previously a monopolist.[94] It is appropriate to dismiss a Section 7 claim where a plaintiff alleges only a change in ownership of already-existing monopoly power.[95]

All Apple adequately pleads is a shift in market power from VoiceAge to Acacia. The shift of market power from one company to another violates no antitrust laws.[96] If such shifts did violate antitrust law, then virtually every sale of a patent would raise antitrust concerns, since

---

[93] *Vizio*, 2010 U.S. Dist. LEXIS 30850, at *13.

[94] If VoiceAge was previously an oligopolist because others possessed substitutes, Acacia is now an oligopolist. Indeed, if VoiceAge was previously a monopolist and transferred only a subset of competing patents, market power has *diffused* from a monopoly to a duopoly.

[95] *See id.; see also SCM Corp. v. Xerox Corp.*, 463 F. Supp. 983, 1001-02 (D. Conn. 1978), *aff'd*, 645 F.2d 1195 (2d Cir. 1981) (holding there is no basis for awarding damages pursuant to Section 7 where acquirer of patents had "no market power prior to the acquisition," and indeed "ha[d] no share at all of [the relevant market].").

[96] *See Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190 (9th Cir. 2000) (holding choice for state-approved monopolist for an electrical plant had no antitrust significance because the monopoly would exist either way); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F. 2d 261, 266 (7th Cir. 1984) (holding no harm to competition resulted when one rival obtained a valid patent monopoly rather than another because the patent monopoly would exist either way).

the "[t]he very object of [the patent] laws is monopoly,"[97] and the fact that the purchasing party values the patent more than the selling party means the purchaser believes it will be able to profit more from the monopoly power conferred by that patent than the seller will. That Acacia's mechanism for making that profit is licensing and litigation rather than product development is of no import. The transfer of a patent has "no antitrust significance."[98] "[T]here is no basis for permitting a damage award for a § 7 violation by an acquirer of patents with no market power prior to the acquisition. Section 7 is concerned with undue **concentrations** of power and the anti-competitive effects of permitting one **entity with market power to strengthen its position** by acquisition."[99] Transfer of power from the previously-powerful to the previously-powerless is the opposite of conduct the antitrust laws are designed to prevent. More, Section 7 is largely a dead letter to prevent asset consolidations, to the extent that the DOJ and FTC decided **not** to pursue a Section 7 claim arising out of an already-existing oligopoly of producers (including Apple) acquiring patents of a direct competitor they ran out of business because the acquisition was "unlikely to substantially lessen competition."[100]

Moreover, Apple has based its Section 7 claim entirely on post-litigation conduct. Apple asserts that the "changes in the licensing market structure" brought about by Acacia's patent acquisition resulted in harm to competition "through Acacia's assertions and coercive litigation designed to extract exorbitant royalties […] far above what […] VoiceAge […] could have continued to obtain itself." (SAC ¶ 51.) In short, but for Acacia's superior willingness and

---

[97] *Bement v. National Harrow Co.*, 186 U.S. 70, 91 (1902).

[98] *Vizio*, 2010 U.S. Dist. LEXIS 30850, at *4-12 (quoting *Brunswick*, 752 F. 2d at 266); *see also Digital Sun v. The Toro Co.*, No. 10-CV-4567-LHK, 2011 U.S. Dist. LEXIS 30222, at *9 (N.D. Cal. Mar. 22, 2011); *CareFusion Corp. v. Medtronic Spine LLC*, No. 10-CV-01111-LHK, 2010 U.S. Dist. LEXIS 122004, at *25 (N.D. Cal. Nov. 1, 2010) (citing *Columbia River*, 217 F.3d at 1190).

[99] *SCM Corp.*, 463 F. Supp. at 1001-02 (emphasis added).

[100] *See* Dep't of Justice, Antitrust Div., *Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigation of Google's Acquisition of Motorola Mobility Holdings Inc. and the Acquisitions of Certain Patents by Apple Inc., Microsoft Corp. and Research in Motion Ltd.* (Feb. 13, 2012). Notably, Google is an operating company who could have utilized patents to obtain power in a product market, while Acacia is not.

1    ability to capitalize on the patent laws after acquiring the patents, Apple would have paid lower

2    royalties.

3         Allegations of this kind of post-transfer conduct are insufficient to state Section 7

4    claim.[101]  Litigation conduct, not the patent transfer, is the proximate cause of any injury Apple

5    suffered.[102]  Apple's theory makes no sense, has been panned by scholars on doctrinal and

6    empirical grounds, and was straightforwardly rejected by the only court to consider it (or any

7    other theory of liability for PAE acquisitions under Section 7).[103]  Purported anticompetitive

8    effects "aris[ing] from [a PAE's] litigation threats, based on the patents it ha[d] accumulated, and

9    the settlements that result[ed] from those litigation threats" do not amount to allegations that the

10   patent transfers at issue "standing alone" lessened competition.[104]

11        **D.  Apple Fails to State a Section 1 Claim.**

12        To state a claim under Section 1 of the Sherman Act, Apple must plead "evidentiary facts

13   which, if true, will prove: (1) that there was a "contract, combination, or conspiracy;" (2) that

14

15   [101] *Compare* SAC ¶ 51 *with SCM Corporation v. Xerox Corporation*, 645 F.2d 1195, 1211-12.

16   (2d Cir. 1981) ("Whatever the meaning that may be ascribed to § 7 in other contexts, the patent
     laws circumscribe the scope of the provision here.  Where a corporation's acquisition of a patent

17   is not violative of § 7, as was the case here, its subsequent holding of the patent cannot later be
     deemed violative of this section.").

18   [102] *Cf. McKeon Constr. v. McClatchy Newspapers*, 1969 U.S. Dist. LEXIS 10593, at *11 (N.D.
     Cal. Nov. 24, 1969) (Section 7 claim dismissed for failure to credibly allege that acquisition

19   rather than subsequent rate-fixing was proximate cause of damage); *Johnson v. University
     Health Servs.*, 931 F. Supp. 1572, 1580 (S.D. Ga. 1996) ("The Supreme Court has recognized

20   that Congress intended common-law tort concepts such as proximate cause and directness of
     injury to apply in the context of litigation under §§ 4 and 7 of the Clayton Act.").

21   [103] *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 2013 U.S. Dist. LEXIS 177836, at

22   *28-30 (E.D. Va. Dec. 18, 2013) (holding that effects of litigation assertions post-dating patent
     acquisition did not give rise to antitrust claim under Section 7).  This theory has also been

23   rejected by scholars.  *See, e.g.,* John "Jay" Jurata, Jr. & Amisha R. Patel, *Taming the Trolls: Why
     Antitrust Is Not a Viable Solution for Stopping Patent Assertion Entities*, 21 Geo. Mason L.

24   Rev. 1251, 1259-1265 (2014) (explaining why patent disaggregation to PAE entities cannot
     constitute an antitrust violation where authorized by law and how changed enforcement

25   incentives is not a proper theory of antitrust liability); Matthew Sipe, *Patent Privateers and
     Antitrust Fears*, 22 Mich. Telecomm. Tech. L. Rev. 191, 214-222 (2016) (arguing that there is

26   no empirical support for transfers to PAE causing the types of harm Apple alleges, but there are
     both theoretical and empirical reasons to suspect that PAEs decrease litigation costs).

27   [104] *Intellectual Ventures*, 2013 U.S. Dist. LEXIS 177836, at *29.

28

1  "the agreement unreasonably restrained trade under either a per se rule of illegality or rule of

2  reason analysis;" and (3) "that the restraint affected interstate commerce."[105]  Apple does not

3  allege facts sufficient to support the claim that Acacia and VoiceAge entered into any agreement

4  that runs afoul of Section 1.  As discussed at length above, the mere patent transfer is insufficient

5  to create market power, exclude competitors, or otherwise restrain trade; it simply (at worst)

6  transfers patents from a monopolist who can engage in protected litigation activity less

7  effectively to a monopolist who can do so more effectively.

8  　　　　Apple alleges that "VoiceAge conspired with Acacia to transfer declared SEPs to Acacia

9  for the purpose and with the effect of evading VoiceAge's FRAND commitments and exploiting

10 the patents in ways that VoiceAge could not by acting alone."  (SAC ¶ 55.)  Under this

11 "agreement," Acacia is to "extract exorbitant royalties" and "share in the fruits of the non-

12 FRAND royalties Acacia demands" from suppliers like Apple.  (SAC ¶ 56.)

13 　　　　It is unclear whether Apple means to allege that the written patent assignment contracts

14 expressly reflect the supposed "agreement" to evade FRAND commitments, or whether Apple is

15 alleging that the alleged conspirators had a "meeting of the minds" beyond these contracts—i.e.,

16 a tacit understanding that the patents would be enforced and/or licensed in a manner inconsistent

17 with FRAND obligations.  As noted above at II.A., however, if the true agreement between the

18 parties is that Acacia would not license on FRAND terms, Acacia breached no contract to which

19 it is a party by adhering to this "agreement."  Apple's antitrust allegation thus squarely

20 contradicts its contract claim that "[w]hen Acacia acquired these declared SEPs, it entered into or

21 was assigned the express or implied contractual commitments with ETSI [to license on FRAND

22 terms]."  (SAC ¶ 44.)  Moreover, the antitrust pleading contradicts Apple's claim that "Acacia

23 has acknowledged [...] that it is bound by VoiceAge's FRAND commitments[.]"  (SAC ¶ 21.)

24 Such fundamental contradictions undermine Apple's conclusory allegations of unlawful

25

26

27 [105] *Tanaka,* 252 F.3d at 1062 (internal quotation marks and citations omitted); *see also Kendall v.*

28 *Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

1   agreements whereby VoiceAge supposedly transferred patents to Acacia in order to evade

2   FRAND commitments, and thus merit dismissal of Apple's Section 1 claim.[106]

3           The only *facts* Apple pleads regarding the transfers are that: (1) VoiceAge used to license

4   some or all of its declared SEPs or other patents through a patent pool or through bilateral

5   agreements; (2) VoiceAge subsequently transferred a portfolio of declared SEPs to Acacia on

6   terms such that VoiceAge and Acacia share in the licensing revenue Acacia generates from that

7   transferred portfolio; and (3) that Acacia subsequently demanded (and obtained) a higher royalty

8   rate than VoiceAge did from at least some of Apple's competitors.  (*See* SAC ¶¶ 24-26.)  The

9   rest of Apple's allegations are barefaced allegations of conspiracy without factual support.

10          The fact that Acacia and VoiceAge entered into a contractual arrangement is insufficient

11  to provide the basis for a Section 1 claim.[107]  While Apple alleges that VoiceAge and Acacia had

12  the "purpose" of evading VoiceAge's FRAND commitments, these bare allegations of scienter

13  do not constitute facts sufficient to infer a conspiracy in this regard.[108]

---

14

15  [106] *See Alatraqchi v. Uber Techs., Inc.*, No. C-13-03156 JSC, 2013 U.S. Dist. LEXIS 119642, at *15-17 (N.D. Cal. Aug. 22, 2013) (granting motion to dismiss claim where allegations regarding

16  key element were contradictory); *see also Hernandez v. Select Portfolio, Inc.*, No. CV 15-01896 MMM AJWX, 2015 U.S. Dist. LEXIS 82922, at *24 (C.D. Cal. June 25, 2015) ("Contradictory

17  allegations … are inherently implausible, and fail to comply with Rule 8, *Twombly*, and *Iqbal*.").
    [107] *See 49er Chevrolet, Inc. v. Gen'l Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986)

18  (declining to infer an antitrust conspiracy from "[o]rdinary sales contracts," for "the antitrust laws are not offended by agreements as such, but only by those with an anticompetitive content")

19  (citation omitted); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016) (declining to accept that "the simple existence of a contract … standing alone, is enough to

20  satisfy the concerted action requirement," for "although Section 1 specifically references contracts … a contract can serve as the basis for a Section 1 claim only if it embodies an

21  agreement to unlawfully restrain trade"); *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.,* 786 F. Supp. 2d 1190, 1198-99 (S.D. Tex. 2009) (dismissing Section 1 claim

22  premised upon mere sales contracts where plaintiff "[failed to make] sufficient allegations to raise a reasonable expectation that discovery would reveal evidence of an illegal agreement");

23  *Toscano v. PGA Tour, Inc.*, 70 F. Supp. 2d 1109, 1114-15 (E.D. Cal. 1999), *aff'd*, 258 F.3d 978 (9th Cir. 2001) (mere existence of written contract was insufficient to demonstrate an agreement

24  to restrain trade).
    [108] *Cf. Twombly*, 550 U.S. at 556-57 (observing that "a bare assertion of conspiracy will not

25  suffice;" to make out a Section 1 claim, allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be

26  independent action."); *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1193, 1198 (9th Cir. 2015) (affirming Rule 12(b)(6) dismissal where, in the absence of direct

27

28

1    Apple does not allege that post-sale, VoiceAge has any input or control over the terms on

2   which Acacia licenses to third parties, or otherwise directs Acacia's enforcement.  Indeed, Apple

3   pleads facts sufficient to infer that Acacia required no encouragement to maximize the revenue it

4   extracts from the portfolio it bought from VoiceAge.  According to Apple:

5   - Acacia has the "ability, as a patent assertion entity (PAE), to engage in brazen and

6     exploitive patent assertion conduct, including demanding and receiving exorbitant non-

7     FRAND royalties."  (SAC ¶ 1.)  Acacia is rather structured for this purpose, owning a

8     "bewildering array of shell subsidiaries that 'generate revenues and related cash flows

9     from the granting of intellectual property rights for the use of patented technologies that

10    [its] operating subsidiaries control or own.'"  (SAC ¶ 5.)

11  - Acacia, previously used "abusive patent enforcement strategies to exploit potential

12    licensees."  (SAC ¶ 25.)  Indeed, Acacia "benefits from a reputation for brazen and

13    ruthless patent assertion tactics, which intimidates targets into settling to avoid the

14    repeated harassment for which Acacia is well known."  (SAC ¶ 30.)

15  - "Acacia has every incentive to and does demand excessive royalties untied to the value of

16    the patents.  By seeking in litigation more money than the patent in suit is worth, it also

17    exploits the risk of error in the judicial process.  Acacia pressures its targets to settle to

18    avoid facing the risk of an exorbitant damages award if they choose to defend themselves

19    through trial, while Acacia stands only to gain a windfall from an erroneously high

20    award."  (SAC ¶ 31.)

21  "'Allegations of facts that could just as easily suggest rational, legal business behavior by the

22  defendants as they could suggest an illegal conspiracy' are insufficient to plead a [Section 1]

23  violation."[109]  Accepting Apple's absurd allegations about Acacia as true, the only reasonable

24  inference to draw is that Acacia would abandon its FRAND commitments without regard to

25

26  evidence showing agreement, plaintiffs failed plausibly to allege non-conclusory facts sufficient
    to "'point[] toward a meeting of the minds' of the alleged conspirators") (quoting *Twombly*, 550

27  U.S. at 557, 560).

28  [109] *In re Musical Instruments*, 798 F.3d at 1194 (citation omitted).

1    VoiceAge's wishes in the matter.  Unless Apple has an independent basis to claim that

2    VoiceAge's transfer of declared SEPs was illegal, then it cannot allege a conspiracy or

3    combination between Acacia and VoiceAge and therefore cannot state a Section 1 claim.

4    **IV.    Apple Fails to State a Claim for Violation of California's UCL.**

5        Finally, Apple's SAC alleges violation of CAL. BUS. PROF. CODE § 17200, *et seq*. based

6    on violations of Clayton Act § 7 (discussed *supra* at III.C.) and Section 5 of the Federal Trade

7    Commission Act 15 U.S.C. § 45 ("Section 5").  Apple additionally accuses Acacia of

8    "conspiracy to evade VoiceAge's FRAND commitments" through its purchase of VoiceAge's

9    patents, and effecting this "conspiracy" through seeking above-FRAND royalties and injunctive

10   relief.[110]  This fails to state a claim under California's UCL.

11       When alleged by competitors: "the word 'unfair' in [the UCL] means conduct that

12   threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those

13   laws because its effects are comparable to or the same as a violation of the law, or otherwise

14   significantly threatens or harms competition."[111]  Where the conduct alleged to be unfair or

15   illegal is governed by other law (e.g., antitrust law), "the UCL claim rises or falls with the other

16   claims."[112]  As a result, whether or not Apple is a "consumer," Apple's antitrust allegations are

17   fully addressed above.

18

19   [110] This is the exact same conduct Apple accuses of antitrust violations.  *Compare* SAC ¶ 62 *with* SAC ¶ 47.

20   [111] *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  While a somewhat broader standard may apply under the test for consumers, Apple has not alleged that it is a consumer.  Indeed, Apple's complaint distinguishes itself from "consumers."  (*See, e.g.,* SAC ¶¶ 3 ("Apple, other participants in industries […], and consumers"), 12 (distinguishing "industry" and "consumers"), 53, 59.)  Importantly, Apple's vague market definition makes it impossible to tell from the complaint whether Apple alleges that it is a competitor in one or more SEP Technology Markets.

24   [112] *Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 911 (N.D. Cal. 2016) (quoting *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1146 (N.D. Cal. 2010)); *see also Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers.") (citing *Cel-Tech*, 20 Cal. 4th 163).

1    Apple's breach of FRAND allegations are insufficient to state a claim for violation of the

2    UCL because "a common law violation such as breach of contract is insufficient" to state a claim

3    under the "unlawful" prong.[113]  And the mere incorporation and restatement of breach of contract

4    claims do not state a cause of action under the "unfair" prong.[114]  Apple would have to allege

5    conduct in connection with the breach of contract that independently establishes unfair

6    competition, which it does not even attempt to do.

7    More, Apple fails to allege standing to pursue a UCL claim.  The UCL limits standing to

8    those who have "lost money or property as a result of the unfair competition."[115]  Apple's only

9    allegations of injury are "litigation costs, supracompetitive licensing rates, business uncertainty,

10   and business resources lost in dealing with the consequences of Acacia's assertion of its acquired

11   VoiceAge patents."  (SAC ¶ 48, 53.)[116]  However, the costs of defending against infringement

12   suits (litigation costs and "business resources lost in dealing with the consequences" of Acacia's

13   suits) cannot be the basis of a UCL claim under the *Noerr-Pennington* doctrine, while "business

14   uncertainty" is not a sufficient injury because it is not "money or property" as required by

15   statute.[117]  And since Apple does not allege that it has actually ***paid*** "supracompetitive" rates or

16   that the rates at issue are "supracompetitive" (its earlier claims in SAC ¶¶ 1, 25-26, and 47, are

17   directed to the rates being "above FRAND," which is not the same), Apple has not sufficiently

18   alleged that these rates have cost it money or property.

19   Finally, assuming arguendo that this theory is available to competitors, Apple's Section 5

20   allegations are insufficient to state a UCL claim.  The "federal courts are the ultimate arbiters of

21   the meaning and scope of section 5 and the FTC's authority under it."[118]  The mere "entering of a

---

22   [113] *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010) (citation
23   omitted).
     [114] *Grant v. Pensco Tr. Co.*, No. 12-cv-06084-WHO, 2014 U.S. Dist. LEXIS 53224, at *19-20
24   (N.D. Cal. Apr. 15, 2014).
     [115] CAL. BUS. & PROF. CODE § 17204.
25   [116] Apple also alleges lost resources dealing with the "unlawful agreement" in its Section 1
     claim.
26   [117] *TCL Communs. Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-
27   0341 JVS (DFMx), 2016 U.S. Dist. LEXIS 140566, at *9-10, 12 (C.D. Cal. Aug. 9, 2016).
     [118] *Cel-Tech*, 20 Cal. 4th at 186.

28

ACACIA PARTIES' MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT
CASE NO. 5:16-CV-07266-EJD

1   consent decree … is not a decision on the merits and therefore does not adjudicate the legality of

2   any action by a party thereto."[119]  Apple's theory of Section 5 liability is "judicially untested"

3   and has been roundly criticized by its own commissioners, resulting in the FTC itself limiting

4   future reliance on its enforcement in this area.[120]  This Court should decline the invitation to

5   make new law regarding the "meaning and scope" of Section 5, particularly where the FTC takes

6   no position and the conduct at issue would expand into areas the FTC has never attempted to

7   enforce.[121]

8                                               **CONCLUSION**

9             For the foregoing reasons, the Acacia Parties request that this Court dismiss Apple's

10   Second Amended Complaint against them, with prejudice and without leave to re-plead.

11

12

13

14

15

---

[119] *Beatrice Foods Co. v. F.T.C.*, 540 F.2d 303, 312 (7th Cir. 1976).

[120] Jorge L. Contreras, *A Market Reliance Theory for FRAND Commitments and Other Patent Pledges*, 2015 UTAH L. REV. 479, 529-533 (compiling FTC enforcement actions, noting substantial disagreement within the commission and among commentators as to whether the theory is viable, and characterizing Section 5 liability for breach of FRAND commitments as "uncertain and judicially untested standard"); Thomas F. Cotter, *Comparative Law and Economics of Standard-Essential Patents and FRAND Royalties*, 22 TEX. INTELL. PROP. L.J. 311, 328-329 (2014) (noting efforts made by FTC to limit precedential scope of orders).  FTC officials have been publicly critical of the use of Section 5 to police FRAND commitments.  *See, e.g.*, Jan M. Rybnicek and Joshua D. Wright, *Defining Section 5 of the FTC Act: the Failure of the Common Law Method and the Case for Formal Agency Guidelines*, 21 GEO. MASON L. REV. 1287 (2014) (characterizing the use of Section 5 to reach breach-of-FRAND-commitment claims as illustrating the need for formal guidelines); Antitrust Source, *Interview with Joshua D. Wright, Commissioner, Federal Trade Commission*, 13-6 ANTITRUST SRC. 4 (2014).

[121] The FTC enforcement action against N-Data that Apple relies on N-Data's explicit repudiation of a specific offer to grant an unlimited license to any company for $1000.  *See Negotiated Data Solutions LLC*, No. C-4234, 2008 WL 4407246, at ¶¶ 12-13, 31-32 (F.T.C. Sept. 22, 2008).  As Apple pleads, Acacia has acknowledged it has FRAND commitments.  (*See* SAC ¶ 21.)  Acacia does not dispute its FRAND obligation to VoiceAge; it disputes that Apple has pled breach of its obligation.  Likewise, the FTC predicated its complaint on injunctions before U.S. tribunals, not German courts..  *See Motorola Mobility, LLC*, No. 121-0120, 2013 WL 124100, at ¶ 27 (F.T.C. Jan. 3, 2013).

1    DATED:  November 8, 2017            /s/ *Edward R. Nelson III*

2                                       NELSON BUMGARDNER PC
                                        Edward R. Nelson III (*pro hac vice*)
3                                       ed@nelbum.com
                                        Ryan P. Griffin (*pro hac vice*)
4                                       ryan@nelbum.com
                                        3131 West 7th Street, Suite 300
5                                       Fort Worth, TX 76107
                                        Telephone: (817) 377-9111
6
7                                       Attorneys for Defendants Acacia Research
                                        Corporation, Saint Lawrence  Communications
8                                       LLC, and Saint Lawrence  Communications GmbH

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

1

2          I hereby certify that on the 8th day of November, 2017, I electronically filed
the foregoing document with the Clerk of the Court using the CM/ECF system, which will then
3  send a notification of such filing (NEF) to the following attorneys of record who have consented
to accept this Notice as service of this document by electronic means:

4

Mark D. Selwyn (SBN: 244180)
5  mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
6  950 Page Mill Road
Palo Alto, CA 94304
7  Telephone: + 1 650 858 6000
Facsimile: + 1 650 858 6100

8

William F. Lee
9  william.lee@wilmerhale.com
Joseph J. Mueller
10  joseph.mueller@wilmerhale.com
Timothy Syrett
11  timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
12  60 State Street
Boston, MA 02109
13  Telephone: + 1 617 526 6000
Facsimile: + 1 617 526 5000

14

Leon B. Greenfield
15  leon.greenfield@wilmerhale.com
Nina S. Tallon
16  nina.tallon@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
17  1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
18  Telephone: + 1 202 663 6000
Facsimile: + 1 202 663 6363

19

20                                    By:    /s/  Edward R. Nelson III

21

22

23

24

25

26

27

28

-40-