Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100

*Attorneys for Plaintiff*
APPLE INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

APPLE INC.,

                    Plaintiff,

        v.

ACACIA RESEARCH CORPORATION,
SAINT LAWRENCE COMMUNICATIONS
LLC, SAINT LAWRENCE
COMMUNICATIONS GMBH, AND
VOICEAGE CORPORATION,

                    Defendants.

Case No.5:16-cv-07266

**APPLE INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS ACACIA RESEARCH CORPORATION, SAINT LAWRENCE COMMUNICATIONS LLC, AND SAINT LAWRENCE COMMUNICATIONS GMBH'S MOTION TO DISMISS APPLE'S SECOND AMENDED COMPLAINT**

William F. Lee
william.lee@wilmerhale.com
Joseph J. Mueller
joseph.mueller@wilmerhale.com
Timothy Syrett
timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000

Leon B. Greenfield
leon.greenfield@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile:  +1 202 663 6363

*Attorneys for Plaintiff*
APPLE INC.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

I.      INTRODUCTION .................................................................................................... 1

II.     NATURE OF PROCEEDING AND STATEMENT OF ISSUES TO BE DECIDED ......... 2

III.    STATEMENT OF FACTS .......................................................................................... 2

    A.   VoiceAge Is an Operating Technology Company That Promised to License Its Declared
    SEPs on FRAND Terms ............................................................................................... 2

    B.   VoiceAge Demonstrated Its Ability to Obtain FRAND Royalties by Itself...................... 3

    C.   Acacia and Other PAEs Are Uniquely Situated to Anticompetitively Exploit Product
    Suppliers ...................................................................................................................... 3

    D.   VoiceAge and Acacia Conspired to Inflate Royalties and Evade FRAND ...................... 4

IV.     ARGUMENT ........................................................................................................... 4

    A.   The Court Should Not Dismiss Based on the "First-to-File" Rule .................................. 4

        1.   This Case Includes Parties Distinct from Those in the EDTX Case.............................. 5
        2.   This Case Involves Issues Dissimilar from Those in the EDTX Case .......................... 7
        3.   Even if the "First to File" Doctrine Applied, the Court Should Retain Jurisdiction
        Based on Principles of Equity .................................................................................... 10

    B.   Apple Has Adequately Alleged Its Breach of Contract Claim ...................................... 10

        1.   Apple Has Adequately Alleged a FRAND Contract It Can Enforce Against Acacia .. 11
        2.   Apple Has Pled Its Breach of Contract Claim with Sufficient Specificity ................. 17
        3.   Apple Has Alleged That It Engaged in Good Faith Licensing Negotiations, and Such
        Allegations Are Not Required Anyway ....................................................................... 18
        4.   Acacia is Obligated to Make FRAND Licensing Offers for Its Declared SEPs ........... 19
        5.   Apple Has Alleged Non-FRAND Conduct.................................................................. 21

    C.   Apple Adequately Alleges That Acacia Violated the Antitrust Laws ............................ 24

        1.   Apple Adequately Alleges Relevant Antitrust Markets............................................. 25
        2.   Apple Adequately Alleges That Acacia Violated Section 7 ....................................... 29
        3.   Apple Has Adequately Pled Its Section 1 Claim ...................................................... 34
        4.   Apple Adequately Alleges Antitrust Injury .............................................................. 39

    D.   Apple Adequately Alleges That Acacia Violated the California UCL............................ 42

V.      CONCLUSION....................................................................................................... 44

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*49er Chevrolet, Inc. v. General Motors Corp.*,
  803 F.2d 1463 (9th Cir. 1986) ...................................................................35, 36

*Adobe Sys. v. A&S Elecs.*,
  153 F. Supp. 3d 1136 (N.D. Cal. 2015) ...........................................................19

*Alltrade, Inc. v. Uniweld Prods., Inc.*,
  946 F.2d 622 (9th Cir. 1991) ...........................................................................5

*American Ad Mgmt. v. GTE Corp.*,
  92 F.3d 781 (9th Cir. 1996) ............................................................................9

*Apple, Inc. v. Motorola, Inc.*,
  869 F. Supp. 2d 901 (N.D. Ill. 2012), *aff'd in part, rev'd in part and remanded
  on other grounds*, 757 F.3d 1286 (Fed. Cir. 2014) ...........................................18, 19

*Apple, Inc. v. Motorola Mobility, Inc.*,
  886 F. Supp. 2d 1061 (W.D. Wis. 2012) ......................................................13, 22

*Apple, Inc. v. Motorola Mobility, Inc.*,
  No. 11-CV-178-BBC, 2011 WL 7324582 (W.D. Wis. June 7, 2011)..................14, 19, 21, 28

*Apple Inc. v. Samsung Elecs. Co.*,
  No. 11–cv–01846, 2012 WL 2571719 (N.D. Cal. June 30, 2012) ....................................39, 42

*Apple Inc. v. Samsung Elecs. Co.*,
  No. 11-CV-01846, 2012 WL 1672493 (N.D. Cal. May 14, 2012).......................14, 19, 23, 28

*Ash Grove Cement Co. v. FTC*,
  577 F.2d 1368 (9th Cir. 1978) ........................................................................8

*Baker v. Aegis Wholesale Corp.*,
  No. 09-5280, 2010 WL 2853915 (N.D. Cal. July 21, 2010) ...................................43

*Barnes & Noble, Inc. v. LSI Corp.*,
  849 F. Supp. 2d 925 (N.D. Cal. 2012) ...........................................................16, 17

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
  166 F. Supp. 3d 988 (N.D. Cal. 2015) ............................................................40

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................38

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)..............................................................................20, 28

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)....................................................................................................29

*Brunswick Corp. v. Riegel Textile Corp.*,
    752 F.2d 261 (7th Cir. 1984) ...................................................................................31

*Cargill Inc. v. Budine*,
    No. 07-349, 2007 WL 2506451 (E.D. Cal. Aug. 30, 2007)...................................25

*Cascades Computer Innovation LLC v. RPX Corp.*,
    No. 12-cv-1143, 2013 WL 6247594 (N.D. Cal. Dec. 3, 2013)........................35, 38

*Cedars-Sinai Med. Ctr. v. Shalala*,
    125 F.3d 765 (9th Cir. 1997) ......................................................................................5

*In re Certain 3G Mobile Handsets*,
    Inv. No. 337-TA-613, 2015 WL 6561709 (ITC Apr. 27, 2015)..............................20

*In re Certain Wireless Devices with 3G &/or 4G Capabilities & Components
    Thereof*,
    Inv. No. 337-TA-868, 2014 WL 2965327 (June 13, 2014) .....................................20

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*,
    690 F.2d 1240 (9th Cir. 1982) ..................................................................................41

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) ....................................................................................39

*Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*,
    217 F.3d 1187 (9th Cir. 2000) ..................................................................................31

*Core Wireless Licensing S.a.r.l. v. Apple Inc.*,
    No. 12-100, 2015 WL 4775973 (E.D. Tex. Aug. 11, 2015) ....................................18

*In re Cybernetic Servs., Inc.*,
    252 F.3d 1039 (9th Cir. 2001) ..................................................................................17

*Datatreasury Corp. v. Wells Fargo & Co.*,
    522 F.3d 1368 (Fed. Cir. 2008)................................................................................16

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ...............................................................25

*United States v. E.I. duPONT de Nemours & Co.*,
    353 U.S. 586 (1957)...........................................................................7, 29, 32

*Ericsson Inc. v. D-Link Sys. Inc.*,
    No. 6:10-cv-473, 2013 U.S. Dist. Lexis 110585 (E.D. Tex. Aug. 6, 2013) ...........................19

*Ericsson Inc. v. D-Link Sys., Inc.*,
    No. 6:10-CV-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013), *aff'd in part,
    vacated in part, rev'd in part*, 773 F.3d 1201 (Fed. Cir. 2014) ...............................22

*FTC v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013)........................................................................25

*FTC v. Procter & Gamble Co.*,
    386 U.S. 568 (1967) ..........................................................................29

*FTC v. Qualcomm Inc.*,
    No. 17-CV-00220-LHK, 2017 WL 2774406 (N.D. Cal. June 26, 2017) ............................23

*Funai Elec. Co. v. LSI Corp.*,
    No. 16-cv-01210, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) ...........................28, 41, 42

*GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank,
    Nat. Ass'n*,
    671 F.3d 1027 (9th Cir. 2012) ...............................................................13

*United States v. Gen. Dynamics Corp.*,
    415 U.S. 486 (1974)............................................................................8

*United States. v. Gillette Co.*,
    828 F. Supp. 78 (D.D.C. 1993) ...........................................................33, 39

*High Technology Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993) .................................................................27

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) .................................................40, 41, 42

*In re Innovatio IP Ventures, LLC Patent Litig.*,
    921 F. Supp. 2d 903 (N.D. Ill. 2013) .........................................................15

*In re Innovatio IP Ventures, LLC Patent Litig.,*
    956 F. Supp. 2d 925 (N.D. Ill. 2013) ..............................................................15, 20

*Innovus Prime, LLC v. Panasonic Corp.,*
    No. C-12-00660-RMW, 2013 WL 3354390 (N.D. Cal. July 2, 2013) ....................16

*Intellectual Ventures I LLC v. Capital One Fin. Corp.,*
    99 F. Supp. 3d 610 (D. Md. 2015) ........................................................................33

*Intellectual Ventures I LLC v. Capital One Fin. Corp.,*
    No. 13-cv-00740, 2013 U.S. Dist. LEXIS 177836 (E.D. Va. Dec. 18. 2013) ........32

*Intersearch Worldwide, Ltd. v. Intersearch Group, Inc.,*
    544 F. Supp. 2d 949 (N.D. Cal. 2008) ................................................................5, 9

*Kaiser Foundation Health Plan, Inc. v. Abbott Labs., Inc.,*
    552 F.3d 1033 (9th Cir. 2009) ..............................................................................42

*Klamath Water Users Protective Ass'n v. Patterson,*
    204 F.3d 1206 (9th Cir. 1999) ..............................................................................13

*Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.,*
    787 F.3d 1237 (9th Cir. 2015) ................................................................................5

*United States v. Line Material Co.,*
    333 U.S. 287 (1948) ..............................................................................................25

*In re Lithium Ion Batteries Antitrust Litig.,*
    No. 13-MD-2420 YGR, 2014 U.S. Dist. LEXIS 141358 (N.D. Cal. Oct. 2,
    2014) .......................................................................................................................6

*Lucas Automotive Eng., Inc. v. Bridgestone/Firestone, Inc.,*
    140 F.3d 1228 (9th Cir. 1998) ..............................................................................40

*Microchip Tech., Inc. v. United Module Corp.,*
    2011 U.S. Dist. LEXIS 73276 (N.D. Cal. July 7, 2011) ..........................................6

*Microsoft Corp. v. Harmony Computers & Elecs., Inc.,*
    846 F. Supp. 208 (E.D.N.Y. 1994) ........................................................................12

*Microsoft Corp. v. Motorola Inc.,*
    2011 WL 11480223 ................................................................................................24

*Microsoft Corp. v. Motorola, Inc.,*
    696 F.3d 872 (9th Cir. 2012) ..................................................................23, 24, 27

*Microsoft Corp. v. Motorola, Inc.*,
  864 F. Supp. 2d 1023 (W.D. Wash. 2012) .......................................................................13, 22

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
  No. 15-723, 2016 WL 1464545 (D. Del. Apr. 13, 2016).....................................................28, 39

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ...............................................................................................38

*National Union Fire Ins. Co. v. Payless Shoesource, Inc.*,
  No. C-11-1892 EMC, 2012 U.S. Dist. LEXIS 112346 (N.D. Cal. Aug. 9,
  2012) ........................................................................................................................................7

*In re Negotiated Data Solutions LLC*,
  File No. 051-0094, FTC Decision and Order, 4 (Sept. 22, 2008)...............................16, 43, 44

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ...................................................................................25, 26, 28

*Norcia v. Samsung Telecommunications Am., LLC*,
  845 F.3d 1279 (9th Cir. 2017), *cert. denied*, No. 17-1, 2017 WL 2870039
  (U.S. Oct. 2, 2017) ..................................................................................................................12

*Oertell v. Six Flags Entm't Corp.*,
  No. 3:16-cv-4002 CRB, 2017 U.S. Dist. LEXIS 17385 (N.D. Cal. Feb. 7,
  2017) ........................................................................................................................................5

*Paice LLC v. Hyundai Motor Co.*,
  No. WDQ-12-0499, 2014 WL5581045 (D. Md. Oct. 29, 2014) ............................................16

*Paice, LLC v. Hyundai Motor Co.*,
  No. WDQ-12-499, 2014 WL 3533667 (D. Md. July 11, 2014) ............................................16

*United States v. Parke, Davis & Co.*,
  362 U.S. 29 (1960)...........................................................................................................35, 36

*Realtek Semiconductor Corp. v. LSI Corp.*,
  946 F. Supp. 2d 998, 1006 (N.D. Cal. 2013) ........................................................................23

*Realtek Semiconductor Corp. v. LSI Corp.*,
  No. 12-03451, 2012 WL 4845628 (N.D. Cal. Oct. 10, 2012) .........................................19, 22

*Research In Motion Ltd. v. Motorola, Inc.*,
  644 F. Supp. 2d 788 (N.D. Tex. 2008) .............................................................................14, 22

*United States v. Rockford Mem'l Corp.*,
    898 F.2d 1278 (7th Cir. 1990) ........................................................................34

*Saint Lawrence LLC v. Apple Inc.*,
    No. 2:16-cv-082 (E.D. Tex. Jan. 27, 2016)........................................................5

*SEC v. Prudential Sec. Inc.*,
    136 F.3d 153 (D.C. Cir. 1998) ........................................................................12

*United States v. Singer Manufacturing Co.*,
    374 U.S. 174 (1963).................................................................................35, 36

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ........................................................................38

*Stevens v. United States*,
    367 F. App'x 158 (Fed. Cir. 2010) .............................................................12, 13

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961).................................................................................26, 27

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ........................................................................26

*TCL Commc'ns Tech. Holdings Ltd v. Telefonaktenbologet LM Ericsson*,
    No. SACV1400341JVSANX, 2014 WL 12588293 (C.D. Cal. Sept. 30, 2014)....................19

*Vizio Inc. v. Funai Elec. Co.*,
    No. cv-09-0174, 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010) ....................17, 30, 36

*Wilkie v. Gentiva Health Servs.*,
    2010 U.S. Dist. LEXIS 97212 (E.D. Cal. Sept. 16, 2010) ........................................5

*Z-Line Designs, Inc. v. Bell'O Int'l Ltd. Liab. Co.*,
    218 F.R.D. 663 (N.D. Cal. 2003)........................................................................5

*Zef Sci., Inc. v. Shimadzu Sci. Instruments, Inc.*,
    No. 14CV1758 JAH (RBB), 2016 U.S. Dist. LEXIS 44123 (S.D. Cal. Mar.
    31, 2016) ........................................................................................................40

**State Cases**

*Jones v. Cooper Indus.*,
    938 S.W.2d 118 (Tex. App. Houston 14th Dist. 1996) ........................................15

*Mercury Cas. Co. v. Maloney*,
    113 Cal. App. 4th 799 (2003) ....................................................................12

*Rembrandt Technologies., L.P. v. Harris Corporation.*,
    No. CIV.A. 07C-09-059JRS, 2008 WL 4824066 (Del. Super. Ct. Oct. 31,
    2008), *vacated on other grounds*, No. CIV.A. 07C-09-059JRS, 2009 WL
    2490873 (Del. Super. Ct. Aug. 14, 2009) ..................................................16

**Federal Statutes**

15 U.S.C. § 1 .................................................................................. *passim*

15 U.S.C. § 18 ................................................................................. *passim*

15 U.S.C. § 45 ............................................................................................43

**State Statutes**

Cal. Bus. & Prof. Code § 17200, *et seq.* .............................2, 9, 42, 43, 44

**Rules**

Federal Rules of Civil Procedure Rule 12(b)(6) ................................. *passim*

**Other Authorities**

9-47 Corbin on Contracts § 47.6 (2017) ...................................................13

DOJ & FTC, Horizontal Merger Guidelines (Aug. 19, 2010) ....................30

DOJ, *Statement of the Department of Justice's Antitrust Division on Its Decision
    to Close Its Investigation of Google's Acquisition of Motorola Mobility
    Holdings Inc. and the Acquisitions of Certain Patents by Apple Inc., Microsoft
    Corp. and Research in Motion Ltd.* (Feb. 13, 2012)..................................33

Fiona M. Scott Morton & Carl Shapiro, *Strategic Patent Acquisitions,* 79
    Antitrust L.J. (2014)..................................................................................33

Michael A. Carrier, *Patent Assertion Entities: Six Actions Antitrust Agencies Can
    Take,* CPI Antitrust Chronicle (Jan. 2013)...............................................33

*In re Motorola Mobility LLC and Google Inc.*,
    File No. 121-0120, Analysis of Proposed Consent Order to Aid Public
    Comment (Jan. 3, 2013)............................................................................23

National Research Council of the National Academies, *Transfers of Patents with Licensing Commitments*, in *Patent Challenges for Standard-Setting in the Global Economy* (eds. Keith Maskus & Stephen A. Merrill, 2013) .......................................15

13 Williston on Contracts § 37:1 (4th ed.) ................................................................14

## I.    INTRODUCTION

In its Second Amended Complaint (SAC), Apple Inc. (Apple) has detailed a continuing anticompetitive scheme by which Acacia,[1] a patent assertion entity (PAE), and its shell subsidiaries have conspired with VoiceAge Corporation (VoiceAge) (collectively with Acacia, the Defendants) to acquire hundreds of patents that VoiceAge had declared essential to standard setting organizations (SSOs) and committed to license on fair, reasonable, and non-discriminatory (FRAND) principles.  Through their collusion, Defendants avoided constraints on exercising market power that VoiceAge faced—with Acacia agreeing to share with VoiceAge the inflated royalties it extracts from abusive patent assertions against Apple and other cell phone suppliers.  Indeed, immediately on acquiring the former VoiceAge patents and their associated FRAND obligations, Acacia began demanding from Apple and other product suppliers exorbitant, non-FRAND royalties—multiple times higher than the FRAND royalties VoiceAge had obtained before the collusion began—and engaging in other abusive conduct.

Seeking to avoid accountability for its misconduct, Acacia asserts that Apple is engaging in "a classic 'patent hold-out' scenario," supposedly to "starve[]" Acacia of royalties and force it to "accept an unreasonably small royalty rate."[2]  Apple always has been willing to—and does—pay fair compensation to license patented technologies Apple actually uses.  Moreover, despite Acacia's claim that abuses regarding FRAND-committed patents are immune from antitrust scrutiny (*id.*), courts have repeatedly applied the antitrust laws to address abuses involving standard-essential patents (SEPs) and other forms of intellectual property.

To seek dismissal of Apple's SAC, Acacia argues that this Court should decline jurisdiction based on a previously-filed case that bears little resemblance to and could never

---

[1] Acacia Research Corporation, Saint Lawrence Communications LLC (SLC), and Saint Lawrence Communications GmbH (SLC GmbH) (collectively, Acacia).

[2] *See* Acacia's Motion to Dismiss Plaintiff's Second Amended Complaint; Memorandum of Points and Authorities in Support Thereof (Acacia Mem.) at 2.

resolve this one, ignores facts alleged in the SAC, asks the Court to draw inferences in its favor (the opposite of the standard of review on a motion to dismiss), and insists that Apple plead unnecessary detail regarding facts that are in *Acacia's own control*. The Court should not permit Acacia to escape responsibility for its continuing anticompetitive scheme and should deny the motion.

## II.    NATURE OF PROCEEDING AND STATEMENT OF ISSUES TO BE DECIDED

Apple filed its original Complaint on December 20, 2016. On December 21, 2016, Apple filed an Amended Complaint against Nokia, Acacia, Conversant, and their subsidiaries. On October 11, 2017, Apple filed its SAC against Acacia and VoiceAge, asserting breach of contract, unlawful agreements to restrain trade under Section 1 of the Sherman Act, unlawful asset acquisitions under Section 7 of the Clayton Act, and violation of the California Unfair Competition Law.

On November 8, 2017, Acacia moved to dismiss all claims in Apple's SAC. The issue before the Court is whether Apple's SAC should be dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

VoiceAge's deadline to answer, move, or otherwise respond to the SAC is December 7, 2017. (Dkt. No. 127.)

## III.    STATEMENT OF FACTS

### A.    VoiceAge Is an Operating Technology Company That Promised to License Its Declared SEPs on FRAND Terms

VoiceAge is a company "engaged in the development, integration, and marketing of digital speech and audio compression solutions and services." SAC ¶ 6. VoiceAge was involved in the European Telecommunications Standards Institute (ETSI) and the Third Generation Partnership Project (3GPP) SSOs, particularly in developing a voice coding and decoding codec known as AMR-WB. AMR-WB is part of the cellular standards adopted by 3GPP/ETSI.

1    *Id.* ¶ 11.  As a member of ETSI, VoiceAge is (and was at all relevant times) contractually bound

2    to abide by ETSI's IPR Policy (including during its participation in 3GPP).  VoiceAge submitted

3    multiple declarations to ETSI identifying patents and patent applications that it claimed were

4    essential to the various standards adopted by ETSI and 3GPP.  VoiceAge's declarations

5    committed to licensing those patents on FRAND terms.  *Id.* ¶ 20.

6    **B.    VoiceAge Demonstrated Its Ability to Obtain FRAND Royalties by Itself**

7    Before transferring declared SEPs to Acacia, VoiceAge had licensed the patents through

8    the W-CDMA patent pool formerly administered by Sipro Lab Telecom, as did many other

9    sophisticated declared SEP holders.  *Id.* ¶ 24.  One of the goals of the Sipro patent pool was to

10   ensure "access to worldwide patents that are essential to W-CDMA FDD 3GPP Standard under

11   fair, reasonable and non-discriminatory [FRAND] terms and conditions."  *Id.*  Through the pool,

12   Apple paid a royalty for a license to VoiceAge patents until December 2015.  In addition, before

13   the transfers, Apple entered into multiple bilateral licensing agreements with VoiceAge.  *Id.*

14   Thus, VoiceAge was demonstrably capable of obtaining FRAND royalties for its declared SEPs.

15   *Id.*

16   **C.    Acacia and Other PAEs Are Uniquely Situated to Anticompetitively Exploit
        Product Suppliers**

17

18   PAEs, such as Acacia, make nothing and generate revenues solely from asserting patents.

19   *Id.* ¶¶ 2, 5.  Acacia is an ideal co-conspirator for VoiceAge because it faces no risks to its

20   reputation or ongoing business relationships by adopting aggressive licensing and litigation

21   practices.  *Id.* ¶ 30.  Indeed, Acacia has cultivated a reputation for ruthless patent assertion tactics

22   precisely to attract operating companies like VoiceAge to partner with it to tax product

23   innovators based on weak patents.  *Id.*  And because Acacia had no role in developing the

24   claimed inventions in the former VoiceAge patents, its litigation discovery exposure and costs

25   are a fraction of those VoiceAge would have faced had it asserted the patents itself.  *Id.* ¶¶ 29-32.

Moreover, because Acacia's litigation costs and risks are disproportionately lower than the costs and risks it imposes on the operating companies it sues, it can afford to bring serial suits based on weak or low-value patents and exploit risks of error and limitations in the judicial process in ways that operating companies cannot. *Id.*

### D.    VoiceAge and Acacia Conspired to Inflate Royalties and Evade FRAND

VoiceAge was fully able to license its declared SEPs itself and obtain FRAND royalties in an open and transparent way. *Id.* ¶ 24. Accordingly, VoiceAge's transfer of patents to Acacia did not unlock fair value or otherwise achieve efficiencies. *Id.* ¶¶ 2, 33, 37, 52. Instead, VoiceAge outsources licensing and enforcement of the transferred VoiceAge patents to Acacia for obvious anticompetitive reasons: unbounded by the market constraints facing VoiceAge, Acacia can obtain inflated royalties (i.e., higher prices) from product suppliers that VoiceAge could not obtain itself and share the spoils of that exploitation with VoiceAge through revenue-sharing agreements. *Id.* ¶¶ 25, 29, 34, 37, 56.

Defendants' scheme has achieved its intended results. Acacia has exploited the inefficiencies created by the patent transfers to demand (and often obtain) from product suppliers vastly inflated royalties, instead of the FRAND royalties VoiceAge charged before it diffused its patents—resulting in anticompetitive effects in both upstream technology markets and downstream consumer markets for cellular products. *Id.* ¶¶ 25-27, 34-41. Indeed, Acacia's sharing of the supracompetitive fruits of this FRAND evasion scheme with VoiceAge drives the very economics of the conspiracy. *Id.* ¶¶ 25, 34, 56.

## IV.    ARGUMENT

### A.    The Court Should Not Dismiss Based on the "First-to-File" Rule

The Court should reject Acacia's attempt (Acacia Mem. at 2-6) to avoid scrutiny of its misconduct regarding the 225 declared SEPs it acquired from VoiceAge based on the "first to file" rule. In effect, Acacia seeks to transform the *possibility* that a determination of certain

issues in SLC's pending patent infringement action in the Eastern District of Texas (the EDTX case)[3] could support issue preclusion arguments in this case into a dismissal under the first-to-file rule. Acacia—or Apple—will be free to make those arguments if and when they become ripe. But the first-to-file rule only applies "when cases involving the same parties and issues have been filed in two different districts." *Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997). Neither condition is satisfied here. Moreover, even if those conditions were met, the Court should "dispense with the rule for reasons of equity." *Z-Line Designs, Inc. v. Bell'O Int'l LLC*, 218 F.R.D. 663, 665 (N.D. Cal. 2003).

### 1.    This Case Includes Parties Distinct from Those in the EDTX Case

The first-to-file rule applies only when the parties in both cases are substantially similar. *See Wilkie v. Gentiva Health Servs.*, No. 10-cv-1451, 2010 U.S. Dist. LEXIS 97212, at *8 (E.D. Cal. Sept. 16, 2010). That is plainly not the case here: VoiceAge, Acacia Research Corporation, and SLC GmbH are not parties to the EDTX case, yet are key defendants in this action. As discussed in more detail below, those parties are in this case—but not the EDTX case—because this case is focused on conspiratorial conduct that also involves SLC, which is not at issue in EDTX. "Cases where courts hold that two parties are 'substantially similar' under the first-to-file rule tend to involve overlapping plaintiff classes or corporate subsidiaries." *Oertell v. Six Flags Entm't Corp.*, No. 3:16-cv-4002 CRB, 2017 U.S. Dist. LEXIS 17385, at *6 n.3 (N.D. Cal. Feb. 7, 2017).[4] VoiceAge is neither. Moreover, VoiceAge is an essential, non-overlapping party

---

[3] *See Saint Lawrence LLC v. Apple Inc.*, No. 2:16-cv-082 (E.D. Tex. Jan. 27, 2016). There is no dispute that the EDTX case was filed before this one.

[4] The authority cited by Acacia for the proposition that cases with different parties may still be "substantially similar" is inapposite. In *Intersearch, Alltrade*, and *Kohn Law*, each of those cases, the second-filed case included fewer parties than the first, and all parties included in the second case were also parties to the first. *See Intersearch Worldwide, Ltd. v. Intersearch Group, Inc.*, 544 F. Supp. 2d 949, 958 (N.D. Cal. 2008); *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 624-625 (9th Cir. 1991); *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1240-41 (9th Cir. 2015). In *Microchip Tech*, there were two parties to the second-filed case that were not parties to the first-file case; as the court observed, one of those parties was a wholly-owned subsidiary of a party to the first-filed case and "presumably m[ight] be added to that case"

1    to this action.  Contrary to Acacia's suggestion (Acacia Mem. at 5)—for which it cites no

2    authority—that Apple obtained certain discovery from VoiceAge in the EDTX case does not

3    negate that undisputable fact.

4         Contrary to Acacia's contention (Acacia Mem. at 4), Apple pleads that SLC GmbH and

5    Acacia Research Corporation play roles that are plainly distinct from SLC in the wrongdoing

6    alleged here.[5]  Apple alleges that Acacia Research Corporation—a self-described "intermediary

7    in the patent marketplace"—itself participated in the illegal conspiracy by which patents were

8    transferred from VoiceAge to Acacia and then asserted against product suppliers to "generate

9    revenues and related cash flows from the granting of intellectual property rights" on non-

10   FRAND terms.  SAC ¶¶ 1, 5, 26.  Moreover, it is irrelevant that SLC GmbH is alleged to have

11   brought litigation only in Germany based on German patents.  Apple has alleged that those

12   litigations were part of a broad anticompetitive scheme to extract exorbitant, non-FRAND

13   royalties that (i) caused anticompetitive effects in *worldwide* SEP Technology Markets (and end

14   cellular device markets in which U.S. consumers participate), and (ii) breached FRAND

15   obligations covering *non-U.S.* declared SEPs that Apple is entitled to enforce through its contract

16   action.  SAC ¶¶ 26-27, 35, 38-40, 42-48.

17

18

19   and the other was the subject of pending motions by the plaintiff in the second-filed case to be
     added to the first-filed case as a necessary and indispensable party.  *See Microchip Tech., Inc. v.*
     *United Module Corp.*, 2011 U.S. Dist. LEXIS 73276, at *12-13 (N.D. Cal. July 7, 2011).  This
20   case, by contrast, includes multiple defendants that are not named in and have no prospect of
     being added to the EDTX case, all of which played central roles in the misconduct alleged here.
21   [5] Acacia wrongly argues that Acacia Research Corporation was misjoined.  (Acacia Mem. at 4
     n.8.)  Apple need not allege in detail the precise role that Acacia Research Corporation played in
22   the conspiracy relative to other members of its corporate family.  *See, e.g.*, *In re Lithium Ion*
     *Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 U.S. Dist. LEXIS 141358, at *164-65
23   (N.D. Cal. Oct. 2, 2014) ("Where an antitrust complaint names multiple members of a corporate
     'family,' adequately pleading a conspiracy claim against a particular corporate defendant does
24   not require detailed defendant by defendant allegations, only enough to draw a plausible
     conclusion that the individual defendant joined the conspiracy and played some role in it.")
25   (internal quotation marks omitted).

### 2.    This Case Involves Issues Dissimilar from Those in the EDTX Case

The issues to be determined in the instant action are very different from those that will be resolved in the EDTX case.  In that case, SLC alleges that Apple has infringed five former VoiceAge patents, EDTX Dkt. No. 1 ¶¶ 22-66; Apple has counterclaimed that SLC breached its FRAND obligations as to those patents.  EDTX Dkt. No. 92, Apple's Counterclaims for Declaratory Relief ¶¶ 75-81.  Here, Apple alleges that VoiceAge—a non-party to the EDTX case—conspired with Acacia to transfer a portfolio of over 225 patents to Acacia to extract exorbitant, non-FRAND royalties from product suppliers; this conduct violated antitrust and unfair competition laws and breached VoiceAge's and Acacia's respective FRAND obligations. SAC ¶¶ 25, 31, 34, 38-39, 51-53.  The propriety of the patent transfers from Acacia to VoiceAge is not at issue in the EDTX case.  This action and the EDTX case are entirely "capable of independent development" and thus do not involve the same issues.  *Nat'l Union Fire Ins. Co. v. Payless Shoesource, Inc.*, No. C-11-1892 EMC, 2012 U.S. Dist. LEXIS 112346, at *10 (N.D. Cal. Aug. 9, 2012).  That is, there are many central issues for litigation here that are unrelated to the breach of contract counterclaim or any other issue in the EDTX case.  *Id.*

Acacia wrongly contends that for all of Apple's claims here, as well as its contract counterclaim in EDTX, "the fundamental issue is identical:  whether Acacia violated contractual FRAND obligations."  (Acacia Mem. at 5.)  To the contrary, each of Apple's claims here implicates essential issues entirely distinct from those to be resolved in EDTX.

*First*, Acacia's violations of Section 7 of the Clayton Act occurred when it consummated its acquisitions of the VoiceAge patents, with the effect of substantially lessening competition. *See United States v. E.I. duPONT de Nemours & Co.*, 353 U.S. 586, 597 (1957) (Congress's intention when enacting Section 7 "was primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil, which may be at or any time after the acquisition, depending upon the circumstances of the particular case.").

Acacia's subsequent breach of its FRAND commitments is direct evidence that the transfers

have in fact injured competition, but not the source of the Section 7 violation itself.  SAC ¶ 36;

*see*, *e.g.*, *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 504 (1974) (issue in Section 7

case is whether transaction may substantially lessen competition going forward, not whether

anticompetitive effects have occurred already); *Ash Grove Cement Co. v. FTC*, 577 F.2d 1368,

1379 (9th Cir. 1978) (although evidence of actual anticompetitive effects post-transaction is

probative, the "essential question remains whether the probability of such future

[anticompetitive] impact exists at the time of trial").  Accordingly, even if the EDTX case

resulted in a determination that Acacia did not breach its FRAND commitments as to the patents

asserted there (or as to the entire former VoiceAge portfolio), that would not dispose of the

Section 7 claim here.  Moreover, Apple has alleged that one of the demonstrated anticompetitive

effects from the illegal patent transfers is SLC GmbH's seeking of injunctions based on FRAND-

encumbered former VoiceAge patents.  SAC ¶¶ 26-27.  That conduct is not remotely at issue in

the EDTX case.

Further, it remains to be determined exactly what issues might be resolved in the EDTX

case that could have implications here.  Indeed, the Acacia entities cannot even agree among

themselves about what is at issue in EDTX.  Here, Acacia argues that the issues in this and the

EDTX case are similar because the EDTX case will broadly resolve whether Acacia breached

FRAND commitments as to the former VoiceAge patents.  But in the EDTX case, SLC  contends

that Apple is limited to seeking to prove a much narrower point:  that SLC breached FRAND

commitments by refusing to make a FRAND offer for a license limited to only the five patents in

suit there.[6]  Apple disagrees, and contends that SLC also failed to make a FRAND offer by other

---

[6] *See* St. Lawrence Communications LLC's Reply in Support of Its Motion to Strike Breach of
Contract Claims Not Pled By Apple, EDTX Dkt. No. 269 at 1 (see Exhibit A).  Public versions
of SLC's motion to strike and Apple's opposition to that motion are not available.

means, including non-FRAND demands for SLC's entire portfolio of former VoiceAge patents.[7] But if the EDTX court accepts SLC's argument, it is unclear what, if any, implications a determination in the EDTX could have for any relevant issue here.

*Second*, the Section 1 violation that Apple alleges is grounded in Acacia's and VoiceAge's conspiracy to evade FRAND commitments and extract exorbitant royalties, itself, not principally the anticompetitive effects resulting from the agreement. *See, e.g., Am. Ad Mgmt. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996) ("a cause of action under [Section 1] consists of . . . (1) *an agreement, conspiracy, or combination between two or more entities*; (2) an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." (emphasis added)).  A determination in the EDTX case that SLC breached FRAND commitments would be direct evidence that the conspiracy has resulted in demonstrable anticompetitive effects; however, a determination in EDTX that no FRAND breach has occurred would not dispose of the Section 1 claim here.

*Third*, Apple's UCL claim is distinct from the EDTX case because it rests on violations of the Sherman and Clayton Acts, or Section 5 of the Federal Trade Commission Act, or other unfair acts that violate the spirit or policy of the antitrust laws.  SAC ¶¶ 60-66.  For reasons similar to those discussed regarding Apple's Section 1 and Section 7 claims above, any determination in the EDTX case that Acacia did not breach its FRAND commitments will not be dispositive of the UCL claims.[8]

---

[7] *See* St. Lawrence Communications LLC's Reply in Support of Its Motion to Strike Breach of Contract Claims Not Pled By Apple, EDTX Dkt. No. 269 at 4.

[8] Acacia's citation to *Intersearch Worldwide* for the proposition that the UCL is particularly susceptible to the "first-to-file" doctrine is unavailing. (Acacia Mem. at 6.)  In those actions, Intersearch alleged a Lanham Act violation and unfair competition.  In the second case, Intersearch also alleged intentional interference with contract, and intentional interference with prospective economic advantage, and a UCL violation.  The court found that Intersearch's additional claims were *all* similar to those in the initial action.  *See Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*, 544 F. Supp. 2d 949, 960 (N.D. Cal. 2008).  Here, the EDTX case does not include any antitrust claims, and as explained above, Apple's antitrust claims are not similar to the claims at issue in EDTX.

*Fourth*, as to Apple's breach of contract claim here, as previously mentioned, the EDTX case could have no bearing on Apple's claim that SLC GmbH breached FRAND commitments by seeking injunctions in Germany based on FRAND-encumbered former VoiceAge patents. And the EDTX case could not resolve *any* aspect of whether *VoiceAge* breached FRAND commitments to Apple when it transferred patents to Acacia to evade VoiceAge's obligations.

### 3. Even if the "First to File" Doctrine Applied, the Court Should Retain Jurisdiction Based on Principles of Equity

Even if the issues and parties in this case were substantially similar to those in the EDTX case—and they are not—equity would dictate that the Court retain jurisdiction over this case. This litigation has been pending since December 20, 2016, and Apple has detailed from the outset that its claims included the former VoiceAge patents. Dkt. No. 12-4 ¶¶ 44, 75-77. Yet, Acacia has never previously argued to this Court that Apple's claims involving the former VoiceAge patents should be litigated in the EDTX case. The EDTX case is now close to trial, and there is no longer any opportunity for Apple to amend its counterclaims in that matter. *See* EDTX Dkt., 5/1/2017 Notice of Hearing (Pretrial Conference set for 1/16/2018).

Applying the "first to file" rule will also not conserve judicial resources. Given the close proximity of trial in the EDTX case, any overlapping litigation of (very limited) common issues in this case and in the EDTX case will be short-lived. Moreover, declining to apply the rule would not foreclose any efficiencies that might be possible based on issue preclusion that could arise from a determination in the EDTX case. At the conclusion of the EDTX case, both SLC and Apple will be free to assert any issue preclusion arguments they deem merited.

### B. Apple Has Adequately Alleged Its Breach of Contract Claim

Apple has alleged that VoiceAge committed to make its declared SEPs available on FRAND terms by entering into contracts with ETSI. SAC ¶¶ 42, 45. Those contracts were for the benefit of third parties that supply products that support ETSI/3GPP standards such as AMR-

WB, including Apple.  SAC ¶ 45.  Apple alleges that VoiceAge's FRAND commitments are

binding on all subsequent patent owners, and when Acacia acquired declared SEPs from

VoiceAge, "it entered into or was assigned the express or implied contractual commitments with

ETSI."  SAC ¶ 44.  "Acacia breached its FRAND obligations by demanding above-FRAND

royalties for the declared SEPs acquired from VoiceAge, and by seeking injunctions blocking

Apple's products based on such patents."  SAC ¶ 47.

Acacia argues that Apple has not properly pled its breach of contract claim against

Acacia.  (Acacia Mem. at 7-21.)  Apple's allegations are plainly sufficient.[9]

### 1.     Apple Has Adequately Alleged a FRAND Contract It Can Enforce Against Acacia

Acacia claims that Apple relies on an "incoherent theory of transferred contractual

obligation that either leaves Acacia with no contractual obligation at all, or leaves Apple without

the right to enforce the contractual obligation that Acacia has."  (Acacia Mem. at 7.)  In fact,

Apple has alleged Acacia FRAND obligations that Apple is entitled to enforce, both because

(1) Apple is an intended third-party beneficiary of contracts between VoiceAge and Acacia that

obligated Acacia to assume VoiceAge's commitments to license the VoiceAge patents on

FRAND terms, and (2) VoiceAge's FRAND commitments to ETSI run with the patents and bind

successors-in-interest, including Acacia.

As an initial matter, Acacia's professed confusion is perplexing given its *admission* that it

is bound by FRAND commitments regarding the declared SEPs that it acquired from

VoiceAge.[10]  *Id.* at 38 n.121 ("As Apple pleads, Acacia has acknowledged it has FRAND

---

[9] Acacia erroneously states that "Apple fails to identify the governing law for any contract(s) at issue."  (Acacia Mem. 6 n.16.)  Apple pleads that Clause 12 of the ETSI IPR Policy states that it shall be governed by the laws of France.  SAC ¶ 18.  Acacia nonetheless assesses Apple's claims under California law.  Acacia's arguments lack merit under both French and California law.
[10] Given Acacia's (erroneous) contention that FRAND obligations do not run with the transferred declared SEPs (Acacia Mem. at 11), Acacia's admission is tantamount to conceding that the terms of its contract with VoiceAge bind it to adhere to the FRAND commitments that VoiceAge made to ETSI.

commitments.)  SAC ¶ 21.  Acacia does not dispute its FRAND obligations to VoiceAge; it

disputes that Apple has pled breach of its obligation.").  Accordingly, Acacia's argument reduces

to a claim that Apple is not entitled to enforce the FRAND commitments that Acacia concedes

bind it.

> **a.    Apple Is a Third-Party Beneficiary of the Patent Transfer Agreement Between VoiceAge and Acacia**

Apple alleges that when "Acacia acquired these declared SEPs, it entered into or was

assigned the express or implied contractual commitments with ETSI."  SAC ¶ 44.  Acacia

misapprehends Apple's theory when it argues that insofar as the VoiceAge-Acacia patent

transfer contracts bound Acacia to license the transferred patents on FRAND terms, Apple is not

an intended third-party beneficiary because those contracts were intended to harm Apple.

(Acacia Mem. at 9-10.)  Apple alleges that Acacia's and VoiceAge's conspiracy—on the

whole—harmed Apple, but that does not negate Apple's status as a third-party beneficiary of a

provision in the patent transfer agreement that was intended to benefit Apple (though it was

breached).  At bottom, Acacia's position is untenable:  it cannot be that Acacia escapes the

consequences of its contract breach *because* it has schemed with VoiceAge to violate its

(conceded) obligations to license on FRAND terms.[11]

---

[11] None of the cases on which Acacia relies addresses anything analogous to a FRAND contract, and none supports Acacia's erroneous argument that Apple cannot be an intended third-party beneficiary because the defendants' overarching purpose was to harm it.  *See Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1290 (9th Cir. 2017), *cert. denied*, No. 17-1, 2017 WL 2870039 (U.S. Oct. 2, 2017) (arbitration provision in customer's service agreement with cellular *network provider* did not encompass dispute with cellular *handset supplier*); *Mercury Cas. Co. v. Maloney*, 113 Cal. App. 4th 799, 803, (2003) (third-party beneficiary cannot obtain benefits while refusing to meet obligations under subject insurance contract); *S.E.C. v. Prudential Sec. Inc.*, 136 F.3d 153, 159 (D.C. Cir. 1998) (consent decree expressly disclaimed third parties would have enforcement rights); *Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F. Supp. 208, 214 (E.D.N.Y. 1994) (no discussion of third-party beneficiary issues in copyright infringement case).  Acacia's reliance on *Stevens v. United States*, 367 F. App'x 158 (Fed. Cir. 2010), is also misplaced.  There, a pro se plaintiff, Stevens, accused the government of conspiring to implant him with an electronic chip.  *Id.* at 159.  Stevens alleged that he was a third-party beneficiary of a contract between the government and the people allegedly

Apple is plainly a third-party beneficiary of the FRAND commitments Acacia acquired from VoiceAge. The Ninth Circuit has explained that the third party "must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027, 1033 (9th Cir. 2012) (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999)). The intended beneficiary "need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract." *Klamath,* 204 F.3d at 1211.

Apple falls squarely within the class of potential standards implementers that are intended beneficiaries of Acacia's agreement to assume FRAND commitments. *See* 9-47 *Corbin on Contracts* § 47.6, at 142 (2017) ("If the assignee contracts with his assignor to discharge the duties of the assignor to the third party, the third party is an intended beneficiary of that contract.") Courts have routinely found that potential implementers of standards are third-party beneficiaries of FRAND commitments regarding patents purportedly covering technology incorporated into that standard. *See, e.g.*, *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012) (finding that Apple, as a "potential user of the standards at issue and a prospective licensee of essential patents," is a third-party beneficiary to FRAND commitment); *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1033 (W.D. Wash. 2012) (finding that FRAND commitments "are clearly designed to benefit potential licensees of Motorola's standard essential patent by ensuring that such patents are readily accessible to everybody at reasonable rates"). Moreover, courts regularly find that potential standard implementers are third-party beneficiaries of FRAND undertakings when breach of FRAND claims are pled *alongside* antitrust or unfair competition claims alleging that the subject FRAND

---

monitoring him. The Federal Circuit found that Stevens could not be a third-party beneficiary to the supposed contract "because there is no evidence that a contract even exists." *Id.* at 160.

undertaking was false when made.[12]  If Acacia were right, those courts would have been

compelled to find that the plaintiff could not be a third-party beneficiary because—like here—

the patentholder allegedly intended to breach its FRAND commitment when making it.  Finally,

Acacia's commitments to license on FRAND terms—which it acknowledges—would have little

or no force if suppliers of products that support the relevant standard were not intended third-

party beneficiaries.[13]

Indeed, Apple is unaware of *any* authority holding that a standards implementer that is a

member of the relevant SSO (like Apple is a member of ETSI) cannot enforce FRAND

commitments made to that SSO.

Acacia also argues that if VoiceAge failed to bind Acacia to license on FRAND terms,

then there is no contract for Apple to enforce.  (Acacia Mem. at 8.)  But Apple nowhere alleges

that VoiceAge failed to formally bind Acacia to assume VoiceAge's FRAND commitments;

rather, it pleads that Acacia and VoiceAge shared an understanding that Acacia would breach

those obligations post-transfer.  SAC ¶¶ 34, 44, 46.  In any event, Acacia's argument is squarely

---

[12] *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 WL 1672493, at *4, 7, 12 (N.D. Cal. May 14, 2012) (denying motion to dismiss breach of FRAND and Section 2 antitrust claims alleging that patent holder made intentionally false FRAND commitments); *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178-BBC, 2011 WL 7324582, at *12 (W.D. Wis. June 7, 2011) (same); *Research In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 796–97 (N.D. Tex. 2008) (same).

[13] Acacia argues that Apple cannot be a third-party beneficiary of provisions in Voice Age-Acacia patent transfer agreements requiring Acacia to abide by FRAND commitments because, accepting Apple's allegations as true, the parties to those agreements never intended that *VoiceAge* could enforce those provisions.  (Acacia Mem. at 10.)  But that the parties conspired to evade FRAND obligations does not suggest that they did not intend that VoiceAge could enforce Acacia's promises.  Those promises obviously had independent value to VoiceAge or it would not have bargained for them.  Moreover, VoiceAge and Acacia need not have had overriding benevolent motivations to have intended for standard implementers like Apple to be able to enforce Acacia's FRAND commitments.  *See, e.g.*, 13 *Williston on Contracts* § 37:1, at 17-18 (4th ed.) ("This [third-party beneficiary] designation is often made with little regard to whether the contracting parties' purpose in entering the contract was to benefit themselves or the third party in whose favor performance was to be rendered.").

1   contravened by its own admission that it "has acknowledged it has FRAND commitments" and

2   "does not dispute its FRAND obligations to VoiceAge." (Acacia Mem. at 38 n.121.)

3                  **b.      VoiceAge's FRAND Commitments Bind Successors-In-Interest**

4           Even if Acacia's patent transfer agreements had not explicitly provided that Acacia

5   would assume VoiceAge's FRAND obligations or Apple were not a third-party beneficiary of

6   that provision—or indeed, even if Acacia and VoiceAge *intended* that the obligations not pass to

7   Acacia—Acacia would still owe a duty to Apple to abide by those commitments. As Apple has

8   alleged, ETSI's IPR policy provides that FRAND undertakings are binding on successors-in-

9   interest, *regardless* of whether transfer documents expressly include such a provision. SAC ¶ 22

10  (quoting ETSI IPR Policy, clause 6.1bis) (emphasis added).

11          Acacia's summary assertion that "FRAND commitments do not run with a patent" is

12  wrong as a matter of law.[14] (Acacia Mem. at 11.) Courts have held that a potential licensee can

13  assert a contract claim based on a FRAND commitment made by the patent holder's predecessor

14  in interest. For example, in *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903

15  (N.D. Ill. 2013), Innovatio acquired patents that previous owners had committed to an SSO to

16  license on FRAND terms. *Id.* at 922-23. After observing that the patent holder did not contest

17  the issue, the court held that those commitments were binding on Innovatio and could be

18  enforced by implementers of the relevant standard. *Id.* at 923; *see also In re Innovatio IP*

19  *Ventures, LLC Patent Litig.*, 956 F. Supp. 2d 925, 933 (N.D. Ill. 2013) (observing that the court

20

21  ────────────────
    [14] *Jones v. Cooper Indus.*, 938 S.W.2d 118 (Tex. App. 1996), on which Acacia relies (Acacia

22  Mem. at 11 n.27), does not address whether FRAND commitments bind successors in interest.
    Rather, it considers whether an obligation to pay royalties to the original owner for the life of the

23  patents transfers to future patent owners. Moreover, the National Research Council chapter that
    Acacia cites actually advocates for the position that is opposite from the one Acacia advances. It

24  states that the "FRAND commitment should travel with the patent when it is transferred" and
    highlights the importance of "ensur[ing] that the [FRAND] commitment automatically runs with

25  the patents." National Research Council of the National Academies, *Transfers of Patents with
    Licensing Commitments*, in *Patent Challenges for Standard-Setting in the Global Economy*, 93-
    94 (eds. Keith Maskus & Stephen A. Merrill, 2013).

1    had previously held that prior owners' FRAND were binding on Innovatio); *see also Rembrandt*

2    *Techs., L.P. v. Harris Corp.*, No. 07C-09-059JRS, 2008 WL 4824066, at *1 (Del. Super. Ct. Oct.

3    31, 2008) (observing that the patent holder had ceased contesting the issue and holding that

4    predecessor's FRAND commitment ran with the patent and bound successor-in-interest), *vacated*

5    *on other grounds*, No. 07C-09-059JRS, 2009 WL 2490873 (Del. Super. Ct. Aug. 14, 2009); *see*

6    *also In re Negotiated Data Solutions LLC*, File No. 051-0094, FTC Decision and Order, 4 (Sept.

7    22, 2008) (finding that, by acquiring patents, N-Data assumed predecessors' promises to SSOs

8    regarding terms on which patents would be licensed if proposed standard were adopted).  This

9    authority is consistent with the black-letter patent principle that patent purchasers take the

10   patents subject to existing legal and equitable encumbrances on substantive patent rights.  *See,*

11   *e.g.*, *Innovus Prime, LLC v. Panasonic Corp.*, No. C-12-00660-RMW, 2013 WL 3354390, at *5

12   (N.D. Cal. July 2, 2013) ("[I]t is a longstanding principle that an assignee of a patent takes the

13   patent subject to prior licenses."); *Paice, LLC v. Hyundai Motor Co.*, No. WDQ-12-499, 2014

14   WL 3533667, at *9 (D. Md. July 11, 2014) ("[A] patent owner cannot transfer an interest greater

15   than that which it possesses, and assignees take patent rights subject to legal encumbrances

16   thereon.").

17        Acacia relies on *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368 (Fed. Cir.

18   2008), and *Paice LLC v. Hyundai Motor Co.*, No. WDQ-12-0499, 2014 WL5581045 (D. Md.

19   Oct. 29, 2014).  (Acacia Mem. at 11, 11 n.28.)  But those cases hold only that procedural terms

20   of a license, such as a duty to arbitrate or a confidentiality provision, do not transfer with the

21   underlying patent.  A FRAND commitment, however, is not a procedural term of a license.  It is

22   a *substantive* commitment to grant licenses on FRAND terms to all parties seeking them.  The

23   court in *Barnes & Noble, Inc. v. LSI Corp.*, 849 F. Supp. 2d 925 (N.D. Cal. 2012), made clear in

24   the context of a FRAND commitment that "any of 'the patentee's previous acts' that have 'legal

25   consequences' flow to the new assignee of a patent."  *Id.* at 932 (*quoting In re Novon Int'l, Inc.*,

No. 98-cv-0677E, 2000 WL 432848, at *5 (W.D.N.Y. Mar. 31, 2000)); *see also In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1052 (9th Cir. 2001) ("'It had long passed into the text-books that . . . an assignee acquired title subject to prior licenses of which the assignee must inform himself as best he can, and at his own risk.'" (quoting *Keystone Type Foundry v. Fastpress Co.*, 272 F. 242, 245 (2d Cir. 1921))).  "Indeed, a contrary holding would result in a perverse policy outcome – a culpable patentee would effectively immunize itself by selling the patent to an assignee free of any encumbrance which would otherwise attach – and obtain full value therefor." *Barnes & Noble, Inx. v. LSI Corp.*, 849 F. Supp. 2d 925, 933 (N.D. Cal. 2012). [15]

## 2.    Apple Has Pled Its Breach of Contract Claim with Sufficient Specificity

Next, Acacia argues that Apple fails to plead sufficient detail to put Acacia on notice of the alleged FRAND breaches at issue and "fails to specify a single patent in its breach of contract claim." (Acacia Mem. at 12-13.)  Acacia simply ignores that Apple has individually identified 225 patents that Acacia acquired from VoiceAge and as to which Acacia breached FRAND commitments.  SAC, Ex. A.

Acacia also contends that Apple has not alleged sufficient information regarding the contracts by which VoiceAge transferred patents to Acacia or the relevant VoiceAge FRAND declarations to ETSI to "put Acacia on notice of the alleged FRAND breaches at issue." (Acacia Mem. at 12-13.)  But Apple need not enumerate this information for Acacia to be on notice of the FRAND breaches at issue.  As Apple alleged in its SAC, Acacia publicly claims to own a portfolio of "standards essential voice coding patents that were developed by VoiceAge

---

[15] Acacia's reliance on *Vizio Inc. v. Funai Elec. Co.*, No. cv-09-0174, 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010*)*, is also misplaced. (Acacia Mem. at 11 n.29.)  The discussion in *Vizio* on which Acacia relies concerns a question entirely separate from whether a FRAND commitment travels with a patent.  As the court in *Barnes & Noble* explained, that discussion concerned whether an acquirer of a patent assumes "culpability and liability for an *anti-trust violation*" committed by a predecessor.  *Id.* at 930-31.

Corporation."  SAC ¶ 25 (citing Saint Lawrence Corporation's website).  Accordingly, Acacia is well aware of the FRAND undertakings that cover those patents and the contracts under which it acquired them.  It is wrongly demanding that Apple plead needless detail about facts within its own control.

### 3.  Apple Has Alleged That It Engaged in Good Faith Licensing Negotiations, and Such Allegations Are Not Required Anyway

Acacia argues that Apple does not "allege that it adhered to its own obligations under any relevant contract, including fulfilling its own obligation to engage in good faith negotiations for a FRAND license."  (Acacia Mem. at 13.)  However, Apple **does** allege facts showing it negotiated in good faith.[16]  SAC ¶ 26 (alleging Apple had told Acacia it was willing to license the patents at issue on FRAND terms, and specifying Apple licensing offers, which Acacia rejected).

In any event, courts have rejected arguments that FRAND obligations are only enforceable if potential licensees meet reciprocal "obligations."  In *Core Wireless Licensing S.a.r.l. v. Apple Inc.*, No. 6:12-cv-100-JRG, 2015 WL 4775973 (E.D. Tex. Aug. 11, 2015), the court rejected Core Wireless's theory that "the licensing obligation for ETSI members cuts both ways" and that as a potential licensee, Apple was obligated to "negotiate a FRAND royalty in good faith."  *Id*. at *2, 4.  The court found that no such obligation exists.  *See id.*

In *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901 (N.D. Ill. 2012), *aff'd in part, rev'd in part and remanded on other grounds*, 757 F.3d 1286 (Fed. Cir. 2014), the court refused to find that a declared SEP holder could be excused from its FRAND obligations under the ETSI IPR Policy because the plaintiff potential licensee purportedly refused to negotiate after rejecting an initial offer: "[The defendant] agreed to license its standards-essential patents on FRAND terms as a *quid pro quo* for their being declared essential to the standard. . . . It does not claim to have

---

[16] Acacia also erroneously argues that "Apple even admits that it rejected Acacia's offer without countering."  (Acacia Mem. at 13.)  Apple makes no such admission.  Apple's SAC identifies the offer it made to Acacia, which Acacia rejected.  SAC ¶ 26.

conditioned agreement on prospective licensees' making counteroffers in license negotiations." *Apple Inc.*, 869 F. Supp. 2d, at 914; *see also Realtek Semiconductor Corp. v. LSI Corp.*, 2012 WL 4845628, at *3 (N.D. Cal. 2012) (finding that case law suggests that FRAND obligations do not turn on whether licensee engaged in active negotiations over a license).[17]

### 4.    Acacia is Obligated to Make FRAND Licensing Offers for Its Declared SEPs

Next, Acacia argues that Apple must plead that the patents are *actually* essential to state a breach of FRAND claim.  (Acacia Mem. at 14-17.)  This contention is wrong as a matter of law, and, if adopted, would undermine the very purpose of FRAND commitments.

A potential licensee need not plead that declared SEPs are actually essential to state a claim for breach of FRAND.   In *TCL Commc'ns Tech. Holdings Ltd v. Telefonaktenbologet LM Ericsson*, No. SACV-14-00341-JVSA, 2014 WL 12588293 (C.D. Cal. Sept. 30, 2014), the court rejected precisely the argument Acacia makes here.  *Id.* at *4; *see also* Acacia Mem. at 17.  The court found it sufficient that the patent holder had "represented that its patents are standard essential to ETSI and as such has obligated itself to offering FRAND terms for such patents." *Id.*; *see also Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178-BBC, 2011 WL 7324582, at *9 (W.D. Wis. June 7, 2011) (rejecting argument that breach of FRAND commitment claim

---

[17] The cases on which Acacia relies are inapposite.  *Adobe Sys. v. A&S Elecs.*, 153 F. Supp. 3d 1136 (N.D. Cal. 2015), says nothing about FRAND obligations or even patents.  *Ericsson Inc. v. D-Link Sys. Inc.*, No. 6:10-cv-473, 2013 U.S. Dist. Lexis 110585, at *87-88 (E.D. Tex. Aug. 6, 2013), considered the licensee's negotiating conduct, among other factors, in determining that Ericsson's royalty demand was not unreasonable and was therefore not a breach of FRAND.  It does not stand for the proposition that a patent holder's FRAND obligations are *contingent* upon certain conduct by the potential licensee.

1   should be dismissed based on failure to allege actual essentiality);[18] *Apple Inc. v. Samsung Elecs.*

2   *Co.*, No. 11-CV-01846, 2012 WL 1672493, at *40-43 (N.D. Cal. May 14, 2012) (same).[19]

3        Here, Apple has alleged that Acacia has claimed the patents it acquired from VoiceAge

4   and demanded that Apple license are standard essential. SAC ¶¶ 25-26. That plainly is

5   sufficient to trigger Acacia's obligation to offer a FRAND license and support a breach of

6   FRAND claim based on Acacia's failure to do so.[20]

7        Finally, requiring that a potential licensee concede essentiality (or that essentiality be

8   otherwise determined) before a declared SEP holder has an obligation to offer a FRAND license

9   would undermine the purpose for SSOs requiring FRAND commitments in the first place.

10  FRAND commitments are designed to guard against the risk that patent holders will abuse the

11  fact that an SSO has standardized their patented technology to demand supracompetitive

---

[18] Acacia's attempt to distinguish *Apple Inc. v. Motorola Mobility* is meritless. In that case, Motorola advanced—and the court rejected—the same argument Acacia makes here: "Motorola must prove in the patent infringement case, or Apple must concede in this case, that Apple has infringed Motorola's patents before Apple is entitled to a license from Motorola." 2011 WL 7324582, at *5. That Motorola framed its argument as a ripeness issue rather than a pleading deficiency does not change the analysis. Under either scenario, a determination or agreement that purported essential patents actually are essential is not a prerequisite for a breach of FRAND claim.

[19] Acacia cites no cases that require pleading of actual essentiality to state a breach of FRAND claim. Rather, it relies on International Trade Commission administrative decisions, *In re Certain 3G Mobile Handsets*, Inv. No. 337-TA-613, 2015 WL 6561709 (ITC Apr. 27, 2015) and *In Re Certain Wireless Devices with 3G &/or 4G Capabilities & Components Thereof*, Inv. No. 337-TA-868, 2014 WL 2965327 (June 13, 2014), that considered the essentiality of asserted patents in assessing arguments that FRAND commitments should bear on whether to grant an order excluding allegedly infringing products from the U.S. market. Similarly, *Innovatio* evaluated whether certain patents were actually essential for purposes of determining *damages* based on the patent holder's failure to meet its FRAND commitment, *not* for purposes of determining whether the plaintiff had successfully plead a breach of FRAND claim. *Innovatio*, 956 F. Supp. 2d at 929-30. None of the literature on which Acacia relies takes a position regarding whether a plaintiff must allege actual essentiality to state a claim for breach of FRAND. (*See* Acacia Mem. at 15 n.39 and 16 nn. 40, 43.)

[20] Acacia complains that it is somehow unfair that it would be forced to offer a FRAND license for a patent that does not cover technology that has been incorporated in the standard and is thus not actually standard essential. (Acacia Mem. at 17.) But if Acacia believes that a patent that it has been holding out as standard essential does not actually have that status, it is free to stop asserting that the patent is essential and decline to license on FRAND terms.

royalties from standard implementers that have become locked into using the standardized technology. *See, e.g., Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 313 (3d Cir. 2007) ("To guard against anticompetitive patent hold-up, most SDOs require firms supplying essential technologies for inclusion in a prospective standard to commit to licensing their technologies on FRAND terms.").

As the court in *Apple v. Motorola* explained, "[t]he policies of the standards setting organizations become far less useful or effective if a company who has declared its patents as essential, thereby encouraging the organization to adopt the standard, can then refuse a fair, reasonable and non-discriminatory license until essentiality is proven, either through patent infringement litigation or otherwise." 2011 WL 7324582, at *6. If a declared SEP holder were not required to offer FRAND licenses until and unless its patents were found actually essential, it could use the threat of litigation—and the associated burdens, costs, and risks for the standard implementer—to extract non-FRAND royalties, thereby accomplishing precisely what the FRAND requirement was intended to avoid.[21]

### 5.    Apple Has Alleged Non-FRAND Conduct

Finally, Acacia claims that Apple has failed adequately to allege a breach of its FRAND commitments. (Acacia Mem. at 14-21.) Its arguments are meritless.

*First*, Acacia argues that Apple "fails to allege facts sufficient to infer that Acacia's license offers are non-FRAND" and that "Apple's bare assertion that Acacia charged more than Apple once paid is insufficient." (Acacia Mem. at 18.) In fact, Apple alleges details regarding

---

[21] Acacia's memorandum well demonstrates the sort of gamesmanship that the rule it advocates would encourage. Now that Apple has challenged Acacia's failure to abide by its FRAND obligations, Acacia is refusing to take a position on whether the former VoiceAge patents that it has demanded Apple license are actually standard essential (Acacia Mem. at 15 n.37 ("Acacia is not claiming here that any particular patent is (or is not) essential; it takes no position on that subject.")), notwithstanding that it has formerly taken a public position that they all are. The reason for Acacia's evasion is transparent; it hopes to avoid being held accountable for the FRAND obligations it has assumed.

1    the non-FRAND offer Acacia made and how it was dramatically higher than the FRAND rate

2    that VoiceAge had been offering before it entered into an anticompetitive patent transfer scheme

3    with Acacia.[22]  SAC ¶¶ 24, 26.  This is more than sufficient to state a claim for breach of

4    FRAND.  Acacia also argues that "Apple was an unwilling licensee engaged in patent hold-out,"

5    and that this somehow nullifies Acacia's obligation to abide by its FRAND commitments.

6    (Acacia Mem. at 18).  However, as discussed above, Apple has pled that it is willing to license

7    on FRAND terms; and regardless, Acacia's FRAND commitments are not contingent upon

8    Apple's conduct.[23]

9         Courts have repeatedly found allegations that a defendant refused to make an initial

10   license offer on FRAND terms to be sufficient to state a claim for breach of a FRAND

11   commitment.  For example, in *Realtek Semiconductor Corp*, the court found that under the

12   liberal pleading standards of a motion to dismiss, a complaint asserting that an initial offer was

13   not made on FRAND terms is sufficient to state a claim for breach of contract.  2012 WL

14   4845628 at *4.[24]  *See also Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 797

15

16   [22] Acacia's claim that Apple does not allege that the "prior price was a FRAND rate at all"
     (Acacia Mem. at 18) is unfounded.  Apple specifically alleges that VoiceAge previously licensed
17   patents through the Sipro pool, whose goal was to ensure access to its patents on FRAND
     conditions; that Apple paid a royalty for a license through the pool; and "[T]hus, VoiceAge was
     demonstrably capable of obtaining FRAND royalties for its declared SEPs."  SAC ¶ 24.
18   [23] Acacia wrongly claims that because Apple "admits that others paid the royalties demanded by
     Acacia" (Acacia Mem. at 18), Acacia is somehow immunized from being found to have made
19   unreasonable demands.  That others were coerced into accepting Acacia's demands is obviously
     not proof that the demands were reasonable.  Similarly, Apple's insistence on licensing on
20   FRAND terms, when others have not received such terms, does not mean it is demanding a
     discriminatory rate.
21   [24] On the question of whether an initial licensing offer must be on FRAND terms, the court in
     *RealTek* expressly distinguished *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023 (W.D.
22   Wash. 2012), an opinion from the same case on which Acacia relies. (Acacia Mem. at 18 n.47
     (citing *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013).))  The
23   court in *Realtek* observed that *Microsoft* found that "any offer by Motorola (be it an initial offer
     or an offer during a back-and-forth negotiation) must comport with the implied duty of good
24   faith and fair dealing inherent in every contract" and thus that it was possible "for an initial offer
     to be so blatantly unreasonable as to breach that duty of good faith."  *Realtek*, 2012 WL
25   4845628, at *4.  Defendants also rely on *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473,
     2013 WL 4046225 (E.D. Tex. Aug. 6, 2013), *aff'd in part, vacated in part, rev'd in part*, 773

1    (N.D. Tex. 2008) (refusing to dismiss breach of FRAND claim alleging the defendants

2    demanded non-FRAND licensing terms for purportedly essential patents); *Apple Inc. v. Motorola*

3    *Mobility, Inc.*, 886 F. Supp. 2d 1061, 1087 (W.D. Wis. 2012) (finding a factual question on the

4    issue of whether Motorola's initial license offer and negotiating posture were non-FRAND).[25]

5        Next, Acacia argues that "[m]erely seeking an [sic] SEP injunction does not constitute a

6    breach of any FRAND obligation under the ETSI IPR Policy." (Acacia Mem. at 20.)  Courts in

7    this District have held that seeking injunctions is inconsistent with the FRAND obligation.  In

8    *Realtek*, for example, the court held that "the act of seeking injunctive relief . . . is inherently

9    inconsistent and a breach of defendants' promise to license the patents on [F]RAND terms."

10   *Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1006 (N.D. Cal. 2013).

11   Similarly, in *Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846, 2012 WL 1672493 (N.D. Cal.

12   May 14, 2012), the court found that seeking an injunction based on FRAND-committed patents

13   could constitute a breach of FRAND commitments under the ETSI IPR Policy:  "Samsung

14   certainly had the right to refuse to license its patents, but arguably relinquished that right when it

15   submitted its FRAND declaration."  *Id.* at *12; *see also Microsoft Corp. v. Motorola, Inc.*, 696

16   F.3d 872, 885 (9th Cir. 2012) ("injunctive relief against infringement is arguably a remedy

17   inconsistent with the [FRAND] licensing commitment"); FTC, *In re Motorola Mobility LLC and*

18   *Google Inc.*, File No. 121-0120, Analysis of Proposed Consent Order to Aid Public Comment, at

---

19   F.3d 1201 (Fed. Cir. 2014), but that case stands only for the proposition that the mere fact that a
     potential licensee believes a license offer is not reasonable does not constitute a breach of
20   FRAND.  *Id.* at *25.  *Ericsson* does not opine on whether an exorbitant initial license offer—
     evidenced by an objective comparison to royalty rates demanded by the previous owner—can
21   constitute a FRAND breach.
     [25]  Acacia asserts that Apple must plead "allegations regarding what a FRAND rate would be or
22   how one is to be calculated" to state a claim for breach of FRAND.  (Acacia Mem. at 18.)  It
     cites no authority for that proposition.  In any event, Apple has alleged that Acacia's demand was
23   enormously inflated relative to pre-transfer FRAND terms obtained by VoiceAge for the exact
     same patents.  In *FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2017 WL 2774406, at *14
24   (N.D. Cal. June 26, 2017), no such comparison was available and the Federal Trade Commission
     relied on other facts to allege why the royalties at issue were non-FRAND.  Nothing in that
25   decision suggests that Apple's allegations are inadequate.

1   3 (Jan. 3, 2013) (finding that an entity breaches its ETSI FRAND commitments by "seeking, or

2   threatening, to enjoin certain competitors from marketing and selling products compliant with

3   the relevant standards. . . from the market unless the competitor paid higher royalty rates or made

4   other concessions").

5          Moreover, Apple's allegations go well beyond Acacia seeking an injunction in isolation.

6   Apple alleges that Acacia sought injunctions as part of a broader course of non-FRAND conduct,

7   which included demanding above-FRAND royalties. *See, e.g.*, SAC ¶ 47.  Acacia coercively

8   used litigation and the threat of injunctions to try to force Apple into taking licenses at exorbitant

9   rates. *See, e.g.*, SAC ¶ 26.  Such conduct plainly states a claim for breach of a FRAND promise.

10  In *Microsoft*, for example, the court held that factual allegations that Motorola breached its

11  FRAND commitment by "failing to offer licenses to Microsoft on [F]RAND terms and by

12  initiating patent actions seeking improperly to enjoin or exclude Microsoft from using the

13  technology" of the SEPs at issue were "sufficient to state a claim for breach of contract."

14  *Microsoft Corp. v. Motorola Inc.*, 2011 WL 11480223, at *3.

15         Finally, Acacia erroneously asserts Apple has pled that it broke off licensing negotiations,

16  which supposedly has implications for whether Acacia was entitled to an injunction under

17  *German* law.  (Acacia Mem. at 20-21; *see also id.* at 19 n.53.)  Apple has made no such

18  allegation.  Moreover, the right question is not whether Acacia could properly seek (or obtain) an

19  injunction under German law; rather, it is whether doing so violated Acacia's FRAND

20  obligations.  Indeed, the Ninth Circuit has made clear that seeking an injunction in Germany may

21  violate a FRAND commitment.  *Microsoft v. Motorola*, 696 F.3d 872, 884-85 (9th Cir. 2012)

22  (upholding antisuit injunction against enforcing German injunction based on German FRAND-

23  committed patents).  SAC ¶ 26.

24  **C.     Apple Adequately Alleges That Acacia Violated the Antitrust Laws**

25

1    Apple has adequately alleged that Acacia has violated Section 1 of the Sherman Act,

2    15 U.S.C. § 1, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

3    Acacia initially argues that Apple cannot allege antitrust violations associated with its

4    patent transfer scheme with VoiceAge because Acacia's "patent right[s] control[] and [the]

5    antitrust law[s] must give way." (Acacia Mem. at 21.) That is not remotely close to the law. As

6    the Supreme Court has recently re-affirmed, the patent laws do not confer any absolute antitrust

7    immunity from antitrust scrutiny. *See FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2230 (2013) (simply

8    because "anticompetitive effects fall within the scope of the exclusionary potential of the patent"

9    does not mean that agreements related to the patent are immune "from antitrust attack"). In

10   *United States v. Line Material Co.*, 333 U.S. 287, 310 (1948), the Supreme Court held "that the

11   'improper use of [a patent] monopoly' is 'invalid' under the antitrust laws." *Actavis*, 133 S. Ct.

12   at 2231 (quoting *Line Material*, 333 U.S. at 310). Here, Apple alleges that VoiceAge's and

13   Acacia's agreements to transfer patents with the purpose and effect of evading FRAND

14   obligations and increasing royalties to anticompetitive levels was an "improper use" of the

15   patents in violation of Section 1 of the Sherman Act and Section 7 of the Clayton Act. Acacia's

16   and VoiceAge's conduct is thus squarely within the reach of the antitrust laws, and Acacia's

17   suggestion otherwise is wrong.

### 1.    Apple Adequately Alleges Relevant Antitrust Markets

19   Contrary to Acacia's argument (Acacia Mem. at 22-25), Apple has easily alleged

20   cognizable antitrust markets. A relevant market "encompass[es] the product at issue as well as

21   all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038,

22   1045 (9th Cir. 2008). "There is no requirement that [relevant markets] be pled with specificity."

23   *Id.* And "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant

24   motions to dismiss for failure to plead a relevant product market." *E.I. du Pont de Nemours &*

25   *Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011); *see also Newcal*, 513 F.3d at 1045

1   ("[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal

2   element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by

3   summary judgment or trial."). "Questions pertaining to proper market definitions are best

4   answered after the benefit of discovery." *Cargill Inc. v. Budine*, No. 07-349, 2007 WL 2506451,

5   at *8 (E.D. Cal. Aug. 30, 2007). All that is required at the pleading stage are allegations

6   sufficient to put defendants on notice of the rough contours of the relevant markets and

7   plaintiff's claim.

8     Antitrust complaints may be dismissed for failure to allege a relevant market only if "it is

9   apparent from the face of the complaint that the alleged market suffers a fatal legal defect."

10  *Newcal*, 513 F.3d at 1045. Courts typically find a fatal legal defect only when plaintiffs allege

11  markets that are so narrow as to defy common sense. For example, in *Tanaka v. Univ. of S. Cal.*,

12  the plaintiff alleged that the relevant product market was the "UCLA women's soccer program."

13  252 F.3d 1059, 1063 (9th Cir. 2001). The Ninth Circuit found such a market "especially

14  unavailing insofar as the very existence of any given intercollegiate athletic program is

15  predicated upon the existence of a field of competition composed of other, similar programs."

16  *Id.* at 1063-64. In other words, the proposed market was fatally flawed on its face. *See Newcal*,

17  513 F.3d at 1045. In contrast, Apple's allegations concerning the relevant markets are logical

18  and grounded in accepted methods for market definition and the case law.

   **a. Apple Adequately Alleges a Geographic Market**

19

20    Acacia argues that Apple's alleged geographic market is deficient, yet fails to explain

21  why that is so under the relevant legal test. (Acacia Mem. at 24.) A relevant geographic market

22  is one "in which the seller operates, and to which the purchaser can practicably turn for

23  suppliers." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). Apple alleges

24  that "Acacia offers to license the patents in its SEP Technology Markets to companies located all

25  over the world, so the market is worldwide." SAC ¶ 34. Because, as described in more detail

below, Acacia is a monopolist in the SEP Technology Markets, Apple can only turn to Acacia

for supplies in the relevant market.  Therefore, Apple has pled "the market area in which the

seller operates, and to which [Apple] can practicably turn for supplies," which satisfies the

geographic market inquiry.[26]  *See Tampa Elec.*, 365 U.S. at 327.

### b.    Apple Adequately Alleges SEP Technology Product Markets

Acacia faults Apple for failing to identify substitutes in the SEP Technology Markets.

(Acacia Mem. at 24.)  The SAC makes clear, however, that there are *no* close substitutes for

VoiceAge's declared SEPs.  Specifically, Apple alleges that a "SEP Technology Market consists

of a technology covered by a patent acquired by Acacia from VoiceAge and any other

technologies that compete or formerly competed to perform the same function."  SAC ¶ 34.

Apple further alleges that in "SEP Technology Markets, when the relevant standard was

established, the particular technology covered by the SEP was selected over formerly competing

technologies that no longer compete (or do not compete closely) once the standard is set."

*Id.* ¶ 35.  As a result, Acacia has "monopoly power in the SEP Technology Markets."  *Id.*  Apple

does not identify available close substitute technologies because, to its knowledge, none exists.

Tellingly, Acacia does not contest Apple's fundamental approach to alleging relevant

SEP Technology Markets, nor could it.  Courts, including in this District, have repeatedly

---

[26] Acacia wrongly argues that it is implausible for "a German patent . . . to ha[ve] an anticompetitive effect in the U.S. market."  (Acacia Mem. at 24.)  As alleged in the SAC, Apple and Acacia have exchanged offers for a license to all the former VoiceAge patents in SLC's portfolio, which includes U.S. and non-U.S. patents.  SAC ¶¶ 25-26; Exhibit A.  This reflects the "commercial realities" that parties often seek to license in one agreement "patent families," i.e., patents from different jurisdictions covering the same underlying technologies.  *See High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (market definition must comport with "commercial realities").  Therefore, as alleged in the SAC, Acacia's pursuit of an injunction in Germany gives it improper leverage to obtain non-FRAND royalties for the entire SLC portfolio, including the U.S. patents in the portfolio.  *See* SAC ¶ 26.  As a result, Acacia's anticompetitive conduct regarding non-U.S. patents directly affects Apple's ability to obtain FRAND terms for the U.S. patents included in the portfolio.  *Cf. Microsoft v. Motorola*, 696 F.3d at 884-85 (upholding antisuit injunction against enforcing German injunction based on German FRAND-committed patents).

1    endorsed the approach Apple uses.  These markets encompass technologies competing "to

2    perform each of the various functions covered by each of [VoiceAge's] purported essential

3    patents" before the standard was adopted.  *Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846,

4    2012 WL 1672493, at *5 (N.D. Cal. May 14, 2012) (accepting allegations of markets defined as

5    "the various markets for technologies that—before the standard was implemented—were

6    competing to perform each of the various functions covered by each of Samsung's purported

7    essential patents"); *Apple Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2011 WL 7324582, at

8    *13 (W.D. Wis. June 7, 2011) ("The relevant markets include the various technologies

9    competing to perform the functions covered by Motorola's declared-essential patents for each of

10   the relevant standards.").  Once the standard has been adopted, "the relevant market may be

11   defined as 'congruent with the scope of' the defendant's patents."  *Funai Elec. Co. v. LSI Corp.*,

12   No. 16-cv-01210, 2017 WL 1133513, at *7 (N.D. Cal. Mar. 27, 2017); *see Broadcom Corp. v.*

13   *Qualcomm Inc.*, 501 F.3d 297, 315 (3d Cir. 2007); *Microsoft Mobile Inc. v. Interdigital, Inc.*,

14   No. 15-723, 2016 WL 1464545, at *2 (D. Del. Apr. 13, 2016).

15          Contrary to Acacia's contention, (Acacia Mem. at 24-25), the SAC puts Acacia on more

16   than adequate notice of the SEP Technology Markets at issue in this case.  Exhibit A to the SAC

17   lists, to the best of Apple's knowledge, the patents that have been transferred from VoiceAge to

18   Acacia.  Dkt. No. 115-1.  Acacia, as the owner of the patents, plainly knows the functions they

19   cover.  Apple alleges that (i) each relevant SEP Technology Market consists of a technology

20   purportedly covered by a former VoiceAge patent and any other technologies that compete or

21   formerly competed to perform the same function, SAC ¶ 34, and (ii) there are no close substitute

22   technologies for those allegedly covered by the former VoiceAge patents.  *Id.* ¶ 35.  Apple's

23   allegations therefore define the relevant market and the participants in it.  Insofar as Acacia

24   wishes to challenge the relevant markets Apple has alleged, that implicates fact issues that can be

25

1    tested on summary judgment or trial, *see Newcal*, 513 F.3d at 1045.  But Acacia clearly has

2    adequate notice of the relevant markets.

3                    **2.        Apple Adequately Alleges That Acacia Violated Section 7**

4            Apple has adequately alleged that the effect of Acacia's acquisitions of VoiceAge's

5    patents "*may* be to substantially lessen competition, or tend to create a monopoly" in violation of

6    Section 7 of the Clayton Act.  15 U.S.C. § 18 (emphasis added).  Acacia's arguments to the

7    contrary lack merit.

8            *First*, Acacia argues that Apple fails to state a Section 7 claim because it has not alleged

9    that the "transaction would increase the concentration of firms in the relevant market," or that

10   "Acacia previously held any patents that compete with patents VoiceAge transferred to Acacia."

11   (Acacia Mem. at 29-30.)  Acacia's argument fails as a legal matter:  it has long been recognized

12   that an acquisition can violate Section 7 by substantially lessening competition whether or not

13   the acquirer competed with the seller before the acquisition.  A vertical or conglomerate merger,

14   in which the acquirer does not participate in the same relevant market as the acquired party, can

15   be unlawful under Section 7.  The Supreme Court has recognized that when Congress amended

16   the Clayton Act in 1950, one of its objectives was "to make plain that [Section] 7 applied not

17   only to mergers between actual competitors, but also to vertical and conglomerate mergers

18   whose effect may tend to lessen competition in any line of commerce in any section of the

19   country."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962); *FTC v. Procter &*

20   *Gamble Co.*, 386 U.S. 568, 577 (1967) ("All mergers are within the reach of § 7, and all must be

21   tested by the same standard, whether they are classified as horizontal, vertical, conglomerate or

22   other."); *see also*, *e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957)

23   (downstream firm's purchase of stock in supplier violated Section 7 based on vertical theory).

24   Acacia's reliance on *horizontal* merger cases, therefore, misses the mark.

25

1    Acacia finds no more success with its argument that an acquisition that is merely a lawful

2  "shift of market power from 'the hands of' one company to another" does not violate Section 7.

3  Acacia Mem. at 30 (citing *Vizio, Inc. v. Funai Elec. Co.*, No. 09-0174, 2010 WL 7762624, at *4

4  (C.D. Cal. Feb. 3, 2010)).  In *Vizio*, unlike here, the plaintiff failed to allege how the transfer of

5  two patents from one owner to another—standing alone—could substantially lessen competition.

6  *Id.* at *4-5.  Here, by contrast, Apple has alleged in detail how Acacia's acquisitions of patents

7  from VoiceAge have substantially lessened competition by placing the patents in the hands of a

8  PAE that has the ability and incentives to extract inflated, non-FRAND royalties from product

9  suppliers in ways that VoiceAge could not.  SAC ¶¶ 29-33, 51-52.  Through the patent transfers,

10  Acacia and VoiceAge exploit multiple types of inefficiencies that the transfers create, including

11  the following:

12  - Acacia can aggressively and serially assert weak patents because, unlike VoiceAge

13     (which seeks to develop technologies), it does not face reputational harm from patent

14     assertions and has no desire to achieve patent peace.  *Id.* ¶¶ 30-31.

15  - Acacia has advantages in asserting weak patents that VoiceAge does not enjoy.  For

16     example, because it did not participate in the claimed inventions, Acacia is less likely

17     to have weak patents that it asserts found invalid or unenforceable (given constraints

18     on third-party discovery from VoiceAge) and face lower litigation costs than

19     VoiceAge would confront.  *Id.* ¶ 32.

20  - Acacia has disputed that it is bound by the FRAND commitments of the previous

21     patent owner, *id.* ¶ 21, as it is doing in this very suit.  (Acacia Mem. at 14-17.)

22    As the U.S. antitrust agencies have stated, a merger or acquisition "enhances market

23  power if it is likely to encourage one or more firms to raise prices, reduce output, diminish

24  innovation, or otherwise harm customers as a result of *diminished competitive constraints or*

25

1    *incentives*."[27]  The patent transfer scheme here is not just *likely* to encourage anticompetitive

2    effects; it has *already* unleashed them.  By transferring VoiceAge's patents to Acacia, VoiceAge

3    and Acacia have materially increased (and actually employed) their ability and incentive to

4    exercise market power in ways that VoiceAge alone simply could not.  SAC ¶¶ 29-33, 51.

5    Acacia has demanded and obtained above-market royalties and has pursued litigation against

6    Apple and other product suppliers to drive up settlement values.  *Id*. ¶¶ 26-27.  VoiceAge has

7    benefitted from these attacks by receiving a large portion of the royalties and settlements that

8    Acacia extracts.  *Id*. ¶¶ 34, 56.[28]

9           Given these allegations, Acacia's argument that Apple has alleged nothing more than that

10   "Acacia is a 'monopolist' in each patent-defined market in *the same way that VoiceAge was*

11   *previously* a monopolist" is obviously false.  Acacia Mem. at 30 (emphasis added).  The SAC

12   describes the multiple ways in which Acacia's acquisition of VoiceAge's patents evaded

13   constraints that had kept from VoiceAge from extracting exorbitant, non-FRAND royalties and

14   enabled Acacia to act in an *entirely different way* with respect to the patents, thereby

15   substantially lessened competition.  SAC ¶¶ 29-33.  Indeed, that was the very point of the

16   anticompetitive conspiracy between Acacia and VoiceAge.  *Id.* ¶¶ 25, 56.

17          *Second*, Acacia's argument that Apple's Section 7 claim fails insofar as it is based on

18   post-acquisition conduct of Acacia (Acacia Mem. at 31) is beside the point.   Apple grounds its

19

20   _____

     [27] DOJ & FTC, Horizontal Merger Guidelines § 2 (Aug. 19, 2010) (emphasis added).

21   [28] Acacia's reliance on *Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d
     1187, 1190 (9th Cir. 2000), and *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266

22   (7th Cir. 1984), is similarly unavailing.  (*Acacia Mem.* at 30 n.96.)  First, unlike *Brunswick* and
     *Columbia River*, Apple is not a competitor of the defendant suing to obtain the monopoly the

23   defendant possesses.  Rather, Apple is a consumer in the relevant market challenging "practices
     that make it hard for consumers to buy at competitive prices."  *Brunswick*, 752 F.2d at 266-267.

24   As detailed above, the SAC alleges the reasons why these particular patent transfers substantially
     lessen competition.  Likewise, the court in *Columbia River* could identify no consumer harm

25   from the defendant being the exclusive supplier of electricity to Boise Cascade versus the
     plaintiff.  *Id*. at 1190.  Here, however, Apple alleges that consumer harm will result (and has
     already resulted) from Acacia's acquisitions of VoiceAge patents.

Section 7 claim in allegations that the *effect* of the patent acquisitions has been substantially to lessen competition and tend to create a monopoly in violation of Section 7.  SAC ¶ 51.  But that does not mean that Apple's Section 7 claim is *based on* post-acquisition conduct rather than the patent acquisitions themselves and their resulting anticompetitive effects.

Acacia relies on *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 13-cv-00740, 2013 U.S. Dist. LEXIS 177836 (E.D. Va. Dec. 18. 2013), but the court there found that the plaintiff had failed to allege that the patent "acquisitions, standing alone, have lessened competition."  *Id.* at *29.  Here, by contrast, Apple has alleged in detail how the acquisitions have substantially lessened competition.  *See supra* at Section C.2.  As the Supreme Court has held, Section 7 proscribes anticompetitive acquisitions in their infancy:  The "Senate declared the objective of the Clayton Act to be . . . to arrest the creation of . . . monopolies *in their incipiency* . . . 'Incipiency' in this context denotes not the time the [asset] was acquired, but any time when the acquisition threatens to ripen into a prohibited effect."  *E.I. du Pont de Nemours & Co.*, 353 U.S. at 597 (emphasis in original).  The anticompetitive patent acquisitions that Apple has identified not only meet the incipiency standard but go far beyond it; the acquisitions have *already* caused demonstrable harm both to actual and potential licensees in the SEP Technology Markets and to downstream consumers and, unless stopped and remedied, will continue to do so.  SAC ¶¶ 26-27, 34, 36-41.  Apple has thus alleged direct evidence of a Section 7 violation.  *See, e.g.*, *E.I. du Pont de Nemours & Co.*, 353 U.S. at 598-607 (determining that acquisition violated Section 7 based on evidence of post-acquisition effects).

*Third*, Apple alleges facts that belie Acacia's argument that Acacia simply "values the patent more than the selling party."  (Acacia Mem. at 31.)  Specifically, Apple alleges that before the transfers, VoiceAge had repeatedly obtained fair value for its patents by licensing its patents through a patent pool and through bilateral agreements with Apple.  SAC ¶¶ 24, 37, 52.  However, VoiceAge was not satisfied with fair value, *id.* ¶ 25, and decided to transfer its patents

to Acacia because Acacia does not "face the same structural constrains or incentives as

VoiceAge," which enables Acacia to extort exorbitant royalties from licensees.  *Id.* ¶ 37.

Defendants' erroneous, constricted view that Section 7 cannot reach Acacia's patent

acquisitions flies in the face of the growing recognition that patent transfer can bring competitive

harm, and that such conduct is an appropriate target for Section 7 enforcement.  Indeed, in the

context of reviewing transfers of SEPs to patent assertion entities, such as Acacia, the Antitrust

Division of the U.S. Department of Justice has announced that it "will not hesitate to take

appropriate enforcement action to stop any anticompetitive use of SEP rights."[29]

Similarly, Acacia's claim that the only court to consider a theory of liability for PAE

acquisitions under Section 7, rejected it (Acacia Mem. at 32), ignores a later decision in a related

case to the one it cites, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d

610, 629-30 (D. Md. 2015) (refusing to dismiss Section 7 claim based on patent acquisitions).

Moreover, contrary to Acacia's assertion, multiple scholars have recognized that patent assertion

entities have much greater incentives than operating companies, such as VoiceAge, to engage in

exploitive and anticompetitive patent assertion practices, *see, e.g.*, Fiona M. Scott Morton & Carl

Shapiro, *Strategic Patent Acquisitions*, 79 Antitrust L.J. 463, 463-490 (2014), and have argued

that such acquisitions are ripe for challenge under Section 7, *see* Michael A. Carrier, *Patent

Assertion Entities:  Six Actions Antitrust Agencies Can Take,* CPI Antitrust Chronicle (Jan.

2013).

---

[29] *See* DOJ, *Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigation of Google's Acquisition of Motorola Mobility Holdings Inc. and the Acquisitions of Certain Patents by Apple Inc., Microsoft Corp. and Research in Motion Ltd.* (Feb. 13, 2012).  Acacia appears to argue that the Department of Justice's decision not to challenge patent acquisitions by other parties should preclude Apple's claims here.  (Acacia Mem. at 31 & n.100.)  That the Department decided not to challenge a patent acquisition based on particular facts of course does not mean that applying Section 7 to patent transfers is a "largely dead letter," as Acacia would claim.  *Id.* at 31.  *See U.S. v. Gillette Co.*, 828 F. Supp. 78, 81 n.7 (D.D.C. 1993) (noting fact specific-nature of determinations under the Clayton Act).

### 3.   Apple Has Adequately Pled Its Section 1 Claim

Acacia argues that Apple has failed adequately to allege concerted conduct that violates Section 1 of the Sherman Act.  (Acacia Mem. at 32-36.)[30]  Apple's allegations are more than sufficient.

To begin, as discussed in Section C.2 above, Apple has adequately alleged that Acacia's agreements with VoiceAge caused actual anticompetitive effects that significantly outweighed any procompetitive benefits.  In fact, the agreements brought no procompetitive benefits at all, given that the arrangements were designed to create inefficiencies in licensing that VoiceAge and Acacia could exploit to harm Apple, other potential licensees, and end cellular product consumers.  Those allegations, by themselves, easily allege an unreasonable restraint for purposes of Section 1.  *See*, *e.g.*, *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990) (finding that both Section 1 and Section 7 "as currently understood prevent transactions likely to reduce competition substantially").

Each of Acacia's contentions regarding supposed infirmities in Apple's Section 1 allegations fails.

*First*, Acacia argues that Apple's breach of contract and Section 1 claims are contradictory.  (Acacia Mem. at 33-34.)  However, Apple's contract claim—alleging that Acacia assumed FRAND commitments associated with the transferred patents and then breached them—is perfectly consistent with its Section 1 conspiracy claim—alleging that Acacia and VoiceAge conspired for Acacia to, among other things, breach its acquired FRAND commitments.   Acacia does not explain why it could not have acquired FRAND obligations when it obtained the declared SEPs from VoiceAge while also agreeing with VoiceAge—before,

---

[30] Acacia also argues that "the mere patent transfer" is insufficient to restrain trade, and references its argument elsewhere.  (Acacia Mem. at 33.)  As explained below, however, Apple has alleged far more than just the fact of patent transfer agreements.  Apple has alleged that Acacia's and VoiceAge's patent transfer scheme reduced competition in relevant SEP technology markets.

1    after, or simultaneously with the patent transfers—that Acacia would breach those FRAND

2    obligations post-transfer. *See Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-cv-

3    1143, 2013 WL 6247594, at *11 (N.D. Cal. Dec. 3, 2013) (finding allegations sufficient to

4    demonstrate agreement inconsistent with express contract terms among alleged conspirators

5    where the parties' conduct and the purpose of the alleged scheme "support the inference of a

6    second, 'off-the-books' agreement or understanding" among defendants).

7        Acacia's insistence that there is some "fundamental contradiction" between Apple's

8    allegations of conspiracy between Acacia and VoiceAge and its allegation that Acacia has

9    acknowledged that it is bound by VoiceAge's FRAND commitments (Acacia Mem. at 33) fares

10   no better. That Acacia made public statements that it was bound by FRAND commitments says

11   nothing about whether it agreed with VoiceAge in private, and without reducing the agreement

12   to writing, to disregard those FRAND commitments (which they have done). *See United States*

13   *v. Singer Manufacturing Co.*, 374 U.S. 174, 195 (1963) ("[W]hether an unlawful combination or

14   conspiracy is proved is to be judged by what the parties actually did rather than by the words

15   they used.").

16       *Second*, Acacia argues that "the fact that Acacia and VoiceAge entered into a contractual

17   arrangement is insufficient to provide the basis for a Section 1 claim." (Acacia Mem. at 34.)

18   But Apple has alleged far more than just the fact of patent transfer agreements, and the contours

19   of the defendants' conspiracies are not constrained by what they put in writing. *See*, *e.g.*, *United*

20   *States v. Parke, Davis & Co.*, 362 U.S. 29, 44 (1960) ("[J]udicial inquiry is not to stop with a

21   search of the record for evidence of purely contractual arrangements."). Apple has alleged that

22   the Defendants agreed to transfer patents as part of a scheme that had the purpose and effect of

23   evading FRAND commitments and exploiting Apple and other potential licensees in ways that

24   VoiceAge could not by itself and to share with one another the exorbitant royalties extracted.

25   SAC ¶¶ 55-56. As the Ninth Circuit stated in *49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803

1    F.2d 1463 (9th Cir. 1986), on which Defendants rely, although the "antitrust laws are not

2    offended by [ordinary sales contracts]," they are violated by "those with an anticompetitive

3    content." *Id.* at 1467.  Apple has plainly alleged that the agreements here have such content.  *See*

4    *Parke, Davis & Co.*, 362 U.S. at 46 (otherwise unobjectionable conduct may be "tainted with the

5    vice of illegality" when used as the "vehicle" to effectuate an anticompetitive scheme) (internal

6    citations and quotations omitted).

7        Moreover, the Supreme Court has long recognized that patent transfers can violate

8    Section 1.  In *United States v. Singer Mfg. Co.*, the Court found that an agreement to transfer a

9    patent for the "common purpose to suppress the Japanese machine competition in the United

10   States through the use of the patent" contravened Section 1.  374 U.S. at 194-95.  In *Singer*, like

11   here, the objective of the transfer was to put the patent in the hands of a new owner that could

12   evade constraints on the original patent owner's ability to enforce the patent to anticompetitive

13   ends.  *Id.* at 184.

14       Indeed, in *Vizio Inc. v. Funai Elec. Co.*, No. 09-0174, 2010 WL 7762624 (C.D. Cal. Feb.

15   3, 2010), the court denied a motion to dismiss a Section 1 challenge to the transfer of a declared

16   SEP.  There, like in this case, the transferor and the transferee "shared a commitment to a

17   common scheme to circumvent [the transferor's] RAND commitment to the [standard-setting

18   organization]" by collecting a royalty in excess of what the transferor could collect and then

19   sharing in the proceeds of the additional royalties.  *Id.* at *6 (quoting complaint).  In finding the

20   allegations sufficient, the court observed that "[t]he Section 1 claim does not rest solely on [the

21   transferee's] acquisition of the [SEP]."  *Id.*  The same is true here.

22       Apple has alleged in detail the circumstances, incentives, and economic rationale

23   showing that VoiceAge and Acacia shared a common purpose—that is, had a meeting of the

24   minds—to employ the patent transfers to evade FRAND commitments and otherwise exploit

25

potential licensees in ways VoiceAge could not acting alone.[31]  Relevant allegations include the following:

- VoiceAge was demonstrably capable of obtaining FRAND royalties for its declared SEPs.  Before transferring the declared SEPs to Acacia, VoiceAge had licensed the patents through a patent pool administered by Sipro Lab Telecom and had amicably entered into bilateral licensing agreements with Apple. SAC ¶ 24.

- VoiceAge and Acacia agreed to share the ill-gotten proceeds from Acacia's licensing efforts for the transferred patents.  SAC ¶ 25.

- PAEs such as Acacia are attractive co-conspirators because they do not face the same structural constraints as operating companies like VoiceAge.  SAC ¶ 33.

- VoiceAge would face constraints in enforcing its patents that Acacia, as a PAE, would not.  PAEs like Acacia can afford to bring suit regardless of the merits because their litigation costs and risks are lower than those of the operating companies they sue; they have minimal documents because they do not develop their own technology; and they do not face risks to their reputation or business relationships from aggressive demands or litigation.  SAC ¶¶ 30-32.

- VoiceAge partnered with Acacia to take advantage of its abusive enforcement strategies to exploit potential licensees.  SAC ¶ 25.  Acacia has a reputation for brazen and ruthless patent assertion tactics, which intimidates targets into settling to avoid the repeated harassment for which Acacia is known.  SAC ¶ 30.

- VoiceAge's transfers did not create efficiencies that VoiceAge could not generate through direct and transparent licensing.  SAC ¶ 33.  The transfers do not

---

[31] Acacia observes that Apple does not allege that VoiceAge had post-sale control over the enforcement of the patents.  (Acacia Mem. at 35.)  But Apple's Section 1 claim does not depend on any such post-transfer control.  The transfers themselves—individually and as part of a larger collusive scheme to deputize Acacia to charge inflated royalties and evade FRAND commitments in ways VoiceAge could not—violate Section 1.

"unlock" any fair value that VoiceAge could not obtain, as it was fully capable of extracting fair value for its patents.  SAC ¶ 37.

Based on these allegations, Apple has easily alleged "enough factual matter (taken as true) to suggest that [agreements were] made."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007); *see also, e.g., Cascades*, 2013 WL 6247594, at *9 (denying motion to dismiss where alleged facts, "if true, would tend to discount entirely innocent explanations and plausibly suggest an economic benefit to be derived from conspiring").

*Third*, Acacia argues that Apple's allegations could just as easily suggest that Acacia engaged in "rational, legal business behavior" of an independent nature because, taking Apple's allegations as true, "Acacia would abandon its FRAND commitments" of its own accord. (Acacia Mem. at 35-36.)  But even if Acacia were correct, that would not support dismissal of Apple's Section 1 claim.  As the Ninth Circuit has held, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)" and "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).[32]

---

[32] Acacia relies on *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015), for the proposition that "in the absence of direct evidence showing agreement, plaintiffs failed plausibly to allege non-conclusory facts sufficient to 'point[] toward a meeting of the minds' of the alleged conspirators.'" (Acacia Mem. 34-35 n.108 (*quoting In re Musical Instruments*, 798 F.3d at 1193, 1198).)  But unlike in *In re Musical Instruments*, Apple *has* alleged direct evidence connecting the Defendants—in the form of patent transfer agreements— supplemented by facts constituting circumstantial evidence supporting Apple's allegations that the intent and purpose of those transfers was to evade FRAND and extract and share royalties beyond what VoiceAge could collect on its own.  In *In re Musical Instruments*, there was no direct evidence linking the alleged conspiring manufacturers to one another.  798 F.3d 1186, 1193.

### 4.   Apple Adequately Alleges Antitrust Injury

Acacia argues that Apple does not adequately allege antitrust injury because the "mere transfer of the patent monopoly is of no antitrust concern," and that "the harm to competition that Apple identifies relates entirely to protected litigation conduct."  (Acacia Mem. at 26.)  Not only are Acacia's arguments meritless, they are misleading or reflect a fundamental misunderstanding of Apple's SAC.

*First*, as explained above, *supra* Section C.2, Apple does not allege that a "mere transfer of a patent monopoly" is an antitrust concern.  Indeed, in any given case, there may be reasons why a transaction or agreement does or does not violate Section 7 of the Clayton Act or Section 1 of the Sherman Act.  "Needless to say, in a fact-intensive determination such as one under the Clayton Act, the blind application of any precedent, as defendants seem to desire, is inappropriate."  *United States v. Gillette Co.*, 828 F. Supp. 78, 81 n.7 (D.D.C. 1993).  Contrary to Acacia's assertion (Acacia Mem. at 26), Apple alleges that the specific transactions at issue in this case, *do* affect the **structure** of the markets by removing the structural constraints that prevented VoiceAge from unfairly exploiting its patents.  *Supra* Section C.2.  That is, Apple does not allege a "mere patent transfer."

Moreover, Acacia ignores Apple's allegations that Acacia's anticompetitive conduct has dramatically increased the prices that other product suppliers—consumers in the SEP Technology Markets—pay for licenses in those markets, SAC ¶¶ 27, 39, and that Acacia has made supracompetitive, non-FRAND demands to Apple for the same licenses.  *Id.* ¶¶ 26, 36-39.  Higher prices are well recognized as a way in which anticompetitive conduct can injure competition.  *See Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 504 (9th Cir. 2010).  Acacia's and VoiceAge's anticompetitive scheme also has forced Apple and other product suppliers to incur inflated litigation costs in those markets.  SAC ¶¶ 3, 39, 53, 59, 66; *Microsoft Mobile Inc. v. Interdigital Commc'ns*, 2016 WL 1464545, at *3; *Apple Inc. v.*

*Samsung Elecs. Co.*, No. 11–cv–01846, 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012); *Hynix Semiconductor Inc. v. Rambus Inc.,* 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (litigation expenses can be recovered "where the patent litigation is used to further the harm caused under a 'more traditional antitrust theory'"). Nor are these the only harms. Acacia's and VoiceAge's anticompetitive conduct has resulted in end consumers suffering from the chilling of procompetitive standard-setting activity and decreased innovation and quality for cellular devices. SAC ¶¶ 38, 40-41, 53, 59, 65-66.[33] Apple's allegations amply plead antitrust injury.

The cases on which Acacia relies (Acacia Mem. at 26 n.80) are not to the contrary. For example, the court in *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 997 (N.D. Cal. 2015), held only that one conclusory allegation that consumers have been harmed is insufficient to plead antitrust injury. Here, Apple, a customer in the relevant SEP Technology Markets, SAC ¶ 39, alleges in detail that it and others have been forced to spend millions on litigation and pay supracompetitive royalties as the result of Acacia's anticompetitive conduct. *Id.* ¶¶ 26-27, 36-39. In *Zef Sci., Inc. v. Shimadzu Sci. Instruments, Inc.*, No. 14-CV-1758-JAH (RBB), 2016 U.S. Dist. LEXIS 44123, at *12 (S.D. Cal. Mar. 31, 2016), the court found that the plaintiff had failed to allege "injury to competition or consumers." Unlike the competitor-plaintiff in *Zef Sci.*, Apple here is a consumer and has alleged injury to itself and other consumers in the relevant markets. SAC ¶¶ 26-27, 36-39.

*Second*, Acacia wrongly argues that its litigation and related activities are "protected from antitrust liability—or any state law claims of unfair business practices—under the *Noerr-Pennington* doctrine." (Acacia Mem. at 27.) *Noerr-Pennington*, however, does not immunize a

---

[33] Moreover, "an antitrust plaintiff seeking injunctive relief need only show a threatened injury, not an actual one." *Lucas Auto. Eng., Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1234 (9th Cir. 1998). Here, to the extent the Court finds that Apple has not asserted a present cognizable injury, there can be no doubt that such injuries are threatened if, for example, Acacia's acquisitions of the VoiceAge patents violate Section 7 of the Clayton Act. *See id.* at 1237 (holding that consumer in the relevant market had standing to bring Section 7 claim for injunction relief).

1     pattern of anticompetitive conduct of which litigation is only one part, as Apple alleges here.  *See*

2     *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1263 (9th Cir. 1982)

3     ("[W]hen there is a conspiracy prohibited by the antitrust laws, and the otherwise legal litigation

4     is nothing but an act in furtherance of that conspiracy, general antitrust principles apply,

5     notwithstanding the existence of *Noerr* immunity.").

6          In *Hynix*, 527 F. Supp. 2d at 1097, the court held that the *Noerr-Pennington* doctrine does

7     not apply to a series of anticompetitive acts that include non-sham litigation if (1) the "other

8     aspects of the scheme independently produce anticompetitive harms" and (2) "the accused patent

9     litigation was causally connected to these anticompetitive harms."  *Id*.  In *Hynix*, Rambus was

10     alleged to have intentionally failed to disclose pending patent applications essential to a standard

11     under development, only to spring a "patent trap" once the industry became locked into using the

12     standard.  *Id.* at 1088-89.  Rambus demanded royalties on the undisclosed patents and brought

13     infringement litigation.  *Id.* at 1089.  In holding *Noerr-Pennington* inapplicable, the court found

14     that the anticompetitive standard-setting conduct was an independent anticompetitive harm under

15     Section 2 of the Sherman Act and that the patent litigation was causally linked to that behavior

16     because "a patent 'ambush' or 'hold-up' is ineffective without the threat of litigation."  *Id.* at

17     1098.  Similarly, in *Funai*, the court applied *Hynix* and found that false FRAND commitments

18     independently caused anticompetitive harm and that the defendant's patent litigation was linked

19     to that harm because it "effectuate[d] Defendants' 'hold-up power' to demand supracompetitive

20     royalties."  *Funai Elec. Co v. LSI Corp.*, No. 16-cv-01210, 2017 WL 1133513, at \*6 (N.D. Cal.

21     2017).

22          Likewise, here, Apple has alleged that patent litigation was just one component of a

23     broader anticompetitive scheme perpetrated by VoiceAge and Acacia.  Indeed, unlike in the

24     cases Acacia cites, Apple does not allege that Acacia engaged in sham litigation.  (Acacia Mem.

25     at 28 n.84, 29 n.88.)  Instead, Apple alleges that VoiceAge and Acacia violated Section 7 of the

Clayton Act through patent transfers that substantially lessened competition and Section 1 of the Sherman Act by conspiring to transfer patents to evade FRAND commitments and illegally exploit product suppliers. SAC ¶¶ 49-59. Acacia's litigation is merely one of the ways in which the harm from Acacia's Section 7 and Section 1 violations has manifested. Because patent litigation is just one component of Apple's antitrust (and UCL) claims, the *Noerr-Pennington* doctrine does not immunize Defendants' conduct from antitrust liability. *See Hynix*, 527 F. Supp. 2d at 1097 ("[W]here the patent litigation is used to further the harm caused under a 'more traditional antitrust theory,' a plaintiff should be allowed a full recovery.").[34]

### D.    Apple Adequately Alleges That Acacia Violated the California UCL

None of Acacia's arguments regarding Apple's claim under Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL"), supports dismissal of the claims. SAC ¶¶ 60-66. Acacia wrongly argues that Apple lacks standing to complain about Acacia's and VoiceAge's UCL violations because it supposedly has alleged injury to itself based only on "the costs of defending against infringement suits." (Acacia Mem. at 37.) The costs of defending against litigation resulting from an anticompetitive scheme constitute cognizable injury—regardless of whether the litigation aspects of the overall scheme constitute sham litigation. *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846, 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012) ("litigation expenses may establish damages for an antitrust claim"); *Funai*, 2017 WL 1133513, at *6 ("[W]here the patent litigation is used to further the harm caused under a 'more traditional

---

[34]Despite Acacia's contention otherwise (Acacia Mem. at 28-29), there is no contradiction between *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1046-47 (9th Cir. 2009), and *Hynix*. The Ninth Circuit in *Kaiser* applied its sham litigation precedents to the case before it, involving a pattern of non-sham litigation. The court did not address whether litigation that is part of a broader anticompetitive scheme that includes non-litigation conduct is immunized by the *Noerr-Pennington* doctrine. Nothing in *Kaiser* suggests that it would not follow *Hynix*. Of course, contrary to Acacia's assertion (Acacia Mem. at 29), that the Federal Circuit has yet to opine on *Hynix* does not mean that it is not good law. *See Funai,* 2017 WL 1133513, at *6.

antitrust theory,' a plaintiff should be allowed a full recovery." (quoting *Hynix*, 527 F. Supp. 2d at 1097)).

Acacia also claims that Apple has alleged neither "unlawful" nor "unfair" conduct under the UCL because it has supposedly failed to allege any antitrust violations.  (Acacia Mem. at 36-37.)  As demonstrated in Sections VI.B and VI.C above, however, Apple has alleged violations of the Sherman and Clayton Acts.

Moreover, contrary to Acacia's argument (Acacia Mem. at 37-38), Apple has alleged not only underlying violations of the Sherman and Clayton Acts, but also that the Defendants' misconduct otherwise satisfies the "unlawful" and "unfair" element" of the UCL.[35]  *See* SAC ¶¶ 63-64 & nn.9, 10; 15 U.S.C. § 45 (prohibiting "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce").  Where "allegations are sufficient to adequately plead 'unfair' conduct under the FTC Act," they are also sufficient to plead "'unlawful' conduct under the [California UCL]."  *Baker v. Aegis Wholesale Corp.*, No. 09-5280, 2010 WL 2853915, at *8 (N.D. Cal. July 21, 2010).[36]  Here, Apple has alleged that the FTC, which enforces Section 5 of the FTC Act, has brought Section 5 actions based on FRAND-related misconduct like that Acacia committed here—including renouncing a predecessor's licensing commitment and seeking to obtain injunctions against a supplier of products that support an industry standard.[37]  SAC ¶¶ 62-64.  Apple has alleged violations of the

---

[35] Acacia's argument that Apple has failed to allege that it is a consumer in the relevant markets (Acacia Mem. at 36 n.111) is puzzling; Apple has squarely alleged that it is a potential licensee—i.e., buyer—of patents that Acacia alleges cover technology that is essential to an industry standard.  SAC ¶¶ 24-26, 38-39.

[36] Acacia suggests that the FTC's consent decrees in *In the Matter of Negotiated Data Solutions LLC* and *In the Matter of Motorola Mobility LLC* are meaningless because the federal courts ultimately determine the scope of the FTC Act, and a consent decree "does not adjudicate the legality of any action by a party thereto."  (Acacia Mem. at 37-38); SAC ¶¶ 63-64 & nn. 9,10.  While it is true that a consent does not adjudicate illegality, Apple has alleged sufficient facts here to state a claim for a UCL violation premised on a violation of the FTC Act.

[37] Acacia argues in passing that this case is distinguishable from *In the Matter of Negotiated Data Solutions LLC* because that case involved disavowal of a predecessor's commitment to an SSO to license intellectual property for a set fee (Acacia Mem. at 38 n.121), but Acacia does not

"unlawful" element of the UCL, even assuming it failed also to allege unlawful Acacia conduct based on Sherman or Clayton Act violations.[38]

## V.    CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion to Dismiss Apple's Second Amended Complaint.

---

explain why that distinction makes any difference given that—whatever Acacia has said about its FRAND obligations—Apple has alleged that Acacia has in practice reneged on the FRAND commitment it inherited from VoiceAge.  SAC ¶¶ 20-23, 25-28, 42-48.  Similarly, Acacia does not explain why the fact that the injunctive actions at issue in *In the Matter of Negotiated Data Solutions LLC* were in the United States (Acacia Mem. at 38 n.121) makes any difference in the outcome when Apple has alleged that the German injunctive actions have harmed global markets.  SAC ¶¶ 34-41.

[38] For this reason, Acacia's reliance on authority dismissing UCL claims that were based on nothing more than alleged violations of other laws that the court found did not state a claim (Acacia Mem. at 36 n.112) are inapposite.

DATED: December 6, 2017

Respectfully submitted,

By:    /s/ Mark D. Selwyn

Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER
  PICKERING HALE AND
  DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile:  +1 650 858 6100

William F. Lee
william.lee@wilmerhale.com
Joseph J. Mueller
joseph.mueller@wilmerhale.com
Timothy Syrett
timothy.syrett@wilmerhale.com
WILMER CUTLER
  PICKERING HALE AND
  DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile:  +1 617 526 5000

Leon B. Greenfield
leon.greenfield@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile:  +1 202 663 6363

*Attorneys for Plaintiff*
  APPLE INC.

1

**CERTIFICATE OF SERVICE**

        I hereby certify that on December 6, 2017, I electronically filed the foregoing documents

using the CM/ECF system which will send notification of such filing to the e-mail addresses

registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.


DATED: December 6, 2017                    _____/s/ Mark D. Selwyn_____
                                                       Mark D. Selwyn