NELSON BUMGARDNER PC
Ed Nelson III (*pro hac vice*)
ed@nelbum.com
Ryan P. Griffin (*pro hac vice*)
ryan@nelbum.com
3131 West 7th Street, Suite 300
Fort Worth, TX 76107
Telephone: (817) 377-9111

CALDWELL CASSADY & CURRY
Bradley W. Caldwell (*pro hac vice*)
bcaldwell@caldwellcc.com
John A. Curry (*pro hac vice*)
acurry@caldwellcc.com
2101 Cedar Springs Road, Suite 1000
Dallas, TX 75201
Telephone: (214) 888-4848

LECLAIRRYAN LLP
Patricia L. Peden (SBN 206440)
patricia.peden@leclairryan.com
44 Montgomery St., Thirty-First Floor
San Francisco, CA 94104
Telephone: (415) 391-7111

Attorneys for Defendants Acacia Research
Corporation, Cellular Communications
Equipment LLC, Cellular Communications
Equipment GmbH, Saint Lawrence
Communications LLC, and Saint Lawrence
Communications GmbH

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLE INC.,<br><br>          Plaintiff,<br><br>   v.<br><br>**ACACIA RESEARCH CORPORATION,** *et al*.,<br><br>          Defendants. | Case No. 5:16-cv-07266-EJD<br><br>**ACACIA PARTIES' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>DATE: February 22, 2018<br>TIME: 9:00 a.m.<br>JUDGE: Honorable Edward J. Davila |

# **TABLE OF CONTENTS**

I.   Apple Fails to Plead a Cause of Action Under Antitrust Law. ................................1

    A.    Acacia's Patent Enforcement Is Immune From Antitrust Liability. ...........2

        1.    Apple Cannot Derive Its Anticompetitive Harms From Litigation Conduct. .......................................................................................2

        2.    Apple Does Not Allege a Course of Conduct *Including* Litigation; It Alleges Only a *Course of Litigation Conduct.* ...........................3

    B.    Apple Fails to Adequately Allege Harm to Competition ...........................5

    C.    Apple's Section 7 Allegations Fail. .............................................................9

II.  Apple Fails to Plead a Cause of Action for Breach of Contract It Can Enforce Against Acacia. ...................................................................................................10

    A.    Apple Fails to Recognize the Relevant Law. ............................................11

    B.    Apple Cannot Proceed on the Theory That It Was an Intended Beneficiary of the Acacia-VoiceAge Contract. ...........................................12

        1.    Apple cannot plead contradictory facts; when the facts Apple pleads contradict Apple's legal assertions, the factual claims are assumed true and legal conclusions are disregarded ....................13

        2.    Apple's basis for its breach of contract claim in the SAC is that it was an intended beneficiary of VoiceAge-ETSI contracts, *not* the Acacia-VoiceAge Contract. ..........................................................14

        3.    Apple pleads facts sufficient to show that it is *not* an intended beneficiary of any Acacia-VoiceAge Contract term obliging Acacia to license acquired patents on FRAND terms ...................15

        4.    Apple's factual allegations regarding VoiceAge's purported breach of contract and Acacia and VoiceAge's purported antitrust conspiracy contradict the legal conclusion that Acacia is contractually bound to adhere to VoiceAge's FRAND obligations. ..................................................................................15

        5.    Apple's factual allegations preclude any inference that Acacia and VoiceAge intended to vest Apple with a right to enforce the Acacia-VoiceAge contract. ...........................................................18

        6.    This court cannot try Apple's claim ...............................................19

    C.    Apple's Operation-of-Law Theory Also Fails. .........................................20

        1.    Only licensed rights to use run with a patent. ...............................20

        2.    A FRAND commitment is not a license; it is a procedural term ...22

III.   Apple's Claims Should Be Dismissed Under the First-to-File Rule. ....................23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases:**                                                                                  **Page(s):**

*Abraxis Bioscience, Inc. v. Navinta LLC,*
    672 F.3d 1239 (Fed. Cir. 2011) .................................................................................. 12

*Apple, Inc. v. Motorola Mobility, Inc.,*
    No. 11-cv-178, 2011 U.S. Dist. LEXIS 72745 (W.D. Wis. June 7, 2011) ............................ 17

*Apple Inc. v. Samsung Elecs. Co.,*
    No. 11-CV-01846, 2012 U.S. Dist. LEXIS 67102 (N.D. Cal. May 14, 2012) ....................... 17

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................................... 13

*Barnes & Noble, Inc. v. LSI Corp.,*
    849 F. Supp. 2d 925 (N.D. Cal. 2012) .................................................................... 20-21

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC,*
    692 F.3d 42 (2d Cir. 2012) .......................................................................................... 19

*Brantley v. NBC Universal, Inc.,*
    675 F.3d 1192 (9th Cir. 2012) ....................................................................................... 6

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) .......................................................................................... 3

*Brown Shoe Co. v. United States,*
    370 U.S. 294, 82 S. Ct. 1502 (1962) ............................................................................. 9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ..................................................................................................... 5

*Cascades Comput. Innovation LLC v. RPX Corp.,*
    No. 12-CV-1143 YGR, 2013 U.S. Dist. LEXIS 170517 (N.D. Cal. Dec. 3, 2013) ............... 17

*Certain Wireless Devices with 3G and/or 4G Capabilities & Components Thereof,*
    No. 337-TA-868, 2014 WL 2965327 (U.S.I.T.C. June 13, 2014) ..................................... 11

*Clegg v. Cult Awareness Network,*
    18 F.3d 752 (9th Cir. 1994) ......................................................................................... 13

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,*
    690 F.2d 1240 (9th Cir. 1982) ....................................................................................... 2

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) ........................................................................ 6

*Credit Suisse First Bos. Corp. v. Pitofsky*,
    824 N.E.2d 929 (2005) ............................................................................... 18

*Datatreasury Corp. v. Wells Fargo & Co.*,
    522 F.3d 1368 (Fed. Cir. 2008) .................................................................. 20

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells*,
    9 F.3d 1060 (2d Cir. 1993) ......................................................................... 19

*ESG Capital Partners, Ltd. P'ship v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) .................................................................... 13

*Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC*,
    4 N.E.3d 336 (N.Y. 2013) .......................................................................... 18

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*,
    485 N.E.2d 208 (N.Y. 1985) ...................................................................... 18

*Funai Elec. Co. v. LSI Corp.*,
    No. 16-cv-01210-BLF, 2017 U.S. Dist. LEXIS 44866 (N.D. Cal. Mar. 27, 2017) ................. 3

*Gen. Tire & Rubber Co. v. Watson-Bowman Assocs., Inc.*,
    No. 4514, 1976 U.S. Dist. LEXIS 12246 (D. Del. Nov. 17, 1976) ......................... 21

*Hickox v. Friedland (In re HBLS, L.P.)*,
    2001 U.S. Dist. LEXIS 19112 (S.D.N.Y. Nov. 13, 2001) ..................................... 19

*Hosp. Corp. of Am. v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) ..................................................................... 9

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) .................................................... 2-3

*In re Innovatio IP Ventures, LLC Patent Litig.*,
    921 F. Supp. 2d 903 (N.D. Ill. 2013) ......................................................... 21

*In re Negotiated Data Solutions LLC*,
    File No. 051-0094, FTC Decision and Order (Sept. 22, 2008) ............................. 22

*In re Negotiated Data Solutions LLC*,
    File No. 051-0094, Complaint (Sept. 22, 2008) ............................................ 22

*In re Novon Int'l, Inc.*,
    No. 98-cv-0677E, 2000 U.S. Dist. LEXIS 5169 (W.D.N.Y. Mar. 31, 2000) ............ 20-21

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   99 F. Supp. 3d 610 (D. Md. 2015) ....................................................................... 10

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   No. PWG-14-111, 2017 U.S. Dist. LEXIS 197714 (D. Md. Nov. 30, 2017) .......................... 5

*Jones v. Cooper Indus.*,
   938 S.W.2d 118 (Tex. App. 1996) ....................................................................... 23

*Leader Plow Co. v. Bridgewater Plow Co.*,
   237 F. 376 (4th Cir. 1916) ............................................................................... 21

*Levin v. Tiber Holding Corp.*,
   277 F.3d 243 (2d Cir. 2002) ............................................................................. 18

*Madeira v. Affordable Hous. Found., Inc.*,
   469 F.3d 219 (2d Cir. 2006) ............................................................................. 18

*Mandarin Trading Ltd. v. Wildenstein*,
   944 N.E.2d 1104 (N.Y. 2011) ........................................................................... 12

*McClurg v. Kingsland*,
   42 U.S. (1 How.) 202 (1843) ............................................................................. 21

*McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*,
   No. 14-cv-6633 (KBF), 2015 U.S. Dist. LEXIS 3347 (S.D.N.Y. Jan. 12, 2015) .................. 19

*N. Star Steel Co. v. United States*,
   477 F.3d 1324 (Fed. Cir. 2007) ......................................................................... 22

*Orion Pictures Distribution Corp. v. Syufy Enters.*,
   829 F.2d 946 (9th Cir. 1987) ............................................................................. 3

*Paycom Billing Servs. v. MasterCard Int'l, Inc.*,
   467 F.3d 283 (2d Cir. 2006) ............................................................................. 5

*Premium Mortg. Corp. v. Equifax, Inc.*,
   583 F.3d 103 (2d Cir. 2009) ............................................................................. 18

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993) ............................................ 2

*Raiser v. City of L.A.*,
   698 F. App'x 412 (9th Cir. 2017) ....................................................................... 13

*Rembrandt Techs., L.P. v. Harris Corp.*,
    No. 07C-09-059-JRS, 2008 Del. Super. LEXIS 400 (Super. Ct. Oct. 31, 2008) .............. 21, 25

*Rembrandt Techs., L.P. v. Harris Corp.*,
    No. 07C-09-059-JRS, 2009 Del. Super. LEXIS 298 (Super. Ct. Aug. 14, 2009) .................. 25

*Research in Motion Ltd. v. Motorola, Inc.*,
    644 F. Supp. 2d 788 (N.D. Tex. 2008) ............................................................................. 17

*Saint Lawrence Communications LLC v. Apple Inc.*,
    No. 2:16-cv-00082, ECF 241 (E.D. Tex.) ........................................................................ 24

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ........................................................................................... 13

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
    425 F.3d 119 (2d Cir. 2005) ............................................................................................ 19

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
    977 F. Supp. 2d 462 (E.D. Pa. 2013) ............................................................................... 11

*URS Corp. v. Transpo Grp., Inc.*,
    No. C14-00860 RSM, 2015 U.S. Dist. LEXIS 11340 (W.D. Wash. Jan. 30, 2015) .............. 18

*Vapor Point LLC v. Moorhead*,
    832 F.3d 1343 (Fed. Cir. 2016) ....................................................................................... 12

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172, 86 S. Ct. 347 (1965) ................................................................................... 3

*Wiles v. Capitol Indem. Corp.*,
    280 F.3d 868 (8th Cir. 2002) ........................................................................................... 13

*Worley v. Tobacco Co.*,
    104 U.S. 340 (1881) ........................................................................................................ 21

**Other Authorities:**

Jorge L. Contreras, *A Market Reliance Theory for FRAND Commitments
    and Other Patent Pledges*, 2015 UTAH L. REV. 479 ..................................................... 11, 22

Thomas F. Cotter, *Comparative Law and Economics of Standard-Essential Patents
    and FRAND Royalties*, 22 TEX. INTELL. PROP. L.J. 311 (2014) ......................................... 22

DOJ & FTC,
    *Horizontal Merger Guidelines* (Aug. 19, 2010) ............................................................... 7

David S. Evans, *Attention Rivalry Among Online Platforms*,
9 J. COMPETITION L. ECON. 313 (2013) .......................................................................... 8

David S. Evans & Elisa V. Mariscal, *Market Definition Analysis in Latin America
with Applications to Internet-Based Industries*, 9 ISJLP 531, 536-537 (2014) ...................... 8

Brent Fisse & Andrew F. Simpson, *Compelled to Compete? Assessing Market Power
in  Regulated Markets*, 1995 CCLJ LEXIS 19 (Nov. 29, 1995) .................................. 8

Eli Greenbaum, *Puzzles of the Zero-Rate Royalty*,
27 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1 (2016) ......................................... 22

Jay P. Kesan & Carol M. Hayes., *FRAND's Forever: Standards, Patent Transfers,
and Licensing Commitments*, 89 Ind. L.J. 231, 289 (2014) ....................................... 22

David W. Long, *Litigating Standard Essential Patents at the U.S. International
Trade Commission*, 17 SEDONA CONF. J. 671 (2016) ............................................... 22

William A. Mogel,
*Regulation of the Gas Industry* (Matthew Bender 2017) (1981) ................................. 9

Fiona M. Scott Morton & Carl Shapiro, *Strategic Patent Acquisitions*,
79 ANTITRUST L.J. 463 (2014) .................................................................. 10

Maureen K. Ohlhausen, *The Elusive Role of Competition in the
Standard-Setting Antitrust Debate*, 20 STAN. TECH. L. REV. 93 (2017) ................................. 7

RESTATEMENT (SECOND) OF CONTRACTS §§ 20, 273, 279, 302 ...............................17-19

J. Gregory Sidak, *International Trade Commission Exclusion Orders for the
Infringement of Standard-Essential Patents*,
26 CORNELL J. L. & PUB. POL'Y 125 (2016) ....................................................... 22

Florian Wagner-von Papp, *Should Google's Secret Sauce Be Organic*,
16 MELBOURNE J. OF INT'L LAW 288 (2015)........................................................ 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Despite Apple's accusations of serial litigation and manipulation of the legal system, it is Apple who cannot seem to take a single case to judgment on a straightforward theory. Rather, Apple is using this Court to interfere with ongoing litigation in the Eastern District of Texas by pleading a diverse set of claims based on contradictory factual allegations in utter disregard for bedrock principles of contract and antitrust law.

Apple's complaint of antitrust injury distills to its assertion that Acacia is able to litigate at lower cost and risk than VoiceAge and can otherwise charge higher prices for patent licenses as a patent monopolist than VoiceAge could as a patent monoplist. This ignores, however, the fact that litigation is constitutionally protected activity precluding antitrust scrutiny. It also ignores the fact that Apple only alleges harm to itself and others as consumers of patented technologies and not harm to competition, which antitrust law requires. There can be no harm to competition when Acacia already holds a monopoly as to its patented technologies. In other words, there is no way for a market to become less competitive than a monopoly.

Further, Apple's purported contract claim distills to an assertion that Acacia inherited (one way or another) VoiceAge's FRAND commitments, regardless of whether Acacia and VoiceAge ever intended that Acacia license on FRAND terms. This ignores that the intention of the parties governs the terms of any contract. This includes whether Apple is an intended beneficiary. Contractual obligations only pass by the mutual intent of the parties.

**I.**     **Apple Fails to Plead a Cause of Action Under Antitrust Law.**

It is unclear what Acacia did to implicate it under any relevant antitrust law. As Apple pleads, Acacia is in the business of acquiring patents via transfer agreements and asserting those patents against infringers. The assertion of patents is constitutionally protected and cannot be the basis of an antitrust claim. Moreover, Acacia's patent acquisitions merely transferred lawfully-acquired monopolies from a less effective monopolist, VoiceAge, to a more effective monopolist, Acacia, and so cannot create a harm to competition. Apple's response brief oddly includes an entire section claiming, first, that the actual ***transfer*** of the patent monopolies from VoiceAge to Acacia does not give rise to Apple's antitrust claims yet, second, Acacia's ***litigation***

is not constitutionally protected because it is just **one part** of an anticompetitive scheme that generates anticompetitive harm independent of the litigation. ECF 128 at 39-42. But Apple never identifies **what else** Acacia does that causes a harm to competition, and goes to great pains in its Second Amended Complaint ("SAC"), and its response, to detail how Acacia's involvement in any licensing scheme centers on its actual or threatened litigation. As a result, Apple has failed to state an antitrust claim.

### A. Acacia's Patent Enforcement Is Immune From Antitrust Liability.

As Acacia argued in its motion, litigation claims are immune from antitrust liability under the *Noerr-Pennington* doctrine, unless brought in bad faith. ECF 123 at 26-29. Apple does not allege sham litigation, as required by the U.S. Supreme Court, but instead relies on a small number of lower court cases that it claims authorize antitrust actions based on "pattern of anticompetitive conduct of which litigation is only one part." ECF 128 at 41. That is not the law. And even if it were, Apple's allegations are almost exclusively related to litigation, from the purported motivation for any conspiracy or acquisition to the damages arising therefrom.

### 1. Apple Cannot Derive Its Anticompetitive Harms From Litigation Conduct.

Apple first relies on *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1263 (9th Cir. 1982) for the proposition that it can bring an antitrust claim for "a pattern of anticompetitive conduct of which litigation is only one part." ECF 128 at 40-41. But *Clipper Exxpress* is not good law for this point. "The *Clipper Exxpress* decision preceded the Supreme Court's decision in *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993) ('*PRE*'), which requires Plaintiff to meet the 'sham' exception to *Noerr-Pennington* immunity[.]" Apple acknowledges that it does not allege sham litigation. *See* ECF 128 at 41.

Apple also cites *Hynix* for the proposition that it can bring an antitrust claim based on non-sham litigation where: "(1) the 'other aspects of the scheme independently produce anticompetitive harms' and (2) 'the accused patent litigation was causally connected to these

anticompetitive harms.'" *Id*. at 41 (citing *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007). *Hynix* is inapposite and inapplicable for the reasons discussed in Acacia motion: (1) it only authorizes the inclusion of litigation costs as damages, not litigation as the vehicle by which the harm was caused; (2) it is no longer good law in this Circuit; and (3) it was never good law in the Federal Circuit, which governs these claims. ECF 123 at 28-29. Additionally, the *Hynix* opinion only "laid out a rule for when patent litigation may be included among a plaintiff's **section 2** scheme allegations." *Hynix*, 527 F. Supp. 2d at 1098 (emphasis added).[1] Apple has not brought a Section 2 claim.

*Hynix* is also inapplicable on its facts. There, the plaintiff alleged that Rambus perpetrated fraud on the SSO, which constituted an independent basis for antitrust analysis based on the particular harms to competition that arise from **deception** and the peculiar likelihood that monopoly power will be **created** in that process.[2] Here, Apple has not alleged deception; it has alleged a breach of contract. A mere breach of contract, unlike deceptive behavior, does not give rise to a cause of independent action under the antitrust laws. *Orion Pictures Distribution Corp. v. Syufy Enters.*, 829 F.2d 946, 949 (9th Cir. 1987) (holding that where duties are governed by contract, the claim sounds in contract rather than antitrust, even where the breach was made possible only by monopolization).

2.  **Apple Does Not Allege a Course of Conduct *Including* Litigation; It Alleges** Only **a *Course of Litigation Conduct*.**

The facts that Apple pleads, taken as true, make clear that Acacia is all about litigating patents. Apple pleads that patent assertion is Acacia's only source of revenue. ECF 128 at 3 (citing SAC ¶¶ 2, 5). Apple pleads that Acacia, completely independent of VoiceAge, "has

---

[1] *Funai Elec. Co. v. LSI Corp.* is predicated on the same Section 2 claim alleging the same sort of fraudulent conduct. *See* No. 16-cv-01210-BLF, 2017 U.S. Dist. LEXIS 44866, at *14-16 (N.D. Cal. Mar. 27, 2017).
[2] *Hynix*, 527 F. Supp. 2d at 1098 (citing *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007)). ***Fraudulently*** using patents to generate a monopoly has long been an exception to *Noerr-Pennington* immunity. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177-78, 86 S. Ct. 347, 350-51 (1965).

1　every incentive to and does demand excessive royalties[,]" in hopes of an "exorbitant damages

2　award if [infringers] choose to defend themselves through trial[.] SAC ¶ 31. Apple pleads that

3　Acacia is effective at litigating patents, doing so at a lower cost and with less risk than product-

4　producing companies. *See* ECF 128 at 3-4 (citing SAC ¶¶ 29-32). Indeed, according to Apple,

5　Acacia's independently-developed reputation for litigating, and ability to litigate so successfully,

6　was the entire motivation for VoiceAge selling its patents to Acacia and retaining an interest in

7　the revenues. *Id.* at 4; SAC ¶ 25. Apple also pleads that Acacia succeeded at its job—it obtained

8　litigation victories and supra-FRAND royalties for the former VoiceAge patents. SAC ¶ 27.

9　　　　Apple's Section 7 claim against Acacia identifies "Acacia's assertions and coercive

10　litigation designed to extract exorbitant royalties" as the only way in which Acacia "lessen[ed]

11　competition substantially" or tended "to create monopolies in the SEP Technology Markets[.]"

12　SAC ¶ 51. In its response, the only "inefficiencies" Apple identifies are litigation related:

13　Acacia's ability to win patent infringement actions more often and litigate them at lower

14　(financial and reputational) cost. ECF 128 at 30 (citing SAC ¶¶ 30-32). Likewise, the only

15　damages Apple claims stem not from the patent acquisitions, but from the patent assertions:

16　"Apple's past and continuing harm includes litigation costs, supracompetitive licensing rates,

17　business uncertainty, and business resources lost in dealing with the consequences of Acacia's

18　assertion of its acquired VoiceAge patents." SAC ¶ 53. While Apple's Section 1 claim is less

19　brazen, it is also wholly-conditioned on the claim that Acacia would "exploit[] the patents in

20　ways that VoiceAge could not by acting alone." SAC ¶ 55; *see also* ECF 128 at 35-36. Apple's

21　response makes clear that the ***only*** thing Acacia could do that VoiceAge could not is litigate

22　patent infringement claims effectively, for the same reasons identified above.

23　　　　Apple pleads that Acacia and VoiceAge formed an agreement with the express intent of

24　having Acacia seek to enforce its patents. The entire purpose of their agreement was for Acacia

25　to litigate the patents, or threaten to litigate the patents, and share the revenues with VoiceAge.

26　This is not litigation in furtherance of some ***other*** scheme. If it is a "scheme" at all, it is one of

27　litigation, assigning the rights to litigate to the party who can litigate most efficiently.

28

1    With similar allegations, another court recently held that the *Noerr-Pennington* doctrine

2    applied to immunize patent assertion by a PAE. *See Intellectual Ventures I LLC v. Capital One

3    Fin. Corp.*, No. PWG-14-111, 2017 U.S. Dist. LEXIS 197714, at *48-77 (D. Md. Nov. 30,

4    2017). Like Apple, Capital One argued "that *Noerr-Pennington* immunity simply does not apply

5    because the 'litigation conduct is part of a broader monopolistic scheme,' and '*Noerr* does not

6    insulate the entire scheme.'" *Id*. at *50 (quoting Capital One's briefing). Like Apple, Capital

7    One pursued Section 7 claims and argued that the acquisition of patents by a PAE "to create

8    market power" constituted an independent basis for antitrust immunity without allegations

9    related to its litigation campaign. *Id*. at *50-51. The court found, however, that because the

10   harm to competition required to state a claim necessarily relied on the allegations regarding

11   litigation, the litigation allegations were an "integral component of the [patentee's] alleged

12   strategy." *Id*. at *51-52. Because Apple's theory of harm to competition and attendant damages

13   both arise directly from Acacia's patent assertions, its antitrust claims should be dismissed based

14   on Acacia's *Noerr-Pennington* immunity.

15       **B.      Apple Fails to Adequately Allege Harm to Competition.**

16       Apple's response fails to show how Apple pled a harm to ***competition*** as distinct from

17   harm to ***competitors*** or harm to ***consumers*** arising from a cause other than harm to competition.

18   As such, Apple's claim cannot sound in antitrust law. As Acacia argued in its motion, (1) all of

19   Apple's antitrust claims require Apple to plead a harm to competition; (2) a harm to competition

20   occurs through reducing the number of competitors or precluding a competitor from entering a

21   market and competing on price; and (3) this harm must be adequately pled to avoid dismissal on

22   the pleadings.[3] "Without harm to competition, there can be no antitrust injury and, consequently,

23   no antitrust standing."[4]

24

25

26   [3] ECF 123 at 25-26, nn. 75-78 (collecting authority).
     [4] *Paycom Billing Servs. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 294 (2d Cir. 2006) (citing
27   *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). There is an exception
     for conduct that is *per se* illegal, but Apple has not alleged any conduct that meets that standard.
28

1    Apple's only attempt to show harm to competition comes in its response at 30-31, where

2    it identifies the allegations of SAC ¶¶ 29-33, 51-52.  All that these paragraphs allege is that

3    Acacia has driven up prices for patent licenses because PAEs are better able than product-

4    producing companies to pursue litigation.[5]  Conspicuously absent from any of these paragraphs

5    is an allegation that Acacia has reduced the number of competitors, or increased barriers to entry,

6    in any "SEP Technology Market."

7    Apple asserts that higher prices are an injury to competition, citing *Coalition for ICANN*

8    *Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 504 (9th Cir. 2010).  *See* ECF 128 at 39.

9    That argument fails for several reasons.  First, it was not only a high price, but a high price

10   "under conditions hostile to competition" that resulted in that decision.  *See* 611 F.3d at 504.

11   Specifically, the allegations were sufficient to state a claim only "in that potential competitors

12   are allegedly unable to bid for operation of the .com registry"—a state of affairs that arose from a

13   conspiracy to eliminate bidding for a contract, which was specifically recognized as stating a

14   Section 1 claim.[6]  Second, the court conflated the "anti-competitive effect" with the "injury to

15   competition."  *Id*.  The Ninth Circuit subsequently corrected this, holding that while allegations

16   of increased prices were sufficient to state that one had suffered harm ***from*** an injury to

17   competition, these allegations were insufficient to plead the injury ***to*** competition itself.[7]

18   There is no question that Apple has pled that the current monopolist (Acacia) charges

19   higher prices for licenses than the previous monopolist (VoiceAge).  But Apple's allegations on

20

21   _____

   [5] *See* SAC ¶¶ 29 (Acacia "used the patents to exploit product suppliers in ways VoiceAge could
22   not."), 30 (Acacia is not faced with constraints on its bringing of lawsuits, and can do so at lower
   cost and lower risk of patent invalidity), 31 (Acacia obtains higher settlements due to risk of high
23   damages award at trial), 32 ("Courts are limited in their practical ability to police erroneous
   awards due to the structure of PAEs."), 33 (legal conclusions regarding lack of efficiencies,
24   claiming PAEs "do not face the same structural constraints as operating companies), 51 (legal
   conclusion on lessened competition), 52 (legal conclusion on lack of efficiencies).
25   [6] *Id.* at 502-05 (noting that where cap expired and contract was reached through competitive
   bidding process, no antitrust injury took place).
26   [7] *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (affirming dismissal of
   antitrust claim).  Importantly, an earlier version of the claim that did allege exclusion of
27   upstream suppliers survived a motion to dismiss.

28

this point conflate harm to competition, anticompetitive effects, and antitrust injury. The Acting Chairman of the FTC explained the important difference:

> A recurring source of confusion lies in the relationship between harm to competition, anticompetitive effects, and antitrust injury. Lifting a competitive constraint yields poor market outcomes, which in turn inflict the antitrust injury necessary for a private litigant to state a claim. But the violation focuses on the dissolved market constraint, not the ultimate price and output effects. Antitrust doctrine does not focus on consumer harm directly. It scrutinizes the means by which that harm materializes. Of course, market effects matter to the larger analysis, but in meritorious antitrust cases they represent a symptom of an injury to the competitive process. **Market outcomes do not define the antitrust violation.**

Hon. Maureen K. Ohlhausen, *The Elusive Role of Competition in the Standard-Setting Antitrust Debate*, 20 STAN. TECH. L. REV. 93 (2017) (emphasis added).[8]

Apple cannot possibly plead that Acacia's action resulted in a harm to competition. A monopoly is the lowest amount of competition a market can have: you cannot reduce ***competition*** from a state of monopoly because you cannot reduce the number of ***competitors*** (and potential competitors) from zero. Apple pled that (1) SSOs set standards; (2) product-makers became locked into the standard; and (3) VoiceAge acquired the relevant patent monopolies all well before Acacia was involved. *See* SAC ¶¶ 13-15, 24-25. By the time Acacia became involved, competition was already entirely eliminated. Acacia simply acquired the same monopoly VoiceAge had, though Apple pleads that Acacia better capitalized on it.

Apple frequently remarks in its response, and pleads in its SAC, that Acacia does not face the same "constraints" that VoiceAge does. Apple also cites the Horizontal Merger Guidelines to argue that that market power results from "diminished competitive constraints or incentives."[9] But not all constraints and incentives are "competitive" constraints and incentives. Rather, the term "competitive" has a meaning derived from antitrust economics.[10]

---

[8] Acacia invites the Court's attention to this entire article, which addresses the particular issue of FTC and other antitrust enforcement regarding SSOs and patentees.
[9] *See* ECF 128 at 30-31 (citing DOJ & FTC, Horizontal Merger Guidelines § 2 (Aug. 19, 2010)).
[10] Similarly, Apple often uses the term "structure" or "structural" in a way that seems intended to have antitrust import (e.g., ECF 128 at 39). The "structure" of import to antitrust economics is "market structure," which refers to the arrangement of buyers and sellers in the market (e.g.,

The economically salient feature of a monopoly is that the monopolist faces only two types of constraints in determining its profit-maximizing price and level of output: (1) **technological constraints** of production (i.e., the ability to obtain a given output with the resources available), represented by its **cost function**;[11] and (2) **constraints imposed by consumer behavior** (i.e., the willingness of consumers to purchase goods at different prices), represented by the consumers' **demand function**. *See* Ex. 1 at 233-234. In all other types of markets, producers face **competitive constraints** (i.e., constraints imposed by competing producers). In an oligopoly, competitors are constrained by the behavior of competing producers and behave strategically. *Id*. at 285-286. In perfect competition (i.e., as the number of competitors approaches infinity), competitive constraints are total: a competitor is so constrained by the behavior of other participants that he can only price at his marginal cost. *Id*. at 290.

It is these constraints imposed by competitors, and the incentives of competitors to act in a constraining way, that are of antitrust import. Examples of **competitive constraints** include, for instance: (1) the output and pricing decisions of direct competitors; (2) the ability of non-competitors to enter the market and become competitors; (3) the availability and utility of substitutes (taking into account switching costs); and (4) innovation (i.e., the potential for market disruption by a new entrant introducing new technology).[12] Similarly, the relevant "incentives" are the incentives to actually engage in competition.

_____

perfect competition, monopolistic competition, oligopoly, monopoly, monopsony). That is not the sense in which Apple is using that word.

[11] For a goods-producing firm, the cost function might include, for example, the cost of overhead, labor and materials. For a patent assertion entity, the costs of licensing include such things as the cost of obtaining the patents, the costs of generating a credible litigation threat, the expected cost of having one's patent found invalid, etc.

[12] *See* David S. Evans and Elisa V. Mariscal, *Market Definition Analysis in Latin America with Applications to Internet-Based Industries*, 9 ISJLP 531, 536-537 (2014); s*ee also* Florian Wagner-von Papp, *Should Google's Secret Sauce Be Organic*, 16 MELBOURNE J. OF INT'L L. 288, 307, 310-313 (2015) (noting that it is other "players" or market participants who create "competitive constraints" and that market definition must take into account full range of constraints); David S. Evans, *Attention Rivalry Among Online Platforms*, 9 J. COMPETITION L. ECON. 313-357 (2013) (discussing "competitive constraints" as those posed by competitors); Brent Fisse and Andrew F Simpson, *Compelled to Compete? Assessing Market Power in Regulated Markets*, 1995 COMPETITION & CONSUMER L.J. 19 (Nov. 29, 1995) ("Under this

1    The constraints Acacia can "evade," as Apple pleads it, are not **competitive** constraints, as

2    these did not exist for VoiceAge or Acacia once the standard-setting process (or patent-granting

3    process, depending on what exactly an "SEP Technology Market" is) granted VoiceAge an

4    ability to exclude all others in the market.  The constraints that Acacia can avoid, as Apple

5    pleads it, are the **technological** constraints about which antitrust laws have nothing to say.  For

6    example, Apple pleads that Acacia faces lower costs of assertions because it does not incur

7    reputational costs and has lower risks of results of patent invalidity.  *See* ECF 128 at 30 (citing

8    SAC ¶¶ 30-32).  These have nothing to do with constraints imposed by competitors; they have

9    only to do with the cost to Acacia of pursuing a license.

10       **C.    Apple's Section 7 Allegations Fail.**

11       Apple argues that it need not allege that Acacia and VoiceAge competed in the same

12   market prior to Acacia's acquisition of VoiceAge patents because Section 7 applies to vertical

13   and conglomerate mergers.  But vertical merger cases do not help Apple because Apple alleges

14   no facts indicating that Acacia participates in any market that is upstream or downstream from

15   the market in which it made its acquisition.  Indeed, Apple pleads that Acacia does not produce

16   anything that would require it to fear a patent suit.  *See* SAC ¶¶ 2, 5, 30.  And even a vertical

17   merger theory is predicated on **increasing the concentration** of firms in a relevant market.[13]

18       Apple's effort to drum up support for its Section 7 theory just illustrates the weak reed on

19   which it relies.  The only case Apple cites in support addressed different arguments than

20

21   [competitive constraints] model, only the constraints imposed by competitors are relevant when

22   assessing market power."); 1-7 Regulation of the Gas Industry § 7.03 (2017) ("In order for a
     competitor to establish the requisite antitrust injury, it must allege harm to competition itself,

23   such as the elimination of a superior product or lower-cost alternative, and not simply economic
     harm to the competitor.").

24   [13] Without this kind of market participation, the rationale for antitrust review of vertical mergers

25   disappears.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S. Ct. 1502, 1523
     (1962) ("Every extended vertical arrangement by its very nature, for at least a time, denies to

26   competitors of the supplier the opportunity to compete for part or all of the trade of the customer-
     party to the vertical arrangement.").  In any event, the line of cases exemplified by *Brown Shoe*

27   and cited by Apple are of dubious continued validity.  *See, e.g., Hosp. Corp. of Am. v. FTC*, 807
     F.2d 1381, 1386 (7th Cir. 1986).

28

presented here and involved a different theory.  *See* ECF 128 at 33 (citing *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d 610 (D. Md. 2015)).  In *Intellectual Ventures I*, the court rejected arguments that (1) the counterclaimants do "not 'allege[] a plausible relevant market' or 'Intellectual Ventures' share of that market'" and (2) the legality of an acquisition is measured at the time of the acquisition.  99 F. Supp. 3d at 629-30 (alterations in original).  But the theory pled was the precise one Apple cannot plead here: that ***combining*** subsequently-acquired patents with earlier-acquired patents ***created*** a monopoly that did not previously exist.  *Id*. at 623.  Here, Apple has no allegations related to aggregation.  Similarly, the scholarly support Apple purports to have does not endorse its theory; the Carrier article is a non-scholarly trade journal piece, while the Morton & Shapiro article finds that pure (non-privateer) "PAEs are neutral with respect to downstream firms.  This is not true of either the hybrid PAE or a downstream firm acquiring patents.  Patent acquisitions by hybrid PAEs and downstream firms are more likely to raise antitrust issues than are patent acquisitions by pure PAEs."[14]

## II.      Apple Fails to Plead a Cause of Action for Breach of Contract It Can Enforce Against Acacia.

Apple's confused treatment of its own breach of contract allegations illustrates both its failure to adequately put Acacia on notice of the claims against it, and its inability to articulate any plausible legal theory giving Apple a right to enforce any contract to which Acacia is a party.  Apple's response attempts to shoehorn its breach of contract pleading into two theories of contractual liability: "(1) Apple is an intended third-party beneficiary of contracts between VoiceAge and Acacia that obligated Acacia to assume VoiceAge's commitments to license the VoiceAge patents on FRAND terms, and (2) VoiceAge's FRAND commitments to ETSI run with the patents and bind successors-in-interest, including Acacia."  ECF 128 at 11.

Apple's first theory is contradicted by Apple's pleading and cannot be litigated in this forum.  Apple's contract claim in its SAC was based exclusively on the VoiceAge-ETSI

---

[14] Fiona M. Scott Morton & Carl Shapiro, *Strategic Patent Acquisitions*, 79 ANTITRUST L.J. 463, 490 (2014).  In other words, Apple's patent acquisitions are more concerning than Acacia's.

contracts, and Apple made factual allegations that make it impossible to infer that Acacia and VoiceAge intended to bind Acacia to license on FRAND terms or otherwise intended Apple to be able to enforce such a commitment. And if they did so intend, Apple is bound by an arbitration clause that precludes this Court from hearing the case.

Apple's second theory is untrue as a matter of law and does not provide a basis for Acacia's *contractual* liability in any event. First, contractual obligations other than licenses do not run with the patent; they only pass to new patent owners if (and to the extent) the new owner agrees by contract to take those obligations. Second, if the FRAND obligation does pass to Acacia by *operation of law* (i.e., does run with the patent), Apple cannot enforce a breach of contract claim, but instead has another equitable (e.g., quasi-contract) claim that it did not plead.

In addition, the facts Apple must plead under either theory preclude it from maintaining a breach of contract claim against VoiceAge and seriously undermine Apple's antitrust allegations. The simple truth is that based on Apple's pleadings and argument, at least some, and likely all, of Apple's claims must be dismissed.

### A. Apple Fails to Recognize the Relevant Law.

Apple claims that the ETSI IPR Policy is governed by French law. ECF 128 at 11, n.9. French law is relevant, if at all, only in the "construction, validity and performance" of ETSI IPR Policy and the (unspecified) Declarations. *See* ECF 76.9 at 42, 43. In any event, (1) the ETSI IPR *Policy* is not a contract;[15] (2) Acacia was never a party to it, as Acacia was never an ETSI member and Apple does not allege otherwise; and (3) the ETSI IPR Policy does not bind *anyone* to license SEPs (much less *declared* SEPs) on FRAND terms.[16] As a result, French law is not relevant to the points in dispute on either of Apple's theories.

---

[15] *Certain Wireless Devices with 3G and/or 4G Capabilities & Components Thereof*, No. 337-TA-868, 2014 WL 2965327 (U.S.I.T.C. June 13, 2014); Jorge L. Contreras, *A Market Reliance Theory for FRAND Commitments and Other Patent Pledges*, 2015 Utah L. Rev. 479, 506; *cf. TruePosition, Inc. v. LM Ericsson Tel. Co.*, 977 F. Supp. 2d 462, 469-70 (E.D. Pa. 2013) (holding that 3GPP policy is too indefinite to constitute a contract).

[16] *See* ECF 76.9 at §§ 4.1, 6.1bis (requiring disclosure using declaration form, but not requiring a member to license on FRAND terms), 6.1 (requiring Director-General of ETSI to "request" that a patent owner, whether an ETSI member or not, agree to license on FRAND terms); *id.* at 43

ACACIA PARTIES' REPLY MEMORANDUM
REGARDING MOTION TO DISMISS
CASE NO. 5:16-CV-07266-EJD

Instead, New York law governs the Acacia-VoiceAge Contract. *See* ECF 132, Ex. A §

7.2. And Apple's operation-of-law theory turns on questions of state and federal property,

contract, and patent law. State law governs questions of legal title to patents by operation of law,

while federal law governs questions about the validity and terms of an assignment of a patent (or

license) for purposes of standing to pursue a patent infringement claim.[17]

**B.      Apple Cannot Proceed on the Theory That It Was an Intended Beneficiary of the Acacia-VoiceAge Contract.**

Apple's belated effort to claim status as an intended beneficiary of the Acacia-VoiceAge

contract fails for three reasons. First, the text of the SAC does not support that theory. Second,

the facts Apple pled in the SAC contradict both the existence of Acacia's contractual obligation

and the intent that Apple be able to enforce such an obligation. Third, Apple's claims—if it can

bring them at all—are subject to binding arbitration and cannot be litigated in this forum.

The Court should first determine if Apple pled facts sufficient to plausibly infer that

Acacia and VoiceAge had a meeting of the minds on a contract term requiring Acacia to license

acquired patents on FRAND terms. If so, then the Court should determine whether Apple pled

facts sufficient to plausibly infer that Acacia and VoiceAge intended that Apple be able to

enforce that obligation.[18] Only if both inquiries are answered affirmatively can Apple bring a

---

(distinguishing "IPR INFORMATION STATEMENT" mandated in "accordance with Clause 4.1 of the ETSI IPR Policy" from "IPR LICENSING DECLARATION" made accordance with Clause 6.1 of the ETSI IPR Policy" and authorizing the declarant to claim it is "not prepared to make the above IRP Licensing Declaration").

[17] *Vapor Point LLC v. Moorhead*, 832 F.3d 1343, 1352-53 (Fed. Cir. 2016); *see also Abraxis Bioscience, Inc. v. Navinta LLC*, 672 F.3d 1239, 1243 (Fed. Cir. 2011) ("Thus, we must begin with the proposition that state law governs the relationship between contracting parties, even vis-á-vis their ownership of patent rights, where application of state law does not create a 'significant conflict' with federal policies or interests articulated in a Congressional Act.").

[18] *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) ("Generally, a party alleging a breach of contract must demonstrate the existence of a contract reflecting the terms and conditions of their purported agreement. In the context of a third-party beneficiary claim, the plaintiff must establish: (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for its benefit, and (3) that the benefit to it is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate it if the benefit is lost.") (internal citations and punctuation omitted).

contract cause of action against Acacia.  If either is answered in the negative, then Apple's claim does not sound in contract, and its breach of contract claim must be dismissed.

Apple misses the mark when it states that "Acacia's argument reduces to a claim that Apple is not entitled to enforce the FRAND commitments that Acacia concedes bind it."  ECF 128 at 12.  Acacia's first argument is that the facts[19] Apple pleads give rise to the legal conclusion that Acacia has *no* contractual obligations to license any patents on FRAND terms.

**1.  Apple cannot plead contradictory facts; when the facts Apple pleads contradict Apple's legal assertions, the factual claims are assumed true and legal conclusions are disregarded.**

The Court should ignore any legal conclusions Apple draws from the facts it pleads, including legal conclusions cast in the form of factual allegations.[20]  While the Court should accept all of Apple's well-pled facts as true, a "court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences[.]"[21]  Apple does not respond to Acacia's argument (ECF 123 at 7-8) that Apple cannot plead in the alternative regarding whether Acacia and VoiceAge had a meeting of the minds on a contract term obliging Acacia to license on FRAND terms.

---

[19] "Facts," in this instance, refer to factual allegations, not truths.  For example, while Acacia believes VoiceAge fully intended Acacia to license on FRAND terms, Apple pleads the "fact" that VoiceAge wanted Acacia to *refuse* to license on FRAND terms.

[20] *ESG Capital Partners, Ltd. P'ship v. Stratos*, 828 F.3d 1023, 1031 (9th Cir. 2016) ("The court must accept as true the facts alleged in a well-pleaded complaint, but mere legal conclusions are not entitled to an assumption of truth.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994) ("However, the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.") *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) ("While the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations.").

[21] *Raiser v. City of L.A.*, 698 F. App'x 412, 413 (9th Cir. 2017) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

1     **2.     Apple's basis for its breach of contract claim in the SAC is that**

2          **it was an intended beneficiary of VoiceAge-ETSI contracts, *not***

3              **the Acacia-VoiceAge Contract.**

4          Even if Apple's newly-promulgated legal theory were theoretically viable and consistent

5     with the pleaded facts, Apple failed to plead it.  Apple claimed only that it was an intended

6     beneficiary of *VoiceAge-ETSI* contracts, ***not*** an intended beneficiary of the ***Acacia-VoiceAge***

7     Contract.  Apple's response identifies a single sentence fragment from a single paragraph to

8     support its theory that it is an intended beneficiary of the Acacia-VoiceAge Contract.  *See* ECF

9     128 at 12-15 (quoting claim in SAC ¶ 44 that Acacia "entered into or was assigned the express or

10    implied contractual commitments with ETSI.").

11         This is insufficient to state a claim against Acacia for breach of the Acacia-VoiceAge

12    Contract.  First, it is a legal conclusion about the legal effect of the patent transfer that the Court

13    need not credit.  Second, Apple justified this claim not by claiming that Acacia and VoiceAge

14    ***agreed*** that Acacia would assume VoiceAge's obligations, but by claiming that "FRAND

15    commitments are binding on all subsequent patent owners."  SAC ¶ 43.  Third, the conclusion

16    Apple drew from this claim was not that Acacia and VoiceAge intended to vest Apple with

17    authority to enforce the Acacia-VoiceAge Contract, but rather that "Apple, as a member of ETSI

18    and an implementer of ETSI standards, is an intended third-party beneficiary of VoiceAge's and

19    Acacia's contracts ***with ETSI***" and that it was "VoiceAge's agreement ***with ETSI***" that

20    "continues to bind Acacia."  SAC ¶ 45 (emphasis added).  This is an operation-of-law theory.

21         This understanding of Apple's pleading is confirmed by Apple conflating the VoiceAge-

22    Acacia Contract and the VoiceAge-ETSI contracts elsewhere in its SAC and response.  Apple's

23    citation to French law, for example, can refer only to the VoiceAge-ETSI contracts for the

24    reasons discussed above. Similarly, as discussed below, all of Apple's citations in support of its

25    argument rely on cases maintaining that standards implementers are third-party beneficiaries of

26    contracts ***with SSOs***.  As a result, Apple's only theory is that Acacia assumed the VoiceAge-

27    ETSI contracts by ***operation of law*** rather than by contractual agreement.  The Court should

28

reject Apple's effort to manufacture a well-pled contract cause of action out of its unnatural interpretation of a single sentence that states a bare legal conclusion.

### 3. Apple pleads facts sufficient to show that it is *not* an intended beneficiary of any Acacia-VoiceAge Contract term obliging Acacia to license acquired patents on FRAND terms.

If VoiceAge breached its obligation to contractually bind Acacia to license the VoiceAge patents on FRAND terms, Acacia has no contractual obligation to license the VoiceAge patents on FRAND terms.[22] If Acacia and VoiceAge agreed that Acacia would ***not*** license on FRAND terms, but instead seek supra-FRAND royalties, then Acacia did not acquire any contractual commitments to license on FRAND terms.[23] And even if VoiceAge and Acacia theoretically could conspire to breach a contract to which they were the only principal parties, mutually intending to give VoiceAge a cause of action against Acacia, it is utterly implausible to infer (and Apple does not plead) that they would have intended to give ***Apple*** a right to enforce the contractual provision they intended to ignore from the beginning.

### 4. Apple's factual allegations regarding VoiceAge's purported breach of contract and Acacia and VoiceAge's purported antitrust conspiracy contradict the legal conclusion that Acacia is contractually bound to adhere to VoiceAge's FRAND obligations.

Apple specifically pled that ***VoiceAge and Acacia both intended for Acacia to violate VoiceAge's FRAND commitments to ETSI*** and obtain supra-FRAND royalties. *See* ECF 123 at

---

[22] Importantly, the converse is also true. If the Court finds that Apple pleads that Acacia and VoiceAge ***did*** intend for Acacia to fulfill VoiceAge's obligations to ETSI, and made that term part of the contract (whether or not Apple can enforce it), then it must dismiss Apple's breach of contract claim against VoiceAge, which is explicitly predicated on VoiceAge's failure to contractually bind Acacia to adhere to VoiceAge's ETSI commitments.

[23] Acacia does not address here whether Apple has other claims available to it, such as a breach of contract action against VoiceAge for failure to bind Acacia, or an equitable defense to damages in a patent litigation action, or some other claim based on the operation-of-law argument discussed *infra*.

8-9; *see also* SAC ¶¶ 2, 25, 46, 55. Apple doubles down on this assertion in its response, claiming that "VoiceAge and Acacia […] had a meeting of the minds[] to employ the patent transfers [sic] to evade FRAND commitments[.]" ECF 128 at 36. If that is true, then Acacia and VoiceAge could not have reached a meeting of the minds on the opposite term (i.e., they could not possibly have simultaneously agreed that Acacia would perform VoiceAge's FRAND commitments to ETSI).[24]

Apple asserts that "Apple is plainly a third-party beneficiary of the FRAND commitments Acacia acquired from VoiceAge." ECF 128 at 13. Apple then goes on to cite a slew of cases holding that standards-implementers are usually intended beneficiaries of FRAND commitments to SSOs. *Id*. But that does not respond to Acacia's argument. Rather, it begs the question. Acacia's argument is that Apple failed to plead facts sufficient to show that ***Acacia agreed*** to be bound by those commitments. Assuming arguendo that Apple is an intended beneficiary of any agreement by VoiceAge to abide ETSI's IPR Policy, or of any relevant VoiceAge Declarations, Apple fails to adequately plead the link ***to Acacia***. Acacia is not presently disputing Apple's status as an intended beneficiary of VoiceAge-ETSI contracts. Acacia disputes that Apple can be a third-party beneficiary of the Acacia-VoiceAge Contract given the facts that it pleads.

Apple argues that Acacia cannot possibly be right because courts have found that "standard implementers are third-party beneficiaries of FRAND undertakings when breach of FRAND claims are pled alongside antitrust or unfair competiton claims alleging that the subject FRAND undertaking was false when made." ECF 128 at 13-14. But this ignores the role of

---

[24] Apple tries to suggest that VoiceAge could "formally bind" Acacia to FRAND commitments and that these formal promises (that neither party intended Acacia to follow through on) "obviously had independent value to VoiceAge or it would not have bargained for them." ECF 128 at 14, n.13. Acacia has no idea what Apple is talking about. There is one contract, and it is what the parties mutually assented to. Even if Acacia and VoiceAge were to mutually agree that Acacia would embark on a cause of action that would let VoiceAge sue it for breach of contract—and that "agreement to breach" did not control the terms of, discharge, novate, substitute, modify, or otherwise equitably prevent enforcement of the contract—Apple does not plead any facts making it plausible that Acacia or VoiceAge would intend to permit Apple to enforce the obligation both knew Acacia would breach.

manifest mutual assent in contract law.  Where one party makes a contract intending to breach it

*without* his counterparty's knowledge, a valid contract containing that term is formed.[25]  Each of

the claims at issue in the cases Apple cites involved alleged fraudulent conduct where an SSO

member made false representations to the SSO *without* the SSO's knowledge and consent, and

the SSO relied on those false representations.[26]  Here, Apple has alleged that VoiceAge knew

about, consented to, and actually desired Acacia's refusal to license on FRAND terms.

Acacia's argument is simple, first-year contract law.  The terms of a contract are

whatever the parties agree to.  *Acacia* has a FRAND commitment *to VoiceAge* if, and only if, the

parties mutually assented to such a commitment.  If *Acacia and VoiceAge agreed* that Acacia

would not license to Apple on FRAND terms, then under the terms of the Acacia-VoiceAge

Contract, Acacia did not have a contractual obligation to VoiceAge to license to Apple on

FRAND terms.  If Acacia does not have such an obligation to VoiceAge, Apple cannot enforce

the obligation as an intended beneficiary of the Acacia-VoiceAge Contract.

Apple's response to Acacia's antitrust arguments may generously be read to advance the

argument that the conspiracy to breach the contract and the formation of the contract could have

arisen at different times.[27]  That does not help Apple's case.  If the Acacia-VoiceAge Contract

(and Acacia's FRAND obligation) came first and the "conspiracy" later, then either (1)

VoiceAge and Acacia modified the Acacia-VoiceAge Contract to no longer contain the

obligation to license on FRAND terms; (2) VoiceAge discharged Acacia's FRAND obligation

---

[25] RESTATEMENT (SECOND) OF CONTRACTS § 20 Illus. 3 ("If A makes the contract with the undisclosed intention of not performing it, it is voidable by B for misrepresentation" but is in fact a valid contract binding A to B's understanding of the contract.).

[26] *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 U.S. Dist. LEXIS 67102, at *15-16 (N.D. Cal. May 14, 2012) (counterclaims at issue alleged that Samsung "defrauded the standards setting organization"); *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2011 U.S. Dist. LEXIS 72745, at *37-39 (W.D. Wis. June 7, 2011) (claim alleged that Motorola made false representations to the SSO, and that SSO may have acted differently had it known of the falsity of Motorola's representations); *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 796 (N.D. Tex. 2008) (noting allegation that "ETSI relied on Motorola's false promises that it would license its patents on FRAND terms.").

[27] *See* ECF 128 at 34-35 (citing *Cascades Comput. Innovation LLC v. RPX Corp.*, No. 12-CV-1143 YGR, 2013 U.S. Dist. LEXIS 170517, at *40-41 (N.D. Cal. Dec. 3, 2013)).

for consideration; or (3) the Acacia-VoiceAge "conspiracy" substituted for the Acacia-VoiceAge Contract.[28]  If the "conspiracy" came first and the Acacia-VoiceAge Contract later, or they occurred at the same time, then all of Acacia's arguments apply.

> **5.    Apple's factual allegations preclude any inference that Acacia and VoiceAge intended to vest Apple with a right to enforce the Acacia-VoiceAge contract.**

Whether Apple is an intended beneficiary of the Acacia-VoiceAge Contract rests on New York law.  New York adopts the Restatement view of intended beneficiaries cited by Acacia.[29]  Under New York law, a third party may enforce a contract when "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir. 2002) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 302).  The contract must "clearly evidence" an intent by the parties to permit enforcement by the third party, *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (internal alteration omitted), such that the benefit to the third party was "sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [the third party] if the benefit [was] lost."  *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006) (internal quotation mark omitted).  In determining whether the parties intended to benefit the third party, a court "should consider the circumstances surrounding the transaction as well as the actual language of

---

[28] *See Credit Suisse First Bos. Corp. v. Pitofsky*, 824 N.E.2d 929, 932 (2005) ("[A]ny two parties to a bilateral contract could agree to modify it."); *Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC*, 4 N.E.3d 336, 343-45 (N.Y. 2013) (performance or reliance permits modification of contract with "no oral modification" clause without signed writing); *URS Corp. v. Transpo Grp., Inc.*, No. C14-00860 RSM, 2015 U.S. Dist. LEXIS 11340, at *8-9 (W.D. Wash. Jan. 30, 2015) (analyzing New York and Ninth Circuit law and holding that contracts pertaining to the same subject matter rescind a prior agreement); Restatement (Second) of Contracts §§ 273, 279. The consideration VoiceAge received for discharge or modification, of course, is the increased revenue VoiceAge anticipated from this strategy. *See* SAC ¶ 25.

[29] *See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 211-12 (N.Y. 1985) (approving RESTATEMENT (SECOND) OF CONTRACTS view of third-party beneficiaries).

the contract." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (internal quotation marks omitted) (quoting Restatement (Second) of Contracts § 302, Reporter's Note, cmt. a). "[D]ismissal of a third-party-beneficiary claim is appropriate where the contract rules out any intent to benefit the claimant, or where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant." *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 52-53 (2d Cir. 2012) (alterations in original) (quoting *Subaru Distribs. Corp.*).

Apple's claim to be an intended beneficiary of the Acacia-VoiceAge Contract fails for nearly every possible reason. First, the VoiceAge-Acacia Contract rules out any intention to confer a benefit on Apple.[30] Second, considering Apple's allegations that Acacia and VoiceAge both intended that Acacia refrain from licensing on FRAND terms, providing Apple with the right to enforce such obligations would serve no purpose but subjecting Acacia to legal liability and reducing both parties' potential returns from enforcement—the exact opposite goal from the one Apple claims the parties sought to accomplish. *See* SAC ¶¶ 24-25. Under those circumstances, it is highly implausible that the parties intended to provide Apple with this right.

### 6. This court cannot try Apple's claim.

Even if Apple were an intended beneficiary of the Acacia-VoiceAge Contract, it could not sue Acacia in this District. The Acacia-VoiceAge Contract provides for good-faith negotiation of the dispute, followed by mediation in accordance with international rules, followed by binding arbitration in New York City. ECF 132, Ex. A § 7.1. New York recognizes that intended beneficiaries of contracts are bound by mediation and arbitration provisions that bind the signatories.[31] If it intends to somehow enforce the Acacia-VoiceAge Contract, Apple

---

[30] *See* ECF 132, Ex. A § 9.2 ("Nothing in this Agreement, whether expressed or implied, shall be construed to give any person […] any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenants, conditions or provisions contained herein, as a third party beneficiary or otherwise.").

[31] *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1063-64 (2d Cir. 1993); *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, No. 14-cv-6633 (KBF), 2015 U.S. Dist. LEXIS 3347, at *31 (S.D.N.Y. Jan. 12, 2015); *Hickox v. Friedland (In re HBLS, L.P.)*, 2001 U.S. Dist. LEXIS 19112, at *27-28 (S.D.N.Y. Nov. 13, 2001).

1   must abide its procedural terms. The Court should dismiss Apple's claim so the parties can

2   negotiate, mediate, and arbitrate.

3       **C.    Apple's Operation-of-Law Theory Also Fails.**

4       Apple's operation-of-law theory likewise fails to create a cause of action for breach of

5   contract. Acacia acknowledges, as it did in its motion, ECF 123 at 11-12, that licenses run with

6   patents. Apple acknowledges in response, ECF 128 at 15-17, as it must, that non-license

7   procedural terms do not run with patents. This leaves two questions. First, are VoiceAge's

8   FRAND commitments more like licenses, which run with the patents, or procedural terms, which

9   do not? Second, if VoiceAge's FRAND commitments run with the patents, do they give Apple a

10  right to ***sue for breach of contract***, or merely a ***defense against damages*** or some other

11  equitable theory?

12              **1.    Only licensed rights to use run with a patent.**

13      Acacia stands on its authority that only licensed rights ***to use*** encumber a patent. The

14  Federal Circuit has spoken to this question, and Apple's contrary authority is from district courts.

15  *See* ECF 123 at 11; ECF 128 at 16-17.[32]  In particular, Apple's citation to *Barnes & Noble, Inc.*

16  *v. LSI Corp.*, 849 F. Supp. 2d 925, 932 (N.D. Cal. 2012) is inapposite.

17      First, the source of the broad "any of the patentee's previous acts" language Apple quotes

18  from that case was *In re Novon Int'l, Inc.*, No. 98-cv-0677E, 2000 U.S. Dist. LEXIS 5169

19  (W.D.N.Y. Mar. 31, 2000)—an unpublished case from a district court in another circuit, which

20  in turn relied on non-Federal Circuit law (most of which was more than 50 years old). Neither

21  *Barnes & Noble* nor *In re Novon* considered *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d

22  1368 (Fed. Cir. 2008).

23      Second, despite the breadth of the language above, it only applies to equitable defenses to

24  patent infringement, not affirmative causes of action. The legal origin of the claim that "the

25  _____

[32] Apple argues that the National Research Counsel advocates for the position contrary to
26  Acacia's. It is true that the chapter ***recommends*** as a policy matter that there be a ***change*** in law
    to cause FRAND commitments to run with patents. But they recommend this change because, as
27  they acknowledge, it is ***not*** the current law. In short, even advocates of Apple's position
    recognize it is untenable. *Compare* ECF 123 at 11, n.27 *with* ECF 128 at 15, n.14.

28

assignee of a patent-right takes it subject to the legal consequences of the previous acts of the patentee" is *Worley v. Tobacco Co.*, 104 U.S. 340, 344 (1881) (citing *McClurg v. Kingsland*, 42 U.S. (1 How.) 202 (1843)).  Each of these cases stood for the straightforward proposition that assigning a patent does not clear it of challenges ***to validity*** based on prior use.  Second, even *Barnes & Noble* and *In re Novon* did not go so far as to permit a breach of contract claim.  Rather, they permitted only equitable defenses to damages—an extenstion of prior cases citing *Worley* and *McClurg*, which addressed the equitable effects of acts by prior patent owners on validity claims and defenses.[33]

Apple attempts to circumvent addressing the legal principles at issue by arguing that courts have permitted breach of contract actions to go forward based on FRAND commitments of previous owners.  But Apple's cases take for granted a ***contractual*** chain of commitments via ***mutual assent*** from the present holder of the patents to the SSO: no patent owner contested the adequacy of pleading on its obligation to license—the very issue discussed *supra* at II.B.

For example, in *In re Innovatio IP Ventures, LLC Patent Litigation*, the plaintiff acknowledged "that it is subject to the contractual obligations of its predecessors in ownership of the patents."[34]  Similarly, in *Rembrandt Techs., L.P. v. Harris Corp.*, Rembrandt "acknowledged that it is bound by" a prior patent-owner's FRAND commitment and that "Harris may enforce that commitment[.]"  No. 07C-09-059-JRS, 2008 Del. Super. LEXIS 400, at *7 (Super. Ct. Oct. 31, 2008) ("*Rembrandt I*").  Moreover, the causes of action at issue were dueling claims for declaratory judgment rather than breach of contract.  *Id.* at *2.  Similarly, the FTC Order on which Apple relies (ECF 128 at 16) did not "find" anything; it is a consent order, and the

---

[33] *See Leader Plow Co. v. Bridgewater Plow Co.*, 237 F. 376, 378 (4th Cir. 1916) (close associate of patent owner equitably estopped from challenging validity of patent); *Gen. Tire & Rubber Co. v. Watson-Bowman Assocs., Inc.*, No. 4514, 1976 U.S. Dist. LEXIS 12246, at *5 (D. Del. Nov. 17, 1976) (transferee subject to inequitable conduct defense).

[34] 921 F. Supp. 2d 903, 922 (N.D. Ill. 2013).  The contested issues in that case bear no relationship to this one. The Plaintiff there argued that an SSO member (as pled, a party to the contract with the SSO) could not sue to enforce the FRAND commitment to a non-member beneficiary. The Court applied Illinois law to find that a contracting party can sue for the benefit of an intended beneficiary. *Id.* at 922-924.

1    complaint on which it is based explicitly predicated N-Data's obligation on an explicit

2    contractual agreement between N-Data and the predecessor.[35]

3           **2.**     **A FRAND commitment is not a license; it is a procedural term.**

4        It is well-established that a FRAND commitment is not a license and does not confer on

5    any party a right to practice or use a patent.[36] "A license is distinct from a licensing commitment

6    in that the latter only constitutes a pledge to provide a license but does not actually provide the

7    requisite rights to access or use the technology. The distinction can be important where, as in the

8    FRAND context, a licensing commitment leaves significant aspects of the license for future

9    negotiation."[37] Courts have specifically found that the FRAND commitment to ETSI does not,

10    under French law, create a right to use a patent, or even guarantee against injunctive relief.[38] At

11    most, the FRAND commitment is an "agreement to agree" that leaves key terms (including price,

12    duration, and scope) to future negotiation.[39] This requires no more than that the patentee agree to

13    "negotiate in good faith" regarding such terms.[40]

14        Apple objects that Acacia's cited authority covers the arbitration clauses, confidentiality

15    provisions, and who is entitled to receive royalty payments, but that the FRAND commitment is

16

---

17 [35] *See In re Negotiated Data Solutions LLC*, File No. 051-0094, FTC Decision and Order, 1
18 (Sept. 22, 2008); *In re Negotiated Data Solutions LLC*, File No. 051-0094, Complaint, ¶ 24 (Sept. 22, 2008); ECF 123 at 37-38.
[36] *See* Jay P. Kesan and Carol M. Hayes., *FRAND's Forever: Standards, Patent Transfers, and*
19 *Licensing Commitments*, 89 IND. L.J. 231, 289 (2014) (noting that a "FRAND commitment is not
20 a license," and asserting that a patent owner making FRAND commitments is covenanting not to sue until good-faith attempts at negotiation (i.e., a procedural requirement) fail).
21 [37] Eli Greenbaum, *Puzzles of the Zero-Rate Royalty*, 27 FORDHAM INTELL. PROP. MEDIA & ENT.
22 L.J. 1, 7 (2016).
[38] Thomas F. Cotter, *Comparative Law and Economics of Standard-Essential Patents and*
23 *FRAND Royalties*, 22 TEX. INTELL. PROP. L.J. 311, 318-319, n.33 (2014).
[39] Market Reliance Theory for FRAND Commitments and Other Patent Pledges, 2015 UTAH L.
24 REV. 479, 514-515; David W. Long, *Litigating Standard Essential Patents at the U.S.*
25 *International Trade Commission*, 17 SEDONA CONF. J. 671 (2016) (noting that the ITC permits "a party seeking to raise FRAND defenses" to do so where the FRAND commitment constitutes "an
26 agreement to agree where the patent owner should negotiate in good faith toward a FRAND license."); J. Gregory Sidak, *International Trade Commission Exclusion Orders for the*
27 *Infringement of Standard-Essential Patents*, 26 CORNELL J. L. & PUB. POL'Y 125, 149-50 (2016).
[40] *See id.*; *see also N. Star Steel Co. v. United States*, 477 F.3d 1324, 1332 (Fed. Cir. 2007).
28

a substantive commitment to grant licenses on FRAND terms.  *See* ECF 128 at 15-16, n.14.

First, the relevant question is whether the grant is a "right to use"—not a procedural/substantive

distinction—else the unquestionably "substantive" entitlement to receive royalty payments in

*Jones v. Cooper Indus.* would have necessarily transferred with the patent.  *See* 938 S.W.2d 118

(Tex. App. 1996).  Second, even if the FRAND commitment creates an entitlement to negotiate

for a license in good faith to ascertain contractual terms in the future, that is no more than a

procedure for parties to follow; it is no more "substantive" than if the commitment specified that

a royalty would be set by an arbitration panel appointed by ETSI.

## III.  Apple's Claims Should Be Dismissed Under the First-to-File Rule.

Apple's suggestion that the parties and claims at issue in the EDTX case and here differ

sufficiently to require simultaneous litigations of whether an Acacia party fulfilled its FRAND

obligations is absurd.  The Acacia parties are certainly similar, being part of the same corporate

family, and apparently so interrelated that after the paragraphs describing the parties Apple saw

fit to individually name Saint Lawrence Communications GmbH ("SLC Germany") in only 2

paragraphs of its SAC.  And the only unique facts pled about that entity is that it sued Apple in

Germany and obtained injunctions against other non-parties.  Despite Apple's extended citation

to a slew of paragraphs, Apple pleads absolutely nothing specific about SLC Germany outside of

SAC ¶¶ 26-27, and nothing at all about the other Acacia parties besides identifying information.

VoiceAge is a new and unrelated party.  But the EDTX case will necessarily resolve the

contract claims against it because Apple will proceed to final verdict and obtain a judgment (one

way or the other) where both sides proceed on the theory that VoiceAge ***did*** transfer contractual

obligations to Saint Lawrence Communications LLC ("SLC").  As a result, Apple will be

estopped from asserting that VoiceAge ***did not*** transfer such obligations, for the reasons

discussed at II.B.1 and II.B.3, n.23, above.  Apple will be left with whatever non-contract

theories it can pursue conditioned on the fact that VoiceAge did, in fact (intentionally or not),

bind Acacia to license on FRAND terms in a way that enabled Apple to enforce that obligation.

The issues are sufficiently similar, and the efficiencies to be gained sufficiently great, to justify application of the first-to-file rule. Apple is bringing a breach-of-FRAND claim against SLC related to the same FRAND obligation on the same Acacia-VoiceAge Contract under the same ETSI IPR Policy. According to Apple, the "affirmative breach is that SLC never made a FRAND offer to Apple (whether or not limited to the asserted patents)[.]" *Saint Lawrence Communications LLC v. Apple Inc.*, 2:16-cv-00082, ECF 241 at 2 (E.D. Tex.) ("the EDTX case"). In the EDTX case, SLC acknowledges its contractual FRAND obligation from VoiceAge. Apple does not plead, in this case or the EDTX case, a theory of FRAND obligation that would have enabled VoiceAge to only transfer FRAND obligations on the patents asserted there. If Apple does not prevail, it can only be because SLC's portfolio offer did not breach the FRAND obligation, and therefore constituted a FRAND license offer. As a result, Acacia (as alleged in its SAC) would have offered such a license.[41] And this license offer would include the German patents.

If Apple received a non-breaching portfolio offer, its "harms" are a proximate cause of its refusal to take a FRAND license, and Acacia necessarily did not evade any FRAND commitments. This fact would certainly dispose of Apple's breach of contract and UCL claims.

Additionally, equity supports dismissing this case under the first-to-file rule, or at least staying it until final judgment in the EDTX case. While that case is close to trial, there is no way of knowing when final judgment will be entered and any appeals exhausted. Proceeding with this action in this forum would provide a risk of conflicting verdicts and encourage gamesmanship with respect to litigation in both forums. Apple's argument that Acacia has delayed in bringing arguments under the first-to-file rule is equally absurd. All of Apple's previous complaints centered on Acacia's transactions with Nokia; Apple's claims regarding VoiceAge were exclusively examples of Acacia's purported litigation behavior, and Apple failed

---

[41] Acacia does not presently claim that Apple is obliged to say which member of a corporate family engaged in each element of a conspiracy. But if Apple wants to parse parties to its advantage, it needed to do so in its pleading. If Apple wants to remain vague and plead in the aggregate, it must accept the consequences of so doing.

1   to bring any claims in this forum with respect to the patents, offers, or transactions at issue.

2   Rather, Apple's early pleadings illustrate that any prejudice it suffers is its own fault, since it

3   plainly knew the facts giving rise to its claims and neglected to bring them.  If Apple had claims

4   related to the Acacia-VoiceAge patents, joinder was available to it in the EDTX Case.

5        Finally, Apple's citation of *Rembrandt I* deserves special attention.  *See* ECF 128 at 16.

6   That court invited a motion for relief from judgment and vacated *Rembrandt I* upon discovering

7   that the case before it was "nothing more than a strategic device to be used by the parties in a

8   manner they perceive most likely to produce a desired outcome in related" patent infringement

9   litigation.  *Rembrandt Techs., L.P. v. Harris Corp.*, No. 07C-09-059-JRS, 2009 Del. Super.

10  LEXIS 298, at *3 (Super. Ct. Aug. 14, 2009) ("*Rembrandt II*").  The *Rembrandt* court based its

11  earlier reason on the assumption that the patents in question were, in fact, essential to

12  implementing standards and the allegedly-infringing party would take the license granted.  Apple

13  is attempting to get this Court to do exactly what the *Rembrandt II* court very much regretted

14  doing: interfering in an ongoing patent litigation proceeding in another court.  This Court should

15  take advantage of the experience provided, and dismiss this case—or at a minimum stay it

16  pending final judgment in the Eastern District of Texas.

## CONCLUSION

18       For the foregoing reasons, Acacia respectfully requests the Court grant its motion to

19  dismiss Apple's claims with prejudice.

DATED:  December 20, 2017                    /s/ Edward R. Nelson III

NELSON BUMGARDNER PC
Edward R. Nelson III (*pro hac vice*)
ed@nelbum.com
Ryan P. Griffin (*pro hac vice*)
ryan@nelbum.com
3131 West 7th Street, Suite 300
Fort Worth, TX 76107
Telephone: (817) 377-9111

Attorneys for Defendants Acacia Research
Corporation, Saint Lawrence  Communications
LLC, and Saint Lawrence  Communications GmbH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of December, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following attorneys of record who have consented to accept this Notice as service of this document by electronic means:

Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: + 1 650 858 6000
Facsimile: + 1 650 858 6100

William F. Lee
william.lee@wilmerhale.com
Joseph J. Mueller
joseph.mueller@wilmerhale.com
Timothy Syrett
timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: + 1 617 526 6000
Facsimile: + 1 617 526 5000

Leon B. Greenfield
leon.greenfield@wilmerhale.com
Nina S. Tallon
nina.tallon@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: + 1 202 663 6000
Facsimile: + 1 202 663 6363

By:     /s/  Edward R. Nelson III